# ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
FILED
FEB 2 5 2003
U.S. COURT OF
FEDERAL CLAIMS
```

**TEXAS PEANUT FARMERS:** BILLY M. )
BARNES; JACOB F. BOSCHMAN; DARRELL )
WAYNE BROWN; WILLIAM DWAIN )
CARROLL; RANDY D. DECKER; LORAINE )
FISCHER ESTATE; BILL GAYLE; JAY )
GRIMSHAW; DAVID and PAM GROSCHKE; )
MELVIN O. ISELT; LORINE B. ISELT; TOMMY )
JOHNSON; PORTER JONES; LUTHER DON )
KEITH; ROBERT D. KEITH; RONALD SCOTT )
KOONCE; LOYAL LASITER; R. S. )
LAWRENCE; DAVID GENE LEHMANN; )
PHILIP S. LEWIS; J. W. LOGAN; TERRY M. )
MATHIS; TIMOTHY L. MATTHEWS; BILLY R )
MEADORF; TOMMIE R. MERCER; SAMMY )
MORGAN; DELBERT L. OTWELL; LEON A. )
PELZEL; GLYNN PENNINGTON; MIKE )
QUATTRIN; WALTER DONALD REGISTER; )
ELMER WAYNE REYNOLDS, JR.; JOE )
ROBINSTON ESTATE; GWEN SCARBROUGH; )
JIMMY SEAY; BILLY W. SHANNON; BILLY )
NEAL SHANNON; TERRY LEE STACY; )
BRADLEE DAVIN STACY; TROYAT )
UNDERWOOD; CLARENCE C. )
WASCHSMANN; SUVELLA WALKER; JULIUS )
WELLS ESTATE; WANDA WINTER; PEGGY S. )
WOODS; HEIDI and JOE ED WORD; A.L.H.M. )
Inc; F.A.C.E., INC.; WADE PENNINGTON & )
SONS FARMS, FN 4798; WADE PENNINGTON )
& SONS FARMS, FN 5868; M. E. WATSON )
FARMS, INC.;**GEORGIA PEANUT FARMERS:** )
BRADFORD L. CARROLL; EDWIN CLARK; )
MICHAEL H. COBB; WALTER L. DAVENPORT;)
TREY HAMILTON DUNAWAY; JOHN L. )
EUBANKS; ERIC S. GIBBS; JOSEPH GWINES; )
ROBIN GWINES; DANNY W. HAWKINS; )
STEVE E. HOUSTON; CHARLES L. ISRAEL; )
JUSTIN ISRAEL JOHNSON; WILLIAM G. )
JONES; LARRY JONES; SHERWOOD T. KING; )
ROBERT A. LANCASTER; JIMMY M. )
McCLURE; ANN G. McCLURE; ROYCE )
McCRARY; TIMOTHY E. McMILLAN; )
MARVIN MOSS; CLIFFORD L. OLIVER; )
WILLIE J. PROTHO; BILLY SENKBEIL; DAN )

No. _____

## 03 -  445C

```
A TRUE COPY:
TEST:        APR 4 2006
        BRIAN BISHOP
Clerk, U.S. Court of Federal Claims
```

W. SMITH; CHARLES E. SMITH, JR.; EUGENE )
WILLIAMS; and GRIGGS FARMS; **ALABAMA** )
**PEANUT FARMERS:** TERRY E. BEASLEY; )
LLOYD D. BRYANT; ELAINE O. BRYANT; )
LARRY WOOD MARSHALL; **FLORIDA** )
**PEANUT FARMERS:** JAMES C. BARNES; )
BRUCE GODWIN; JOSEPH M. DIAMOND; )
DONNIE FRANK LWRY; ALLAN EDWARDS; )
**SOUTH CAROLINA PEANUT FARMERS:** )
WALLACE A. BERRY; WILLIAM R. MARSH; )
and OTHERS SIMILARLY SITUATED, )
                     Plaintiffs, )
                      )
    vs. )
                      )
ROSS J. DAVIDSON, ADMINISTRATOR FOR )
RISK MANAGEMENT AGENCY, RISK )
MANAGEMENT AGENCY, UNITED STATES )
OF AMERICA, ANN M.VENEMAN, )
SECRETARY OF AGRICULTURE FOR THE )
UNITED STATES OF AMERICA, UNITED )
STATES DEPARTMENT OF AGRICULTURE, )
RON BERRYHILL, RMA REGIONAL OFFICE )
DIRECTOR, Oklahoma City, Oklahoma; and )
MIKE MOORE, RMA REGIONAL OFFICE )
DIRECTOR, Valdosta, Georgia, )
                   Defendants. )

---

## COMPLAINT

### I. INTRODUCTION

1.    Plaintiffs are peanut farmers in Texas, Georgia, Alabama, Florida and South Carolina in the "Southwestern and Southeastern Growing Area" (hereinafter Plaintiff Peanut Farmers) who grow and harvest peanuts and who applied for and received Multiple Peril Crop Insurance Policies for the growing season of 2002.

2.    Plaintiff Peanut Farmers bring this class action on behalf of all peanut farmers in Texas, Georgia, Alabama, Florida, and South Carolina who are eligible for the Multiple Peril Crop Insurance Policy for crop year 2002 and are similarly situated to the named Plaintiffs.

2

3.      Plaintiff Peanut Farmers bring this action to challenge the unlawful and unilateral contract modification and impairment that Defendants made on or after May 13, 2002 to the Multiple Peril Crop Insurance Policy which changed the price guarantee of their insurance protection by reducing it from $.31 to $.1775 per pound of peanuts.

4.      Plaintiff Peanut Farmers seek, among other claims for relief, a declaratory judgment pursuant to RFCC Rule 57 that the Defendants' conduct in unilaterally and retrospectively changing the terms and conditions of the contract for insurance breaches the contract, is contrary to law as set forth in *U.S. v. Winstar*, 518 U.S. 839, 116 S. Ct. 2432, 135 L.Ed. 2d 964 (1996), violates statutory requirements for changes in policies and is arbitrary and capricious and therefore unconstitutional. Defendants' conduct also destroys Plaintiffs' reasonable expectations and impairs other existing contracts and thus deprives them of their property without due process of law.

5.      In addition, Plaintiff Peanut Farmers seek injunctive relief to compel the Defendants including USDA and RMA to honor the contract to provide insurance at the agreed contractual coverage of $.31 per pound.

6.      Plaintiff Peanut Farmers further seek a preliminary injunction forbidding the Secretary of Agriculture or the Administrator of the RMA from illegally and unconstitutionally demanding that farmers waive their property right to the Multiple Peril Crop Insurance Policy as published in the Federal Register and Code of Federal Regulations or else have their peanut peril insurance coverage rejected or cancelled for the 2002 crop year and future years.

## II. PARTIES AND JURISDICTION

7.      Plaintiffs Billy M. Barnes; Jacob F. Boschman; Darrell Wayne Brown; William Dwain Carroll; Randy D. Decker; Loraine Fischer Estate; Bill Gayle; Jay Grimshaw; David and

Pam Groschke; Melvin O. Iselt; Lorine B. Iselt; Tommy Johnson; Porter Jones; Luther Don Keith; Robert D. Keith; Ronald Scott Koonce; Loyal Lasiter; R.S. Lawrence; David Gene Lehmann; Philip S. Lewis; J. W. Logan; Terry M. Mathis; Timothy L. Matthews; Billy R. Meadorf; Tommie R. Mercer; Sammy Morgan; Delbert L. Otwell; Leon A. Pelzel; Glynn Pennington; Mike Quattrin; Walter Donald Register; Elmer Wayne Reynolds, Jr.; Joe Robinston Estate; Gwen Scarbrough; Jimmy Seay; Billy W. Shannon; Billy Neal Shannon; Terry Lee Stacy; Bradlee Davin Stacy; Troyat Underwood; Clarence C. Waschsmann; Suvella Walker; Julius Wells Estate; Wanda Winter; Peggy S. Woods; Heidi and Joe Ed Word; A.L.H.M., Inc., F.A.C.E., Inc.; Wade Pennington & Sons Farms, FN 4798; Wade Pennington & Sons Farms, FN 5868; and M.E. Watson Farms, Inc. are peanut farmers who farm and reside in Comanche County, Gaines County, Anderson County, Erath County, Denton County, Houston County, Eastland County, Waller County, Lee County, Fayette County, Stonewall County, Lamar County, Grayson County, Irwin County, Collingsworth County, Atascosa County, Motley County, Hall County, Wilburger County, and Hardeman County, Texas.

8.     Plaintiffs Bradford L. Carroll; Edwin Clark; Michael H. Cobb; Walter L. Davenport; Trey Hamilton Dunaway; John L. Eubanks; Eric S. Gibbs; Joseph Gwines; Robin Gwines; Danny W. Hawkins; Steve E. Houston; Charles L. Israel; Justin Israel Johnson; William G. Jones; Larry Jones; Sherwood T. King; Robert A. Lancaster; Jimmy M. McClure; Ann G. McClure; Royce McCrary; Timothy E. McMillan; Marvin Moss; Clifford L. Oliver; Willie J. Protho; Billy Senkbeil; Dan W. Smith; Charles E. Smith, Jr.; Eugene Williams and Griggs Farms are peanut farmers who farm and reside in Ben Hill County, Wilcox County, Miller County, Sumter County, Pulaski County, Mitchell County, Worth County, Grady County, Stewart County and Berrien County, Georgia.

9.    Plaintiffs Terry E. Beasley; Lloyd D. Bryant; Elaine O. Bryant; Larry Wood Marshall are peanut farmers who farm and reside in Henry County and Opp County, Alabama.

10.    Plaintiffs James C. Barnes, Bruce Godwin, Joseph M. Diamond, Donnie Frank Lowry, and Allan Edwards are peanut farmers who farm and reside in Jackson County and Santa Rosa County, Florida.

11.    Plaintiffs Wallace A. Berry and William R. Marsh are peanut farmers who farm and reside in Lee County, South Carolina.

12.    Defendant Ann M. Veneman, is Secretary of Agriculture for the United States of America.

13.    Defendant Ross J. Davidson is Manager and Chief Executive Officer for the Federal Crop Insurance Corporation 7 U.S.C. § 1505(d), and is also Administrator of the Risk Management Agency.

14.    The Risk Management Agency (RMA) was established under provisions of the Federal Agriculture Improvement and Reform Act of 1996 (Freedom to Farm Act), P.L. 104-127, approved April 4, 1996. It is an independent office within the United States Department of Agriculture responsible for supervision of the Federal Crop Insurance Corporation (FCIC) and the administration and enforcement of programs authorized under the Federal Crop Insurance Act. (See 7 U.S.C. §§ 1501 *et seq.*).

15.    The RMA Regional Office that serves Georgia, Alabama, Florida, and South Carolina is located in Valdosta, Georgia, and the Regional Office Director is Mike Moore.

16.    The RMA Regional Office that serves Texas is located in Oklahoma City, Oklahoma, and the Regional Office Director is Ron Berryhill.

5

17.    Defendants, including the United States of America and the United States Department of Agriculture (hereinafter the "Government,") through its right to contract with private citizens have waived sovereign immunity as a defense to the contract entered into by the parties and specifically waived its rights of sovereign immunity in the insurance contract.

18.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution [USCS, Constitution], or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, . . . "); and 28 U.S.C. § 1346(a) ("The district courts shall have original jurisdiction concurrent with the United States Court of Federal Claims.") This action arises under the Federal Crop Insurance Act, 7 U.S.C. §§ 1501, *et seq.*, and the Constitution of the United States.

19.    The Plaintiffs' cause of action is created by the judicial review provisions of the Administrative Procedures Act, 5 U.S.C. § 702-706.

20.    To date, Plaintiff Peanut Farmers complied with all terms and conditions of the insurance contract as required by Paragraph 25 of the Multiple Peril Crop Insurance Policy.

21.    Under 7 CFR 780.2, no reconsideration or appeal may be sought under this part of any general program provision or program policy, or any statutory or regulating requirement that is applicable to all similarly situated participants.  Furthermore, the requirement of exhausting administrative remedies is not applicable where mathematical formulas established under a statute or program regulations, and decisions based solely on the application of those formulas are not appealable under Title 7 CFR § 780.2.  However, Plaintiffs in each respective state have filed an Administrative Petition with the United States Department of Agriculture to rebut the

defense that Plaintiffs have not exhausted their administrative remedies before filing their claims in Federal Court.

22.    For Plaintiff Peanut Farmers to make individual administrative claims would be an effort in futility in that Plaintiff Peanut Farmers have been advised by Defendants that the Defendants lowered the rates of insurance coverage from $.31 per pound to $.1775 per pound for all claims under the peanut provisions of the Multiple Peril Crop Insurance Policy.

23.    Furthermore, time is of the essence in that the Plaintiffs' crops have been harvested and farmers must pay their obligations for loans, interest on loans, seed, fertilizer, labor, equipment, etc. in a timely fashion in order to avoid bankruptcy or legal actions by third-party contractors against Plaintiff Peanut Farmers.

24.    Most Plaintiffs have not received their settlement checks, but they have been advised that their contractually agreed-upon maximum coverage of $.31 per pound will not be honored.

## III. CLASS ACTION STATUS

25.    Plaintiff Peanut Farmers participate in the federal peanut program and are by law offered Multiple Peril Crop Insurance Policy coverage.

26.    Plaintiff Peanut Farmers reside in, grow and harvest crops in Texas, Georgia, Alabama, Florida, and South Carolina and participate in the peanut growing regions known as the "Southwestern and Southeastern Growing Regions."

27.    Plaintiff Peanut Farmers participate in the federal peanut program and are by law offered Multiple Peril Crop Insurance Policy coverage.

28.    Defendants are in possession of documents which will determine an exact number of plaintiffs who are potential class action participants.

29.    The class is so numerous that joinder of all members is impracticable.

30.    The facts and legal issues as set forth in this Complaint are common issues of law and common issues of fact common to the entire class.

31.    The claims and defenses of the representative parties are typical of the claims and defenses of the class.

32.    The named parties are representative parties who will fairly and adequately protect the interests of the class.

33.    Prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the Defendants.

34.    Adjudication with respect to individual members of the class would, as a practical matter, be dispositive of the interests of the other members, not parties to the adjudications and would not substantially impair or impede their ability to protect their interest.

35.    The Defendants' actions are generally applicable to the class thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

36.    Common questions of law and fact common to the members of the class predominate over questions affecting only individual members.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

37.    Named Plaintiff Peanut Farmers are willing to serve as class representatives and will adequately represent the class as a whole.

38.    Plaintiffs' counsel are experienced in class action litigation and are willing to serve as counsel for the class.

39.    Accordingly Plaintiff Peanut Farmers and their Counsel request that this action be certified as a class action pursuant to RCFC 23.

## IV.  FACTUAL BACKGROUND

### A.  Background on Peanuts and Insurance Plans

40.    Plaintiff Peanut Farmers have been in the business of growing and harvesting peanuts for at least six crop years prior to 2002 and in the crop year 2002.

41.    In a preceding crop year before the crop season begins, Plaintiff Peanut Farmers generally begin working on details of the upcoming crop year by entering into numerous contracts to purchase seed and materials for planting and harvesting peanut crops by securing adequate financing and by making other financial and contractual arrangements.

42.    Farmers invest thousands of dollars in the preceding winter in preparation for the peanut planting season the following spring.

43.    There are three main growing regions in the United States.  The V-C Growing Area, the Southwestern Growing Area and the Southeastern Growing Area.

44.    Planting season begins in April and continues through mid May.

45.    Peanut crops are cultivated throughout the summer.

46.    Peanut crops are harvested and sold in September through October.

47.    Peanut crops are usually sold from mid-September to early November.

48.    For at least the six previous years, the Defendants provided a quota system and a price support system to protect the farmers from violent swings in prices.

49.    For at least six years prior to 2002, farmers also could obtain crop insurance through the Government program to insure against different perils including adverse weather conditions.

50.    Each year for the past six years, Plaintiff farmers would begin contract negotiations with third parties in the preceding winter in preparation for the following crop year.

51.    Each year for the past six years, Plaintiff Peanut Farmers entered into contracts of "Multiple Peril Crop Insurance" for assuring indemnity for crop damages including losses caused by adverse weather conditions.

52.    Each year for the past six years, the deadline was November 30 for Defendants to make contract changes ("the Contract Change Date") to the crop insurance policy.

53.    Each year for the past six years, law required the Defendants to announce the national peanut quota in December for the following peanut crop year.

54.    Each year for the past six years, investment plans by Plaintiff Peanut Farmers on how much peanut crop to plant were based on the amount and terms of insurance coverage as well as on price support and quota.

55.    Each year for the past six years, many Plaintiff Peanut Farmers borrowed money from banks, entered into lease agreements and made other contractual arrangements based on total acres to be planted and anticipated yield.

56.    Each year for the past six years, most Plaintiff Peanut Farmers in the Southwestern and Southeastern Growing Regions made investments and plans to plant and harvest an amount of peanuts equal to the quota amount which also equaled the amount of insurance coverage to be provided for that crop season.

57.    Each year for the past six years, Defendants, by law, were required to announce the price support rate by February 15th for that year's peanut crop.

58.    Each year for the past six years, Plaintiff Peanut Farmers and Defendants were contractually bound to the Multiple Peril Crop Insurance Policy as of the "Sales Closing Date."

59.    Each year for the past six years, Plaintiff Peanut Farmers were contractually bound by insurance contracts, written by Defendants, which set as deadlines specific dates for cancellation and termination of the insurance contract by either party.

60.    Each year for the past six years, Plaintiff Peanut Farmers have relied upon the contractual promises and guarantees of the United States and other Defendants to provide Multiple Peril Crop Insurance offered by the Defendants at the rate of thirty-one cents per pound ($.31 per pound).

61.    Each year for the past six years, the Plaintiff Peanut Farmers relied on the financial security protection and contractual assurances that were provided by the contracts of insurance by:

(1)    Foregoing other farming options;

(2)    Canceling other insurance;

(3)    Returning or canceling purchase of seed and inputs for crops other than peanuts;

(4)    Purchase of peanut seed for planting;

(5)    Rental of land for planting peanuts;

(6)    Forward contracting peanuts for delivery in the fall of the growing year by the policy published in the Federal Register;

(7)    Obtaining credit based on the price and guarantee provided by the policy published in the Federal Register;

(8)    Providing the proceeds of the peanut contract as collateral on loans; and

(9)    Trading, purchasing or leasing equipment for use in the crop year in reliance on the revenue guaranteed by the insurance in the event of multiple perils including adverse weather conditions.

62.    Plaintiff Peanut Farmers' reliance upon the written representations made by the Defendants both in the Multiple Peril Crop Insurance Policy and outside this contract was

reasonable and was consistent with the business practices known to and condoned by Defendants.

