ORIGINAL

FILED

MAY 1 2 2003

U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TEXAS PEANUT FARMERS et. al,           )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )  No. 03-445C
                                       )  (Judge Firestone)
THE UNITED STATES,                     )
                                       )
            Defendant.                 )

DEFENDANT'S MOTION FOR AN ENLARGEMENT OF TIME WITHIN
WHICH TO FILE DEFENDANT'S NOTICE, PURSUANT TO THE
COURT'S MARCH 31, 2003 ORDER, OF DEFENDANT'S INTENT
TO PROCEED BY MOTION IN LIEU OF AN ANSWER TO THE COMPLAINT
AND
DEFENDANT'S MOTION TO STAY
THE FILING OF AN ANSWER TO THE COMPLAINT

Introduction

Pursuant to the Court's Special Procedures Order (SPO) dated
March 31, 2003, we respectfully request that the Court grant
defendant an enlargement of time of 65 days, to and including
July 21, 2003, within which to submit defendant's memorandum.
Our memorandum will identify the factual and legal bases that
support a motion to dismiss the complaint for failure to state a
claim upon which relief may be granted, and an alternative motion
for summary judgment, which motion we intend to file in lieu of
an answer to the complaint.

Counsel for defendant contacted plaintiffs' counsel early in
the week of May 5, 2003, and counsel have been consulting about
these matters. Plaintiffs' counsel indicated he may wish to file

1

TJW

a response to our legal memorandum and, if so, would require thirty days from receipt of our legal memorandum within which to file plaintiffs' response before participating in a conference call with the Court. If plaintiff files a response, defendant's counsel would require at least ten days to review plaintiffs' memorandum and consult with the appropriate agency counsel and other Department of Justice attorneys before participating in the Court's conference call. Given these time frames, counsel for defendant is available for a status conference during the week of August 25 (beginning on Tuesday, August 26) or the weeks of September 8 or 15, 2003. Counsel suggests that defendant file a supplement to this motion at a time after counsel have attempted to agree to dates and contacted the Court's chambers (pursuant to the Court's SPO).

This is defendant's second request for an enlargement of time relating to the date for filing the answer or otherwise to plead. By motion dated April 23, 2003, defendant filed an unopposed motion for an enlargement of time of 18 days, to and including May 16, 2003, within which to file its answer or otherwise plead; the motion was granted. However, at the time defendant filed its motion, counsel for defendant was unaware of the Court's Special Procedures Order (SPO) dated March 31, 2003, because counsel for defendant had not received it. It was only in a telephone conversation with plaintiffs' counsel about

2

matters relating to this case that counsel became aware of this order.  Later, on April 25, 2003, counsel for plaintiffs forwarded by facsimile a copy of the Court's SPO to counsel for defendant.

Also, during counsels' telephone conversation, counsel for defendant requested that counsel for plaintiffs forward to counsel for defendant a copy of the separate peanut crop provisions of the crop insurance policies, because the incorrect crop provisions (relating to cotton) were attached to plaintiffs' complaint.  (Counsel for defendant had reviewed a copy of the peanut crop provisions, which had been attached to the complaint in a companion district court case filed in North Carolina), but both counsel agreed that plaintiffs' counsel should forward a copy of the specific document upon which plaintiffs rely in this case to support their complaint, so that counsel for defendant and the Court possess the correct document(s).  Counsel for defendant suggested that counsel for plaintiffs file a motion for leave to file an amended complaint, attaching the correct peanut crop provisions, a motion that defendant would not oppose.[1]

Defendant also respectfully requests that this Court stay defendant's obligation to file an answer to plaintiffs' complaint

---

[1] Counsel was out of the office on April 24-25, 2003, in connection with the care of an elderly parent.  Upon counsel's return to her office on April 28, 2003, counsel reviewed the Court's SPO, consulted with plaintiffs' counsel, and prepared this motion.

3

pending the Court's resolution of the defendant's Notice, pursuant to the Court's March 31, 2003 order, of defendant's intent to proceed by motion in lieu of an answer to the complaint.