63.     Each year for the past six years, after entering into agreements including the insurance contract providing insurance coverage at the rate of $.31 per pound of peanuts, the Plaintiff Peanut Farmers would begin planting their crops in the spring and finish by mid-May or early June.

## B. Statutory Provisions

64.     The purpose of the Federal Crop Insurance Corporation is to improve economic stability of farmers.  As stated by Congress, it is the purpose of the Federal Crop Insurance Corporation "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance."  7 U.S.C. § 1502 ("Declaration of Purpose".)

65.     Crop insurance is called the "centerpiece of the safety net" of the federal government farm programs.

66.     The Multiple Peril Crop Insurance Policy is a continuous policy that remains in effect each following year unless canceled by the insured or terminated by the terms of the policy or by the Defendant, RMA as Administrator for the FCIC.

67.     Coverage is reinsured by the Federal Crop Insurance Corporation (FCIC) under the provisions of the Federal Crop Insurance Act, as amended (7 U.S.C. §§ 1501 *et seq.)*  All provisions of the policy and rights and responsibilities of the parties are specifically subject to the Act.

68.    The provisions of the policy are published in the <u>Federal Register</u> and codified in Title 7 of the Code of Federal Regulations (CFR) under the Federal Register Act (44 U.S.C. §§ 1501 *et seq*) and, by law, may not be waived or varied in any way by the crop insurance agent, insurance company or any other agent or employee of FCIC.

69.    In the event the insurance company cannot pay a loss, the claim is settled in accordance with the provisions of the policy and paid by FCIC. No state or other guarantee fund is liable for a loss.

70.    The Crop Insurance Regulations which was in effect for the 2002 crop year were set forth at 7 C.F.R. §§ 457 *et seq*. This Federal Crop Insurance Corporation, USDA regulation was in effect at all times material to this Complaint.

71.    7 C.F.R. § 457.7 provides that the insurance contract shall become effective upon the acceptance by the Corporation or the reinsured company of a duly executed application for insurance on a form prescribed by the Corporation.

72.    7 C.F.R. § 457.7 further provides that, "The contract shall consist of the accepted Application, the Basic Provisions, the Crop Provisions, the Special Provisions, the County Actuarial Table, and any amendments or options thereto."

73.    7 C.F.R. § 457.7 further provides that "[C]hanges made in the contract shall not affect its continuity from year to year;" that "[N]o indemnity shall be paid unless the insured complies with all terms and conditions of the contract;" and that "[T]he forms referred to in the contract are available at the offices of the crop insurance agent."

74.    7 C.F.R. § 457.8 provides the basic terms and conditions of the insurance contract which includes the Basic Provisions.

13

75.    7 C.F.R. § 457.8 provides that Common Crop insurance regulations in the application and policy must contain the following terms and conditions:

Contract Change date
Cancellation Date
Termination Date
Sales Closing Date
Beginning Coverage Date
Earliest Planting Date
Final Planting Date
Acreage Reporting Date
End of Insurance Period Date

76.    7 C.F.R. § 457.8 defines the insurance period as having the following beginning dates and end dates:

11.    Insurance Periods

(a)    Coverage begins ... at the later of
    (1)    The date we accept your application...;
    (2)    The date the insured crop was planted...; and
    (3)    The calendar date contained in the Crop Provisions for the beginning of the insurance period

(b)    Coverage ends at the earlier of
    (1)    Total destruction of the insured crop...;
    (2)    Harvest;
    (3)    Final adjustment of a loss;
    (4)    The calendar date contained in the Crop Provision for the end of the insurance period;
    (5)    Abandonment; and
    (6)    As otherwise specified in the Crop Provisions

77.    7 C.F.R. § 457.8 further provides that the policy provisions are Basic Provisions; Crop Provisions, Special Provisions, Endorsements or Options Actuarial Documents for the Insured Crop and Catastrophic Risk (where applicable).

78.    7 C.F.R. § 457.8 further provides that, "You will be notified, in writing, of changes to the Basic Provisions, Crop Provisions, and Special Provisions not later than 30 days prior to the cancellation date for the insured crop."...

79.    7 C.F.R. § 457.134 provides for the specific crop insurance provisions for peanuts for the 1999 and succeeding crop years.  This Federal Crop Insurance Corporation, USDA regulation was in effect for the 2002 crop year and at all times material to this Complaint.

80.    7 C.F.R. § 457.134 provides the following applicable dates:

**Contract Change Date**:
November 30 (preceding the Cancellation Date)

**Cancellation and Termination Date**:
Jackson, Victoria, Golliad, Bee, Live Oak, McMullen, LaSalle, and Dimmit Counties, Texas and all Texas Counties lying south thereof
- January 15th;
El Paso, Hudspeth, Culbertson, Reeves, Loving, Winkler, Ector, Upton, Reagan, Sterline, Coke, Tom Green, Concho, McCulloch, San Saba, Mils, Hamilton, Bosque, Johnson, Tarrant, Wise, Cooke Counties, Texas, and all Texas counties south and east thereof; and all other states
- February 28th

New Mexico; Oklahoma, Virginia; and all other Texas counties
- March 15

**End of Insurance Period**:
The calendar date for the end of the insurance period is the dated immediately following planting as follows:
(a)    November 30 in all states except New Mexico, Oklahoma and Texas; and
(b)    December 31 in New Mexico, Oklahoma, and Texas
(c)    Removal of peanuts from the field" replaces "harvest" as an event marking the end of the insurance period in section 11 of the Basic Provisions.

81.    7 C.F.R. § 457.134 provides that insurance is provided against losses that occur during the insurance period caused by, *inter alia*, adverse weather conditions.

82.    Neither 7 C.F.R. § 457.8 nor 7 C.F.R. § 457.134 provide for any change in terms or conditions if the quota program is subsequently terminated or cancelled.

## C.   Insurance Contract for 2002 Crop

15

83.    Defendants offered, through its agents, and Plaintiffs accepted a standard "Multiple Peril Crop Insurance Common Crop Insurance Policy, a copy of which is attached hereto and incorporated herein as **Exhibit A.**

84.    The Multiple Peril Crop Insurance Policy (Exhibit A) is a contract, according to the terms and definitions of the Policy.

85.    Under the Insurance Contract (Exhibit A which is attached hereto and incorporated herein,) the key terms and conditions, under the **Basic Provisions,** are as follows:

1.    **Definitions.**

**Acreage Reporting Date**:    The date contained in the Special Provisions or as provided in Section 6 by which you are required to submit your acreage report.

**Cancellation Date:**    The calendar date specified in the Crop Provisions on which coverage for the crop will automatically renew unless canceled in writing by either you or us or terminated in accordance with the policy terms.

**Contract Change Date:**    The calendar date by which we make any policy changes available for inspection in the agent's office (see Section 4).

**Coverage Begins Date**:    The calendar date insurance begins on the insured crop, as contained in the Crop Provisions, or the date planting begins on the unit (see Section 11 of these Basic Provisions for specific provisions relating to prevented planting).

**Earliest Planting Date:**    The earliest date established for planting the insured crop (see Special Provisions and section 13).

**Final Planting Date:** The date contained in the Special Provisions for the insured crop by which the crop must initially be planted in order to be insured for the full production guarantee or amount of insurance per acre.

**Policy:**    The agreement between you and us consisting of the accepted application, these Basic Provisions, the Crop Provisions, the Special Provisions, other applicable endorsement or options, the actuarial documents for the insured crop, the Catastrophic Risk Protection Endorsement, if applicable, and the applicable regulations published in 7 CFR Chapter IV.

**Price Election:**    The amounts contained in the Special Provisions or an addendum thereto, to be used for computing the value per pound, bushel, ton,

16

carton, or other applicable unit of measure for the purposes of determining premium and indemnity under the policy.

**Sales Closing Date:**  A date contained in the Special Provisions by which an application must be filed.  The last date by which you may change your crop insurance coverage for a crop year.

2. **Life of Policy, Cancellation and Termination.**

(a) This is a continuous policy and will remain in effect for each crop year following the acceptance of the original application until canceled by you in accordance with the terms of the policy or terminated by operation of the terms of the policy or by us.

(c) After acceptance of the application, you may not cancel this policy for the initial crop year.  Thereafter, the policy will continue in force for each succeeding crop year unless canceled or terminated as provided below.

(d) Either you or we may cancel this policy after the initial crop year by providing written notice to the other on or before the cancellation date shown in the Crop Provisions.

(h) The cancellation and termination dates are contained in the Crop Provisions.

3. **Insurance Guarantees, Coverage Levels, and Prices for Determining Indemnities.**

(a) For each crop year, the production guarantee or amount of insurance, coverage level, and price at which an indemnity will be determined for each unit will be those used to calculate your summary of coverage.  The information necessary to determine those factors will be contained in the Special Provisions or in the actuarial documents.

(b) You may select only one coverage level from among those offered by us for each insured crop.  You may change the coverage level, price election, or amount of insurance for the following crop year by giving written notice to us not later than the sales closing date for the insured crop.  Since the price election or amount of insurance may change each year, if you do not select a new price election or amount of insurance on or before the sales closing date, we will assign a price election or amount of insurance which bears the same relationship to the price election schedule as the price election or amount of insurance that was in effect for the preceding year. (For example: If you selected 100 percent of the market price for the previous crop year and you do not select a new price election

for the current crop year, we will assign 100 percent of the market price for the current crop year.)

(e)   In addition to the price election or amount of insurance available on the contract change date, we may provide an additional price election or amount of insurance no later than 15 days prior to the sale closing date. You must select the additional price election or amount of insurance on or before the sales closing date for the insured crop.  These additional price elections or amounts of insurance will not be less than those available on the contract change date.  If you elect the additional price election or amount of insurance, any claim settlement and amount of premium will be based on this amount.

**4.    Contract Changes.**

(a)   We may change the terms of your coverage under this policy from year to year.

(b)   Any changes in policy provisions, price elections, amounts of insurance, premium rates, and program dates will be provided by us to your crop insurance agent not later than the contract change date contained in the Crop Provisions, except that price elections may be offered after the contract change date in accordance with section 3.  You may view the documents or request copies from your crop insurance agent.

(c )   You will be notified, in writing, of changes to the Basic Provisions, Crop Provisions, and Special Provision not later than 30 days prior to the cancellation date for the insured crop.  Acceptance of changes will be conclusively presumed in the absence of notice from you to change or cancel your insurance coverage.

**7.    Annual Premium and Administrative Fees.**

(a)   The annual premium is earned and payable at the time coverage begins.  You will be billed for premium due not earlier than the premium billing date specified in the Special Provisions.  The premium due, plus any accrued interest, will be considered delinquent if it is not paid on or before  the termination date specified in the Crop Provisions.

**11.    Insurance Period.**

(a)   Except for prevented planting coverage (see section 17), coverage begins on each unit or part of a unit at the later of:
(1)      The date we accept your application (For the purposes of this paragraph, the date of acceptance is the date that you

18

submit a properly executed application in accordance with section 2);

(2)   The date the insured crop is planted; or

(3)   The calendar date contained in the Crop Provisions for the beginning of the insurance period.

## 18.   Written Agreements.

Terms of this policy which are specifically designated for the use of written agreements may be altered by written agreement in accordance with the following:

(a)   You must apply in writing for each written agreement no later than the sales closing date, except as provided in section 18(e);

(b)   The application for a written agreement must contain all variable terms of the contract between you and us that will be in effect if the written agreement is not approved;

(c)   If approved, the written agreement will include all variable terms of the contract, including, but not limited to, crop type or variety, the guarantee, premium rate, and price election;

(d)   Each written agreement will only be valid for one crop year (If a written agreement is not specifically renewed the following year, insurance coverage for subsequent crop years will be in accordance with the printed policy);

(e)   An application for a written agreement submitted after the sales closing date may be approved if you demonstrate your physical inability to apply prior to the sales closing date, or it is submitted in accordance with any regulation which may be promulgated under 7 C.F.R. part 400, and after inspection of the acreage by us, if required it is determined that no loss has occurred and the crop is insurable in accordance with the policy and written agreement provisions.

## 25.   Legal Action Against Us.

(a)   You may not bring legal action against us unless you have complied with all of the policy provisions.

(b)   If you do take legal action against us, you must do so within 12 months of the date of denial of the claim. Suit must be brought in accordance with the provisions of 7 U.S.C. § 1508(j).

(c)   Your right to recover damages (compensatory, punitive, or other), attorney's fees, or other charges is limited or excluded by this contract or by Federal Regulations.

86.    The "Multiple Peril Crop Insurance Peanut Crop Provisions" in **Exhibit A** (hereinafter **"Crop Provisions"**) provide the following:

4.    **Contract Changes.**

In accordance with section 4 of the Basic Provisions, the Contract Change Date is November 30 preceding the cancellation date.

5.    **Cancellation and Termination Dates.**

In accordance with section 2 of the Basic Provisions, the cancellation and termination dates are:

| State and County | Cancellation & Termination Dates |
|---|---|
| For Jackson, Victoria, Golliad, Bee, Live Oak, McMullen, La Salle, and Dimmit Counties, Texas and all Texas Counties lying south thereof. | January 15 |
| El Paso, Hudspeth, Culberson, Reeves, Loving, Winkler, Ector, Upton, Reagan, Sterling, Coke, Tom Green, Concho, McCulloch, San Saba, Mills, Hamilton, Bosque, Johnson, Tarrant, Wise, Cooke Counties, Texas, and all Texas counties south and East thereof; and all other states. | February 28 |
| New Mexico; Oklahoma; Virginia; and all other Texas counties. | March 15 |

11.    **Causes of Loss.**

In accordance with the provisions of section 12 of the Basic Provisions, insurance is provided only against the following causes of loss that occur during the insurance period:
(a)    Adverse weather conditions. . . . (Exhibit A)

87.    The "Special Provisions of Insurance 2002 and Succeeding Crop Years" (hereinafter **"Special Provisions"**) set the following dates for each State:  Sales Closing Date; Initial Planting Date; Final Planting Date; Acreage Reporting Date and Billing Date.

**D.  Facts & Events Regarding Insurance Contract and 2002 Peanut Crop**

88.     Plaintiff Peanut Farmers had been operating under the same standard insurance contract for the last six crop years.

89.     The Multiple Peril Common Crop Insurance Policy is a continuous policy. By its terms, the policy automatically renews unless canceled in writing by either party to the contract or terminated in accordance with the policy terms.

90.     Prior to November 30, 2001 the contract change date for the 2002 Multiple Peril Common Crop Insurance Policy expired, and no changes had been made to the insurance contract by the Government, through RMA, USDA or the FCIC which could result in reducing the agreed coverage rate of $.31 per pound.

91.     On November 30, 2001, the United States, through Defendant USDA, issued crop established price elections for the 2002 crop year agreeing that the maximum coverage for peanuts again was $.31 per pound.

92.     On December 14, 2001 the United States, through the USDA, announced the 2002 Crop Peanut National Poundage Quota: that the same 2001 nationwide quota will apply to the 2002 crop year. The national average, 2002 quota price which was set by statute, was $610 per short ton which is consistent with $.31 per pound.

93.     On February 15, 2002 the United States through the USDA announced the peanut price support level for the 2002 crop year would again be $610 per pound, the same as 2001 crop year. This support level is consistent with the 2001 level of $.31 per pound.

94.     In January, February and March, 2002 the cancellation and termination dates for the Multiple Peril Crop Insurance Policy expired. The maximum insurance coverage remained $.31 per pound.

95.    The "Sales Closing Date", for the 2002 Crop Year also expired without change to the insurance coverage of $.31 per pound.

96.    Plaintiff Peanut Farmers submitted final applications for the 2002 crop year well prior to May 13, 2002.

97.    On or after April 5, 2002, Defendants, through at least one of its agents, mailed or caused to be mailed a Multiple Peril Insurance Policy Declaration with a fixed and agreed price election of $.31 per pound.  This declaration states, "We have accepted and processed your Policy as requested.  We will be contacting you at a later time to get your final prevented/planted acreage report." (Emphasis added.)

98.    Identical standard Multiple Peril Crop Insurance Policies were agreed to with Plaintiff Peanut Farmers insuring their 2002 peanut crops.

99.    From November, 2001 through April, 2002, Plaintiff Peanut Farmers made plans including leases, bank loans and purchase of supplies relying in part on contracts and assurances by Defendants that they had insurance coverage of $.31 per pound as in previous years.

100.    Some farmers assigned their rights to insurance proceeds to secure loans, leases and other third party agreements.  Assignments were based on the contract rate of $.31 per pound.  Banks and other third parties relied upon the representations of Defendants and insurance companies that the peanut crop coverage in the event of loss would be calculated at a rate of $.31 for a certain amount of peanuts and $.1775 for any additional peanuts insured.

101.    Plaintiff Peanut Farmers, relying on Defendants' assurances, the law and their contracts that their insurance coverage was $.31 per pound, began planting 2002 peanut crops prior to and during May, 2002 and completed planting well before the established Final Planting Dates for 2002.

102.     Customarily, Plaintiff Peanut Farmers grow enough peanuts that are covered by insurance at the agreed-upon rate and that are within the quota limits.

103.     The average cost of planting and harvesting peanuts can be as high as $.29 per pound.

104.     The Farm Security and Rural Investment Act of 2002 (the "2002 Farm Bill") became law on or about May 13, 2002. The Farm Bill eliminated the marketing peanut quota program.

105.     On or about May 28, 2002, Defendant Ross J. Davidson, Jr., Administrator for RMA, sent an interagency Bulletin MGR-02-006.1 entitled "Additional Price Elections for Certain 2002 Crop Year Crops." This bulletin stated, "Additional price elections are the maximum crop year price elections." The "additional price election" was $.1775 per pound. No mention was made of any changes to insurance coverage.

106.     An announcement to Plaintiff Peanut Farmers that Defendants were purporting to lower the insurance coverage for all peanuts from $.31 down to $.1775 per pound came after expiration of the acreage reporting date. The Insurance Companies sent Multiple Peril Crop Insurance Policy Declarations with crop summary information which, for the first time, showed a price election for peanuts of $.1775 per pound.

107.     On August 20, 2002, Defendant Ross J. Davidson, Jr., Administrator for RMA, sent a second interagency Bulletin MGR-02-016 to all reinsured companies, risk management agencies and other interested parties announcing that the Farm Security and Rural Investment Act of 2002 terminated the peanut marketing quota program. In the memorandum, Defendant Davidson stated that all insured peanuts would be considered "nonquota peanuts for all aspects of the policy, including calculation of the premium, liability and indemnity."

23

108.    The maximum amount of coverage for all peanuts was purportedly changed to $.1775 per pound.

109.    Peanut Farmer members of Plaintiffs' class all are parties to the same standard Multiple Peril Crop Insurance Policies.  These contracts cover, as one of its perils, losses due to adverse weather conditions.