Nature of the Case

This is a case filed by peanut farmers in Texas, Georgia, Alabama, Florida and South Carolina.  Plaintiffs (who seek class certification) challenge the part of the 2002 Farm Bill (Farm Security and Rural Investment Act of 2002, effective May 13, 2002) that reduced the crop insurance coverage level for peanuts from $.31 per pound (formerly, the price for quota peanuts) to $.17 per pound (price for non-quota peanuts), as of May 13, 2002. The reduction in the price per pound to be paid for peanut crop losses was a direct result of another provision of the 2002 Farm Bill that repealed the peanut marketing quota program.  We discuss that repeal below, because it is the subject of another case pending in this Court.  Members of the Peanut Quota Holders Association v. United States, No. 02-1664C(Fed. Cl.).[2]

The crop insurance policy at issue is the Multiple Peril Crop Insurance Policy (MPCI). (A copy of the MPCI policy is attached to plaintiffs' complaint.)  The MPCI is issued by state insurance agencies, and is reinsured by the Federal Crop

_____

[2] Counsel is also considering whether to file a Rule 40.2(b) Notice of Indirectly-Related Cases, in connection with these cases.

Insurance Corporation (FCIC).  The MPCI program is administered
by the United States Department of Agriculture, through the Risk
Management Agency (RMA).  The insurance covers adverse weather
conditions.  During the crop year at issue, there were droughts
affecting peanut farmers in the three peanut growing regions of
the United States.

As noted above, counsel for defendant is also counsel of
record for another a case filed in this Court by plaintiff peanut
farmers in <u>Members of the Peanut Quota Holders Association v.</u>
<u>United States</u>, No. 02-1664C(Fed. Cl.) (answer filed; dispositive
motion was due May 12, 2003; motion for enlargement recently
granted, with due date now June 11, 2003).  These plaintiffs (who
also seek class certification, but who are represented by a
different attorney) challenge the repeal of the peanut marketing
quota program, that led to the reduction in the crop insurance
payment at issue in this case.  These cases arise out of farm
legislation that began in the late 1930s after the Great
Depression, and which have changed periodically over the years
since then.  In <u>Members of the Peanut Quota Holders Association</u>,
the Court directed counsel for defendant to provide plaintiffs'
counsel with a summary of the Government's defenses.  We attach a
copy of our letter dated February 27, 2003, to plaintiffs'
counsel (which was later filed in connection with a motion for an
enlargement of time in that case); our letter describes some (but

not necessarily) all of the defenses that we will raise in our dispositive motion in that case.  Appendix (App). 1-10.

As our letter establishes, the issues raised by plaintiffs who challenge various farm legislation involve complex statutory and regulatory schemes, with long and evolving histories, as well as complicated legal issues.  See generally S.Rep.No. 357, 101st Cong. 2d Sess. 118-19 (1990), U.S. Code Cong. & Admin. News 1990, pp. 4456-5284. In all three complaints challenging the reduction in the payment on the peanut crop insurance policies (this case in this Court, and the two pending cases in Federal district courts), plaintiffs allege the following counts:

1.    breach of contract;

2.    violation of due process by impairment of contract;

3.    denial of due process;

4.    violation of statutory requirement that policy changes be published in Federal Register;

5.    violation of statutory requirement that policy changes be made before November 30, 2001; and,

6.    violation of plaintiffs' statutory and due process rights by failing to notify plaintiffs of their right to appeal.

Plaintiffs also assert the same claims for relief in all three suits.  While most are framed in terms of declaratory or injunctive relief,  all of the claims are essentially claims for money damages owing, for the past (current peanut crop year), and possibly also for future years.  Plaintiffs assert entitlement to:

1.  injunctive relief to forbid the settlement of insurance claims at the lower level of $.17 per pound;

2.  declaratory judgment relief to enforce the terms of the contract of insurance which provided for insurance coverage at $.31 per pound for any losses covered by the contract;

3.  relief including a preliminary injunction and a permanent injunction to declare that the Secretary of Agriculture must immediately implement the insurance policy at the indemnity rate, according to the dates established by the various contracts;

4.  a declaration that the agency conduct was an abuse of discretion and violated the Constitution;

5.  a remand to USDA and an injunction, essentially to enforce the insurance policy at $.33 per pound;

6.  a money judgment in accordance with the contract, to recover losses at $.31 per pound; and,

7.  an injunction declaring the agency Bulletins void under the contract and the Constitution.