110.    During the 2002 crop-growing season, parts of the Southwestern and Southeastern Growing Areas experienced serious adverse weather conditions.

111.    Plaintiff Peanut Farmers, who relied on insurance coverage at the rate of $.31 per pound for the majority of their peanut crops, faced significant financial losses due to the adverse weather conditions, one of the conditions covered by the Multiple Peril Crop Insurance Policy.

112.    Plaintiff Peanut Farmers were advised by Defendants and insurance companies that their coverage for all peanuts lost due to adverse weather conditions would be covered at a rate of only $.1775 per pound rather than the contract rate of $.31 per pound as the total production guarantee.

113.    Some Plaintiff Peanut Farmers are facing inability to pay for various contracts entered into while relying on insurance coverage at $.31 per pound, bankruptcy, loss of their farms and other financial disasters as a result of the threatened change in the insurance coverage from $.31 to $.1775 per pound.

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### (Breach of Contract)

114.    Paragraphs 1 through 113 are realleged and incorporated herein.

115.   By the unilateral and untimely modification of the terms of the insurance agreement, the Defendants have breached the insurance contract and the terms and conditions of the Multiple Peril Crop Insurance Policy.

116.   By the failure and refusal to provide insurance coverage as agreed upon, Defendants have violated the insurance contracts.

117.   Plaintiff Peanut Farmers have been damaged by thousands of dollars in lost insurance coverage.

### SECOND CLAIM FOR RELIEF

#### (Violation of Due Process by Impairment of Contract)

118.   Paragraph 1 through 117 are realleged and reincorporated by reference.

119.   Plaintiff Peanut Farmers entered into other contracts with other private companies, including leases, land leases, purchases of seed and other materials for harvesting peanut crops.

120.   Defendants arbitrarily and capriciously changed the insurance coverage by unilateral and retroactive action which impaired other contracts of Plaintiff Peanut Farmers and in so doing, Defendants violated Plaintiff Peanut Farmers' substantive and procedural due process rights in violation of the Fifth and Fourteenth Amendments to the United States Constitution. The court should declare the Defendants' conduct unlawful and void pursuant to 5 U.S.C. §§702-706, the Administrative Procedures Act.

### THIRD CLAIM FOR RELIEF

#### (Denial of Due Process)

121.   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 120 above.

122.   The right to submit applications for peanut insurance protection under the terms and conditions published in the Federal Register up to and including the contract change date,

cancellation and termination date, sales closing date and initial planting date to receive the protection of the Multiple Peril Crop Insurance Policy contract as published in the Federal Register and Code of Federal Regulations is a significant and substantial property right and the Defendants' claim of "preemption" of that right constituted a substantial impairment and deprivation of a protected property interest without substantive and procedural due process of law guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

123.    The Defendants' violation of the farmers' rights to substantive and procedural due process of law was arbitrary, capricious and not in accordance with law and those acts should be declared void and set aside by the court pursuant to the Administrative Procedures Act.  5 U.S.C. §§ 702-706.

## FOURTH CLAIM FOR RELIEF

### (Violation of Statutory Requirement That Policy Changes Be Published in the Federal Register)

124.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 123 above.

125.    The changes to the policy by Defendants' actions and through the 2002 Farm Bill and Manager's Bulletins to the FCIC Peanut Multiple Peril Crop Insurance coverage were not timely published in the Federal Register in violation of Chapter IV of Title 7 of the Code of Federal Regulations and under the Federal Register Act 44 U.S.C. §§ 1501 *et seq* and is wholly void and illegal.

126.    The revocation of the peanut price formula as printed in the Federal Register is arbitrary, capricious, an abuse of discretion and not in accordance with law.  The court should declare the Defendants' conduct unlawful and void pursuant to 5 U.S.C. §§702-706, the Administrative Procedures Act.

## FIFTH CLAIM FOR RELIEF

### (Violation of Statutory Requirement That Policy
### Changes Be Made Before November 30, 2001.)

127.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 126 above.

128.    The change to the Policy by Defendants' action and the May 28, 2002 Manager's Bulletin MGR-02-006.1 and the August 20, 2002 Manager's Bulletin 02-016 regarding insurance coverage were not made by November 30, 2001, the last date that contract changes could be made in violation of Chapter IV of Title 7 of the Code of Federal Regulations and under the Federal Register Act 44 U. S. C. §§ 1501 *et seq.* and is wholly void and illegal.

129.    The change in a term or condition of the peanut coverage formula as printed in the Farm Bill and Manager's Bulletin is arbitrary, capricious, an abuse of discretion and not in accordance with law. The Court should declare the Defendants' conduct unlawful and void pursuant to 5 U.S.C. § 702-706, the Administrative Procedures Act.

## SIXTH CLAIM FOR RELIEF

### (Violation of Plaintiffs' Statutory And Due Process Rights
### By Failing To Notify Plaintiffs Of Their Right To Appeal)

130.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 129 above.

131.    Assuming, *arguendo*, that the Government attempts to assert that Plaintiffs had an administrative remedy to exhaust, Secretary Veneman and Administrator Davidson are in violation of 7 U.S.C. § 6994 which provides:

> Not later than 10 working days after an adverse decision is made that affects the participant, the Secretary shall provide the participant with written notice of such adverse decision and the rights available to the participant under this subchapter or other law for the review of such adverse decision. (Emphasis supplied.)

132.    The adverse decision was "suggested" on May 28, 2002, by RMA Program Bulletin MGR 02-006.1 and made by the August 20, 2002 Bulletin MGR 02-016.

133.    Ten working days later, the Defendants were required by law to notify in writing each of peanut farmers in Alabama, Florida, Georgia, South Carolina and Texas who were

eligible for Multiple Peril Crop Insurance Policy contracts of their right to appeal. The Plaintiff Peanut Farmers were not notified of their appeal rights.

134.    Plaintiffs received no notice of any right to appeal the change in terms of their policy and the purported loss of the approximately $.14 per pound coverage in the event of adverse weather conditions.

135.    Defendants have not only disregarded "notions of basic fairness" by expecting the farmer/victims to discover the purported administrative remedies that are allegedly available to them, they have flagrantly violated the explicit statutory requirement in 7 U.S.C. § 6994 that the agency tell the farmers in writing within 10 days exactly how Plaintiffs must pursue those remedies.

136.    The Government's violation of the farmers' right to due process of law was arbitrary, capricious and not in accordance with law and should be declared void and set aside by the court pursuant to the Administrative Procedures Act. 5 U.S.C. §§ 702-706

## VI.  PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS PRAY THAT THIS COURT:

1.    Certify this action as a class action pursuant to RCFC 23

2.    Enter injunctive relief prohibiting the Government from attempting to settle at $.1775 per pound any valid and enforceable claims filed, and enjoin and estop Defendants from forcing Plaintiffs to waive their rights to recover the full agreed upon coverage amount of $.31 per pound.

3.    Enter a Declaratory Judgment enforcing the terms of contract insuring coverage at the rate of thirty-one cents ($.31) per pound for any losses covered by the insurance contract.

4.     Issue a Preliminary Injunction and Permanent Injunction declaring that the Secretary and Administrator must immediately implement the Multiple Peril Crop Insurance Policy as published in the Federal Register and Code of Federal Regulations and make that policy available to plaintiffs and class plaintiffs under the terms and conditions and at the indemnity rate as published in the Federal Register and Code of Federal Regulation as of the Contract Change Date, the Cancellation and Termination Date, the Sales Closing Date, and the Initial Planting Date.

5.     Issue a judgment declaring that the agency conduct challenged in this action was arbitrary, irrational, capricious, and an abuse of discretion in violation of the United States Constitution and not in accordance with law pursuant to 7 U.S.C. §§ 702-706.

6.     Issue an order remanding this matter to USDA and an injunction prohibiting the Defendants Administrator Davidson and Secretary Veneman from demanding that the farmers waive their property right to seek performance of the agreed-upon contract under the terms and conditions that were announced in the Federal Register and Code of Federal Regulations or forfeiting their right to apply for Multiple Peril Crop Insurance Protection.

7.     Enter judgment in accordance with the Plaintiffs' and Defendants' contracts and the law and upon proper proofs of loss for recovery of a common fund in the total amount of the Plaintiff's class losses at the rate of $.31 per pound, said common fund to be administered by and under authority of the United States Court of Federal Claims.

8.     Preliminary and Permanent Injunctive Relief declaring the Manager's Bulletins void and unenforceable under the Contract, Statutes and United States Constitution, as set forth herein.

9.     Issue such other relief as the Court deems appropriate.

Dated this _19th_ day of _February_, 2003.

BOYCE & ISLEY, PLLC

_R. Daniel Boyce_
R. Daniel Boyce
N. C. State Bar # 12329

_G. Eugene Boyce_
G. Eugene Boyce
N. C. State Bar # 0435

_Philip R. Isley_
Philip R. Isley
N. C. State Bar # 19094
Post Office Box 1990
Raleigh, North Carolina  27602-1990
Telephone:  (919) 833-7373
Facsimile:  (919) 833-7536
*Attorneys for Plaintiffs*

31

# Multiple Peril
# Crop Insurance
# Policy



**North Carolina Farm Bureau**
**Multiple Peril Crop Insurance**
P.O. BOX 27427, RALEIGH, NORTH CAROLINA 27611

Administered and processed by The American Agricultural Insurance Company, 225 Touhy Avenue, Park Ridge, IL 60068-7058

Visit our websites at www.ncfbins.com and www.afbisinc.com

**Please Read Your Multiple Peril Crop Insurance Policy Carefully**

EXHIBIT

A

MULTIPLE PERIL CROP INSURANCE                 **2001-NCIS 700B**
COMMON CROP INSURANCE POLICY
(This is a continuous policy. Refer to section 2.)

This insurance policy is reinsured by the Federal Crop Insurance Corporation (FCIC) under the provisions of the Federal Crop Insurance Act, as amended (7 U.S.C. 1501 et seq.) (Act). All provisions of the policy and rights and responsibilities of the parties are specifically subject to the Act. The provisions of the policy are published in the Federal Register and codified in chapter IV of title 7 of the Code of Federal Regulations (CFR) under the Federal Register Act (44 U.S.C. 1501 et seq.), and may not be waived or varied in any way by the crop insurance agent or any other agent or employee of FCIC or the company. In the event we cannot pay your loss, your claim will be settled in accordance with the provisions of this policy and paid by FCIC. No state guarantee fund will be liable for your loss.

Throughout this policy, "you" and "your" refer to the named insured shown on the accepted application and "we," "us," and "our" refer to the insurance company providing insurance. Unless the context indicates otherwise, use of the plural form of a word includes the singular and use of the singular form of the word includes the plural.

AGREEMENT TO INSURE: In return for the payment of the premium, and subject to all of the provisions of this policy, we agree with you to provide the insurance as stated in this policy. If a conflict exists among the policy provisions, the order of priority is as follows: (1) the Catastrophic Risk Protection Endorsement, as applicable; (2) the Special Provisions; (3) the Crop Provisions; and (4) these Basic Provisions, with (1) controlling (2), etc.

**TERMS AND CONDITIONS**
**BASIC PROVISIONS**

**1.    Definitions.**

**Abandon** - Failure to continue to care for the crop, providing care so insignificant as to provide no benefit to the crop, or failure to harvest in a timely manner, unless an insured cause of loss prevents you from properly caring for or harvesting the crop or causes damage to it to the extent that most producers of the crop on acreage with similar characteristics in the area would not normally further care for or harvest it.

**Acreage report** - A report required by paragraph 6 of these Basic Provisions that contains, in addition to other required information, your report of your share of all acreage of an insured crop in the county, whether insurable or not insurable.

**Acreage reporting date** - The date contained in the Special Provisions or as provided in section 6 by which you are required to submit your acreage report.

**Act** - The Federal Crop Insurance Act, (7 U.S.C. 1501 et seq.).

**Actuarial documents** - The material for the crop year which is available for public inspection in your agent's office, and which shows the amounts of insurance or production guarantees, coverage levels, premium rates, practices, insurable acreage, and other related information regarding crop insurance in the county.

**Additional coverage** - A level of coverage greater than catastrophic risk protection.

**Administrative fee** - An amount you must pay for catastrophic risk protection and additional coverage for each crop year as specified in section 7 and the Catastrophic Risk Protection Endorsement.

**Agricultural commodity** - All insurable crops and other fruit, vegetable or nut crops produced for human or animal consumption.

**Another use, notice of** - The written notice required when you wish to put acreage to another use (see section 14).

**Application** - The form required to be completed by you and accepted by us before insurance coverage will commence. This form must be completed and filed in your agent's office not later than the sales closing date of the initial insurance year for each crop for which insurance coverage is requested. If cancellation or termination of insurance coverage occurs for any reason, including but not limited to indebtedness, suspension, debarment, disqualification, cancellation by you or us or violation of the controlled substance provisions of the Food Security Act of 1985, a new application must be filed for the crop. Insurance coverage will not be provided if you are ineligible under the contract or under any Federal statute or regulation.

**Approved yield** - The actual production history (APH) yield determined in accordance with 7 CFR part 400, subpart (G), including any adjustments elected under section 36.

**Assignment of indemnity** - A transfer of policy rights, made on our form, and effective when approved by us. It is the arrangement whereby you assign your right to an indemnity payment to any party of your choice for the crop year.

**Basic unit** - All insurable acreage of the insured crop in the county on the date coverage begins for the crop year:

(1)  In which you have 100 percent crop share; or
(2)  Which is owned by one person and operated by another person on a share basis. (Example: If, in addition to the land you own, you rent land from five landlords, three on a crop share basis and two on a cash basis, you would be entitled to four units; one for each crop share lease and one that combines the two cash leases and the land you own.) Land which would otherwise be one unit may, in certain instances, be divided according to guidelines contained in section 34 of these Basic Provisions and in the applicable Crop Provisions.

**Cancellation date** - The calendar date specified in the Crop Provisions on which coverage for the crop will automatically renew unless canceled in writing by either you or us or terminated in accordance with the policy terms.

**Catastrophic risk protection** - The minimum level of coverage offered by FCIC that is required before you may qualify for certain other USDA program benefits unless you execute a waiver of any eligibility for emergency crop loss assistance in connection with the crop.

**Catastrophic Risk Protection Endorsement** - The part of the crop insurance policy that contains provisions of insurance that are specific to catastrophic risk protection.

**Claim for indemnity** - A claim made on our form by you for damage or loss to an insured crop and submitted to us not

later than 60 days after the end of the insurance period (see section 14).

**Consent** - Approval in writing by us allowing you to take a specific action.

**Contract** - (See "policy").

**Contract change date** - The calendar date by which we make any policy changes available for inspection in the agent's office (see section 4).

**County** - Any county, parish, or other political subdivision of a state shown on your accepted application, including acreage in a field that extends into an adjoining county if the county boundary is not readily discernible.

**Coverage** - The insurance provided by this policy, against insured loss of production or value, by unit as shown on your summary of coverage.

**Coverage begins, date** - The calendar date insurance begins on the insured crop, as contained in the Crop Provisions, or the date planting begins on the unit (see section 11 of these Basic Provisions for specific provisions relating to prevented planting).

**Crop Provisions** - The part of the policy that contains the specific provisions of insurance for each insured crop.

**Crop year** - The period within which the insured crop is normally grown, regardless of whether or not it is actually grown, and designated by the calendar year in which the insured crop is normally harvested.

**Damage** - Injury, deterioration, or loss of production of the insured crop due to insured or uninsured causes.

**Damage, notice of** - A written notice required to be filed in your agent's office whenever you initially discover that the insured crop has been damaged to the extent that a loss is probable (see section 14).

**Days** - Calendar days.

**Deductible** - The amount determined by subtracting the coverage level percentage you choose from 100 percent. For example, if you elected a 65 percent coverage level, your deductible would be 35 percent (100% - 65% = 35%).

**Delinquent account** - Any account you have with us in which premiums and interest on those premiums is not paid by the termination date specified in the Crop Provisions, or any other amounts due us, such as indemnities found not to have been earned, which are not paid within 30 days of our mailing or other delivery of notification to you of the amount due.

**Earliest planting date** - The earliest date established for planting the insured crop (see Special Provisions and section 13).

**Economic significance** - A value of a crop, or of a type or variety of a crop (if the applicable crop policy allows you the option to separately insure individual crop types or varieties) equal to ten percent (10%) or more of the total value of your share of all crops grown in the county the previous crop year or that you expect to grow in the current crop year. However, an amount will not be considered economically significant if the expected liability under the Catastrophic Risk Protection Endorsement is equal to or less than the administrative fee required for the crop, or if applicable, the crop type or variety.

**End of insurance period, date of** - The date upon which your crop insurance coverage ceases for the crop year (see Crop Provisions and section 11).

**Enterprise unit** - All insurable acreage of the insured crop in the county in which you have a share on the date coverage begins for the crop year. An enterprise unit must consist of:

(1) Two or more basic units of the same insured crop that are located in two or more separate sections, section equivalents, or FSA farm serial numbers; or

(2) Two or more optional units of the same insured crop established by separate sections, section equivalents, or FSA farm serial numbers.

**Field** - All acreage of tillable land within a natural or artificial boundary (e.g., roads, waterways, fences, etc.).

**Final planting date** - The date contained in the Special Provisions for the insured crop by which the crop must initially be planted in order to be insured for the full production guarantee or amount of insurance per acre.

**FSA** - The Farm Service Agency, an agency of the USDA, or a successor agency.

**FSA farm serial number** - The number assigned to the farm by the local FSA office.

**Good farming practices** - The cultural practices generally in use in the county for the crop to make normal progress toward maturity and produce at least the yield used to determine the production guarantee or amount of insurance, and are those recognized by the Cooperative State Research, Education, and Extension Service as compatible with agronomic and weather conditions in the county.

**Insured** - The named person as shown on the application accepted by us. This term does not extend to any other person having a share or interest in the crop (for example, a partnership, landlord, or any other person) unless specifically indicated on the accepted application.

**Insured crop** - The crop for which coverage is available under these Basic Provisions and the applicable Crop Provisions as shown on the application accepted by us.

**Interplanted** - Acreage on which two or more crops are planted in a manner that does not permit separate agronomic maintenance or harvest of the insured crop.

**Irrigated practice** - A method of producing a crop by which water is artificially applied during the growing season by appropriate systems and at the proper times, with the intention of providing the quantity of water needed to produce at least the yield used to establish the irrigated production guarantee or amount of insurance on the irrigated acreage planted to the insured crop.

**Late planted** - Acreage initially planted to the insured crop after the final planting date.

**Late planting period** - The period that begins the day after the final planting date for the insured crop and ends 25 days after the final planting date, unless otherwise specified in the Crop Provisions or Special Provisions.