Counsel for defendant requires additional time within which to research and prepare the legal memorandum required by the Court's recent SPO, given the numerous complex procedural and substantive issues raised in plaintiffs' complaint in this Court, as well as the complaints filed by plaintiffs' counsel in Barnhill et al v. Davidson et al, No. 4:02-CV-159-H (E.D. N.C.), and another (virtually identical) complaint filed in Alabama, Watford et al v. Davidson et al, No. 03-M-153-S (M.D. Ala.), in which plaintiff peanut farmers assert the same claims and seek essentially the same relief.

For example, there are numerous legal and factual issues

which require substantial additional work, before defendant will
be able to file its memorandum, including (but not limited to):

1.    Whether this Court possesses jurisdiction to entertain this
       complaint, or whether exclusive jurisdiction resides in the
       United States District Courts for the Eastern District of
       North Carolina or the Middle District of Alabama, see 7
       U.S.C. § 1506(d))(Federal Crop Insurance Corporation (FCIC);

       a.    whether plaintiffs are in privity of contract with the
              United States, sufficient to establish jurisdiction
              before this Court;

       b.    whether the reinsurance contracts at issue are drawn
              with such provisions as to create a liability on the
              part of the Government as the reinsurer directly to the
              peanut farmers who hold the insurance policies;

2.    Whether plaintiffs have exhausted their administrative
       remedies, see 7 U.S.C. § 6992(d);

3.    Whether plaintiffs' complaint should be dismissed because
       the contracting agency, the United States Department of
       Agriculture (USDA), did not make any changes to the crop
       insurance policies that would support a breach of contract
       claim;

4.    Whether the contract provisions contained in the peanut crop
       provisions permit the Government to settle the insurance
       claim at the lesser, non-quota per pound rate, see section

8

14(b)(3) (settlement of claim) and section 3(b);

5.   Whether the United States has violated any of plaintiffs'
     statutory and due process rights by allegedly failing to
     notify plaintiffs of their right to appeal;

6.   Whether the United States has violated plaintiff's due
     process rights;

7.   Whether the United States has violated any statutory
     requirements relating to whether policy changes be published
     in the Federal Register, and if so, before November 30,
     2001;

8.   Whether, in the event this Court finds in favor of
     plaintiffs on liability, plaintiffs are entitled to any of
     the relief sought, including declaratory and injunctive
     relief and/or specific performance.

     In addition, there are other issues that counsel must
address with the other agency counsel and Assistant United States
Attorneys handling the other cases pending in Federal district
courts, even though they may not be the subject of a dispositive
motion.  These issues include:

1.   Whether this case should be stayed pending resolution of
     Members of Peanut Quota Holders Association v. United
     States, No. 02-1664C (Fed. Cl.);

2.   Whether the Court should certify the action as a class
     action;

9

3.   If the Court certifies the action as a class action, whether
     28 U.S.C § 1500 would then preclude this Court from
     exercising jurisdiction to entertain the case, given that
     some of the individual plaintiff peanut farmers could be the
     same in this Court and in one or more Federal district
     courts.

Counsel's Other Responsibilities

     As explained above, this case is one of several cases
presently assigned to counsel of record that involve agricultural
commodities and relatively recent farm legislation.  Counsel is
required to prepare our dispositive motion in The Peanut Quota
Holders Association, Inc. v. United States, No. 02-1664C (Fed.
Cl.) (third motion for enlargement of time to June 11, 2003
recently granted).  Further, counsel was recently assigned
responsibility for another complex case involving crop insurance,
in which the Government's answer was also due on April 28, 2003
(motion for an enlargement of time to June 12, 2003, having been
granted).  ACE Property & Casualty Insurance Co. v. United
States, No. 03-470C (Fed. Cl.).