**Limited resource farmer** - A producer or operator of a farm:

(a) With an annual gross income of $20,000 or less derived from all sources, including income from a spouse or other members of the household, for each of the prior two years; or

(b) With less than 25 acres aggregated for all crops, where a majority of the producer's gross income is derived from such farm or farms, but the producer's gross income from farming operations does not exceed $20,000.

**Loss, notice of** - The notice required to be given by you not later than 72 hours after certain occurrences or 15 days after the end of the insurance period, whichever is earlier (see section 14).

**Negligence** - The failure to use such care as a reasonably prudent and careful person would use under similar circumstances.

**Non-contiguous** - Any two or more tracts of land whose boundaries do not touch at any point, except that land

separated only by a public or private right-of-way, waterway, or an irrigation canal will be considered as contiguous.

**Person** - An individual, partnership, association, corporation, estate, trust, or other legal entity, and wherever applicable, a State or a political subdivision or agency of a State. "Person" does not include the United States Government or any agency thereof.

**Planted acreage** - Land in which seed, plants, or trees have been placed, appropriate for the insured crop and planting method, at the correct depth, into a seedbed that has been properly prepared for the planting method and production practice.

**Policy** - The agreement between you and us consisting of the accepted application, these Basic Provisions, the Crop Provisions, the Special Provisions, other applicable endorsements or options, the actuarial documents for the insured crop, the Catastrophic Risk Protection Endorsement, if applicable, and the applicable regulations published in 7 CFR chapter IV.

**Practical to replant** - Our determination, after loss or damage to the insured crop, based on all factors, including, but not limited to moisture availability, marketing window, condition of the field, and time to crop maturity, that replanting the insured crop will allow the crop to attain maturity prior to the calendar date for the end of the insurance period. It will not be considered practical to replant after the end of the late planting period, or the final planting date if no late planting period is applicable, unless replanting is generally occurring in the area. Unavailability of seed or plants will not be considered a valid reason for failure to replant.

**Premium billing date** - The earliest date upon which you will be billed for insurance coverage based on your acreage report. The premium billing date is contained in the Special Provisions.

**Prevented planting** - Failure to plant the insured crop with proper equipment by the final planting date designated in the Special Provisions for the insured crop in the county. You may also be eligible for a prevented planting payment if you failed to plant the insured crop with the proper equipment within the late planting period. You must have been prevented from planting the insured crop due to an insured cause of loss that is general in the surrounding area and that prevents other producers from planting acreage with similar characteristics.

**Price election** - The amounts contained in the Special Provisions or an addendum thereto, to be used for computing the value per pound, bushel, ton, carton, or other applicable unit of measure for the purposes of determining premium and indemnity under the policy.

**Production guarantee (per acre)** - The number of pounds, bushels, tons, cartons, or other applicable units of measure determined by multiplying the approved yield per acre by the coverage level percentage you elect.

**Production report** - A written record showing your annual production and used by us to determine your yield for insurance purposes (see section 3). The report contains yield information for previous years, including planted acreage and harvested production. This report must be supported by written verifiable records from a warehouseman or buyer of the insured crop or by measurement of farm-stored production, or by other records of production approved by us on an individual case basis.

**Replanting** - Performing the cultural practices necessary to prepare the land to replace the seed or plants of the damaged or destroyed insured crop and then replacing the seed or plants of the same crop in the insured acreage with

the expectation of producing at least the yield used to determine the production guarantee.

**Representative sample** - Portions of the insured crop that must remain in the field for examination and review by our loss adjuster when making a crop appraisal, as specified in the Crop Provisions. In certain instances we may allow you to harvest the crop and require only that samples of the crop residue be left in the field.

**Sales closing date** - A date contained in the Special Provisions by which an application must be filed. The last date by which you may change your crop insurance coverage for a crop year.

**Section** - (for the purposes of unit structure) A unit of measure under a rectangular survey system describing a tract of land usually one mile square and usually containing approximately 640 acres.

**Share** - Your percentage of interest in the insured crop as an owner, operator, or tenant at the time insurance attaches. However, only for the purpose of determining the amount of indemnity, your share will not exceed your share at the earlier of the time of loss or the beginning of harvest.

**Special Provisions** - The part of the policy that contains specific provisions of insurance for each insured crop that may vary by geographic area.

**State** - The state shown on your accepted application.

**Substantial beneficial interest** - An interest held by any person of at least 10 percent in the applicant or insured.

**Summary of coverage** - Our statement to you, based upon your acreage report, specifying the insured crop and the guarantee or amount of insurance coverage provided by unit.

**Tenant** - A person who rents land from another person for a share of the crop or a share of the proceeds of the crop (see the definition of "share" above).

**Termination date** - The calendar date contained in the Crop Provisions upon which your insurance ceases to be in effect because of nonpayment of any amount due us under the policy, including premium.

**Timely planted** - Planted on or before the final planting date designated in the Special Provisions for the insured crop in the county.

**USDA** - United States Department of Agriculture.

**Void** - When the policy is considered not to have existed for a crop year as a result of concealment, fraud or misrepresentation (see section 27).

**Whole-farm unit** - All insurable acreage of the insured crops in the county in which you have a share on the date coverage begins for each crop for the crop year.

**Written agreement** - A document that alters designated terms of a policy as authorized under these Basic Provisions, the Crop Provisions, or the Special Provisions for the insured crop (see section 18).

2. **Life of Policy, Cancellation, and Termination.**

    (a) This is a continuous policy and will remain in effect for each crop year following the acceptance of the original application until canceled by you in accordance with the terms of the policy or terminated by operation of the terms of the policy or by us.

    (b) Your application for insurance must contain all the information required by us to insure the crop. Applications that do not contain all social security numbers and employer identification numbers, as applicable (except as stated herein), coverage level, price election, crop, type, variety, or class, plan of insurance, and any other material information required to insure the crop, are not acceptable. If a person with a substantial beneficial interest in the insured crop

refuses to provide a social security number or employer identification number and that person is:

(1) Not on the non-standard classification system list, the amount of coverage available under the policy will be reduced proportionately by that person's share of the crop; or

(2) On the non-standard classification system list, the insurance will not be available to that person and any entity in which the person has a substantial beneficial interest.

(c) After acceptance of the application, you may not cancel this policy for the initial crop year. Thereafter, the policy will continue in force for each succeeding crop year unless canceled or terminated as provided below.

(d) Either you or we may cancel this policy after the initial crop year by providing written notice to the other on or before the cancellation date shown in the Crop Provisions.

(e) If any amount due, including administrative fees or premium, is not paid or an acceptable arrangement for payment is not made on or before the termination date for the crop on which the amount is due, you will be determined to be ineligible to participate in any crop insurance program authorized under the Act in accordance with 7 CFR part 400, subpart U.

(1) For a policy with unpaid administrative fees or premium, the policy will terminate effective on the termination date immediately subsequent to the billing date for the crop year;

(2) For a policy with other amounts due, the policy will terminate effective on the termination date immediately after the account becomes delinquent;

(3) Ineligibility will be effective as of the date that the policy was terminated for the crop for which you failed to pay an amount owed and for all other insured crops with coincidental termination dates;

(4) All other policies that are issued by us under the authority of the Act will also terminate as of the next termination date contained in the applicable policy;

(5) If you are ineligible, you may not obtain any crop insurance under the Act until payment is made, you execute an agreement to repay the debt and make the payments in accordance with the agreement, or you file a petition to have your debts discharged in bankruptcy;

(6) If you execute an agreement to repay the debt and fail to timely make any scheduled payment, you will be ineligible for crop insurance effective on the date the payment was due until the debt is paid in full or you file a petition to discharge the debt in bankruptcy and subsequently obtain discharge of the amounts due. Dismissal of the bankruptcy petition before discharge will void all policies in effect retroactive to the date you were originally determined ineligible to participate;

(7) Once the policy is terminated, the policy cannot be reinstated for the current crop year unless the termination was in error;

(8) After you again become eligible for crop insurance, if you want to obtain coverage for your crops, you must reapply on or before the sales closing date for the crop (Since applications for crop insurance cannot be accepted after the sales closing date, if you make any payment after the sales closing date, you cannot apply for insurance until the next crop year); and

(9) If we deduct the amount due us from an indemnity, the date of payment for the purpose of this section will be the date you sign the properly executed claim for indemnity.

(10) For example, if crop A, with a termination date of October 31, 1997, and crop B, with a termination date of March 15, 1998, are insured and you do not pay the premium for crop A by the termination date, you are ineligible for crop insurance as of October 31, 1997, and crop A's policy is terminated on that date. Crop B's policy is terminated as of March 15, 1998. If you enter an agreement to repay the debt on April 25, 1998, you can apply for insurance for crop A by the October 31, 1998, sales closing date and crop B by the March 15, 1999, sales closing date. If you fail to make a scheduled payment on November 1, 1998, you will be ineligible for crop insurance effective on November 1, 1998, and you will not be eligible unless the debt is paid in full or you file a petition to have the debt discharged in bankruptcy and subsequently receive discharge.

(f) If you die, disappear, or are judicially declared incompetent, or if you are an entity other than an individual and such entity is dissolved, the policy will terminate as of the date of death, judicial declaration, or dissolution. If such event occurs after coverage begins for any crop year, the policy will continue in force through the crop year and terminate at the end of the insurance period and any indemnity will be paid to the person or persons determined to be beneficially entitled to the indemnity. The premium will be deducted from the indemnity or collected from the estate. Death of a partner in a partnership will dissolve the partnership unless the partnership agreement provides otherwise. If two or more persons having a joint interest are insured jointly, death of one of the persons will dissolve the joint entity.

(g) We may terminate your policy if no premium is earned for 3 consecutive years.

(h) The cancellation and termination dates are contained in the Crop Provisions.

(i) When obtaining catastrophic or additional coverage, you must provide information regarding crop insurance coverage on any crop previously obtained at any other local FSA office or from an approved insurance provider, including the date such insurance was obtained and the amount of the administrative fee.

3. **Insurance Guarantees, Coverage Levels, and Prices for Determining Indemnities.**

(a) For each crop year, the production guarantee or amount of insurance, coverage level, and price at which an indemnity will be determined for each unit will be those used to calculate your summary of coverage. The information necessary to determine those factors will be contained in the Special Provisions or in the actuarial documents.

(b) You may select only one coverage level from among those offered by us for each insured crop. You may change the coverage level, price election, or amount of insurance for the following crop year by giving written notice to us not later than the sales closing date for the insured crop. Since the price election or amount of insurance may change each year, if you do not select a new price election or amount of insurance on or before the sales closing date, we will assign a price election or amount of insurance which bears the same relationship to the price election schedule as the price election or

amount of insurance that was in effect for the preceding year. (For example: If you selected 100 percent of the market price for the previous crop year and you do not select a new price election for the current crop year, we will assign 100 percent of the market price for the current crop year.)

(c) You must report production to us for the previous crop year by the earlier of the acreage reporting date or 45 days after the cancellation date unless otherwise stated in the Special Provisions:

   (1) If you do not provide the required production report, we will assign a yield for the previous crop year. The yield assigned by us will not be more than 75 percent of the yield used by us to determine your coverage for the previous crop year. The production report or assigned yield will be used to compute your approved yield for the purpose of determining your coverage for the current crop year.

   (2) If you have filed a claim for any crop year, the documents signed by you which state the amount of production used to complete the claim for indemnity will be the production report for that year unless otherwise specified by FCIC.

   (3) Production and acreage for the prior crop year must be reported for each proposed optional unit by the production reporting date. If you do not provide the information stated above, the optional units will be combined into the basic unit.

(d) We may revise your production guarantee for any unit, and revise any indemnity paid based on that production guarantee, if we find that your production report under paragraph (c) of this section:

   (1) Is not supported by written verifiable records in accordance with the definition of production report; or

   (2) Fails to accurately report actual production, acreage, or other material information.

(e) In addition to the price election or amount of insurance available on the contract change date, we may provide an additional price election or amount of insurance no later than 15 days prior to the sales closing date. You must select the additional price election or amount of insurance on or before the sales closing date for the insured crop. These additional price elections or amounts of insurance will not be less than those available on the contract change date. If you elect the additional price election or amount of insurance any claim settlement and amount of premium will be based on this amount.

(f) You must obtain the same level of coverage (catastrophic risk protection or additional) for all acreage of the crop in the county unless one of the following applies:

   (1) The applicable Crop Provisions allow you the option to separately insure individual crop types or varieties. In this case, each individual type or variety insured by you will be subject to separate administrative fees. For example, if two grape varieties in California are insured under the Catastrophic Risk Protection Endorsement and two varieties are insured under an additional coverage policy, a separate administrative fee will be charged for each of the four varieties. Although insurance may be elected by type or variety in these instances, failure to insure a type or variety that is of economic significance may result in the

denial of other farm program ben     ·erson execute a waiver of any eligibility     ·ny crop loss assistance in connection \

   (2) If you have additional coverage for county and the acreage has been "high-risk" by FCIC, you will be at High-Risk Land Exclusion Option for the high-risk land under the additional coverage policy and insure the high-risk acreage under a separate Catastrophic Risk Protection Endorsement, provided that the Catastrophic Risk Protection Endorsement is obtained from the same insurance provider from which the additional coverage was obtained.

(g) Hail and fire coverage may be excluded from the covered causes of loss for a crop policy only if additional coverage is selected.

(h) Any person may sign any document relative to crop insurance coverage on behalf of any other person covered by such a policy, provided that the person has a properly executed power of attorney or such other legally sufficient document authorizing such person to sign.

4.  **Contract Changes.**

   (a) We may change the terms of your coverage under this policy from year to year.

   (b) Any changes in policy provisions, price elections, amounts of insurance, premium rates, and program dates will be provided by us to your crop insurance agent not later than the contract change date contained in the Crop Provisions, except that price elections may be offered after the contract change date in accordance with section 3. You may view the documents or request copies from your crop insurance agent.

   (c) You will be notified, in writing, of changes to the Basic Provisions, Crop Provisions, and Special Provisions not later than 30 days prior to the cancellation date for the insured crop. Acceptance of changes will be conclusively presumed in the absence of notice from you to change or cancel your insurance coverage.

5.  **Liberalization.**

   If we adopt any revision that broadens the coverage under this policy subsequent to the contract change date without additional premium, the broadened coverage will apply.

6.  **Report of Acreage.**

   (a) An annual acreage report must be submitted to us on our form for each insured crop in the county on or before the acreage reporting date contained in the Special Provisions, except as follows:

   (1) If you insure multiple crops with us that have final planting dates on or after August 15 but before December 31, you must submit an acreage report for all such crops on or before the latest applicable acreage reporting date for such crops; and

   (2) If you insure multiple crops with us that have final planting dates on or after December 31 but before August 15, you must submit an acreage report for all such crops on or before the latest applicable acreage reporting date for such crops.

   (3) Notwithstanding the provisions in sections 6(a)(1) and (2):

      (i) If the Special Provisions designate separate planting periods for a crop, you must submit an acreage report for each planting period on or before the acreage reporting date contained in the Special Provisions for the planting period; and

(ii) If planting of the insured crop continues after the final planting date or you are prevented from planting during the late planting period, the acreage reporting date will be the later of:
  (A) The acreage reporting date contained in the Special Provisions;
  (B) The date determined in accordance with sections (a)(1) or (2); or
  (C) Five (5) days after the end of the late planting period for the insured crop, if applicable.

(b) If you do not have a share in an insured crop in the county for the crop year, you must submit an acreage report, on or before the acreage reporting date, so indicating.

(c) Your acreage report must include the following information, if applicable:
  (1) All acreage of the crop in the county (insurable and not insurable) in which you have a share;
  (2) Your share at the time coverage begins;
  (3) The practice;
  (4) The type; and
  (5) The date the insured crop was planted.

(d) Because incorrect reporting on the acreage report may have the effect of changing your premium and any indemnity that may be due, you may not revise this report after the acreage reporting date without our consent.

(e) We may elect to determine all premiums and indemnities based on the information you submit on the acreage report or upon the factual circumstances we determine to have existed, subject to the provisions contained in section 6(g).

(f) If you do not submit an acreage report by the acreage reporting date, or if you fail to report all units, we may elect to determine by unit the insurable crop acreage, share, type and practice, or to deny liability on such units. If we deny liability for the unreported units, your share of any production from the unreported units will be allocated, for loss purposes only, as production to count to the reported units in proportion to the liability on each reported unit. However, such production will not be allocated to prevented planting acreage or otherwise affect any prevented planting payment.

(g) If the information reported by you on the acreage report for share, acreage, practice, type or other material information is inconsistent with the information that is determined to actually exist for a unit and results in:
  (1) A lower liability than the actual liability determined, the production guarantee or amount of insurance on the unit will be reduced to an amount that is consistent with the reported information. In the event that insurable acreage is under-reported for any unit, all production or value from insurable acreage in that unit will be considered production or value to count in determining the indemnity; and
  (2) A higher liability than the actual liability determined, the information contained in the acreage report will be revised to be consistent with the correct information. If we discover that you have incorrectly reported any information on the acreage report for any crop year, you may be required to provide documentation in subsequent crop years that substantiates your report of acreage for those crop years, including, but not limited to, an acreage measurement service at your own expense.

(h) Errors in reporting units may be corrected by us at the time of adjusting a loss to reduce our liability and to conform to applicable unit division guidelines.

**7. Annual Premium and Administrative Fees.**

(a) The annual premium is earned and payable at the time coverage begins. You will be billed for premium due not earlier than the premium billing date specified in the Special Provisions. The premium due, plus any accrued interest, will be considered delinquent if it is not paid on or before the termination date specified in the Crop Provisions.

(b) Any amount you owe us related to any crop insured with us under the authority of the Act will be deducted from any prevented planting payment or indemnity due you for any crop insured with us under the authority of the Act.

(c) The annual premium amount is determined, as applicable, by either:
  (1) Multiplying the production guarantee per acre times the price election, times the premium rate, times the insured acreage, times your share at the time coverage begins, and times any premium adjustment percentages that may apply; or
  (2) Multiplying the amount of insurance per acre times the premium rate, times the insured acreage, times your share at the time coverage begins, and times any premium adjustment percentages that may apply.

(d) The premium will be computed using the price election or amount of insurance you elect or that we assign in accordance with section 3(b).

(e) In addition to the premium charged:
  (1) You, unless otherwise authorized in 7 CFR part 400, must pay an administrative fee each crop year of $30 per crop per county for all levels of coverage in excess of catastrophic risk protection.
  (2) The administrative fee must be paid no later than the time premium is due.
  (3) Payment of an administrative fee will not be required if you file a bona fide zero acreage report on or before the acreage reporting date for the crop. If you falsely file a zero acreage report you may be subject to criminal and administrative sanctions.