     In addition, counsel has responsibilities in other cases
during this time and into the coming weeks: HPI/GSA-3C, LLC. v.
GSA, No. 03-1252 (Fed. Cir.) (appellant's brief due to be filed
in May 28; Government's brief presently due July 7, 2003);
Schleicher Community Corrections Center, Inc. v. Attorney General

of the United States, No. 03-1039 (Fed. Cir. (brief filed March 10, 2003 on jurisdictional issue; court of appeals could at any time require briefing on the merits).

Defendant's Motion to Stay

Defendant also respectfully requests that this Court stay defendant's obligation to file an answer to plaintiffs' complaint pending the Court's resolution of the defendant's notice, pursuant to the Court's March 31, 2003 order, of defendant's intent to proceed by motion in lieu of an answer to the complaint.

Given the complexities of this case, both procedurally and substantively, as described above, defendant believes that it would be in the interest of judicial economy for defendant to focus its resources upon preparing the legal memorandum, and ultimately defendant's dispositive motion, rather than expend the resources necessary to complete preparation of defendant's answer to the complaint.

Conclusion

Accordingly, defendant respectfully requests that this Court grant defendant an enlargement of time of 65 days to and including July 21, 2003, within which to submit defendant's memorandum that will briefly identify the factual and legal bases that support a motion to dismiss the complaint for failure to state a claim upon which relief may be granted, and an

alternative motion for summary judgment, which motion we intend
to file in lieu of an answer to the complaint.

Defendant also respectfully requests that this Court stay
defendant's obligation to file a response to plaintiffs'
complaint pending the Court's resolution of the defendant's
notice, pursuant to the Court's March 31, 2003 order, of
defendant's intent to proceed by motion in lieu of an answer to
the complaint.

                              Respectfully submitted,

                              ROBERT D. McCALLUM, JR.
                              Assistant Attorney General

                              DAVID M. COHEN
                              Director

                              JANE W. VANNEMAN
Kim Arrigo                    Senior Trial Counsel
United States Department      Commercial Litigation Branch
  of Agriculture              Civil Division
Office of the General         Department of Justice
  Counsel                     Attn:  Classification Unit
Washington, D.C.                     8th Floor
                              1100 L Street, N.W.
Mark Simpson                  Washington, D.C.  20530
United States Department      Tele: (202) 307-1011
  of Agriculture              Facsimile: (202) 514-8624
Office of the General
  Counsel                     Attorneys for Defendant
Atlanta, Georgia


May 12, 2003

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on May 12th,
2003, I caused to be served by United States mail, postage
prepaid, copies of "DEFENDANT'S MOTION FOR AN ENLARGEMENT OF TIME
WITHIN WHICH TO FILE DEFENDANT'S NOTICE, PURSUANT TO THE COURT'S
MARCH 31, 2003 ORDER, OF DEFENDANT'S INTENT TO PROCEED BY MOTION
IN LIEU OF AN ANSWER TO THE COMPLAINT AND DEFENDANT'S MOTION TO
STAY THE FILING OF AN ANSWER TO THE COMPLAINT" and "APPENDIX"
addressed as follows:

R. Daniel Boyce
Post Office Box 1990
Raleigh
North Carolina 27602-1990

<u>APPENDIX</u>

<u>Page</u>

Letter, February 27, 2003, from Ms. Jane Vanneman
    to Mr. David Boone, <u>Members of the Peanut
    Quota Holders Association v. United States</u>,
    No. 02-1664L (Fed. Cl.) . . . . . . . . . . . . .     1

# **APPENDIX**

**U.S. Department of Justice**

Civil Division

RM:DMC:JVanneman
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

Telephone:  (202) 307-1011
Fax:        (202) 514-8624

*Washington, D.C. 20530*

February 27, 2003

Mr. David Boone
Boone & Stone
3166 Mathieson Drive
Atlanta, Georgia 30305

> Re:  Members of Peanut Quota Holders
>      <u>Association v. United States, No. 02-1664 (Fed. Cl.)</u>

Dear Mr. Boone:

<u>Introduction</u>

At the status conference held in this case on January 23, 2003, the court directed the government to notify plaintiffs if we intend to file a dispositive motion.  This letter is to provide our notice that we do intend to file a dispositive motion.