  (4) The administrative fee will be waived if you request it and you qualify as a limited resource farmer.
  (5) Failure to pay the administrative fees when due may make you ineligible for certain other USDA benefits.

**8. Insured Crop.**

(a) The insured crop will be that shown on your accepted application and as specified in the Crop Provisions or Special Provisions and must be grown on insurable acreage.

(b) A crop which will NOT be insured will include, but will not be limited to, any crop:
  (1) If the farming practices carried out are not in accordance with the farming practices for which the premium rates, production guarantees or amounts of insurance have been established, unless insurance is allowed by a written agreement;
  (2) Of a type, class or variety established as not adapted to the area or excluded by the policy provisions;
  (3) That is a volunteer crop;
  (4) That is a second crop following the same crop (insured or not insured) harvested in the same crop

year unless specifically permitted by the Crop Provisions or the Special Provisions;

(5) That is planted for the development or production of hybrid seed or for experimental purposes, unless permitted by the Crop Provisions or by written agreement to insure such crop; or

(6) That is used solely for wildlife protection or management. If the lease states that specific acreage must remain unharvested, only that acreage is uninsurable. If the lease specifies that a percentage of the crop must be left unharvested, your share will be reduced by such percentage.

**9. Insurable Acreage.**

(a) Acreage planted to the insured crop in which you have a share is insurable except acreage:

(1) That has not been planted and harvested within one of the 3 previous crop years, unless:

   (i) Such acreage was not planted:

      (A) To comply with any other USDA program;

      (B) Because of crop rotation, (e.g., corn, soybean, alfalfa; and the alfalfa remained for 4 years before the acreage was planted to corn again);

      (C) Due to an insurable cause of loss that prevented planting; or

      (D) Because a perennial tree, vine, or bush crop was grown on the acreage;

   (ii) Such acreage was planted but was not harvested due to an insurable cause of loss; or

   (iii) The Crop Provisions or a written agreement specifically allow insurance for such acreage;

(2) That has been strip-mined, unless otherwise approved by written agreement, or unless an agricultural commodity other than a cover, hay, or forage crop (except corn silage), has been harvested from the acreage for at least five crop years after the strip-mined land was reclaimed;

(3) On which the insured crop is damaged and it is practical to replant the insured crop, but the insured crop is not replanted;

(4) That is interplanted, unless allowed by the Crop Provisions;

(5) That is otherwise restricted by the Crop Provisions or Special Provisions; or

(6) That is planted in any manner other than as specified in the policy provisions for the crop unless a written agreement to such planting exists.

(b) If insurance is provided for an irrigated practice, you must report as irrigated only that acreage for which you have adequate facilities and adequate water, or the reasonable expectation of receiving adequate water at the time coverage begins, to carry out a good irrigation practice. If you knew or had reason to know that your water may be reduced before coverage begins, no reasonable expectation exists.

(c) Notwithstanding the provisions in section 8(b)(1), if acreage is irrigated and we do not provide a premium rate for an irrigated practice, you may either report and insure the irrigated acreage as "non-irrigated," or report the irrigated acreage as not insured.

(d) We may restrict the amount of acreage that we will insure to the amount allowed under any acreage limitation program established by the United States Department of Agriculture if we notify you of that restriction prior to the sales closing date.

**10. Share Insured.**

(a) Insurance will attach only to the share of the person completing the application and will not extend to any other person having a share in the crop unless the application clearly states that:

(1) The insurance is requested for an entity such as a partnership or a joint venture; or

(2) You as landlord will insure your tenant's share, or you as tenant will insure your landlord's share. In this event, you must provide evidence of the other party's approval (lease, power of attorney, etc.). Such evidence will be retained by us. You also must clearly set forth the percentage shares of each person on the acreage report.

(b) We may consider any acreage or interest reported by or for your spouse, child or any member of your household to be included in your share.

(c) Acreage rented for a percentage of the crop, or a lease containing provisions for **BOTH** a minimum payment (such as a specified amount of cash, bushels, pounds, etc.,) AND a crop share will be considered a crop share lease.

(d) Acreage rented for cash, or a lease containing provisions for **EITHER** a minimum payment **OR** a crop share (such as a 50/50 share or $100.00 per acre, whichever is greater) will be considered a cash lease.

**11. Insurance Period.**

(a) Except for prevented planting coverage (see section 17), coverage begins on each unit or part of a unit at the later of:

(1) The date we accept your application (For the purposes of this paragraph, the date of acceptance is the date that you submit a properly executed application in accordance with section 2);

(2) The date the insured crop is planted; or

(3) The calendar date contained in the Crop Provisions for the beginning of the insurance period.

(b) Coverage ends at the earliest of:

(1) Total destruction of the insured crop on the unit;

(2) Harvest of the unit;

(3) Final adjustment of a loss on a unit;

(4) The calendar date contained in the Crop Provisions for the end of the insurance period;

(5) Abandonment of the crop on the unit; or

(6) As otherwise specified in the Crop Provisions.

**12. Causes of Loss.**

The insurance provided is against only unavoidable loss of production directly caused by specific causes of loss contained in the Crop Provisions. All other causes of loss, including but not limited to the following, are NOT covered:

(a) Negligence, mismanagement, or wrongdoing by you, any member of your family or household, your tenants, or employees;

(b) Failure to follow recognized good farming practices for the insured crop;

(c) Water contained by any governmental, public, or private dam or reservoir project;

(d) Failure or breakdown of irrigation equipment or facilities; or

(e) Failure to carry out a good irrigation practice for the insured crop, if applicable.

**13. Replanting Payment.**

(a) If allowed by the Crop Provisions, a replanting payment may be made on an insured crop replanted after we have given consent and the acreage replanted is at least the lesser of 20 acres or 20 percent of the insured planted acreage for the unit (as determined on the final

planting date or within the late planting period if a late planting period is applicable).

(b) No replanting payment will be made on acreage:
   (1) On which our appraisal establishes that production will exceed the level set by the Crop Provisions;
   (2) Initially planted prior to the earliest planting date established by the Special Provisions; or
   (3) On which one replanting payment has already been allowed for the crop year.

(c) The replanting payment per acre will be your actual cost for replanting, but will not exceed the amount determined in accordance with the Crop Provisions.

(d) No replanting payment will be paid if we determine it is not practical to replant.

**14. Duties in the Event of Damage or Loss.**

Your Duties -

(a) In case of damage to any insured crop you must:
   (1) Protect the crop from further damage by providing sufficient care;
   (2) Give us notice within 72 hours of your initial discovery of damage (but not later than 15 days after the end of the insurance period), by unit, for each insured crop (we may accept a notice of loss provided later than 72 hours after your initial discovery if we still have the ability to accurately adjust the loss);
   (3) Leave representative samples intact for each field of the damaged unit as may be required by the Crop Provisions; and
   (4) Cooperate with us in the investigation or settlement of the claim, and, as often as we reasonably require:
      (i) Show us the damaged crop;
      (ii) Allow us to remove samples of the insured crop; and
      (iii) Provide us with records and documents we request and permit us to make copies.

(b) You must obtain consent from us before, and notify us after you:
   (1) Destroy any of the insured crop that is not harvested;
   (2) Put the insured crop to an alternative use;
   (3) Put the acreage to another use; or
   (4) Abandon any portion of the insured crop. We will not give consent for any of the actions in sections 14(b)(1) through (4) if it is practical to replant the crop or until we have made an appraisal of the potential production of the crop.

(c) In addition to complying with all other notice requirements, you must submit a claim for indemnity declaring the amount of your loss not later than 60 days after the end of the insurance period. This claim must include all the information we require to settle the claim.

(d) Upon our request, you must:
   (1) Provide a complete harvesting and marketing record of each insured crop by unit including separate records showing the same information for production from any acreage not insured; and
   (2) Submit to examination under oath.

(e) You must establish the total production or value received for the insured crop on the unit, that any loss of production or value occurred during the insurance period, and that the loss of production or value was directly caused by one or more of the insured causes specified in the Crop Provisions.

(f) All notices required in this section that must be received by us within 72 hours may be made by telephone or in person to your crop insurance agent but must be confirmed in writing within 15 days.

Our Duties -

(a) If you have complied with all the policy provisions, we will pay your loss within 30 days after:
   (1) We reach agreement with you;
   (2) Completion of arbitration or appeal proceedings; or
   (3) The entry of a final judgment by a court of competent jurisdiction.

(b) In the event we are unable to pay your loss within 30 days, we will give you notice of our intentions within the 30-day period.

(c) We may defer the adjustment of a loss until the amount of loss can be accurately determined. We will not pay for additional damage resulting from your failure to provide sufficient care for the crop during the deferral period.

(d) We recognize and apply the loss adjustment procedures established or approved by the Federal Crop Insurance Corporation.

**15. Production Included in Determining Indemnities.**

(a) The total production to be counted for a unit will include all production determined in accordance with the policy.

(b) The amount of production of any unharvested insured crop may be determined on the basis of our field appraisals conducted after the end of the insurance period.

(c) If you elect to exclude hail and fire as insured causes of loss and the insured crop is damaged by hail or fire, appraisals will be made as described in the applicable Form FCI-78 "Request To Exclude Hail and Fire" or a form containing the same terms approved by the Federal Crop Insurance Corporation.

(d) The amount of an indemnity that may be determined under the applicable provisions of your crop policy may be reduced by an amount, determined in accordance with the Crop Provisions or Special Provisions, to reflect out-of-pocket expenses that were not incurred by you as a result of not planting, caring for, or harvesting the crop. Indemnities paid for acreage prevented from being planted will be based on a reduced guarantee as provided for in the crop policy and will not be further reduced to reflect expenses not incurred.

(e) Appraised production will be used to calculate your claim if you will not be harvesting the acreage. To determine your indemnity based on appraised production, you must agree to notify us if you harvest the crop and advise us of the production. If the acreage will be harvested, harvested production will be used to determine any indemnity due, unless otherwise specified in the policy.

**16. Late Planting.**

Unless limited by the Crop Provisions, insurance will be provided for acreage planted to the insured crop after the final planting date in accordance with the following:

(a) The production guarantee or amount of insurance for each acre planted to the insured crop during the late planting period will be reduced by 1 percent per day for each day planted after the final planting date.

(b) Acreage planted after the late planting period (or after the final planting date for crops that do not have a late planting period) may be insured as follows:
   (1) The production guarantee or amount of insurance for each acre planted as specified in this subsection will be determined by multiplying the production guarantee or amount of insurance that is provided for acreage of the insured crop that is

timely planted by the prevented planting coverage level percentage you elected, or that is contained in the Crop Provisions if you did not elect a prevented planting coverage level percentage;

(2) Planting on such acreage must have been prevented by the final planting date (or during the late planting period, if applicable) by an insurable cause occurring within the insurance period for prevented planting coverage; and

(3) All production from acreage as specified in this section will be included as production to count for the unit.

(c) The premium amount for insurable acreage specified in this section will be the same as that for timely planted acreage. If the amount of premium you are required to pay (gross premium less our subsidy) for such acreage exceeds the liability, coverage for those acres will not be provided (no premium will be due and no indemnity will be paid).

(d) Any acreage on which an insured cause of loss is a material factor in preventing completion of planting, as specified in the definition of "planted acreage" (e.g., seed is broadcast on the soil surface but cannot be incorporated) will be considered as acreage planted after the final planting date and the production guarantee will be calculated in accordance with section 16(b)(1).

**17. Prevented Planting.**

(a) Unless limited by the policy provisions, a prevented planting payment may be made to you for eligible acreage if:

(1) You were prevented from planting the insured crop by an insured cause that occurs:

(i) On or after the sales closing date contained in the Special Provisions for the insured crop in the county for the crop year the application for insurance is accepted; or

(ii) For any subsequent crop year, on or after the sales closing date for the previous crop year for the insured crop in the county, provided insurance has been in force continuously since that date. Cancellation for the purpose of transferring the policy to a different insurance provider for the subsequent crop year will not be considered a break in continuity for the purpose of the preceding sentence;

(2) You include any acreage of the insured crop that was prevented from being planted on your acreage report; and

(3) You did not plant the insured crop during or after the late planting period. If such acreage was planted to the insured crop during or after the late planting period, it is covered under the late planting provisions.

(b) The actuarial documents may contain additional levels of prevented planting coverage that you may purchase for the insured crop:

(1) Such purchase must be made on or before the sales closing date.

(2) If you do not purchase one of those additional levels by the sales closing date, you will receive the prevented planting coverage specified in the Crop Provisions.

(3) If you have a Catastrophic Risk Protection Endorsement for any crop, the additional levels of prevented planting coverage will not be available for that crop.

(4) You may not increase your elected or assigned prevented planting coverage level for any crop year if a cause of loss that will or could prevent planting is evident prior to the time you wish to change your prevented planting coverage level.

(c) The premium amount for acreage that is prevented from being planted will be the same as that for timely planted acreage. If the amount of premium you are required to pay (gross premium less our subsidy) for acreage that is prevented from being planted exceeds the liability on such acreage, coverage for those acres will not be provided (no premium will be due and no indemnity will be paid for such acreage).

(d) Drought or failure of the irrigation water supply will be considered to be an insurable cause of loss for the purposes of prevented planting only if, on the final planting date (or within the late planting period if you elect to try to plant the crop):

(1) For non-irrigated acreage, the area that is prevented from being planted has insufficient soil moisture for germination of seed and progress toward crop maturity due to a prolonged period of dry weather. Prolonged precipitation deficiencies must be verifiable using information collected by sources whose business it is to record and study the weather, including, but not limited to, local weather reporting stations of the National Weather Service; or

(2) For irrigated acreage, there is not a reasonable probability of having adequate water to carry out an irrigated practice.

(e) The maximum number of acres that may be eligible for a prevented planting payment for any crop will be determined as follows:

(1) The total number of acres eligible for prevented planting coverage for all crops cannot exceed the number of acres of cropland in your farming operation for the crop year, unless you are eligible for prevented planting coverage on double cropped acreage in accordance with section 17(f)(4) or (5). The eligible acres for each insured crop will be determined in accordance with the following table.

| Type of Crop | Eligible acres if, in any of the 4 most recent crop years, you have planted any crop in the county for which prevented planting insurance was available or have received a prevented planting insurance guarantee | Eligible acres if, in any of the 4 most recent crop years, you have not planted any crop in the county for which prevented planting insurance was available or have not received a prevented planting insurance guarantee |
|---|---|---|
| (i) The crop is not required to be contracted with a processor to be insured | (A) The maximum number of acres certified for APH purposes or reported for insurance for the crop in any one of the 4 most recent crop years (not including reported prevented planting acreage that was planted to a substitute crop other than an approved cover crop). The number of acres determined above for a crop may be increased by multiplying it by the ratio of the total cropland acres that you are farming this year (if greater) to the total cropland acres that you farmed in the previous year, provided that you submit proof to us that for the current crop year you have purchased or leased additional land or that acreage will be released from any USDA program which prohibits harvest of a crop. Such acreage must have been purchased, leased, or released from the USDA program, in time to plant it for the current crop year using good farming practices. No cause of loss that will or could prevent planting may be evident at the time the acreage is purchased, leased, or released from the USDA program. | (B) The number of acres specified on your intended acreage report which is submitted to us by the sales closing date for all crops you insure for the crop year and that is accepted by us. The total number of acres listed may not exceed the number of acres of cropland in your farming operation at the time you submit the intended acreage report. The number of acres determined above for a crop may only be increased by multiplying it by the ratio of the total cropland acres that you are farming this year (if greater) to the number of acres listed on your intended acreage report, if you meet the conditions stated in section 17(e)(1)(i)(A). |
| (ii) The crop must be contracted with a processor to* be insured | (A) The number of acres of the crop specified in the processor contract, if the contract specifies a number of acres contracted for the crop year; or the result of dividing the quantity of production stated in the processor contract by your approved yield, if the processor contract specifies a quantity of production that will be accepted. (For the purposes of establishing the number of prevented planting acres, any reductions applied to the transitional yield for failure to certify acreage and production for four prior years will not be used.) | (B) The number of acres of the crop as determined in section 17(e)(1)(ii)(A). |

(2) Any eligible acreage determined in accordance with the table contained in section 17(e)(1) will be reduced by subtracting the number of acres of the crop (insured and uninsured) that are timely and late planted, including acreage specified in section 16(b).

(f) Regardless of the number of eligible acres determined in section 17(e), prevented planting coverage will not be provided for any acreage:

(1) That does not constitute at least 20 acres or 20 percent of the insurable crop acreage in the unit, whichever is less. Any prevented planting acreage within a field that contains planted acreage will be considered to be acreage of the same crop, type, and practice that is planted in the field unless the acreage that was prevented from being planted constitutes at least 20 acres or 20 percent of the total insurable acreage in the field and you

produced both crops, crop types, or followed both practices in the same field in the same crop year within any of the 4 most recent crop years;

(2) For which the actuarial documents do not designate a premium rate unless a written agreement designates such premium rate;

(3) Used for conservation purposes or intended to be left unplanted under any program administered by the USDA;

(4) On which the insured crop is prevented from being planted, if you or any other person receives a prevented planting payment for any crop for the same acreage in the same crop year (excluding share arrangements), unless you have coverage greater than the Catastrophic Risk Protection Plan of Insurance and have records of acreage and production that are used to determine your approved yield that show the acreage was double-cropped in each of the last 4 years in which the insured crop was grown on the acreage;

(5) On which the insured crop is prevented from being planted, if any crop from which any benefit is derived under any program administered by the USDA is planted and fails, or if any crop is harvested, hayed or grazed on the same acreage in the same crop year (other than a cover crop which may be hayed or grazed after the final planting date for the insured crop), unless you have coverage greater than that applicable to the Catastrophic Risk Protection Plan of Insurance and have records of acreage and production that are used to determine your approved yield that show the acreage was double-cropped in each of the last 4 years in which the insured crop was grown on the acreage (If one of the crops being double cropped is not insurable, other verifiable records of it being planted may be used);

(6) Of a crop that is prevented from being planted if a cash lease payment is also received for use of the same acreage in the same crop year (not applicable if acreage is leased for haying or grazing only) (If you state that you will not be cash renting the acreage and claim a prevented planting payment on the acreage, you could be subject to civil and criminal sanctions if you cash rent the acreage and do not return the prevented planting payment for it);

(7) For which planting history or conservation plans indicate that the acreage would have remained fallow for crop rotation purposes;

(8) That exceeds the number of acres eligible for a prevented planting payment;

(9) That exceeds the number of eligible acres physically available for planting;

(10) For which you cannot provide proof that you had the inputs available to plant and produce a crop with the expectation of at least producing the yield used to determine the production guarantee or amount of insurance (Evidence that you have previously planted the crop on the unit will be considered adequate proof unless your planting practices or rotational requirements show that the acreage would have remained fallow or been planted to another crop);

(11) Based on an irrigated practice production guarantee or amount of insurance unless adequate irrigation facilities were in place to carry out an

irrigated practice on the acreage prior to the insured cause of loss that prevented you from planting. Acreage with an irrigated practice production guarantee will be limited to the number of acres allowed for that practice under sections 17(e) and (f); or

(12) Based on a crop type that you did not plant, or did not receive a prevented planting insurance guarantee for, in at least one of the four most recent crop years. Types for which separate price elections, amounts of insurance, or production guarantees are available must be included in your APH database in at least one of the four most recent crop years, or crops that do not require yield certification (crops for which the insurance guarantee is not based on APH) must be reported on your acreage report in at least one of the four most recent crop years except as allowed in section 17(e)(1)(i)(B). We will limit prevented planting payments based on a specific crop type to the number of acres allowed for that crop type as specified in sections 17(e) and (f).