At the status conference, the court also directed the government to provide you with a statement of our defenses.  In making this direction, the court made clear that we would not be limited to whatever statements of defenses we outline in this letter.  In addition, this letter will serve to provide you, in accordance with the court's order dated January 24, 2003, with citations to some of the various statutes and regulations relating to the peanut program.

*/*

-2-

Statement of the Case

This case involves the Farm Bill of 2002, and in particular, the peanut program. Plaintiffs are individuals who allege that they own farms that either had produced peanuts in the past or for which plaintiffs had leased out their peanut marketing quotas in recent years to others who actually produced the peanuts. Plaintiffs challenge the Farm Bill of 2002 as effecting a unlawful takings and they seek money damages. It appears that plaintiffs allege three major types of claims:

1.  the buyout figure of $.11 per pound (over 5 years in installment payments, for a total of $.55 per pound, in one-time payment) of their quota is less than fair market value;

2.  the repeal of the former peanut marketing poundage quota, and Congress's enactment of the new peanut "base" (from which future price and/or income supports or other benefits will be calculated) to those who had actually produced the peanuts during the last four years, is an unfair and retroactive taking of plaintiffs' property (e.g., the peanut marketing quota);

3.  the repeal of the former peanut marketing poundage quota diminishes the value of plaintiffs' land.

Farm Bills, Particularly the 2002 Farm Bills Relating to Peanuts

The Farm Bill of 2002 (Farm Security and Rural Investment Act, P.L. 107-171) is one of many farm bills enacted periodically since 1938 relating to various agricultural commodities, including peanuts (which were first made part of the farm bills in 1941). These farm bills frequently modify and/or eliminate various price and/or income support payments, and other benefits relating to peanuts, as well as other agricultural commodities. In fact, the new "peanut base" program was a new program created in 2002 that included direct payments and counter-cyclical payments for peanuts, similar to the programs that had existed for cotton and other commodities in previous years (and which

-3-

continued for other commodities in a modified form).  See
generally Competitive Enters. Inst. v. United States Dept. of
Agriculture, 954 F. Supp. 265 (D.C. D.C. 1996) (summary of farm
bills relating to peanut programs).

Summary of History of Farm Bills, Beginning in 1938

     The provisions of the 1938 Act, the seminal farm legislation
enacted during the Great Depression, are often suspended and
superseded by multi-year farm legislation.  In 1941, the 1938 Act
was amended to establish a national marketing quota program for
peanuts.  Pub. L. No. 77-27, 55 Stat. 88 (1941).  The various
programs relating to peanuts have changed numerous times over the
years since 1941.  Under the old program (prior to revisions
which we will discuss below), the annual national marketing quota
was converted later to a national acreage allotment and
distributed to qualified farms.  A peanut farmer was subject to
financial penalties for marketing peanuts in excess of the farm's
allotment.  Additionally, a system was created so that the
marketing quota program could be temporarily suspended if a
certain percentage of peanut farmers voted in a referendum that
way; however, price support loans for peanuts would not be
available during years in which the marketing quota was
suspended.  See generally 7 U.S.C. §§ 1358 and 1359.

     In 1967, 1969, and 1970 legislation, Congress authorized the
transfer of peanut acreage allotments.  Pub. L. No. 90-211, 81
Stat. 658 (1967); see also Pub. L. No. 91-122, 83 Stat. 213
(1969); Pub. L. No. 91-568, 84 Stat. 1499 (1970).  Subject to
certain conditions, acreage allotment holders were permitted to
sell or lease all or part of their allotments.  See generally 7
U.S.C. § 1358a.