(g) If you purchased an additional coverage policy for a crop, and you executed a High-Risk Land Exclusion Option that separately insures acreage which has been designated as "high-risk" land by FCIC under a Catastrophic Risk Protection Endorsement for that crop, the maximum number of acres eligible for a prevented planting payment will be limited for each policy as specified in sections 17(e) and (f).

(h) If you are prevented from planting a crop for which you do not have an adequate base of eligible prevented planting acreage, as determined in accordance with section 17(e)(1), your prevented planting production guarantee or amount of insurance, premium, and prevented planting payment will be based on the crops insured for the current crop year, for which you have remaining eligible prevented planting acreage. The crops used for this purpose will be those that result in a prevented planting payment most similar to the prevented planting payment that would have been made for the crop that was prevented from being planted.

(1) For example, assume you were prevented from planting 200 acres of corn and have 100 acres eligible for a corn prevented planting guarantee that would result in a payment of $40 per acre. You also had 50 acres of potato eligibility that would result in a $100 per acre payment, 90 acres of grain sorghum eligibility that would result in a $30 per acre payment, and 100 acres of soybean eligibility that would result in a $25 per acre payment. Your prevented planting coverage for the 200 acres would be based on 100 acres of corn ($40 per acre), 90 acres of grain sorghum ($30 per acre), and 10 acres of soybeans ($25 per acre).

(2) Prevented planting coverage will be allowed as specified in this section (17(h)) only if the crop that was prevented from being planted meets all policy provisions, except for having an adequate base of eligible prevented planting acreage. Payment may be made based on crops other than those that were prevented from being planted even though other policy provisions, including but not limited to, processor contract and rotation requirements, have not been met for the crop on which payment is being based.

(i) The prevented planting payment for any eligible acreage within a unit will be determined by:

(1) Multiplying the liability per acre for timely planted acreage of the insured crop (the amount of insurance per acre or the production guarantee per acre multiplied by the price election for the crop, or type if applicable) by the prevented planting coverage level percentage you elected, or that is contained in the Crop Provisions if you did not elect a prevented planting coverage level percentage;

(2) Multiplying the result of section 17(i)(1) by the number of eligible prevented planting acres in the unit; and

(3) Multiplying the result of section 17(i)(2) by your share.

**18. Written Agreements.**

Terms of this policy which are specifically designated for the use of written agreements may be altered by written agreement in accordance with the following:

(a) You must apply in writing for each written agreement no later than the sales closing date, except as provided in section 17(e);

(b) The application for a written agreement must contain all variable terms of the contract between you and us that will be in effect if the written agreement is not approved;

(c) If approved, the written agreement will include all variable terms of the contract, including, but not limited to, crop type or variety, the guarantee, premium rate, and price election;

(d) Each written agreement will only be valid for one crop year (If a written agreement is not specifically renewed the following year, insurance coverage for subsequent crop years will be in accordance with the printed policy);

(e) An application for a written agreement submitted after the sales closing date may be approved if you demonstrate your physical inability to apply prior to the sales closing date, or it is submitted in accordance with any regulation which may be promulgated under 7 CFR part 400, and after inspection of the acreage by us, if required, it is determined that no loss has occurred and the crop is insurable in accordance with the policy and written agreement provisions.

**19. Crops as Payment.**

You may not abandon any crop to us. We will not accept any crop as compensation for payments due us.

**20. Arbitration.**

(a) If you and we fail to agree on any factual determination, the disagreement will be resolved in accordance with the rules of the American Arbitration Association. Failure to agree with any factual determination made by FCIC must be resolved through the FCIC appeal provisions published at 7 CFR part 11.

(b) No award determined by arbitration or appeal can exceed the amount of liability established or which should have been established under the policy.

**21. Access to Insured Crop and Records, and Record Retention.**

(a) We reserve the right to examine the insured crop as often as we reasonably require.

(b) For three years after the end of the crop year, you must retain, and provide upon our request, complete records of the harvesting, storage, shipment, sale, or other disposition of all the insured crop produced on each unit. This requirement also applies to the records used to establish the basis for the production report for each unit. You must also provide upon our request, separate

records showing the same information for production from any acreage not insured. We may extend the record retention period beyond three years by notifying you of such extension in writing. Your failure to keep and maintain such records will, at our option, result in:

(1) Cancellation of the policy;
(2) Assignment of production to the units by us;
(3) Combination of the optional units; or
(4) A determination that no indemnity is due.

(c) Any person designated by us will, at any time during the record retention period, have access:

(1) To any records relating to this insurance at any location where such records may be found or maintained; and
(2) To the farm.

(d) By applying for insurance under the authority of the Act or by continuing insurance for which you previously applied, you authorize us, or any person acting for us, to obtain records relating to the insured crop from any person who may have custody of those records including, but not limited to, FSA offices, banks, warehouses, gins, cooperatives, marketing associations, and accountants. You must assist us in obtaining all records which we request from third parties.

## 22. Other Insurance.

(a) **Other Like Insurance** - You must not obtain any other crop insurance issued under the authority of the Act on your share of the insured crop. If we determine that more than one policy on your share is intentional, you may be subject to the sanctions authorized under this policy, the Act, or any other applicable statute. If we determine that the violation was not intentional, the policy with the earliest date of application will be in force and all other policies will be void. Nothing in this paragraph prevents you from obtaining other insurance not issued under the Act.

(b) **Other Insurance Against Fire** - If you have other insurance, whether valid or not, against damage to the insured crop by fire during the insurance period, and you have not excluded coverage for fire from this policy, we will be liable for loss due to fire only for the smaller of:

(1) The amount of indemnity determined pursuant to this policy without regard to such other insurance; or
(2) The amount by which the loss from fire is determined to exceed the indemnity paid or payable under such other insurance.

(c) For the purpose of subsection (b) of this section the amount of loss from fire will be the difference between the fair market value of the production of the insured crop on the unit involved before the fire and after the fire, as determined from appraisals made by us.

## 23. Conformity to Food Security Act.

Although your violation of a number of federal statutes, including the Act, may cause cancellation, termination, or voidance of your insurance contract, you should be specifically aware that your policy will be canceled if you are determined to be ineligible to receive benefits under the Act due to violation of the controlled substance provisions (title XVII of the Food Security Act of 1985 (Pub. L. 99-198) and the regulations promulgated under the Act by USDA. Your insurance policy will be canceled if you are determined, by the appropriate Agency, to be in violation of these provisions. We will recover any and all monies paid to you or received by you during your period of ineligibility, and

your premium will be refunded, less a reasonable amount for expenses and handling not to exceed 20 percent of the premium paid or to be paid by you.

## 24. Amounts Due Us.

(a) Interest will accrue at the rate of 1.25 percent simple interest per calendar month, or any portion thereof, on any unpaid amount due us. For the purpose of premium amounts due us, the interest will start to accrue on the first day of the month following the premium billing date specified in the Special Provisions.

(b) For the purpose of any other amounts due us, such as repayment of indemnities found not to have been earned, interest will start to accrue on the date that notice is issued to you for the collection of the unearned amount. Amounts found due under this paragraph will not be charged interest if payment is made within 30 days of issuance of the notice by us. The amount will be considered delinquent if not paid within 30 days of the date the notice is issued by us.

(c) All amounts paid will be applied first to expenses of collection (see subsection (d) of this section) if any, second to the reduction of accrued interest, and then to the reduction of the principal balance.

(d) If we determine that it is necessary to contract with a collection agency or to employ an attorney to assist in collection, you agree to pay all of the expenses of collection.

(e) Amounts owed to us by you may be collected in part through administrative offset from payments you receive from United States government agencies in accordance with 31 U.S.C. chapter 37.

## 25. Legal Action Against Us.

(a) You may not bring legal action against us unless you have complied with all of the policy provisions.

(b) If you do take legal action against us, you must do so within 12 months of the date of denial of the claim. Suit must be brought in accordance with the provisions of 7 U.S.C. 1508(j).

(c) Your right to recover damages (compensatory, punitive, or other), attorney's fees, or other charges is limited or excluded by this contract or by Federal Regulations.

## 26. Payment and Interest Limitations.

(a) Under no circumstances will we be liable for the payment of damages (compensatory, punitive, or other), attorney's fees, or other charges in connection with any claim for indemnity, whether we approve or disapprove such claim.

(b) We will pay simple interest computed on the net indemnity ultimately found to be due by us or by a final judgment of a court of competent jurisdiction, from and including the 61st day after the date you sign, date, and submit to us the properly completed claim on our form. Interest will be paid only if the reason for our failure to timely pay is NOT due to your failure to provide information or other material necessary for the computation or payment of the indemnity. The interest rate will be that established by the Secretary of the Treasury under section 12 of the Contract Disputes Act of 1978 (41 U.S.C. 611) and published in the Federal Register semiannually on or about January 1 and July 1 of each year, and may vary with each publication.

## 27. Concealment, Misrepresentation or Fraud.

(a) If you have falsely or fraudulently concealed the fact that you are ineligible to receive benefits under the Act or if you or anyone assisting you has intentionally concealed or misrepresented any material fact relating to this policy:

(1) This policy will be voided; and

(2) You may be subject to remedial sanctions in accordance with 7 CFR part 400, subpart R.

(b) Even though the policy is void, you may still be required to pay 20 percent of the premium due under the policy to offset costs incurred by us in the service of this policy. If previously paid, the balance of the premium will be returned.

(c) Voidance of this policy will result in you having to reimburse all indemnities paid for the crop year in which the voidance was effective.

(d) Voidance will be effective on the first day of the insurance period for the crop year in which the act occurred and will not affect the policy for subsequent crop years unless a violation of this section also occurred in such crop years.

### 28. Transfer of Coverage and Right to Indemnity.

If you transfer any part of your share during the crop year, you may transfer your coverage rights, if the transferee is eligible for crop insurance. We will not be liable for any more than the liability determined in accordance with your policy that existed before the transfer occurred. The transfer of coverage rights must be on our form and will not be effective until approved by us in writing. Both you and the transferee are jointly and severally liable for the payment of the premium and administrative fees. The transferee has all rights and responsibilities under this policy consistent with the transferee's interest.

### 29. Assignment of Indemnity.

You may assign to another party your right to an indemnity for the crop year. The assignment must be on our form and will not be effective until approved in writing by us. The assignee will have the right to submit all loss notices and forms as required by the policy. If you have suffered a loss from an insurable cause and fail to file a claim for indemnity within 60 days after the end of the insurance period, the assignee may submit the claim for indemnity not later than 15 days after the 60-day period has expired. We will honor the terms of the assignment only if we can accurately determine the amount of the claim. However, no action will lie against us for failure to do so.

### 30. Subrogation (Recovery of Loss From A Third Party).

Since you may be able to recover all or a part of your loss from someone other than us, you must do all you can to preserve this right. If we pay you for your loss, your right to recovery will, at our option, belong to us. If we recover more than we paid you plus our expenses, the excess will be paid to you.

### 31. Applicability of State and Local Statutes.

If the provisions of this policy conflict with statutes of the State or locality in which this policy is issued, the policy provisions will prevail. State and local laws and regulations in conflict with federal statutes, this policy, and the applicable regulations do not apply to this policy.

### 32. Descriptive Headings.

The descriptive headings of the various policy provisions are formulated for convenience only and are not intended to affect the construction or meaning of any of the policy provisions.

### 33. Notices.

(a) All notices required to be given by you must be in writing and received by your crop insurance agent within the designated time unless otherwise provided by the notice requirement. Notices required to be given immediately may be by telephone or in person and confirmed in writing. Time of the notice will be determined by the time of our receipt of the written

notice. If the date by which you are required to submit a report or notice falls on Saturday, Sunday, or a Federal holiday, or if your agent's office is, for any reason, not open for business on the date you are required to submit such notice or report, such notice or report must be submitted on the next business day.

(b) All notices and communications required to be sent by us to you will be mailed to the address contained in your records located with your crop insurance agent. Notice sent to such address will be conclusively presumed to have been received by you. You should advise us immediately of any change of address.

### 34. Unit Division.

(a) You may elect an enterprise unit or a whole-farm unit if the Special Provisions allow such unit structure, subject to the following:

(1) You must make such election on or before the earliest sales closing date for the insured crops and report such unit structure to us in writing. Your unit selection will remain in effect from year to year unless you notify us in writing by the earliest sales closing date for the crop year for which you wish to change this election. These units may not be further divided except as specified herein;

(2) For enterprise units:

(i) You must report the acreage for each optional or basic unit on your acreage report that comprises the enterprise unit;

(ii) These basic units or optional units that comprise the enterprise unit must each have insurable acreage of the same crop in the crop year insured;

(iii) You must comply with all reporting requirements for the enterprise unit (You must maintain any required production records on a basic or optional unit basis if you wish to change your unit structure for any subsequent crop year);

(iv) The qualifying basic units or optional units may not be combined into an enterprise unit on any basis other than as described herein;

(v) If you do not comply with the reporting provisions for the enterprise unit, your yield for the enterprise unit will be determined in accordance with section 3(c)(1); and

(vi) If you do not qualify for an enterprise unit when the acreage is reported, we will assign the basic unit structure.

(3) For a whole-farm unit:

(i) You must report on your acreage report the acreage for each optional or basic unit for each crop produced in the county that comprises the whole-farm unit; and

(ii) Although you may insure all of your crops under a whole-farm unit, you will be required to pay separate applicable administrative fees for each crop included in the whole-farm unit.

(b) Unless limited by the Crop Provisions or Special Provisions, a basic unit as defined in section 1 of the Basic Provisions may be divided into optional units if, for each optional unit, you meet the following:

(1) You must plant the crop in a manner that results in a clear and discernible break in the planting pattern at the boundaries of each optional unit;

(2) All optional units you select for the crop year are identified on the acreage report for that crop year (Units will be determined when the acreage is

reported but may be adjusted or combined to reflect the actual unit structure when adjusting a loss. No further unit division may be made after the acreage reporting date for any reason);

  (3)  You have records, that are acceptable to us, of planted acreage and the production from each optional unit for at least the last crop year used to determine your production guarantee;

  (4)  You have records of marketed or stored production from each optional unit maintained in such a manner that permits us to verify the production from each optional unit, or the production from each optional unit is kept separate until loss adjustment is completed by us; and

(c)  Each optional unit must meet one or more of the following, unless otherwise specified in the Crop Provisions or allowed by written agreement:

  (1)  Optional units may be established if each optional unit is located in a separate section. In the absence of sections, we may consider parcels of land legally identified by other methods of measure such as Spanish grants, as the equivalents of sections for unit purposes. In areas which have not been surveyed using sections, section equivalents or in areas where boundaries are not readily discernible, each optional unit must be located in a separate FSA farm serial number; and

  (2)  In addition to, or instead of, establishing optional units by section, section equivalent or FSA farm serial number, optional units may be based on irrigated and non-irrigated acreage. To qualify as separate irrigated and non-irrigated optional units, the non-irrigated acreage may not continue into the irrigated acreage in the same rows or planting pattern. The irrigated acreage may not extend beyond the point at which the irrigation system can deliver the quantity of water needed to produce the yield on which the guarantee is based, except the corners of a field in which a center-pivot irrigation system is used may be considered as irrigated acreage if the corners of a field in which a center-pivot irrigation system is used do not qualify as a separate non-irrigated optional unit. In this case, production from both practices will be used to determine your approved yield.

(d)  Optional units are not available for crops insured under a Catastrophic Risk Protection Endorsement.

(e)  If you do not comply fully with the provisions in this section, we will combine all optional units that are not in compliance with these provisions into the basic unit from which they were formed. We will combine the optional units at any time we discover that you have failed to comply with these provisions. If failure to comply with these provisions is determined by us to be inadvertent, and the optional units are combined into a basic unit, that portion of the additional premium paid for the optional units that have been combined will be refunded to you for the units combined.

## 35. Multiple Benefits.

(a)  If you are eligible to receive an indemnity under an additional coverage plan of insurance and are also eligible to receive benefits for the same loss under any other USDA program, you may receive benefits under both programs, unless specifically limited by the crop insurance contract or by law.

(b)  The total amount received from all such sources may not exceed the amount of your actual loss. The total amount of the actual loss is the difference between the fair market value of the insured commodity before and after the loss, based on your production records and the highest price election or amount of insurance available for the crop.

(c)  FSA will determine and pay the additional amount due you for any applicable USDA program, after first considering the amount of any crop insurance indemnity.

## 36. Substitution of Yields.

You may elect to exclude actual yields used to calculate the APH yield that are less than 60 percent of the applicable transitional yield (T-yield), as defined in 7 CFR 400.52. Each excluded actual yield will be replaced with a yield equal to 60 percent of the applicable T-yield for the county. The replacement yields will be used in the same manner as actual yields for the purpose of calculating the APH yield. Premium rates for approved yields that are adjusted under this section will be based on the producer's yield prior to replacing the actual yields or such other basis as determined appropriate by FCIC.

© 2000 NCIS

2001-NCIS 700B

MULTIPLE PERIL CROP INSURANCE
COTTON CROP PROVISIONS

1999-NCIS 703

If a conflict exists among the policy provisions, the order of priority is as follows: (1) the Catastrophic Risk Protection Endorsement, if applicable; (2) the Special Provisions; (3) these Crop Provisions; and (4) the Basic Provisions with (1) controlling (2), etc.

1.  **Definitions**
    **Cotton** - Varieties identified as American Upland Cotton.
    **Growth area** - A geographic area designated by the Secretary of Agriculture for the purpose of reporting cotton prices.
    **Harvest** - The removal of the seed cotton from the open cotton boll, or the severance of the open cotton boll from the stalk by either manual or mechanical means.
    **Mature cotton** - Cotton that can be harvested either manually or mechanically.
    **Planted acreage** - In addition to the definition contained in the Basic Provisions, cotton must be planted in rows, unless otherwise provided by the Special Provisions, actuarial documents, or by written agreement. The yield conversion factor normally applied to non-irrigated skip-row cotton acreage will not be used if the land between the rows of cotton is planted to any other spring planted crop.