     The peanut program was revised again in the Food and
Agriculture Act of 1977, Pub. L. No. 95-113, §§ 801-807, 91 Stat.
913, 944 (1977) (the 1977 Act).  The 1977 Act implemented a farm
poundage quota system with acreage allotments and a two-tier
classification of peanuts, in addition to price support loans.
The two categories of peanuts were: (1) quota peanuts and (2)
additional peanuts.  "Quota" peanuts were those produced pursuant
to a farm poundage quota on an eligible farm and thereby eligible
for domestic edible use and seed.  "Additional" peanuts were
those produced in excess of the farm poundage quota on an

3

-4-

eligible farm and thereby eligible only for export or crushing resulting in oil for food uses and meal for feed uses. Financial penalties applied to the marketing of peanuts in violation of the rules. In fact, as indicated in Calloway v. Block, 763 F.2d 1283 (11th Cir. 1985)(discussed below), the 1981 Farm Bill actually reduced the amount of expected demand that would be committed to "quota" peanuts, so as provide more opportunities to market "additional" peanuts; that is, the quota was reduced. In addition, provisions were made in the 1981 Act to eliminate the marketing quota in certain cases for farms owned by persons who were not actually producers of peanuts. Indeed, throughout the period of several farm bills, there were a number of years in which the marketing quota was a number which could fluctuate based upon demand issues and upon provisions of the pertinent statutes in effect at the time.

The peanut program was revised again in 1981, in the Agriculture and Food Act of 1981, Pub. L. No. 97-98, §§ 701-707, 95 Stat. 1213, 1248 (1981). The 1981 Act implemented a farm poundage quota system, without acreage allotments, and maintained (with modification) a two-tier classification of peanuts (as well as the two-tier structure of price support loans). Absent transfers, farm which had acreage allotments under the 1977 Act received a farm poundage quota under the 1981 Act and were the only ones allowed to produce quota peanuts. As before, those farms could also produce additional peanuts. However, because there were no acreage allotments under the 1981 Act, other farms could now produce "additional" peanuts.

The 1981 Act also established annual national poundage quotas. There were complex rules governing the apportionment among the states and within each particular state of the national poundage quotas allocated under previous law. Criteria were established for making reductions in poundage quotas with respect to farms in a state when the amount of national poundage quota allocated to a state was reduced in future years. There were also rules concerning increases in poundage quota allocations. Additionally, a system was created so that the poundage quota program could be temporarily suspended if a certain percentage of quota peanut farmers voted that way in a referendum. There were also rules governing the definitions of "quota peanuts" and "additional peanuts." Also, under the 1981 Act, subject to certain conditions, the owner of a farm could sell or lease all

-5-

or part of the poundage quota to any other owner or operator of a farm within a specified geographic range for transfer to the farm.  See generally 7 U.S.C. § 1358b and 7 C.F.R. § 729.214.

Subsequent to the 1981 Act and prior to the 2002 Act, the most basic provisions of the peanut poundage quota system were continued essentially unchanged in multi-year farm legislation. See Food Security Act of 1985, Pub. L. No. 99-198, §§ 701-707, 99 Stat. 1354, 1430 (1985); Food, Agriculture, Conservation and Trade Act of 1990, Pub. L. No. 101-624, §§ 801-809, 104 Stat. 3359, 3459 (1990); Pub. L. No. 103-66, § 1109, 107 Stat. 312, 325 (1993); Agricultural Market Transition Act, Pub. L. No. 104-127, § 155, 110 Stat. 888, 922 (1996).  See generally 7 U.S.C. §§ 1358-1, 1358b, 1358c, and 1359a; 7 C.F.R. part 729 (2001). This is not to say that the quota amounts were fixed, or that there were not substantive adjustments made to the peanut marketing program.  Rather, the quota amounts did change at times, as, for example, in the 1996 legislation in which Congress made provisions again (as it had in 1981) for farms to lose quotas in cases in which the quotas were held by persons who did not meet certain producing criteria.