    **Production guarantee** - The number of pounds determined by multiplying the approved yield per acre by any applicable yield conversion factor for non-irrigated skip-row planting patterns, and multiplying the result by the coverage level percentage you elect.
    **Skip-row** - A planting pattern that:
    (1) Consists of alternating rows of cotton and fallow land or land planted to another crop the previous fall; and
    (2) Qualifies as a skip-row planting pattern as defined by the Farm Service Agency (FSA) or a successor agency.

2.  **Insurance Guarantees, Coverage Levels, and Prices for Determining Indemnities**
    In addition to the requirements of section 3 (Insurance Guarantees, Coverage Levels, and Prices for Determining Indemnities) of the Basic Provisions, you may select only one price election for all cotton in the county insured under this policy.

3.  **Contract Changes**
    The contract change date is November 30 preceding the cancellation date (see the provisions of section 4 (Contract Changes) of the Basic Provisions).

4.  **Cancellation and Termination Dates**
    In accordance with section 2 (Life of Policy, Cancellation and Termination) of the Basic Provisions, the cancellation and termination dates are:

    | State and County | Cancellation and Termination Dates |
    |---|---|
    | Val Verde, Edwards, Kerr, Kendall, Bexar, Wilson, Karnes, Goliad, Victoria, and Jackson Counties, Texas, and all Texas counties lying south thereof. | January 15 |
    | Alabama; Arizona; Arkansas; California; Florida; Georgia; Louisiana; Mississippi; Nevada; North Carolina; South Carolina; El Paso, Hudspeth, Culberson, Reeves, Loving, Winkler, Ector, Upton, Reagon, Sterling, Coke, Tom Green, Concho, McCulloch, San Saba, Mills, Hamilton, Bosque, Johnson, Tarrant, Wise, and Cooke Counties, Texas, and all Texas counties lying south and east thereof to and including Terrell, Crockett, Sutton, Kimble, Gillespie, Blanco, Comal, Guadalupe, Gonzales, De Witt, Lavaca, Colorado, Wharton, and Matagorda Counties, Texas. | February 28 |
    | All other Texas counties and all other states. | March 15 |

5.  **Insured Crop**
    In accordance with section 8 (Insured Crop) of the Basic Provisions, the crop insured will be all the cotton lint, in the county for which premium rates are provided by the actuarial documents:
    (a) In which you have a share; and
    (b) That is not (unless allowed by the Special Provisions or by written agreement):
        (1) Colored cotton lint;
        (2) Planted into an established grass or legume;
        (3) Interplanted with another spring planted crop;
        (4) Grown on acreage from which a hay crop was harvested in the same calendar year unless the acreage is irrigated; or
        (5) Grown on acreage on which a small grain crop reached the heading stage in the same calendar year unless the acreage is irrigated or adequate measures are taken to terminate the small grain crop prior to heading and less than fifty percent (50%) of the small grain plants reach the heading stage.

6.  **Insurable Acreage**
    In addition to the provisions of section 9 (Insurable Acreage) of the Basic Provisions:
    (a) The acreage insured will be only the land occupied by the rows of cotton when a skip-row planting pattern is utilized; and
    (b) Any acreage of the insured crop damaged before the final planting date, to the extent that a majority of producers in the area would not normally further care for the crop, must be replanted unless we agree that it is not practical to replant.

7.  **Insurance Period**
    (a) In lieu of section 11(b)(2) of the Basic Provisions, insurance will end upon the removal of the cotton from the field.
    (b) In accordance with the provisions under section 11 (Insurance Period) of the Basic Provisions, the calendar date for the end of the insurance period is the date immediately following planting as follows:
        (1) September 30 in Val Verde, Edwards, Kerr, Kendall, Bexar, Wilson, Karnes, Goliad, Victoria, and Jackson Counties, Texas, and all Texas counties lying south thereof;
        (2) January 31 in Arizona, California, New Mexico, Oklahoma, and all other Texas counties; and
        (3) December 31 in all other states.

8.  **Causes of Loss**
    In accordance with the provisions of section 12 (Causes of Loss) of the Basic Provisions, insurance is provided only against the following causes of loss which occur within the insurance period:
    (a) Adverse weather conditions;
    (b) Fire;
    (c) Insects, but not damage due to insufficient or improper application of pest control measures;
    (d) Plant disease, but not damage due to insufficient or improper application of disease control measures;
    (e) Wildlife;
    (f) Earthquake;
    (g) Volcanic eruption; or

© 1998 National Crop Insurance Services, Inc.

(h) Failure of the irrigation water supply, if applicable, due to an unavoidable cause of loss occurring within the insurance period.

9. **Duties in the Event of Damage or Loss**

(a) In addition to your duties under section 14 (Duties in the Event of Damage or Loss) of the Basic Provisions, in the event of damage or loss:

    (1) The cotton stalks must remain intact for our inspection; and

    (2) If you initially discover damage to the insured crop within 15 days of harvest, or during harvest, you must leave representative samples of the unharvested crop in the field for our inspection. The samples must be at least 10 feet wide and extend the entire length of each field in the unit.

(b) The stalks must not be destroyed, and required samples must not be harvested, until the earlier of our inspection or 15 days after harvest of the balance of the unit is completed and written notice of probable loss given to us.

10. **Settlement of Claim**

(a) We will determine your loss on a unit basis. In the event you are unable to provide records of production:

    (1) For any optional unit, we will combine all optional units for which acceptable records of production were not provided; or

    (2) For any basic unit, we will allocate any commingled production to such units in proportion to our liability on the harvested acreage for each unit.

(b) In the event of loss or damage covered by this policy, we will settle your claim on any unit by:

    (1) Multiplying the insured acreage by the production guarantee;

    (2) Subtracting from this the total production to count;

    (3) Multiplying the remainder by your price election; and

    (4) Multiplying this result by your share.

(c) The total production (pounds) to count from all insurable acreage on the unit will include:

    (1) All appraised production as follows:

        (i) Not less than the production guarantee for acreage:

            (A) That is abandoned;

            (B) Put to another use without our consent;

            (C) Damaged solely by uninsured causes;

            (D) For which you fail to provide records of production that are acceptable to us; or

            (E) On which the cotton stalks are destroyed, in violation of section 9;

        (ii) Production lost due to uninsured causes;

        (iii) Unharvested production (mature unharvested production of white cotton may be adjusted for quality deficiencies in accordance with subsection 10(d); and

        (iv) Potential production on insured acreage you want to put to another use or you wish to abandon or no longer care for, if you and we agree on the appraised amount of production. Upon such agreement, the insurance period for that acreage will end if you put the acreage to another use or abandon the crop. If agreement on the appraised amount of production is not reached:

            (A) If you do not elect to continue to care for the crop we may give you consent to put the acreage to another use if you agree to leave intact, and provide sufficient care for, representative samples of the crop in locations acceptable to us (The amount of production to count for such acreage will be based on the harvested production or appraisals from the samples at the time harvest should have occurred. If you do not leave the required samples intact, or you fail to provide sufficient care for the samples, our appraisal made prior to giving you consent to put the acreage to another use will be used to determine the amount of production to count); or

            (B) If you elect to continue to care for the crop, the amount of production to count for the acreage will be the harvested production, or our reappraisal if additional damage occurs and the crop is not harvested; and

    (2) All harvested production from the insurable acreage, including any mature cotton retrieved from the ground.

(d) Mature white cotton may be adjusted for quality when production has been damaged by insured causes. Such production to count will be reduced if the price quotation for cotton of like quality (price quotation "A") for the applicable growth area is less than seventy-five percent (75%) of price quotation "B." Price quotation "B" is defined as the price quotation for the applicable growth area for cotton of the color and leaf grade, staple length, and micronaire reading designated in the Special Provisions for this purpose. Price quotations "A" and "B" will be the price quotations contained in the Daily Spot Cotton Quotations published by the USDA Agricultural Marketing Service on the date the last bale from the unit is classed. If the date the last bale classed is not available, the price quotations will be determined on the date the last bale from the unit is delivered to the warehouse, as shown on the producer's account summary obtained from the gin. If eligible for adjustment, the amount of production to be counted will be determined by multiplying the number of pounds of such production by the factor derived from dividing price quotation "A" by seventy-five percent (75%) of price quotation "B."

(e) Colored cotton lint will not be eligible for quality adjustment.

11. **Prevented Planting**

(a) In addition to the provisions contained in section 17 of the Basic Provisions, your prevented planting production guarantee will be based on your approved yield without adjustment for skip-row planting patterns.

(b) Your prevented planting coverage will be 50 percent of your production guarantee for timely planted acreage. If you have limited or additional levels of coverage, as specified in 7 CFR part 400, subpart T, and pay an additional premium, you may increase your prevented planting coverage to a level specified in the actuarial documents.

© 1998 NCIS

1999-NCIS 703

MULTIPLE PERIL CROP INSURANCE
CATASTROPHIC RISK PROTECTION ENDORSEMENT
(This is a continuous endorsement)

2001-NCIS 777

If a conflict exists between this Endorsement and any of the policies specified in section 2 or the Special Provisions for the insured crop, this endorsement will control.

## Terms and Conditions

### 1. Definitions

**Approved insurance provider** - A private insurance company, including its agents, that has been approved and reinsured by FCIC to provide insurance coverage to producers participating in the Federal Crop Insurance program.

**Approved yield** - The amount of production per acre computed in accordance with FCIC's actual production history program (7 CFR part 400, subpart G) or for crops not included under 7 CFR part 400, subpart G, the yield used to determine the guarantee in accordance with the Crop Provisions or the Special Provisions, and any adjustments elected in accordance with section 36 of the Basic Provisions.

**County** - The political subdivision of a state listed in the actuarial table and designated on your accepted application, including land in an adjoining county, provided such land is part of a field that extends into the adjoining county and the county boundary is not readily discernible. For peanuts and tobacco, the county will also include any land identified by a FSA farm serial number for the county but physically located in another county.

**Crop of economic significance** - A crop that has either contributed in the previous crop year, or is expected to contribute in the current crop year, ten percent (10%) or more of the total expected value of your share of all crops grown in the county. However, a crop will not be considered a crop of economic significance if the expected liability under the Catastrophic Risk Protection Endorsement is equal to or less than the administrative fee required for the crop.

**Expected market price** - (price election) The price per unit of production (or other basis as determined by FCIC) anticipated during the period the insured crop normally is marketed by producers. This price will be set by FCIC before the sales closing date for the crop. The expected market price may be less than the actual price paid by buyers if such price typically includes remuneration for significant amounts of post-production expenses such as conditioning, culling, sorting, packing, etc.

**FCIC** - The Federal Crop Insurance Corporation, a wholly owned Government Corporation within USDA.

**FSA** - The Farm Service Agency, an agency of the United States Department of Agriculture or any successor agency.

**Insurance is available** - When crop information is contained in the county actuarial documents for a particular crop.

**Linkage requirement** - The legal requirement that a producer must obtain at least catastrophic risk protection coverage for any crop of economic significance as a condition of receiving benefits for such crop from certain other USDA programs in accordance with section 12(e), unless the producer executes a waiver of any eligibility for emergency crop loss assistance in connection with the crop.

**Secretary** - The Secretary of the United States Department of Agriculture.

**USDA** - The United States Department of Agriculture.

**Zero acreage report** - An acreage report filed by you that certifies you do not have a share in the crop for that crop year.

### 2. Eligibility, Life of Policy, Cancellation, and Termination

(a) You must have one of the following policies in force to elect this Endorsement:
   (1) The General Crop Insurance Policy (7 CFR 401.8) and crop endorsement;
   (2) The Common Crop Insurance Policy (7 CFR 457.8) and crop provisions;
   (3) The Group Risk Plan Policy, if available for catastrophic risk protection; or
   (4) A specific named crop insurance policy.

(b) You must have made application for catastrophic risk protection on or before the sales closing date for the crop in the county.

(c) You must be a "person" as defined in the crop policy to be eligible for catastrophic risk protection coverage.

### 3. Unit Division

(a) This section is in lieu of the unit provisions specified in the applicable crop policy.

(b) For catastrophic risk protection coverage, a unit will be all insurable acreage of the insured crop in the county on the date coverage begins for the crop year:
   (1) In which you have one hundred percent (100%) crop share; or
   (2) Which is owned by one person and operated by another person on a share basis.
   (Example: If, in addition to the land you own, you rent land from five landlords, three on a crop share basis and two on a cash basis, you would be entitled to four units; one for each crop share lease and one that combines the two cash leases and the land you own.)

(c) Further division of the units described in paragraph (b) above is not allowed under this Endorsement.

4. **Insurance Guarantees, Coverage Levels, and Prices for Determining Indemnities**
   (a) Notwithstanding any provision contained in any other policy document, for the 1995 through 1998 crop years, catastrophic coverage will offer protection equal to fifty percent (50%) of your approved yield indemnified at sixty percent (60%) of the expected market price, or a comparable coverage as established by FCIC.
   (b) Notwithstanding any provision contained in any other policy document, for the 1999 and subsequent crop years, catastrophic coverage will offer protection equal to fifty percent (50%) of your approved yield indemnified at fifty-five percent (55%) of the expected market price, or a comparable coverage as established by FCIC.
   (c) If the crop policy denominates coverage in dollars per acre or other measure, or any other alternative method of coverage, such coverage will be converted to the amount of coverage that would be payable at fifty percent (50%) of your approved yield indemnified at sixty percent (60%) of the expected market price for the 1995 through 1998 crop years and fifty percent (50%) of your approved yield indemnified at fifty-five percent (55%) of the expected market price for the 1999 and subsequent crop years.
   (d) You may elect catastrophic coverage for any crop insured or reinsured by FCIC on either an individual yield and loss basis or an area yield and loss basis, if both options are offered as set out in the Actuarial Table or the Special Provisions.
   (e) To be eligible for an indemnity under this endorsement you must have suffered at least a 50 percent loss in yield.

5. **Report of Acreage**
   (a) The report of crop acreage that you file in accordance with the crop policy must be signed on or before the acreage reporting date. For catastrophic risk protection, unless the other person with an insurable interest in the crop objects in writing prior to the acreage reporting date and provides a signed acreage report on their own behalf, the operator may sign the acreage report for all other persons with an insurable interest in the crop without a power of attorney. All persons with an insurable interest in the crop, and for whom the operator purports to sign and represent, are bound by the information contained in that acreage report.
   (b) For the purpose of determining the amount of indemnity only, your share will not exceed your insurable interest at the earlier of the time of loss or the beginning of harvest. Unless the accepted application clearly indicates that insurance is requested for a partnership or joint venture, insurance will only cover the crop share of the person completing the application. The share will not extend to any other person having an interest in the crop except as may otherwise be

specifically allowed in this endorsement. Any acreage or interest reported by or for your spouse, child or any member of your household may be considered your share. A lease containing provisions for both a minimum payment (such as a specified amount of cash, bushels, pounds, etc.) *and* a crop share will be considered a crop share lease. A lease containing provisions for either a minimum payment (such as a specified amount of cash, bushels, pounds, etc.,) *or* a crop share will be considered a cash lease. Land rented for cash, a fixed commodity payment, or any consideration other than a share in the insured crop on such land will be considered as owned by the lessee.

6. **Annual Premium and Administrative Fees**
   (a) Notwithstanding any provision contained in any other policy document, you will not be responsible to pay a premium, nor will the policy be terminated because the premium has not been paid. FCIC will pay a premium subsidy equal to the premium established for the coverage provided under this endorsement.
   (b) In return for catastrophic risk protection coverage, you must pay an administrative fee to the insurance provider within 30 days after you have been billed by us, unless otherwise specified in 7 CFR part 400 (You will be billed by the date stated in the Special Provisions);
      (1) The administrative fee owed is $100 for each crop in the county.
      (2) Payment of an administrative fee will not be required if you file a bona fide zero acreage report on or before the acreage reporting date for the crop (if you falsely file a zero acreage report you may be subject to criminal and administrative sanctions).
   (c) The administrative fee provisions of paragraph (b) of this section do not apply if you meet the definition of a limited resource farmer. If you qualify as a limited resource farmer and desire to be exempted from paying the administrative fee you must sign the waiver at the time of application (on or before the sales closing date).
   (d) When a crop policy has provisions to allow you the option to separately insure individual crop types or varieties, you must pay a separate administrative fee in accordance with paragraph (b) of this section for each type or variety you elect to separately insure.
   (e) If the administrative fee is not paid when due, you, and all persons with an insurable interest in the crop under the same contract, may be ineligible for certain other USDA program benefits as set out in section 12, and all such benefits already received for the crop year must be refunded.

7. **Insured Crop**
   The crop insured is specified in the applicable crop policy, however:

(a) Notwithstanding any other policy provision requiring the same insurance coverage on all insurable acreage of the crop in the county, if you purchase additional coverage for a crop, you may separately insure acreage under catastrophic coverage that has been designated as "high-risk" land by FCIC, provided that you execute a High-Risk Land Exclusion Option and obtain a catastrophic risk protection policy with the same approved insurance provider, if available, on or before the applicable sales closing date. If catastrophic coverage is not available from the same insurance provider, you may obtain the catastrophic risk protection policy for the high-risk land from another approved insurance provider or FSA, if available. You will be required to pay a separate administrative fee for both the additional coverage policy and the catastrophic coverage policy.

(b) A tobacco producer may insure one hundred percent (100%) of the tobacco crop that is identified by a tobacco marketing card issued by FSA for a specific producer and Farm Serial Number under one CAT policy, provided the producer and other persons each have a share in the crop, all the shareholders agree in writing to such arrangement, and none of the persons hold any other interest in another tobacco crop for which they are required to obtain at least catastrophic coverage. If the tobacco crop is insured under one policy:

(1) The linkage requirements will be satisfied for each shareholder of the crop; and

(2) The producer insuring the crop will:

    (i) Make application for insurance and provide the name and social security number, or employer identification number, of each person with a share in the tobacco crop;

    (ii) File the acreage report showing a one-hundred percent (100%) share in the crop (all insurable acreage covered by such marketing card will be considered as one unit);

    (iii) Be responsible to pay the one administrative fee for all the producers within the county;

    (iv) Fulfill all requirements under the crop insurance contract; and

    (v) Receive any indemnity payment under his or her social security number or employer identification number and distribute the indemnity payments to the other persons sharing in the crop.