Congress, in the 2002 Act repealed the marketing quota program for peanuts in part VI of subtitle B of title III of the 1938 Act, as amended (7 U.S.C. §§ 1357-1359a).  Section 1309(b)(1) provided for the "buyout" for each person that the Secretary determines is an eligible peanut quota holder, at the statutorily-determined price of 11 cents per pound.

Section 1309(f) of the 2002 Act defines "eligible peanut quota holder."  Section 1309(f)(1) provides the general rule that a person is an eligible peanut quota holder if the person, as of the date of enactment of the 2002 Act, owned a farm that, also as of that same date, was eligible for a peanut quota under § 358-1(b) of the Agricultural Adjustment Act of 1938 (7 U.S.C. § 1358-1(b)), irrespective of temporary leases or transfers of quotas. Section 1309(f)(6) provides in part that the determination of the peanut poundage amount for which the person qualifies shall be made based on the 2001 crop quota levels.

5

-6-

Defendant's Dispositive Motion

Our legal arguments may be structured as follows:

1.  Pursuant to Rule 12(b)(6) [formerly Rule 12(b)(4) in the Court of Federal Claims], the court should grant defendant's motion to dismiss for plaintiffs' failure to state a claim upon which relief may be granted. <u>See generally</u> <u>Fifth Third Bank of Western Ohio v. United States</u>, No. 95-503C (February 10, 2003, Fed. Cl.), slip op. at 4 (standards for Rule 12(b)(6) motion) (Judge Miller);

    a.  With respect to the peanut marketing programs under various Farm Bills, no person ever "owned" a quota; rather, by statute and regulations, the marketing quotas were assigned to a farm, not to persons;

        i.  In any event, because the peanut marketing quota was a program of congressional creation, and was simply an allowance to market peanuts without financial penalties, Congress could change the program when it wished to further the public policy;

            (1)  The "buyout" in the 2002 Farm Bill was, in reality, simply a payment to persons who were formerly associated with farms that had a peanut marketing quota;

            (2)  The "buyout" was neither required by any law or by the Constitution;

        ii.  Because plaintiffs did not own a quota or a right to exclude other persons from marketing peanuts penalty-free, the repeal of the peanut marketing poundage quota and enactment of a new peanut "base" do not constitute a taking; in fact, plaintiffs' farms now, in effect, have an unlimited "quota" because they can grow without penalty all the peanuts they want, as can every other farm whether or not it held a quota in the past;

        iii.  To the extent, if any, that the peanut marketing program that ended with the 2002 Farm Bill had an adverse effect upon farm land values generally in areas where peanuts are grown, that effect was one

6

-7-

that reflected a risk that always existed in
connection with the congressional ability to
regulate farm commodities, including peanuts, and
was extraneous to any inherent characteristic or
value of the farm itself because no owner of a
peanut farm possesses a right to compensation
whenever Congress changes the regulatory scheme
governing peanuts as a farm commodity;

2.  Alternatively, pursuant to Rule 56, the court should grant
    defendant's motion for summary judgment;

    a.  There are no genuine issues as to any material fact and
    the government is entitled to judgment as a matter of
    law.  See generally Fifth Third Bank of Western Ohio v.
    United States, No. 95-503C (February 10, 2003, Fed.
    Cl.), slip op. at 13 (standards for summary
    judgment)(Judge Miller);

    b.  Plaintiffs are not entitled to any recovery under any
    takings theory;

        i.  A regulatory takings case is evaluated according
        to a three-part test: character of Government
        action (whether government took property for
        public use), economic impact, and interference
        with reasonable investment-backed expectations.
        See Ruckelshaus v. Monsanto Co., 467 U.S. 986,
        1005 (1984); see generally Penn. Cent. Transp. Co.
        v. New York City, 438 U.S. 104 (1978);

        ii.  Plaintiffs did not own any property interest.
        Calloway v. Block, 763 F.2d 1283 (11th Cir. 1985)
        (peanut farmers had no protected property interest
        in the peanut quotas; important public policy of
        reducing the peanut price support program, in
        part, to allow growers of "additional" peanuts to
        participate in marketing of peanuts; Congress
        reduced quotas and affirmed preferences for those
        who actually produced peanuts and took the
        business and market risks of production);

           (1)  Even if plaintiffs did own some kind of
            property interest in the former peanut
            marketing quota, plaintiffs had no reasonable
            investment-backed expectation that Congress
            would continue the peanut marketing quota at
            all, or in the same format(s) unchanged;
            rather, Congress could determine that a

7

-8-

change was in order whether by ad hoc
legislation or by a new farm bill at whatever
time new legislation might be in order.