(c) A landowner will be allowed to obtain catastrophic coverage to satisfy linkage requirements for all other landowners who hold an undivided interest in the insurable acreage, provided:

(1) All the landowners must agree in writing to such arrangement and have their social security number or employer identification number listed on the application, without regard to the actual amount of their interest in the insured acreage;

(2) All landowners must have an undivided interest in the insurable acreage;

(3) None of the landowners may hold any share in other acreage for which they are required to obtain at least catastrophic coverage;

(4) The total cumulative liability under the Catastrophic Risk Protection Endorsement for all landowners must be $2,500 or less;

(5) The landowner insuring the crop will:

    (i) Make application for insurance and provide the name and social security number or employer identification number of each person with an undivided interest in the insurable acreage;

    (ii) Be responsible to pay the one administrative fee for all the producers within the county;

    (iii) Fulfill all requirements under the insurance contract; and

    (iv) Receive any indemnity payment under the landowner's social security number, or when applicable, employer identification number, and distribute the indemnity payments to the other persons sharing in the crop.

**8. Replanting Payment**

Notwithstanding any provision contained in any other crop insurance document, no replant payment will be paid whether or not replanting of the crop is required under the policy.

**9. Claim for Indemnity**

(a) If two or more insured crop types, varieties, or classes are insured within the same unit, and multiple price elections are applicable, the dollar amount of insurance and the dollar amount of production to be counted will be determined separately for each type, variety, class, etc., that have separate price elections and then totaled to determine the total liability or dollar amount of production to be counted for the unit.

(b) If you are eligible to receive an indemnity under this endorsement and benefits compensating you for the same loss under any other USDA program, you must elect the program from which you wish to receive benefits. Only one payment or program benefit is allowed. However, if other USDA program benefits are not available until after you filed a claim for indemnity, you may refund the total amount of the indemnity and receive the other program benefit. Notwithstanding the first sentence of this subsection, farm ownership, operating, and emergency loans may be obtained from the USDA in addition to an indemnity under this endorsement.

© 2000 NCIS

2001-NCIS 777

### 10. Concealment or Fraud

Notwithstanding any provision contained in any other crop insurance document, your CAT policy may be voided by us on all crops without waiving any of our rights, including the right to collect any amounts due:

(a) If at any time you conceal or misrepresent any material fact or commit fraud relating to this or any other contract issued under the authority of the Federal Crop Insurance Act with any insurance provider; and

(b) The voidance will be effective as of the beginning of the crop year during which such act or omission occurred. After the policy has been voided, you must make a new application to obtain catastrophic risk protection coverage for any subsequent crop year. If your policy is voided under this section, any waiver of eligibility for emergency crop loss assistance in connection with the crop will not be effective for the crop for the year in which the voidance occurred.

### 11. Exclusion of Coverage

(a) Options or endorsements that extend the coverage available under any crop policy offered by FCIC will not be available under this endorsement, except the Late Planting Agreement Option. Written agreements are not available for any crop insured under this endorsement.

(b) Notwithstanding any provision contained in any other crop policy, hail and fire coverage and high-risk land may not be excluded under catastrophic risk protection.

### 12. Eligibility for Other USDA Program Benefits

(a) Even if it was a crop of economic significance for the previous crop year, if you do not intend to plant the crop in the current crop year, you do not have to obtain crop insurance or execute a waiver of your eligibility for any emergency crop loss assistance in connection with the crop to remain eligible for the USDA program benefits specified in subsection (e). However, if, after the sales closing date, you plant that crop, you will be unable to obtain insurance for that crop and you must execute a waiver of your eligibility for emergency crop loss assistance in connection with the crop to remain eligible for the USDA program benefits specified in section 12(e). Failure to execute such a waiver will require you to refund any benefits already received under a program specified in section 12(e).

(b) You are initially responsible to determine the crops of economic significance in the county. The insurance provider may assist you in making these initial determinations. However, these determinations will not be binding on the insurance provider. To determine the percentage value of each crop:

(1) Multiply the acres planted to the crop, times your share, times the approved yield, and times the price;

(2) Add the values of all crops grown by the producer in the county; and

(3) Divide the value of the specific crop by the result of section 12(b)(2).

(c) You may use the type of price such as the current local market price, futures price, established price, highest amount of insurance, etc., for the price when calculating the value of each crop, provided that you use the same type of price for all crops in the county.

(d) You may be required to justify the calculation and provide adequate records to enable the insurance provider to verify whether a crop is of economic significance.

(e) You must obtain at least catastrophic coverage for each crop of economic significance in the county in which you have an insurable share, if insurance is available in the county for the crop, unless you execute a waiver of any eligibility for emergency crop loss assistance in connection with the crop to be eligible for:

(1) Benefits under the Agricultural Market Transition Act;

(2) Loans or any other USDA provided farm credit, including: guaranteed and direct farm ownership loans, operating loans, and emergency loans under the Consolidated Farm and Rural Development Act provided after October 13, 1994; and

(3) Benefits under the Conservation Reserve Program derived from any new or amended application or contracts executed after October 13, 1994.

(f) Failure to comply with all provisions of the policy constitutes a breach of contract and may result in ineligibility for certain other farm program benefits for that crop year and any benefit already received must be refunded. If you breach the insurance contract, the execution of a waiver of any eligibility for emergency crop loss assistance will not be effective for the crop year in which the breach occurs.

© 2000 NCIS

2001-NCIS 777

This Policy is signed by the President and Secretary of the Company. One of our authorized representatives must also countersign the policy.

**Secretary**

**President**

# In Case of Loss, Notify

North Carolina Farm Bureau Mutual Ins. Co.
P.O. Box 27427
Raleigh                    NC   27611-0000

Crop Insurance Policies sold or reinsured by the Federal Crop Insurance Corporation are available to all producers regardless of race, color, national origin, sex, age, or disability.

10/05/2001

COUNTY ACTUARIAL TABLE

PAGE 1

SPECIAL PROVISIONS OF INSURANCE
2002 AND SUCCEEDING CROP YEARS

ST: NORTH CAROLINA (37)
CO: Northampton (131)

CROP: COTTON (0021)
PLAN: APH (90)

THE SPECIAL PROVISIONS OF INSURANCE IS THE PART OF THE POLICY THAT CONTAINS
SPECIFIC PROVISIONS OF INSURANCE FOR THE INSURED CROP IN THIS COUNTY.

---

INSURABLE TYPES AND PRACTICES:

TYPE(S)
-------
(997) No Type Specified
(997) No Type Specified

PRACTICE(S)
-----------
(002) Irrigated
(003) Non-Irrigated

PROGRAM DATES FOR INSURABLE TYPES AND PRACTICES:

| SALES CLOSING | INITIAL PLANTING | FINAL PLANTING | ACREAGE REPORTING | BILLING DATE |
|---|---|---|---|---|
| TYPE(S) ------- | | | PRACTICE(S) ----------- | |
| ALL TYPES LISTED ABOVE | | | ALL PRACTICES LISTED ABOVE | |
| 02/28/2002 | | 05/15/2002 | 06/30/2002 | 11/01/2002 |

---

GENERAL STATEMENT(S):
    Enterprise units are available in this county.

CROP STATEMENT(S):
    Contact your agent regarding possible premium discounts, options,
    and/or additional coverage that may be available.

    In lieu of the percentage of price quotation "B" required for quality
    adjustment in section 10(d) of the Cotton Crop Provisions, production
    to count will be reduced if price quotation "A" is less than 85 percent
    of price quotation "B". If eligible for adjustment, the amount of
    production to be counted will be determined by multiplying the number
    of pounds of such production by the factor derived from dividing price
    quotation "A" by 85 percent of the price quotation "B".

    Grade of Strict Low Middling, (41) Leaf 4, 1 3/32 inch staple length and 4.3
    micronaire reading will be used for quality adjustments in accordance
    with the provisions of the insurance policy.

    A cotton crop which is properly planted, using a machine designed for such
    purpose, into an established grass or legume, will be insurable provided
    that prior to the emergence of the planted crop, the established grass or
    legume is treated with a herbicide which is labeled and recommended for
    the purpose of killing the established grass or legume.

(Continued on Next Page)

10/05/2001

COUNTY ACTUARIAL TABLE

PAGE 2

SPECIAL PROVISIONS OF INSURANCE
2002 AND SUCCEEDING CROP YEARS

ST: NORTH CAROLINA (37)
CO: Northampton (131)

CROP: COTTON (0021)
PLAN: APH (90)

In lieu of the definition of late planting period in Section 1 of the Basic
Provisions, the late planting period begins the day after the final planting
date for the insured crop and ends 15 days after the final planting date.

INSURANCE AVAILABILITY STATEMENT(S):
The Federal Crop Insurance Corporation (FCIC) makes crop insurance
available for all producers, regardless of race, color, national
origin, religion, sex, age or handicap.

APPROVED: ACTUARIAL DIVISION 10/05/2001

10/05/2001

COUNTY ACTUARIAL TABLE

PAGE    1

FCI-35 COVERAGE AND RATES
2002 AND SUCCEEDING CROP YEARS

ST: NORTH CAROLINA (37)
CO: Northampton (131)

CROP: COTTON (0021)
PLAN: APH (90)

---

TYPE
(997)NTS -- No Type Specified
(997)NTS -- No Type Specified

PRACTICE
Irrigated -- I (002)
Non-Irrigated -- NI (003)

---

| TYPE PRACTICE | (997) NTS (002) I | (997) NTS (003) NI |
|---|---|---|
| REFERENCE YIELD(LBS) | 532.0 | 532.0 |
| REFERENCE RATE | 0.089 | 0.089 |
| EXPONENT | -1.417 | -1.417 |
| FIXED RATE LOAD | 0.036 | 0.036 |

| COVERAGE LEVEL RATE DIFFERENTIALS | | |
|---|---|---|
| CAT | 0.47 | 0.47 |
| 50% | 0.47 | 0.47 |
| 55% | 0.51 | 0.51 |
| 60% | 0.57 | 0.57 |
| 65% | 0.65 | 0.65 |
| 70% | 0.79 | 0.79 |
| 75% | 1.00 | 1.00 |
| 80% | 1.27 | 1.27 |
| 85% | 1.60 | 1.60 |

| UNIT FACTORS | | |
|---|---|---|
| (BU) BASIC UNIT | 0.90 | 0.90 |
| (OU) OPTIONAL UNITS | 1.00 | 1.00 |
| (EU) ENTERPRISE UNIT | | |
| 50.0 - 299.0 ac | 0.89 | 0.89 |
| 300.0 - 549.0 ac | 0.83 | 0.83 |
| 550.0 & Above ac | 0.78 | 0.78 |

| OPTIONAL COVERAGE FACTORS | | |
|---|---|---|
| (HF) HAIL & FIRE EXCLUSION | 0.99 | 0.99 |
| (PF) PREVENTED PLANTING +5% | 1.01 | 1.01 |
| (PT) PREVENTED PLANTING +10% | 1.02 | 1.02 |
| (YA) YIELD ADJUSTMENT 60% | 1.00 | 1.00 |

| TRANSITIONAL YIELDS (LBS) | | |
|---|---|---|
| | 660.0 | 660.0 |

(Continued on Next Page)

```
10/05/2001                    COUNTY ACTUARIAL TABLE
                                                              PAGE    2
                            FCI-35 COVERAGE AND RATES
                          2002 AND SUCCEEDING CROP YEARS

ST: NORTH CAROLINA (37)
CO: Northampton (131)                              CROP: COTTON (0021)
                                                   PLAN: APH (90)
-------------------------|----------------------------------------------------
```

GENERAL STATEMENT(S):

THE PREMIUM SUBSIDY FACTORS APPLY TO ALL POLICIES. WHEN THE COVERAGE ENHANCEMENT
OPTION IS APPLICABLE AND ELECTED, THE PREMIUM SUBSIDY FACTOR IS BASED ON THE
COVERAGE ENHANCEMENT OPTION COVERAGE LEVEL.

| COVERAGE LEVEL | CAT | 50 | 55 | 60 | 65 | 70 | 75 | 80* | 85* | 90* |
|---|---|---|---|---|---|---|---|---|---|---|
| PREMIUM SUBSIDY FACTOR ** | 1.00 | .67 | .64 | .64 | .59 | .59 | .55 | .48 | .38 | na |
| GRP/GRIP PREMIUM SUBSIDY FACTOR | 1.00 | na | na | na | na | .64 | .64 | .59 | .59 | .55 |
| ADMINISTRATIVE FEE | $100 | $30 | $30 | $30 | $30 | $30 | $30 | $30 | $30 | $30 |

*where applicable
**applies to all plans of insurance except GRP and GRIP

Enterprise units are available in this county.

APPROVED: ACTUARIAL DIVISION 10/05/2001

# ORIGINAL

RECEIVED

FEB 25 2003

OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

### Cover Sheet

Plaintiff(s) or Petitioner(s)

Please See Attached _____

_____

Name of the attorney of record: [See RCFC 83.1 (c)    R. Daniel Boyce _____

Firm Name:    Boyce & Isley, PLLC

**03 - 445C**

Post Office Box:    P. O. Box 1990

Street Address:    107 Fayetteville Street Mall, Ste. 100

City-State-Zip:    Raleigh, NC 27602-1990

Telephone & Facsimile Numbers:    Tele: (919) 833-7373; Fax: (919) 833-7536

Is the attorney of record admitted to the Court of Federal Claims Bar? Has Been Filed (Pending)
If NO, Please call (202)219-9630 for admission papers and instructions.

Nature of suit code:    / 1 /      / 3 /      / 4 /

Select only one (three digit) nature of suit code from
Attached sheet and if numbers 118, 134, 226, 312, 356 or
528 are used, please explain.

**Government's Breach of Insurance for
Multiple Peril Peanut Crop Insurance
by reducing coverage from $.31/lb.
to $.1775/lb.**

Agency Identification Code:    / A /      / G /      / R /
See attached sheet for three digit codes.

Amount Claimed:    $      Undetermined (Class Action)
Use estimate if specific amount is not pleaded.

Vaccination Date (vaccine cases only)    _____

If this is case directly related to any pending or previous case. are you required to file a separate
notice of directly related case(s). See FCRC 40.2.

A TRUE COPY
TEST: APR 4 2006

BRIAN BISHOP
Clerk, U.S. Court of Federal Claims

By _____
Deputy Clerk

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Barnes | James | C | |
| 2 | Barnes | Billy | M | |
| 3 | Beasley | Terry | E | |
| 4 | Berry | Wallace | A | |
| 5 | Boschman | Jacob | F | |
| 6 | Brown | Darrel | Wayne | |
| 7 | Bryant | Lloyd | D | |
| 8 | Bryant | Elaine | O | |
| 9 | Carroll | Bradford | L | |
| 10 | Carroll | William | Dwain | |
| 11 | Clark | Edwin | | |
| 12 | Cobb | Michael | Harrell | |
| 13 | Davenport | Walter | L | |
| 14 | Decker | Randy | D | |
| 15 | Diamond | Joseph | M | |
| 16 | Dunaway | Trey | Hamilton | |
| 17 | Edwards | Allan | | |
| 18 | Eubanks | John | L | |
| 19 | Falkner, Jr. | James | L | |
| 20 | Falkner, Sr. | James | L | |
| 21 | Fischer | Loraine | Estate | |
| 22 | Gayle | Bill | | |
| 23 | Gibbs | Eric | S | |
| 24 | Godwin | Bruce | | |
| 25 | Griggs | George | C | |
| 26 | Griggs, III | WC (Billy) | | |
| 27 | Griggs, IV | WC | | |
| 28 | Grimshaw | Jay | | |
| 29 | Groschke | David & Pam | | |
| 30 | Gwines | Joseph & Robin | | |
| 31 | Hawkins | Danny | W | |
| 32 | Houston | Steve | E | |
| 33 | Iselt | Melvin | O | |
| 34 | Iselt | Lorine | B | |
| 35 | Israel | Charles | L | |
| 36 | Johnson | Justin | Israel | |
| 37 | Johnson | Tommy | | |
| 38 | Jones | William | G | |
| 39 | Jones | Larry | | |
| 40 | Jones | Porter | | |
| 41 | Keene | Marvin | L | |
| 42 | Keene | Gregg | L | |
| 43 | Keith | Luther | Don | |
| 44 | Keith | Luther | Don | |
| 45 | Keith | Robert | D | |
| 46 | King | Sherwood | T | |
| 47 | Koonce | Ronald | Scott | |
| 48 | Lancaster | Robert | A | |

|    | A | B | C | D |
|----|---|---|---|---|
| 49 | Lasiter | Loyal | | |
| 50 | Lawrence | R.S. | | |
| 51 | Lehmann | David | Gene | |
| 52 | Lewis | Philip | S | |
| 53 | Logan | JW | | |
| 54 | Lowry | Donnie | F | |
| 55 | Marsh | William | R | |
| 56 | Marshall | Larry | Wood | |
| 57 | Mathis | Terry | M | |
| 58 | Matthews | Timothy | L | |
| 59 | McClure | Jimmy | M | |
| 60 | McClure | Ann | G | |
| 61 | McClure | Jimmy & Ann | | |
| 62 | McCrary | Royce | | |
| 63 | McMillan | Timothy | E | |
| 64 | Meadorf | Billy | R | |
| 65 | Mercer | Tommie | R | |
| 66 | Morgan | Sammy | | |
| 67 | Moss | Marvin | | |
| 68 | Oliver | Clifford | L | |
| 69 | Otwell | Delbert | L | |
| 70 | Pelzel | Leon | A | |
| 71 | Pennington | Glynn | | |
| 72 | Protho | Willie | J | |
| 73 | Quattrin | Mike | | |
| 74 | Register | Walter | Donald | |
| 75 | Reynolds, Jr. | Elmer | Wayne | |
| 76 | Robinston Estate | Joe | | |
| 77 | Scarbrough | Gwen | | |
| 78 | Seay | Jimmy | | |
| 79 | Senkbeil | Billy | | |
| 80 | Shannon | Billy | W | |
| 81 | Shannon | Billy | W | |
| 82 | Shannon | Billy | Neal | |
| 83 | Smith | Dan | W | |
| 84 | Smith, Jr. | Charles | E | |
| 85 | Stacy | Terry | Lee | |
| 86 | Stacy | Bradlee | Davin | |
| 87 | Underwood | Troyat | | |
| 88 | Wachsmann | Clarence | C | |
| 89 | Walker | Suvella | | |
| 90 | Wells Estate | Julius | | |
| 91 | Williams | Eugene | | |
| 92 | Winter | Wanda | | |
| 93 | Woods | Peggy | S | |
| 94 | Word | Heidi & JoeEd | | |
| 95 | **Farms** | | | |
| 96 | A.L.H.M. Inc. | | | |

| | A | B | C | D |
|---|---|---|---|---|
| 97 | F.A.C.E. Inc. | | | |
| 98 | Griggs Farms | | | |
| 99 | M.E. Watson Farms, Inc. | | | |
| 100 | Wade Pennington & Sons Farms, FN 4798 | | | |
| 101 | Wade Pennington & Sons Farms, FN 5868 (State of Texas land) | | | |