(2)   Congress had modified the peanut program many
times since the early 1940s, and, because the
quota system was a regulatory system for
determining which peanuts could be marketed
penalty-free, no one could reasonably have
expected that any future Congress would
waive, for peanuts or any other farm
commodity, Congress' own ability to regulate
agricultural markets;

(3)   Because plaintiffs had no reasonable
investment-backed expectations, there would
be no need for the court to evaluate the
economic impact of the government action;

iii.   In any event, the "buyout" payment is not
insufficient because "insufficiency" assumes that
there was some obligation on the part of Congress
to make a "buyout" payment, and there was no such
obligation;

(1)   Further, it was anticipated that Congress
would enact a new farm bill at the end of the
2002 crop year, if not sooner, because the
applicability of previous Farm Bills ended
with that 2002 crop;

(2)   Even if, however, the termination of the last
year of coverage of the previous Farm Bill
could create a claim for that one final year
(2002) (which it cannot), the amount of the
buyout is more than the "fair market value"
of the quota because the support rate for
marketing of peanuts in 2002 was $605 per
ton, or approximately $.30 per pound, and,
Congress provided for a total of $.55 per
pound in the "buyout";

c.   Congress can change the terms of the Farm Bills
governing peanuts (and other agricultural commodities)
without incurring any type of monetary liability to
those who had received benefits under the prior Farm
Bills;

i.   The changes that Congress made to the peanut
commodity program serve important public policies,

-9-

including, among others, Congress's determinations about what legislation is needed, if any, to address the orderly marketing of peanuts, considering changes in the domestic and international agricultural markets; what protections, if any, are necessary for producers, handlers, processors, consumers of peanuts, and local communities involved in the production of peanuts;

d.  Changes enacted by Congress with respect to other farm commodities since the 1938 bill, which included reductions and/or eliminations of benefits previously provided to farmers and/or producers of various commodities (including reductions to various types of quotas for other types of farm commodities), establish that farmers and/or producers can have no reasonable investment-backed expectations that any particular type of programmatic support to farmers or producers of particular agricultural commodities will continue unchanged, see Calloway v. Block, 763 F.2d at 1283;

e.  To the extent that plaintiffs contend that any official of the United States government made statements or promises that no changes would be made to the peanut marketing quota program that might adversely affect plaintiffs, any such statements cannot bind the United States as a matter of law. E.g., City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990) (government employees have actual authority to bind the government only when the Constitution, a statute, or a regulation conveys such authority in an unambiguous manner), citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947).

  i.  The rationale for these requirements is obvious, because federal expenditures would be wholly uncontrollable if government employees could, of their own volition, obligate the United States. City of El Centro, 922 F.2d at 820. Accord OPM v. Richmond, 496 U.S. 414 (1990);

  ii.  Moreover, there was no basis on which any reasonable person could reasonably have believed that any officer or employee of the United States Department of Agriculture had the power to guarantee that Congress would not change the

9

-10-

peanut program at any time that Congress, in its
judgment, decided that a change was in order.

If you believe that we have misconstrued or misinterpreted
any of the claims in the complaint, or if we have not addressed
any claims that you believe you have raised in your complaint
omitted, please inform me in writing.  Also, if you have any
questions, please feel free to telephone me at 202 307-1011.

Very truly yours,

S/

JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division

cc:  Mr. Terry Jackson
     Mr. Michael Gurwitz

A TRUE COPY
TEST:  APR  4 2006

BRIAN BISHOP
Clerk, U.S. Court of Federal Claims

By _____
Deputy Clerk

/ 0