ORIGINAL

No. 03-445C
(Judge Firestone)

FILED

SEP 2 1 2005

U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TEXAS PEANUT FARMERS, et al.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR TRANSFER OF THIS
CASE TO THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

A TRUE COPY:
TEST:    APR 4 2006
BRIAN BISHOP
Clerk, U.S. Court of Federal Claims
Deputy Clerk

JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W., 8th Floor
Washington D.C. 20530
Tele: (202) 307-1011
Fax: (202) 514-8624

September 21, 2005          Attorneys for Defendant

# TABLE OF CONTENTS

Page(s)

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR TRANSFER
OF THIS CASE TO THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION ........ 1

Introduction ....................................................................... 1

1.    Status of Claims Pending Before Eastern District of North Carolina,
Transferred by JPML ............................................................. 3

    A.    Introduction ................................................................ 3

    B.    JPML Transfer Order and Status of Claims Pending
Before Eastern District of North Carolina ........................... 4

2.    Defendant's Proposed Procedure - Transfer Pursuant to 28 U.S.C. §1631 ...... 6

    A.    Introduction ................................................................ 6

    B.    Two Categories of Plaintiffs ................................................ 6

        1.    Plaintiffs Whose Farms Are Located Within One Of
the Judicial Districts in the Five States ...................... 7

        2.    Plaintiffs Whose Farms Are Not Located In
The Judicial Districts In The Five States ...................... 7

        3.    Conclusion ......................................................... 10

3.    It Is Not Necessary For This Court To Notify the JPML Of the
Pendency of Potentialf "Tag-Along" Actions in This Court And/or
In District Courts Other Than Those Already Subject to the JMPL Order ..... 11

CONCLUSION ..................................................................... 12

## TABLE OF AUTHORITIES

### CASES

Barnhill et al. v. Ross J. Davidson et al,
    No. 4:02-159 (E.D. N.C.) ................................................................ 1, 4, 15

Illinois Municipal Retirement Fund v. Citigroup, Inc.,
    391 F.3d 844 (7th Cir. 2004) ............................................................ 11

In re Peanut Crop Insurance Litigation, 342 F.Supp.2d 1353 (JPML, 2004)...................passim

Texas Peanut Farmers v. United States,
    409 F.3d 1370 (Fed. Cir. 2005) ........................................................ 1

Wiatt v. Merck & Company,
    2005 WL 1799740 (W.D. Wa, 2005) ............................................... 11

### STATUTES

7 U.S.C. §1506(d)........................................................................................passim

7 U.S.C. §1508(j)(2)(A) ............................................................................. passim

28 U.S.C. §81..................................................................................................8

28 U.S.C. §89..................................................................................................8

28 U.S.C. §90..................................................................................................8

28 U.S.C. §113..................................................................................................5

28 U.S.C. §121..................................................................................................8

28 U.S.C. §124..................................................................................................8

28 U.S.C. §1407...............................................................................................10

28 U.S.C. §1631...........................................................................................passim

**MISCELLANEOUS**

"The Judicial Panel and the Conduct of Multidistrict Litigation,:" 87 Harv.L.Rev.1001
    (1974) .................................................................................................................... 11

JPML Rules, 199 F.R.D. 425 (2001)............................................................................11

JPML Rule 1.1.......................................................................................................... 11

INDEX TO APPENDIX

                                                                          Page

Letter, September 6, 2005, from counsel for plaintiffs, Mr. R. Daniel Boyce
    to The Honorable Nancy Firestone.......................................................................    1

Barnhill et al. v. Ross J. Davidson et al, No. 4:02-159 (E.D. N.C.),
    Order, July 22, 2004 (summary judgment, class certification)...........................    11

Barnhill et al. v. Ross J. Davidson et al, No. 4:02-159 (E.D. N.C.),
    Order, January 21, 2005(practice and procedure order,
    pursuant to JPML transfer).................................................................................    61

Barnhill et al. v. Ross J. Davidson et al, No. 4:02-159 (E.D. N.C.),
    Order, March 31, 2005(damage formula).......................................................    66

Barnhill et al. v. Ross J. Davidson et al, No. 4:02-159 (E.D. N.C.),
    Order, March 31, 2005(summary judgment in transferee cases;
    district-wide class)............................................................................................    74

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TEXAS PEANUT FARMERS, et al.       )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        No. 03-445C
                                   )        (Judge Firestone)
THE UNITED STATES,                 )
                                   )
            Defendant.             )

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR TRANSFER
OF THIS CASE TO THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

Introduction

Pursuant to the Court's Order dated September 9, 2005, defendant, the United States, respectfully files this opposition to plaintiffs' motion to notify the Judicial Panel on Multidistrict Litigation (JPML) that this case may be a "tag-along" action to the action that the JPML transferred, In re Peanut Crop Insurance Litigation, 342 F.Supp.2d 1353 (JPML, 2004), to the United States District Court for the Eastern District of North Carolina. Barnhill et al. v. Ross J. Davidson et al, No. 4:02-159 (E.D. N.C.).

The case before this Court is on remand from the United States Court of Appeals for the Federal Circuit. Texas Peanut Farmers v. United States, 409 F.3d 1370 (Fed. Cir. 2005)(7 U.S.C. §1508(j); 7 U.S.C. §1506(d)). The Federal Circuit affirmed this Court's order, which held that the Court of Federal Claims lacks jurisdiction to entertain plaintiffs' crop insurance claims because the judicial district of the district court in which the farm is located possesses exclusive

1

jurisdiction to entertain the claims. 7 U.S.C. §1508(j)(2)(A). The court remanded to this court, with instructions to transfer the claims pursuant to 28 U.S.C. §1631.

During the (unrecorded) telephone status conference held on September 7, 2005, which was conducted to address the proceedings required pursuant to the order of the Federal Circuit, the Court stated that it would treat the letter that plaintiffs' counsel sent to the Court, dated September 6, 2005, as a motion. The Court directed defendant to respond to plaintiffs' motion by September 21, 2005.

In plaintiffs' letter/motion, plaintiffs noted only that the Federal Circuit held that jurisdiction to entertain these types of claims (alleging breach of plaintiffs' Multiple Peril Crop Insurance (MPCI) policies) is in Federal district courts, not in this Court, and that the claims pending before this Court should be transferred to "various federal districts where venue would be proper." Appendix (App.) 1-10. Plaintiffs also attached a copy of some of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation (JPML). Id.

However, during the status conference, plaintiffs modified their request, and urged that this Court transfer this case directly to the JPML, so that the JPML could transfer the claims to the United States District Court for the Eastern District of North Carolina, pursuant to its earlier transfer order.

During the status conference, we objected to plaintiffs' request. We proposed a different procedure, explained below. The transfer procedure that we propose is based upon the remand from the Federal Circuit, to transfer pursuant to 28 U.S.C. §1631, and is based upon the strict jurisdictional requirements of the applicable crop insurance statute, 7 U.S.C. §1506(d), 1508(j)(2)(A). While the procedures we propose may seem complicated, they reflect the

2

principle, recently recognized by the Federal Circuit, that Congress waived sovereign immunity of the United States to be sued on these types of claims in a very limited manner.    And, even though they may involve additional district courts, that is precisely what Congress directed when it enacted 7 U.S.C. §1508(j)(2)(A).

During the status conference, and in their letter, plaintiffs presented an incomplete and misleading summary of the status of all the cases pending involving these matters.    Therefore, we have summarized below the status of various claims relating to this case.

1.    Status of Claims Pending Before Eastern District of North Carolina, Transferred by JPML

A.    Introduction

These sets of cases are very complicated procedurally, as well as substantively.    Congress established a statutory scheme, pursuant to which plaintiffs, if they choose to file a crop insurance claim, must file, as a jurisdictional matter, "only in the district in which the farm is located." 7 U.S.C. §1508(j); 7 U.S.C. §1506(d).    Because matters of sovereign immunity of the United States are involved, we respectfully request that the Court consider the remand order from the Federal Circuit in light of this carefully-constructed statutory scheme for administrative and judicial review.    We seek to have this Court transfer the claims in a manner that is jurisdictionally correct.    It would be far better for this Court to transfer the claims now, in a manner consistent with the jurisdictional requirements of 7 U.S.C. §1508(j)(2)(A), so that in any future proceedings, each plaintiff at least "started" in the correct court, and no further transfer order might be required.

As we indicated in the status conference, and as we address below, this case cannot be considered a "tag-along" case under JPML principles because this Court is not a "district court"

3

pursuant to 28 U.S.C. §1407, the statute that governs JPML transfers. Therefore, this Court is only authorized, pursuant to 28 U.S.C. §1631, to transfer a claim to the court in which the claim "could have been brought at the time it was filed." The only courts that meet that standard are the judicial districts of the district courts in which the farms are located. The JPML is not a court in which plaintiffs could have filed initially.

B.    JPML Transfer Order and Status of Claims
      Pending Before Eastern District of North Carolina

The JPML, over the Government's opposition, transferred all the claims pending in the district courts in the five states named in this action ((Texas, Florida, Alabama, Georgia, South Carolina, which included all of the plaintiffs named in the caption in the Court of Federal Claims), to the Eastern District of North Carolina. The JPML also ordered the transfer of the plaintiffs named in the Eastern District of Virginia action to the Eastern District of North Carolina. Barnhill v. Davidson, No. 4:02-159 (E.D. N.C.).

Prior to the JPML order, the district court in the Eastern District of North Carolina certified a class, but limited the class to the plaintiffs who had farms in the district of the Eastern District, pursuant to 7 USC 1508(j)(2)(A). App. 24, 58, 75-76. The court in North Carolina also dismissed the claims of plaintiffs in the Eastern District of North Carolina who did not have farms in the Eastern District, pursuant to 7 USC §§1508(j)(2)(A). Id. The court in North Carolina subsequently certified a class as to each of the transferred cases, but also limited the class to the plaintiffs who had farms in the districts where the action had been filed. App. 76.

The North Carolina court ruled against the Government on other issues. The court held that plaintiffs were not required to exhaust administrative remedies before filing suit. App. 34-

58. The court ruled against the Government on liability. Id. The court later issued a decision adopting a damages formula, based upon the difference in the value of peanuts at the higher quota price (31 cents per pound) and the lower non-quota price (17 cents per pound), and rejected some of the Government's proposed offsets. App. 66-73.

Still pending before the Eastern District of North Carolina is plaintiffs' motion for nationwide class certification. This motion includes plaintiffs' attempts, among other things, to include in the action in North Carolina additional plaintiffs from states not previously involved in any of these actions (e.g., Oklahoma). Also pending is plaintiffs' motion for the court to reconsider its dismissal of plaintiffs with farms which are located outside the Eastern District of North Carolina (plaintiffs whose farms were located in the Middle or Western districts of North Carolina). 28 U.S.C. §113.

Also pending before the Eastern District are additional matters relating to damages, including the manner in which the money would be distributed[1] — whether the Government would issue the checks; whether the court would order the Government to pay a lump sum to plaintiffs' counsel who would distribute the checks; or, whether the court should appoint a special master.

---

[1] If the Government prevails on appeal, there will be no money distributed.

2.    Defendant's Proposed Procedure - Transfer Pursuant to 28 U.S.C. §1631

    A.    Introduction

    During the status conference in this Court, we proposed the procedure described below with respect to transfer to various district courts, not involving a transfer to the JPML

    This Court is a Court with no jurisdiction to entertain the claims, that is now required to transfer the claim to a court which does possess jurisdiction.   Neither the Eastern District of North Carolina nor the JPML possesses jurisdiction to entertain these claims, because the claims that the JPML transferred there are in the Eastern District in North Carolina only for consolidated pre-trial proceedings, not because jurisdiction exists in that court.

    B.    Two Categories of Plaintiffs

    Because it is plaintiffs' burden to establish jurisdiction, plaintiffs should be required to gather the appropriate information for each plaintiff named in this case, and identify the judicial district(s) in each of the five states involved (Texas, Florida, Alabama, Georgia, South Carolina) in which the plaintiff's farm (or farms)[2] is located. This process would reveal two distinct categories of plaintiffs:

    (i)    those who were named plaintiffs in one of the previously-filed district court cases now pending in the Eastern District of North Carolina, whose farms were located within the judicial district where the case was originally filed; and,

    (ii)    those whose farms were not within any such judicial districts.

---

[2] Some plaintiffs may have farms in more than one district within a state, for example, if their farm(s) is located overlapping a county line that is a boundary for a district court, or, if one plaintiff has more than one farm, each in different counties and districts within a state.

6

1.    Plaintiffs Whose Farms Are Located Within One
Of the Judicial Districts In the Five States

As to the former category ((i)), those plaintiffs are already a part of, and their claims encompassed within, the class previously certified by the court in the Eastern District of North Carolina for each of the district-specific cases transferred to it by the JPML. Accordingly, as to those plaintiffs, it may be both efficient and appropriate for this Court to transfer their claims directly to the Eastern District of North Carolina - given the transfer order issued by the JPML -- while expressly reserving our right on appeal to argue that the JPML erred in ordering the transfer. Conversely, it could be wasteful for this Court to transfer the claims for these plaintiffs individually named in this action to each of the districts in the five states. Transfer of this nature would require the transferee district courts to retransfer the claims to the JPML, which, in turn, would transfer to the Eastern District of North Carolina.

We propose that this Court, pursuant to 28 U.S.C. §1631, transfer the claims of those named plaintiffs pending before this Court, whose farms are located in the correct judicial districts in the five states in which cases were previously filed, to the Eastern District of North Carolina - given the transfer order issued by the JPML -- while expressly reserving our right on appeal to argue that the JPML erred in ordering the transfer.[3]

2.    Plaintiffs Whose Farms Are Not Located
In The Judicial Districts In The Five States

The latter category of plaintiffs (category (ii)), are quite different, as they have never been a part of any case pending in any appropriate or correct judicial district. Accordingly, for those

---

[3] The government also reserves the right to argue to the Eastern District of North Carolina that the transferred claims should be dismissed because they are entirely duplicative of claims already pending in that court.

plaintiffs named in this action, whose farms are <u>not</u> located in the specific judicial districts in the five states in which the cases were filed, this Court should transfer the claims for those named plaintiffs to the *appropriate judicial districts* in the district courts in the five states in which the farms are located, pursuant to 7 USC §1508(j)(2)(A), or, to the "home" district.

For example, in the action filed in this Court, plaintiffs named 56 plaintiffs in Texas, without, however, matching the names of the plaintiffs, to the counties in which the farms are located, to the four possible districts in the district courts in Texas. Plaintiffs filed one action in Texas, in the Eastern District of Texas, naming most if not all of the plaintiffs named in the action filed in this Court. However, in this Court, only 23 of the 56 Texas plaintiffs have farms in the Eastern District of Texas; it appears that the other 33 plaintiffs have farms in the three other districts in Texas (Northern, Southern, and Western districts). 28 U.S.C. §124 (four districts in Texas).[4]

Given the jurisdictional requirement of 7 U.S.C. §1508(j)(2)(A), once plaintiff identifies the named plaintiff and his or her farm, to the county, to the appropriate district within Texas, this Court should transfer the claims of each of those 33 plaintiffs to those districts in which each of the plaintiff's farm(s) are located, or, to the appropriate "home district."

---

[4] Of the five states named, three have more than one district (including the Northern, Middle and Southern Districts): Alabama, 28 U.S.C. §81; Florida, 28 U.S.C. §89; Georgia, 28 U.S.C. §90. In South Carolina, there is only one judicial district within the state. 28 U.S.C. §121.

In some of the complaints filed, there appear to be other errors in naming plaintiffs and matching the counties in which the farms are located to the judicial districts within the states. For example, in paragraph 9 of the Complaint filed in this Court, plaintiffs list "Opp" county in Alabama, but there is no such county listed in 28 U.S.C. §81. Plaintiffs should be responsible for correcting any errors in the names of plaintiffs, counties listed, match of names of plaintiffs to counties to judicial districts within a state, etc.

8

Once transferred to these appropriate district courts, the Government could agree, for present purposes, that it would not oppose a transfer by the JPML to the Eastern District of North Carolina (pursuant to the earlier transfer order of the JPML), as a tag-along case or otherwise, subject to our reservation of rights to argue on appeal that the JPML erred in ordering the transfer.[5]

While this may seem complicated, we also proposed a procedure to attempt to minimize the burden on the additional courts and offices of the United States Attorney that would become involved. As we explained during the status conference, if this Court effects the transfer as we propose, counsel of record at the Department of Justice, Commercial Litigation Branch, would communicate with all of the respective offices of the United States Attorneys to advise them of these proceedings and their status, and that the claims transferred to their districts should be transferred to the Eastern District of North Carolina, pursuant to the JPML order. This Court could also summarize, in the transfer order, the status of these proceedings. In this fashion, even though other district courts are involved, there will be little, if any, proceedings in the cases, and/or on the merits (at least in the near future) until the Eastern District of North Carolina decides all of the pending issues before it, and the Government determines whether to appeal that decision to the United States Court of Appeals for the Fourth Circuit, and if so, to pursue the appeal to completion.

---

[5] In the status conference, we proposed that the "home" district transfer directly to the Eastern District of North Carolina without plaintiffs filing, first, with the JPML. However, it appears that it would be more appropriate for the parties and the courts to comply with the procedures applicable to JPML transfers, and that, once this Court transfers the appropriate plaintiffs to the appropriate home districts, plaintiffs file their motion with the JPML, which we would not oppose, for transfer to the Eastern District of North Carolina (subject to our appellate rights).

Error: timeout

3.     Conclusion

The process that we propose is the only transfer process consistent with 28 U.S.C. §1631 and the mandate from the Federal Circuit to this Court. The Federal Circuit remanded the case for a narrow purpose – so that this Court would evaluate *transfer pursuant to 28 U.S.C. §1631* to a district court which possesses jurisdiction to entertain the claim, and nothing more.

In contrast, plaintiffs' proposal ignores the limited scope of the remand, by requesting that this Court direct transfer pursuant to other rules -- that of the JPML, 28 U.S.C. §1407 -- that are not applicable in or to the Court of Federal Claims – and without explaining the authority, if any, that the Court of Federal Claims would possess to invoke those rules. Whatever rules or procedures exist that define or describe for the JPML the manner in which the JPML might treat these claims once they are in an appropriate district have no bearing upon the section 1631 transfer that is the **only** subject matter for this Court. In short, plaintiffs request that this Court act as if it is **both** the JPML and a transferor court that already possesses jurisdiction, when in reality, it is neither.

Accordingly, we respectfully request that this Court:

1.     transfer to the Eastern District of North Carolina the claims of those named plaintiffs whose farms are located in the correct judicial districts in which the suits were actually filed in the five states, subject to our right on appeal to argue that the JPML erred in ordering the transfer;

2.     require plaintiff's counsel to identify those plaintiffs named in this action, whose farms are not located in the specific judicial districts in the five states in which the cases were filed, so that this Court may transfer the claims for those named plaintiffs to the appropriate judicial districts in the district courts in the five states in which the farms are located, pursuant to 7 USC §1508(j)(2)(A), subject to our right on appeal to argue that the JPML erred in ordering the transfer.

10

*      *      *

3.     It Is Not Necessary For This Court To Notify the JPML Of the Pendency
       of Potential "Tag-Along" Actions in This Court And/or In
       District Courts Other Than Those Already Subject to the JPML Order

        Pursuant to this Court's Order dated September 7, 2005, defendant states that, for the

reasons set forth above, it is not necessary or appropriate, at this time, for this Court to notify the

JPML of the pendency of potential tag-along actions in this Court and/or in district courts other

than those already subject to the JPML Order.

        There is a body of law developed pursuant to the decisions and rules of the JPML,

including the "tag-along" rules of the JPML. See 199 F.R.D. 425 (2001) for a complete set of

the JPML Rules. A "tag-along" action is defined in JPML Rule 1.1 as "a civil action pending in

a district court and involving common questions of fact with actions previously transferred under

section 1407." E.g., Wiatt v. Merck & Company, 2005 WL 1799740, *3 (W.D. Wa, 2005);

Illinois Municipal Retirement Fund v. Citigroup, Inc., 391 F.3d 844,  (7th Cir. 2004). See

generally "The Judicial Panel and the Conduct of Multidistrict Litigation,:" 87 Harv.L.Rev.1001

(1974).

        The Court of Federal Claims is not a district court.  Any action filed here cannot, by

definition, be a "tag-along" action.  Therefore, it is not necessary for this Court to notify the

JPML of any possible transfer from this Court to the JPML because such a transfer is not

authorized by law.

        Further, there is no requirement for *this Court* to notify the JPML of any possible transfer

from a judicial district in one of the four states (Alabama, Florida, Georgia, Texas) to the JPML.

Rather, it is more appropriate for any additional district court (a "home" district) to which

11

plaintiffs may be transferred, either to notify the JPML of a possible tag-along action, and/or transfer directly to the Eastern District of North Carolina, pursuant to the earlier JPML order.

If, however, this Court determines that it would be an appropriate courtesy for this Court to inform the JPML of the status of these cases, we would have no objection to such notice.

In sum, each named plaintiff should be in the correct "home" district - the judicial district in which the farm is located. 7 U.S.C. §1508(j)(2)(A). After that is accomplished, the Government could stipulate, for present purposes, that it would not oppose any motion filed with the JPML by plaintiffs in the appropriate home district to transfer those claims to the Eastern District of North Carolina (reserving our right on appeal to argue that the JPML transfer order was in error), at least until the North Carolina court issues all the decisions necessary for the Government to be in a position to decide whether to appeal to the Fourth Circuit, and to pursue that appeal through completion.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that this Court issue an order to:

1.     transfer to the Eastern District of North Carolina the claims of those named plaintiffs who are named plaintiffs in one of the previously-filed district court cases in the Middle District of Alabama, Northern District of Florida, Middle District of Georgia, District South Carolina, and Eastern District of Texas, whose farms were located in the judicial district in which their claims were filed, subject to our right on appeal to argue that the JPML erred in ordering the transfer;

12

2.    require plaintiff's counsel to identify those plaintiffs named in this action, whose

farms are <u>not</u> located in the specific judicial districts in the five states in which the

cases were filed, so that this Court may transfer the cases for those named

plaintiffs to the appropriate judicial districts in the district courts in the five states

in which the farms are located, pursuant to 7 USC §1508(j)(2)(A), subject to our

right on appeal to argue that the JPML erred in ordering the transfer.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
    Attn:  Classification Unit
    8th Floor
1100 L Street, N.W.
Washington, D.C.  20530
Tele: (202) 307-1011
Facsimile: (202) 514-8624
Attorneys for Defendant

September 21, 2005

13

APPENDIX

INDEX TO APPENDIX

                                                                                        Page

Letter, September 6, 2005, from counsel for plaintiffs, Mr. R. Daniel Boyce
    to The Honorable Nancy Firestone.................................................................    1

Barnhill et al. v. Ross J. Davidson et al, No. 4:02-159 (E.D. N.C.),
    Order, July 22, 2004 (summary judgment, class certification)...........................    11

Barnhill et al. v. Ross J. Davidson et al, No. 4:02-159 (E.D. N.C.),
    Order, January 21, 2005(practice and procedure order,
    pursuant to JPML transfer)..............................................................................    61

Barnhill et al. v. Ross J. Davidson et al, No. 4:02-159 (E.D. N.C.),
    Order, March 31, 2005(damage formula).......................................................    66

Barnhill et al. v. Ross J. Davidson et al, No. 4:02-159 (E.D. N.C.),
    Order, March 31, 2005(summary judgment in transferee cases;
    district-wide class)...........................................................................................    74

BOYCE & ISLEY, PLLC

ATTORNEYS AT LAW
LAWYERS WEEKLY BUILDING, SUITE 100
POST OFFICE BOX 1990
RALEIGH, NORTH CAROLINA 27602-1990

107 Fayetteville Street Mall
Raleigh, North Carolina 27601

Telephone (919) 833-7373
Facsimile (919) 833-7536

G. Eugene Boyce
R. Daniel Boyce
Philip R. Isley
Laura Boyce Isley

September 6, 2005

(VIA FACSIMILE 903-935-0221
AND UNITED STATES MAIL)

The Honorable Nancy Firestone
Judge - United States Court of Federal Claims
717 Madison Place, NW
Washington, DC 20005

    Re:    Texas Peanut Farmers: Billy M. Barnes, et al. v. Ross J. Davidson, et al.
           No. 03-445, Judge Firestone

Dear Judge Firestone:

    It is my understanding we are scheduled for a telephone conference on September 7, 2005. Although the notice did not indicate the purpose of the status conference, I am assuming it is to discuss the Federal Circuit Court of Appeals' ruling that jurisdiction does indeed lie in the federal district courts, but that the case presently pending in the Court of Federal Claims should be transferred to the various federal districts where venue would be proper. For purposes of such a discussion, I am enclosing a copy of the transfer order from the Judicial Panel on Multidistrict Litigation, as well as the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, specifically Rule 1.1, "Definitions" regarding "tag-along action"; Rule 1.6, "Transfer of Files"; Rule 7.4, "Conditional Transfer Orders for 'Tag-Along Actions'", and Rule 7.5, "Miscellaneous Provisions Concerning 'Tag-Along Actions'". I hope this Order and these Rules of Procedure will assist us in our discussion of the transfer.

    Thank you for your attention to these matters.

           Very truly yours,

           BOYCE & ISLEY, PLLC

           R. Daniel Boyce

           R. Daniel Boyce

RDB/sj
Enclosures
cc:    Ms. Jane Vaneman (via facsimile)
(cc/claims/9/6/05 judge fireston ltr)

Scanned

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FILED-CLERK
US DISTRICT COURT

OCT 2 6 2004

*RELEASED FOR PUBLICATION* 98
04 NOV -1  PM 2: 1

FILED
CLERK'S OFFICE

*DOCKET NO. 1634* MARSHALL

*BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

*IN RE PEANUT CROP INSURANCE LITIGATION* 2:03CV130

*BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ, ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL*

*TRANSFER ORDER*

This litigation currently consists of seven actions listed on the attached Schedule A and pending, respectively, in the Middle District of Alabama, the Northern District of Florida, the Middle District of Georgia, the Eastern District of North Carolina, the District of South Carolina, the Eastern District of Texas, and the Eastern District of Virginia.[1] Plaintiffs in the seven actions move the Panel, pursuant to 28 U.S.C. § 1407, for an order centralizing this litigation in the Eastern District of North Carolina. The defendants in the actions, who are the United States, two United States Government officials, and three United States departments or agencies, oppose transfer. If the Panel determines to order transfer over their objections, then these defendants suggest that the Eastern District of Virginia would be an appropriate transferee district.

On the basis of the papers filed and hearing session held, the Panel finds that the actions in this litigation involve common questions of fact, and that centralization under Section 1407 in the Eastern District of North Carolina will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. Plaintiff peanut farmers in each action allege that common defendants on or after May 13, 2002, unlawfully and unilaterally imposed modifications to the Multiple Peril Crop Insurance Policy for Year 2002, which changed the plaintiff farmers' insurance coverage by reducing it from $ .31 to $.1775 per pound of peanuts. Centralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to jurisdictional and class certification matters), and conserve the resources of the parties, their counsel and the judiciary.

Objecting defendants have argued that Section 1407 transfer would circumvent the requirements of 7 U.S.C. § 1508(j)(2)(a), which provides that actions on crop insurance claims may

[1] The Section 1407 motion, as originally filed, also pertained to an additional action brought in the United States Court of Federal Claims. Movants subsequently withdrew this action from the list of actions encompassed by their motion in recognition of the fact that the action had been dismissed and was on appeal. Also, the Panel has been notified of one additional related action recently filed in the Middle District of Alabama. In light of the Panel's disposition of this docket, this action will be treated as a potential tag-along action. See Rules 7.4 and 7.5, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001).

2

- 2 -

be brought only in the district court for the district in which the insured farm is located. Opponents argue that because of this clear Congressional mandate that a federal court, in a particular district, possesses exclusive jurisdiction to entertain certain farmers' crop insurance claims, the Panel cannot or should not exercise its Section 1407 authority to transfer multiple such actions to a single district for coordinated or consolidated pretrial proceedings. We note, however, that in considering transfer under Section 1407, the Panel is not encumbered by considerations of venue. *In re Great Western Ranches Litigation*, 369 F Supp. 1406, n.1 (J P M L 1974). An opposite conclusion would frustrate the essential purpose of Congress in enacting Section 1407 and providing for transfer of civil actions to "any district" by the Panel, namely, to permit centralization in one district of all pretrial proceedings when civil actions involving one or more common questions of fact are pending in different districts. *See In re Matter of New York City Municipal Securities Litigation*, 572 F 2d 49 (2nd Cir. 1978). We also note that any action transferred under Section 1407 for coordinated or consolidated pretrial proceedings that has not been terminated in the transferee district court will be remanded to its transferor district for trial. *See* Rule 7.6, R.P J P M L, 199 F R D 425, 436-38 (2001).

In concluding that the Eastern District of North Carolina is an appropriate forum for this docket, we note that the proceedings are furthest advanced in that district, which is also well equipped with the resources that this docket is likely to require.

IT IS THEREFORE ORDERED that, pursuant to 28 U S C § 1407, the actions listed on Schedule A and pending outside the Eastern District of North Carolina are transferred to the Eastern District of North Carolina and, with the consent of that court, assigned to the Honorable Malcolm J. Howard for coordinated or consolidated pretrial proceedings with the action pending in that district and listed on Schedule A.

FOR THE PANEL

Wm. Terrell Hodges
Chairman

3

SCHEDULE A

MDL-1634 -- In re Peanut Crop Insurance Litigation

        Middle District of Alabama

*Terry E. Beasley, et al. v. Ross J. Davidson, et al.*, C.A. No. 1-03-500

        Northern District of Florida

*Florida Peanut Farmers, et al. v. Ross J. Davidson, et al.*, C.A. No. 5-03-107

        Middle District of Georgia

*Georgia Peanut Farmers, et al. v. Ross J. Davidson, et al.*, C.A. No. 1-03-175

        Eastern District of North Carolina

*Marvin Taylor Barnhill, et al. v. Ross J. Davidson, et al.*, C.A. No. 4-02-159

        District of South Carolina

*Wallace A. Berry, et al. v. Ross J. Davidson, et al.*, C.A. No. 3-03-1631

        Eastern District of Texas

*Texas Peanut Farmers, et al. v. Ross J. Davidson, et al.*, C.A. No. 2-03-120

        Eastern District of Virginia

*Tom Clements, et al. v. Ross J. Davidson, et al.*, C.A. No. 2-03-552

4

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
FILED

April 2, 2001

MICHAEL J. BECK
CLERK OF THE PANEL

Effective    November    2,    1998,
With    Amendments    Effective
June 2, 2000,  &  April 2, 2001

RULES OF PROCEDURE
OF THE
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

TABLE OF CONTENTS

I. GENERAL RULES/RULES FOR MULTIDISTRICT LITIGATION
UNDER 28 U.S.C. §1407

Rule 1.1:    Definitions
Rule 1.2:    Practice
Rule 1.3:    Failure to Comply with Rules
Rule 1.4:    Admission to Practice Before the Panel and Representation in Transferred Actions
Rule 1.5:    Effect of the Pendency of an Action Before the Panel
Rule 1.6:    Transfer of Files
Rule 5.1:    Keeping Records and Files
Rule 5.11:   Place of Filing of Papers
Rule 5.12:   Manner of Filing Papers
Rule 5.13:   Filing of Papers, Computer Generated Disk Required
Rule 5.2:    Service of Papers Filed
Rule 5.3:    Corporate Disclosure Statement
Rule 6.2:    Applications for Extensions of Time
Rule 7.1:    Form of Papers Filed
Rule 7.2:    Motion Practice
Rule 7.3:    Show Cause Orders
Rule 7.4:    Conditional Transfer Orders for "Tag-Along Actions"
Rule 7.5:    Miscellaneous Provisions Concerning "Tag-Along Actions"
Rule 7.6:    Termination and Remand
Rule 16.1:   Hearing Sessions and Oral Argument

II. RULES FOR MULTICIRCUIT PETITIONS FOR REVIEW
UNDER 28 U.S.C. §21120(a)(5)

Rule 17.1:   Random Selection
Rule 25.1:   Filing of Notices
Rule 25.2:   Accompaniments to Notices
Rule 25.3:   Service of Notices
Rule 25.4:   Form of Notices
Rule 25.5:   Service of Panel Consolidation Order

CONVERSION TABLE

- 2 -

RULES OF PROCEDURE
OF THE
JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

I. GENERAL RULES/RULES FOR MULTIDISTRICT LITIGATION
UNDER 28 U.S.C. §1407

**RULE 1.1:    DEFINITIONS**

As used in these Rules "Panel" means the members of the Judicial Panel on Multidistrict Litigation appointed by the Chief Justice of the United States pursuant to Section 1407, Title 28, United States Code.

"Clerk of the Panel" means the official appointed by the Panel to act as Clerk of the Panel and shall include those deputized by the Clerk of the Panel to perform or assist in the performance of the duties of the Clerk of the Panel.

"Chairman" means the Chairman of the Judicial Panel on Multidistrict Litigation appointed by the Chief Justice of the United States pursuant to Section 1407, or the member of the Panel designated by the Panel to act as Chairman in the absence or inability of the appointed Chairman.

A "tag-along action" refers to a civil action pending in a district court and involving common questions of fact with actions previously transferred under Section 1407.

**RULE 1.2:    PRACTICE**

Where not fixed by statute or rule, the practice shall be that heretofore customarily followed by the Panel.

**RULE 1.3:    FAILURE TO COMPLY WITH RULES**

The Clerk of the Panel may, when a paper submitted for filing is not in compliance with the provisions of these Rules, advise counsel of the deficiencies and a date for full compliance. If full compliance is not accomplished within the established time, the non-complying paper shall nonetheless be filed by the Clerk of the Panel but it may be stricken by order of the Chairman of the Panel.

**RULE 1.4:    ADMISSION TO PRACTICE BEFORE THE PANEL AND REPRESENTATION IN
TRANSFERRED ACTIONS**

Every member in good standing of the Bar of any district court of the United States is entitled without condition to practice before the Judicial Panel on Multidistrict Litigation. Any attorney of record in any action

6

RULE 1.6: TRANSFER OF FILES

(a) Upon receipt of a certified copy of a transfer order from the clerk of the transferee district court, the clerk of the transferor district court shall forward to the clerk of the transferee district court the complete original file and a certified copy of the docket sheet for each transferred action.

(b) If an appeal is pending, or a notice of appeal has been filed, or leave to appeal has been sought under 28 U.S.C. §1292(b) or a petition for an extraordinary writ is pending, in any action included in an order of transfer under 28 U.S.C. §1407, and the original file or parts thereof have been forwarded to the court of appeals, the clerk of the transferor district court shall notify the clerk of the court of appeals of the order of transfer and secure the original file long enough to prepare and transmit to the clerk of the transferee district court a certified copy of all papers contained in the original file and a certified copy of the docket sheet.

(c) If the transfer order provides for the separation and simultaneous remand of any claim, cross-claim, counterclaim, or third-party claim, the clerk of the transferor district court shall retain the original file and shall prepare and transmit to the clerk of the transferee district court a certified copy of the docket sheet and copies of all papers except those relating exclusively to separated and remanded claims.

(d) Upon receipt of an order to remand from the Clerk of the Panel, the transferee district court shall prepare and send to the clerk of the transferor district court the following:

(i) a certified copy of the individual docket sheet for each action being remanded;

(ii) a certified copy of the master docket sheet, if applicable;

(iii) the entire file for each action being remanded, as originally received from the transferor district court and augmented as set out in this rule;

(iv) a certified copy of the final pretrial order, if applicable; and

(v) a "record on remand" to be composed of those parts of the files and records produced during coordinated or consolidated pretrial proceedings which have been stipulated to or designated by counsel as being necessary for any or all proceedings to be conducted following remand. It shall be the responsibility of counsel originally preparing or filing any document to be included in the "record on remand" to furnish on request sufficient copies to the clerk of the transferee district court.

(e) The Clerk of the Panel shall be notified when any files have been transmitted pursuant to this Rule.

- 6 -

designating such a pleading as a motion, shall acknowledge that designation by the distribution of a briefing schedule to all parties in the docket. Response time resulting from an additional motion shall ordinarily be extended only to those parties directly affected by the additional motion. An accelerated briefing schedule for the additional motion may be set by the Clerk of the Panel to conform with the hearing session schedule established by the Chairman.

(i)    Any party or counsel in a new group of actions under consideration by the Panel for transfer under Section 1407 shall promptly notify the Clerk of the Panel of any potential 'tag-along' action in which that party is also named or in which that counsel appears.

RULE 7.3:    SHOW CAUSE ORDERS

(a)    When transfer of multidistrict litigation is being considered on the initiative of the Panel pursuant to 28 U.S.C. §1407(c)(i), an order shall be filed by the Clerk of the Panel directing the parties to show cause why the action or actions should not be transferred for coordinated or consolidated pretrial proceedings. Any party or counsel in such actions shall promptly notify the Clerk of the Panel of any other federal district court actions related to the litigation encompassed by the show cause order. Such notification shall be made for additional actions pending at the time of the issuance of the show cause order and whenever new actions are filed.

(b)    Any party may file a response to the show cause order within twenty days of the filing of said order unless otherwise provided for in the order. Failure of a party to respond to a show cause order shall be treated as that party's acquiescence to the Panel action contemplated in the order.

(c)    Within five days after the lapse of the time period for filing a response, any party may file a reply limited to new matters.

(d)    Responses and replies shall be filed and served in conformity with Rules 5.12, 5.2 and 7.1 of these Rules.

(e)    With respect to any action that is the subject of Panel consideration, counsel shall promptly notify the Clerk of the Panel of any development that would partially or completely moot the matter before the Panel.

RULE 7.4:    CONDITIONAL TRANSFER ORDERS FOR "TAG-ALONG ACTIONS"

(a)    Upon learning of the pendency of a potential "tag-along action," as defined in Rule 1.1 of these Rules, an order may be entered by the Clerk of the Panel transferring that action to the previously designated transferee district court on the basis of the prior hearing session(s) and for the reasons expressed in previous opinions and orders of the Panel in the litigation. The Clerk of the Panel shall serve this order on each party to the litigation but, in order to afford all parties the opportunity to oppose transfer, shall not send the order to the clerk of the transferee district court for fifteen days from the entry thereof.

(b)    Parties to an action subject to a conditional transfer order shall notify the Clerk of the Panel within the fifteen-day period if that action is no longer pending in its transferor district court.

8

- 10 -

(c)     Any party opposing the transfer shall file a notice of opposition with the Clerk of the Panel within the fifteen-day period. If a notice of opposition is received by the Clerk of the Panel within this fifteen-day period, the Clerk of the Panel shall not transmit said order to the clerk of the transferee district court until further order of the Panel. The Clerk of the Panel shall notify the parties of the briefing schedule.

(d)     Within fifteen days of the filing of its notice of opposition, the party opposing transfer shall file a motion to vacate the conditional transfer order and brief in support thereof. The Chairman of the Panel shall set the motion for the next appropriate hearing session of the Panel. Failure to file and serve a motion and brief shall be treated as withdrawal of the opposition and the Clerk of the Panel shall forthwith transmit the order to the clerk of the transferee district court.

(e)     Conditional transfer orders do not become effective unless and until they are filed with the clerk of the transferee district court.

(f)     Notices of opposition and motions to vacate such orders of the Panel and responses thereto shall be governed by Rules 5.12, 5.2, 7.1 and 7.2 of these Rules.

## RULE 7.5     MISCELLANEOUS PROVISIONS CONCERNING "TAG-ALONG ACTIONS"

(a)     Potential "tag-along actions" filed in the transferee district require no action on the part of the Panel and requests for assignment of such actions to the Section 1407 transferee judge should be made in accordance with local rules for the assignment of related actions.

(b)     Upon learning of the pendency of a potential "tag-along action" and having reasonable anticipation of opposition to transfer of that action, the Panel may direct the Clerk of the Panel to file a show cause order, in accordance with Rule 7.3 of these Rules, instead of a conditional transfer order.

(c)     Failure to serve one or more of the defendants in a potential "tag-along action" with the complaint and summons as required by Rule 4 of the Federal Rules of Civil Procedure does not preclude transfer of such action under Section 1407. Such failure, however, may be submitted by such a defendant as a basis for opposing the proposed transfer if prejudice can be shown. The inability of the Clerk of the Panel to serve a conditional transfer order on all plaintiffs or defendants or their counsel shall not render the transfer of the action void but can be submitted by such a party as a basis for moving to remand as to such party if prejudice can be shown.

(d)     A civil action apparently involving common questions of fact with actions under consideration by the Panel for transfer under Section 1407, which was either not included in a motion under Rule 7.2 of these Rules, or was included in such a motion that was filed too late to be included in the initial hearing session, will ordinarily be treated by the Panel as a potential "tag-along action."

(e)     Any party or counsel in actions previously transferred under Section 1407 or under consideration by the Panel for transfer under Section 1407 shall promptly notify the Clerk of the Panel of any potential "tag-along actions" in which that party is also named or in which that counsel appears.

# BOYCE & ISLEY, PLLC

### ATTORNEYS AT LAW

LAWYERS WEEKLY BUILDING, SUITE 100
POST OFFICE BOX 1990
RALEIGH, NORTH CAROLINA 27602-1990

G. EUGENE BOYCE
R. DANIEL BOYCE
PHILIP R. ISLEY
LAURA BOYCE ISLEY

107 FAYETTEVILLE STREET MALL
RALEIGH, NORTH CAROLINA 27601

TELEPHONE (919) 833-7373
FACSIMILE (919) 833-7536

## FACSIMILE COVER SHEET

To:        The Honorable Nancy Firestone        Fax:    903-935-0221
           Jane Vaneman                                  202-514-8624

From:      R. Daniel Boyce

Date:      September 6, 2005

Number of pages, including cover sheet:  10

Hard Copy to Follow: Yes ___✓___        No _____

Message    Re:    Telephone conference on September 7, 2005
                  Texas Peanut Case

## CONFIDENTIALITY NOTE

        The information contained in this facsimile message is confidential and intended only for
the use of the recipient named above. If you receive this transmission in error, please
immediately notify us by telephone and return the original via U.S. Mail. Thank you.
                                                Operator: _____

10

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:02-CV-159-H(4)

FILED

JUL 2 2 2004

MARVIN TAYLOR BARNHILL, et
al.,

    Plaintiffs,

    v.

ROSS J. DAVIDSON,
ADMINISTRATOR, RISK
MANAGEMENT AGENCY, et al.,

    Defendants.

**ORDER**

This matter is before the court on the plaintiffs' motion for
class certification pursuant to Fed. R. Civ. P. 23, filed June 18,
2003, and on the parties' cross-motions for summary judgment, filed
June 6, 2003, and January 2, 2004. The court conducted a full
hearing in this matter on May 20, 2004, at which the parties
addressed all pending issues and motions. Thus, this matter is
ripe for adjudication.

## STATEMENT OF THE CASE

Plaintiffs in this action are 461 peanut farmers from
Virginia, North Carolina, and South Carolina,[1] who applied for and
obtained Multiple Peril Crop Insurance ("MPCI"), pursuant to the
Federal Crop Insurance Act, 7 U.S.C. § 1508(h), for their peanut

---

[1] Of the 461 plaintiffs, 274 are from North Carolina, 185 are
from Virginia, and 2 are from South Carolina.

ll

crops for the 2002 crop year.[2]  Defendants administer the federal
crop insurance program and include the Risk Management Agency
(RMA); Ross Davidson, the Administrator for the RMA; the United
States Department of Agriculture (USDA); Ann Veneman, the Secretary
of Agriculture for the United States; and, the United States.[3]

    Plaintiffs expected to receive federal crop insurance coverage
at the quota price election level of $0.31 per pound of peanuts
grown for 2002.  However, on May 13, 2002, Congress passed the Farm
Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116
Stat. 134 ("the Farm Security Act"), which eliminated the quota
system for peanuts.[4]  As a result, all insurance claims for peanut
crop losses were paid at the non-quota price election rate of
$0.1775 per pound.  Plaintiffs claim that defendants breached the
insurance contract by reducing the coverage payments from $0.31 to
$0.1775 per pound of peanuts.

    Plaintiffs' complaint, filed on November 19, 2002, includes
six claims: a breach of contract claim, three claims for denial of

---

    [2] The court is aware that similarly situated peanut farmers
have filed complaints in the Court of Federal Claims and in federal
district courts in Virginia, Texas, Alabama, Georgia, Florida, and
South Carolina.  Additionally, the plaintiffs have filed documents
with the Judicial Panel on Multidistrict Litigation.  However, as
pendency before the panel does not affect pretrial jurisdiction of
this court, this court will currently decide the motions before it.

    [3] The court will collectively refer to the defendants as "the
government."

    [4] The sections of the Farm Security Act that relate to peanuts
are codified at 7 U.S.C. 7951-7960.

2

12

due process, and two claims for violation of various statutes requiring notice of policy changes. Plaintiffs currently seek class certification and request summary judgment on the breach of contract and due process claims.

On January 2, 2004, defendants filed a motion to dismiss, or alternatively for summary judgment. Because defendants' motion references documents outside the pleadings, the court will consider it as a motion for summary judgment. Defendants' motion for summary judgment requests the court to dismiss the plaintiffs' claims for lack of standing and for failure to exhaust administrative remedies.

## STATEMENT OF THE FACTS

The parties agree on the following facts.[5] The peanut quota system had been in place, in various versions, since 1938, when Congress enacted the Agricultural Adjustment Act of 1938 ("the 1938 Act"), currently codified at 7 U.S.C. § 1281 (2000). The 1938 Act "terminated the free market production and sale of agricultural commodities within the United States, including peanuts." See Members of the Peanut Quota Holders Ass'n v. United States, 60 Fed. Cl. 524, 525 (2004) (discussing history of peanut quota

---

[5]    Though defendants dedicate a section of their response to plaintiffs' motion for summary judgment to "disputed facts," defendants do not actually dispute any of the dispositive facts, but merely the legal conclusions that may follow from them.

3

regulation). It provided assistance to farmers through direct payments and restrictions on competition. Id. The peanut quotas were initially based solely on acreage, but the Food and Agriculture Act of 1977, Pub. L. No. 95-113, §§ 801-807, 91 Stat. 913, instituted quotas based on the weight of peanuts produced. Id. These poundage quotas applied to domestic edible peanuts, but not those grown for export or for crushing into oil. Id. In 1981 Congress terminated acreage quotas, leaving only poundage quotas. Id. (citing the Agriculture and Food Act of 1981, Pub. L. No. 97-98, §§ 701-707, 95 Stat. 1213, 1248).

In 1996, Congress passed the Federal Agriculture Improvement and Reform Act of 1996, Pub. L. No. 104-127, § 155(I)(2), 110 Stat. 888, 928 ("the 1996 Act"). This Act ended direct payments to peanut farmers but gave them price supports in the form of marketing loans. The 1996 Act set the loan rate for quota peanuts at $610 per ton (approximately $0.31 per pound) for the years 1996 through 2002. In contrast, the loan rate originally set for non-quota peanuts for the 2002 crop year was only $132 per ton ($0.16 per pound).

On May 13, 2002, Congress passed the Farm Security Act. The Farm Security Act took the drastic step of eliminating the quota system for peanuts, so that "anyone could now grow and market unlimited quantities of peanuts without penalty or restriction." Members of the Peanut Quota Holders Ass'n v. United States, 60 Fed.

4

14-

Cl. at 525. The Farm Security Act included a "buyout" for quota holders under which quota holders would receive a total of $0.55 per pound. This buyout did not affect the crop insurance agreements. The federal peanut program is managed by the Farm Service Agency (FSA), an agency of the USDA.

The federal crop insurance program also began in 1938, with the passage of the Federal Crop Insurance Act of 1938. See H. R. Rep. No. 103-649, reprinted in 1994 U.S.S.C.A.N. 2516, 2518. "From its origin, the stated purpose of the federal crop insurance program has been 'to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance.'" Wiley v. Glickman, No. CIV A3-99-32, 1999 WL 33283312, at *1 (D.N.D. Sept. 3, 1999) (discussing history of federal crop insurance program) (quoting 7 U.S.C. § 1502(a)). The crop insurance program was amended in 1980 and again in 1994 to increase farmers' participation in the program and to make federal crop insurance "the farmers' primary source of risk management." Id. (citing 1994 U.S.S.C.A.N. at 2517, 2519).

The federal MPCI policies are contracts of insurance between private insurers and eligible farms. The Federal Crop Insurance Corporation ("FCIC"), an agency of the USDA, reinsures these contracts through separate contracts between the insurers and the FCIC. The Risk Management Agency is also an independent agency of the USDA and is responsible for overseeing the FCIC and

15

administering the MPCI program.

For the 2002 crop year, plaintiffs obtained MPCI policies on their peanut crops. The MPCI policies consisted of the basic provisions, the peanut provisions, the special provisions and actuarial documents, the applicable regulations in 7 CFR chapter IV and the accepted insurance application. (MPCI policy, basic provisions § 1.) The amount of MPCI coverage available to peanut farmers was tied to the federal peanut program as it then existed. Under the MPCI policy provisions, any changes to the policy provisions, price elections, amounts of insurance, premium rates, and program dates must be made prior to the contract change date. (Id. § 4(b).) For the 2002 crop year, the contract change date was November 30, 2001. (MPCI policy, peanut provisions § 4.) On November 30, 2001, an addendum to the insurance policies provided that the price election would be $0.31 per pound for quota peanuts and $0.16 per pound for non-quota peanuts. (MPCI policy, special provisions.)

The MPCI policies also contained other key dates. The cancellation and termination date and the sales closing date for North Carolina policies was February 28, 2002. (Peanut provisions § 5; N.C. Special Provisions.) After this date, the farmers were bound by the insurance contract and were not allowed to rescind or change the contract. (Basic provisions § 1.) The initial planting

16

date for North Carolina farmers was April 16, 2002.[6] (N.C. Special Provisions.) Farmers in North Carolina could plant their peanut crops only between this date and the final planting date, May 31, 2002. (Basic provisions § 1.)

The method for settling crop loss claims was set forth in the peanut crop provision, § 14. Under that method, the amount of insured non-quota peanuts is equal to the insured acreage multiplied by the production guarantee per acre, minus the insured effective poundage marketing quota. (Peanut provisions § 14(c)(1)-(2)). For settling the claim, the effective poundage marketing quota is the lesser of:

1) The amount of the effective poundage marketing quota reported on the acreage report;
2) The amount of the FSA effective poundage marketing quota; or
3) The amount determined at the final settlement of your claim.

(Id. § 14(b)). Similarly, the peanut provisions define the term "[e]ffective poundage marketing quota" as "[t]he number of pounds reported on the acreage report as eligible for the average support

---

[6] The cancellation and termination date for Virginia, New Mexico, and Oklahoma, and some Texas counties was March 15, 2002. (Peanut provisions § 5.) Some other Texas counties were subject to a January 15, 2002, cancellation and termination date, and the February 28, 2002, cancellation and termination date also applied to some counties in Texas and to all other states. (Id.) The sales closing date in Virginia was March 15, 2002. For Virginia peanut farmers, the initial planting date was April 11, 2002, and the final planting date was June 10, 2002. (V.A. Special Provisions.)

17

price per pound..., not to exceed the Marketing Quota established
by FSA for the farm serial number." (Id. § 1.)

Each year between 1996 and 2002, the Secretary of Agriculture
would establish a national poundage quota by December 15 of the
year preceding the marketing year, pursuant to former 7 U.S.C. §
1358-1. See 7 U.S.C. § 1358-1(a)(2) (2001) (requiring Secretary to
announce national peanut poundage quota for a marketing year not
later than December 15 preceding the marketing year). The national
poundage quota would later be apportioned to the states, and the
FSA would then assign farm poundage quotas to individual farms.
See 7 U.S.C. § 1358-1(a)(3) (2001) (stating that the national
poundage quota shall be apportioned among the states); 7 U.S.C. §
1358-1(b) (2001) (providing for allocation of farm poundage quotas
to individual farms). On December 14, 2001, the USDA announced a
national poundage quota for peanuts for the 2002 crop year.
(Admin. Record at Vol. 2 p. 3.) The 2002 quota was at the same
level as the 2001 quota. When the USDA allocated the national
poundage quota to the states on January 15, 2002, it stated that
"[t]he 2002 national poundage quota ... will be allocated to
eligible quota and nonquota farms according to 1-PN, paragraph
140." (FSA Notice PN-649, Record at Vol. 2 p. 5.)

However, the FSA never allocated the 2002 national poundage
quota to individual farms. In fact, on May 3, 2002, the FSA
directed the county offices not to allocate the current year peanut

quota, and it informed them that the software that the offices would soon receive would be disabled from allocating the quotas to individual farms.  (FSA Notice PN-652, Record at Vol. 2 p. 9; see also RMA Bulletin MGR-01-016, Record at Vol. 1 p. 28.)

The December 14, 2001, announcement alerted the farmers to the possibility that the quota system might be eliminated. Specifically, it stated that:

> The Farm Bill currently being considered by Congress would dramatically change the peanut program. Poundage quotas would be eliminated and price support would be replaced with a target price and deficiency payment plan.  If pending legislation is enacted as Law for 2002, the 2002 poundage quota announced according to this notice will be altered or rescinded.

(Record at Vol. 2 p. 3.)  The notice allocating the quota to the states also contained a warning that the new Farm Bill, if passed, might eliminate the quota system for peanuts. (FSA Notice PN-649, Record at Vol. 2 p. 5.)

Congress passed the Farm Security Act on May 13, 2002, eliminating the quota system of price supports for peanuts in the middle of the 2002 crop year, after peanuts had been planted and after the last date farmers could cancel or change their crop insurance.  The Farm Security Act raised the price election for non-quota peanuts from $0.16 to $0.1775 per pound and effectively eliminated the $0.31 per pound price election for quota peanuts. Because the Farm Security Act eliminated all quota peanuts, the

9

19

USDA sent a bulletin to the insurance companies stating that all peanuts were to be treated as non-quota peanuts. (RMA Bulletin MGR-02-006.1, Record at Vol. 1 p. 25.) At least some farmers then received an insurance declaration from their insurance company, which stated that "the price election for your peanut crop has been corrected to $0.1775/MPCI.... We apologize for any confusion." (Ex. 9-C to Pls.' Mot. for Partial Summ. J.)

The year 2002 was a disastrous year for the peanut crops. Plaintiffs characterize it as "the worst drought in thirty to forty years." (Pls.' Mot. for Summ. J. at p. 12.) According to the North Carolina Department of Agriculture and Consumer Services, drought reduced peanut production in North Carolina by 41 percent from the 2001 levels. N.C. Dept. Of Agr. & Consumer Servs., N.C. Agriculture Overview -- Field Crops, available at http://www. ncagr.com/stats/general/crop_fld.htm.

The peanut farmers now argue that the insurance contracts had provided coverage for their peanut crops at the price election level of $0.31 per pound for quota peanuts. They argue that the defendants changed the terms of the contract after the contract change date and after the farmers had planted their crops in reliance on this historical program. The farmers have now received loss payments at the election rate of $0.1775 per pound, and they are currently suing for the difference of about $0.13 per pound, which they contend was reasonable to rely upon.

10

## COURT'S DISCUSSION

### I.  Class Certification

A district court passing on a motion for class certification is accorded broad discretion in deciding whether to certify a class. <u>In re American Med. Sys., Inc.</u>, 75 F.3d 1069, 1079 (6th Cir. 1996). However, the court must exercise this discretion within the strictures of Rule 23, which outlines the requirements a plaintiff must meet in order to bring a representative action. <u>See id.; Lienhart v. Dryvit Systems, Inc.</u>, 255 F.3d 138, 146 (4th Cir. 2001). The four threshold requirements for class certification are (1) numerosity, (2) commonality, (3) typicality, and (4) representativeness. Fed. R. Civ. P. 23(a). In addition to these requirements, a plaintiff seeking certification must also satisfy one of the three concepts embodied in Rule 23(b).

Plaintiffs have proposed the following definition of the class:

> Peanut farmers in North Carolina and in eligible counties in Virginia and South Carolina who contracted during the period from November 30, 2001 through March 15, 2002 for the 2002 Multiple Peril Crop Insurance policy for peanuts, the terms and conditions of which were published in the Federal Register. The class includes peanut farmers who had automatically applied by virtue of having a contract in 2001 (the Multiple Peril Crop Insurance policy) with continuous coverage who did not cancel the insurance contract. The class does not include farmers who initially applied for Peanut Multiple Peril Crop Insurance Policy coverage, but who had withdrawn that application before March 15,

11

21

> 2002, nor does it include farmers who never
> applied for Peanut Multiple Peril Crop
> Insurance coverage.

(Pls.' Mot. for Class Certification at p. 2.)

Defendants object to certification of the class as defined by plaintiffs on the grounds that it is overly broad and that it fails to meet the requirements of Rule 23(a) and (b). Defendants have several specific objections. First, they object to the inclusion in class of peanut farmers from outside the Eastern District of North Carolina.[7] They point to 7 U.S.C. § 1508(j)(2)(a), which states that "an action on the [crop insurance] claim may be brought against the Corporation or Secretary only in the United States district court for the district in which the insured farm is located." Defendants also note that the provisions of the MPCI policy provide that any legal action must be brought in accordance with the provisions of 7 U.S.C. § 1508(j). (Basic provisions § 25.) Because this court has no jurisdiction over peanut farmers whose farms are located outside the Eastern District of North Carolina, the court agrees that the plaintiff class should be limited to those farmers whose farms are located in this district.

---

[7] The Eastern District of North Carolina consists of the forty-four counties east of Raleigh, including Wake County. Most of the peanuts grown in North Carolina are grown in these counties; the only county outside the Eastern District which grows a significant amount of peanuts (more than fifty acres) is Scotland County, in the Middle District of North Carolina. See The Peanut Farmer, Acreage Map, available at http://www.peanutfarmer.com/acreage/pfmap.pdf.

12

22

Defendants also object that the class definition improperly includes peanut farmers who "(i) never had insurance coverage on peanuts for various reasons (e.g. never planted or did not file acreage reports); (ii) did not have any loss in the 2002 crop year; or, (iii) had claims for losses which were denied for reasons wholly unrelated to the loss of peanut quota." Plaintiffs do not take issue with the defendants' objections, but instead respond that the court can tailor the definition of the class to meet the objections raised by the defendant. Indeed, the plaintiffs seem to acknowledge that even though 1,848 peanut producers contracted for crop insurance as of the sales closing date, only the 735 producers who have been paid claims at the rate of $0.1775 would be eligible to recover under this suit. Thus, the court must further limit the class to those peanut producers who actually recovered $0.1775 under the insurance policy for their losses.

Defendants also argue that the plaintiffs' class definition is overly broad in that it does not limit the class of peanut farmers to those who operated farms to which a quota was assigned in previous years by the Farm Service Agency. Defendants contend that only those farmers who had "lost" their quotas due to the 2002 Farm Bill were impacted by the elimination of the quota.

Plaintiffs do not address this argument, but they imply elsewhere in their briefs that because the price election level for growing peanuts was below the cost to the farmers for growing

13

peanuts, many if not all of the farmers only grew peanuts that they
believed would be quota peanuts. (Pls.' Reply at p. 11.) Under
the 2001 version of 7 U.S.C. § 1358-1(b)(1)(B), the quota for each
farm would be "the same as the farm poundage quota for the farm for
the immediately preceding marketing year," subject to adjustments
that could increase or decrease the quota amount. Because the
peanut quotas for each year were based on the quota assigned the
previous year, only those peanut farmers who had been assigned a
quota in 2001 had an expectation of receiving a quota for the 2002
crop year and "lost" the quota for 2002. Accordingly, the court
concludes that the class should include only those farmers who had
been assigned a quota for the 2001 crop year.

    As limited by the court, the new definition of the class is as
follows:

> Peanut farmers whose farms are located in the
> Eastern District of North Carolina, who had
> insurance coverage on peanuts under the 2002
> Peanut Multiple Peril Crop Policies, who had
> losses for the 2002 crop year, who settled
> those losses for $0.1775 per pound, and who
> had been assigned farm poundage quotas for the
> 2001 crop year.

The court will now turn to the requirements of Federal Rule of
Civil Procedure 23(a) and 23(b).

**A.    Numerosity**

    Numerosity requires that a class be so large that "joinder of
all members is impracticable." Fed. R. Civ. P. 23(a)(1). Seven
hundred and thirty-five North Carolina peanut farmers have settled

14

24

their insurance claims at the rate of $0.1775 per pound.
Potentially all of these farmers would be included in the plaintiff
class.[8] Currently, 274 North Carolina farmers have joined in this
lawsuit; therefore, the plaintiff class would include about 461
additional eastern North Carolina farmers.  Plaintiffs argue that
they have met the numerosity requirement under Rule 23(a)(1), and
defendants concede this point.  The court believes that judicial
economy is best served by handling these matters as a class action,
and finds that the numerosity threshold is satisfied.

**B.    Commonality**

Commonality requires that there are "questions of law or fact
common to the class."  Fed. R. Civ. P. 23(a)(2); see Stott v.
Hawsworth, 916 F.2d 134, 145 (4th Cir. 1990).  Plaintiffs argue
that the commonality requirements are met because all the insurance
contracts had the exact same terms and were subject to the same
rates, rules, and regulations provided by the FCIC or the RMA.
Plaintiffs note that the changes in the peanut quota system
affected all farmers in the exact same manner and that the
defendants' defenses are the same for all class members.

Defendants note that the requirements of commonality and

---

[8] While the plaintiffs did not specify in their filings how
many of these North Carolina farmers are from the Eastern District
of North Carolina, they later indicated that only the Lassiters,
from Moore County, are from another North Carolina district.  As
stated above, the court has subject matter jurisdiction only over
plaintiffs from the Eastern District of North Carolina, and the
court will dismiss all farmers from outside this district.

typicality tend to merge with adequacy of representation.
Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 337
(4th Cir. 1998). Defendants argue that the class, as originally
defined by plaintiffs, includes many peanut producers who would not
be entitled to recover at all, including those who never had or
perfected a loss claim, who had never grown quota peanuts, and who
had not filed the required acreage report. However, as the court
has defined the class more narrowly, most of defendants' concerns
disappear.[9]

Defendants argue that even when the class is more narrowly
defined, some commonality issues would remain. Specifically,
defendants argue that because no quotas were ultimately assigned to
individual farms for the 2002 crop year due to the 2002 Farm Bill,
plaintiffs' damages can be determined only by first making an
individualized determination as to what quota might have been
assigned to each farm. Defendants point out that under the
applicable regulations, former 7 C.F.R. § 729.210, enacted in 1996
under the 1996 Act, the quota assigned to an individual farm could
change from year to year.

Plaintiffs agree that there are certain variables among the

_____

[9] The court believes that it is better to address defendants'
concern that most or all of the plaintiffs have not exhausted their
administrative remedies as a substantive inquiry rather than a
certification issue. Furthermore, the court believes that the
argument that some farmers have assigned their insurance proceeds
to banks is more appropriately addressed at the damages stage.

26

plaintiffs -- the level of insurance coverage (e.g. 70% or 85%),
the actual production histories, and the number of acres -- that
are necessary to calculate damages for individual plaintiffs.
Plaintiffs contend that class treatment is nevertheless warranted
because class issues predominate. Plaintiffs assert that the issue
of damages could be handled as a matter of administration and would
impose no burden on the court.

The court believes that this case is an ideal prospect for
class action litigation, as the basic facts of this case are the
same for each plaintiff. Each plaintiff had the exact same crop
insurance contract, each plaintiff had previously been assigned a
quota by the FSA in 2001, each plaintiff expected to have coverage
at the price election level of $0.31 per pound for their peanut
crop, and each plaintiff received only $0.1775 per pound in
insurance proceeds for the 2002 crop year because Congress
eliminated the quota system for peanuts. The determination of
damages for each plaintiff is a mathematical determination that can
be easily calculated based on each farmer's percentage of coverage
and the like. Because these facts are the same for each plaintiff,
each plaintiff has the same claims for breach of contract and
violation of due process.

Furthermore, class certification in this case is proper even
though the individual amounts of damage will differ. "Individual
questions of damages are typical in class actions, and they are

17

27

rarely a barrier to certification." DeLoach v. Philip Morris Cos.,
Inc., 206 F.R.D. 551, 566 (M.D.N.C. 2002). Accordingly, the court
finds that this case involves questions of law and fact common to
all plaintiffs.

### C.   Typicality

Typicality requires that the claims of the named class
representatives be typical of those of other members of the class.
In short, a named class member who satisfies the typicality
requirement "must be part of the class and possess the same
interest and suffer the same injury as the class members." General
Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982).

In the plaintiffs' proposed order for class certification,
plaintiffs suggest that the class representatives should consist of
only the original fourteen plaintiffs named in the complaint.[10] As
some of these plaintiffs are Virginia farmers, not all of the
proposed representatives would be part of the class, which is
restricted to farmers with farms located in the Eastern District of
North Carolina.

The first four of these plaintiffs -- Barnhill, Hamill,
Branham, and Jenkins -- farm and reside in the Eastern District of

---

[10] On the same day that they filed their complaint, the named
plaintiffs moved to join over 400 additional plaintiffs. The court
allowed the joinder of these additional plaintiffs previous to this
order, and so there are currently 461 named plaintiffs. Exhibit A
to plaintiffs' motion lists the North Carolina plaintiffs to be
added and Exhibit B lists the Virginia plaintiffs.

2.8

North Carolina. Of the next four plaintiffs, Clements resides in Virginia and has farms in Virginia and North Carolina, and Grant, Phelps, and Flythe reside in North Carolina and have farms in Virginia and North Carolina. The remaining farmers reside and farm only in Virginia.[11]

As the court has already indicated, the court has no subject matter jurisdiction over plaintiffs from other North Carolina districts, Virginia districts, and the District of South Carolina. 7 U.S.C. § 1508(j). The court therefore will dismiss all plaintiffs, including the proposed class representatives, who do not have farms in the Eastern District of North Carolina. These farmers and others similarly situated must address these issues within their own district. The farmers who have farms in both the Eastern District of North Carolina and Virginia will not be dismissed, but may only recover as to their farms in North Carolina.

The remaining eight proposed class representatives are peanut farmers who farm in the Eastern District of North Carolina and who had perfected insurance contracts on their crops for the 2002

---

[11] Although the complaint indicates clearly that the first four farmers farm and reside in the Eastern District of North Carolina, it did not specify whether the remaining ten plaintiffs farmed in Virginia, North Carolina, or both because farms in both Virginia and North Carolina, as well as a small section in South Carolina, were part of the Virginia-Carolina growing region and were all subject to regulation by the Raleigh, North Carolina, Regional RMA office.

29

growing season.   The FSA had assigned a farm poundage quota to these proposed representatives for crop years prior to 2002.   The proposed representatives all sustained losses on their crops from the unusually poor weather during the summer of 2002.   Their peanut crop losses were covered by their crop insurance, and their claims were settled at the non-quota price election amount of $0.1775 per pound.

The elimination of the peanut quota system affected the rights of the proposed class representatives in the same manner as the rest of the plaintiff class.   These proposed representative plaintiffs suffered the same injury as the rest of the class.   The court therefore finds that the claims of the remaining proposed class representatives are typical of the class, and will appoint those eight farmers as class representatives.

### D.   Representativeness

Representativeness requires that the named class members "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P.  23(a)(4).   The class representatives have the same claims and are subject to the same defenses as the entire plaintiff class. The representative plaintiffs do not appear to have any interests antagonistic to the class interests.   The court finds that the representatives will fairly and adequately protect the interests of the class from the Eastern District of North Carolina.

The court finds that plaintiffs' current counsel, Philip R.

20

Isley, G. Eugene Boyce, and R. Daniel Boyce, will adequately represent the plaintiff class within the Eastern District of North Carolina. Counsel is currently representing peanut farmers in similar cases in other federal district courts, and counsel has had previous experience in class action litigation.

This court therefore concludes that the class, as defined by the court, satisfies the requirements of numerosity, commonality, typicality, and representativeness under Rule 23(a).

**E.    Rule 23(b)**

For a plaintiff class to be certified, the class must satisfy all the requirements of 23(a), and one of the one of the following subsections of Rule 23(b):

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
>> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only

21

31

> individual members, and that a class action is
> superior to other available methods for the
> fair and efficient adjudication of the
> controversy. ...

Plaintiffs argue that classification is appropriate under Rule 23(b)(2) because defendants' actions are generally applicable to the class and because plaintiffs seek injunctive relief and/or recovery of insurance proceeds at $0.31 per pound. In the complaint, plaintiffs request a declaratory judgment that the defendants breached the insurance contract and violated plaintiffs' due process and statutory rights. Plaintiffs also seek an injunction compelling the defendants to honor the contract. Alternatively, plaintiffs seek recovery of money damages.

Class certification under Rule 23(b)(2) is appropriate only when "the relief sought is exclusively or predominantly injunctive or declaratory." Lukenas v. Bryce's Mountain Resort, Inc., 538 F.2d 594, 595 (4th Cir. 1976). Defendants argue that although the requested relief is couched in terms of declaratory and injunctive relief, plaintiffs essentially seek monetary damages. The court agrees and finds that the appropriate final relief is predominantly monetary. "[A]n action seeking a declaration that certain conduct constitutes a breach of conduct would not qualify under Rule 23(b)(2) because the effect simply is to lay the basis for a damage award rather than injunctive relief." Wright & Miller, Fed. Prac. & Proc. § 1775. Accordingly, the court finds that the plaintiff class may not be certified pursuant to 23(b)(2).

22

32

Plaintiffs alternatively argue that the court may certify the class pursuant to 23(b)(1) or 23(b)(3).  "[W]here certification is appropriate under both Rule 23(b)(1) and Rule 23(b)(3), the Court must certify the class under the former so that any resulting judgment will have res judicata effect as to the entire class."  Peoples v. Wendover Funding, Inc., 179 F.R.D. 492, 500 (D. Md. 1998) (citing In re A.H. Robins Co., Inc., 880 F.2d 709, 728 (4th Cir. 1989)).

Wright and Miller have indicated that certification under Rule 23(b)(1)(B) is appropriate for cases involving breach of contract.  Wright & Miller, Fed. Prac. & Proc., § 1774.  In this case, individual class members would present the same facts and claims and would be subject to the same defenses.  Furthermore, although the court believes that any monetary relief would predominate the requested declaratory relief, any declaratory or injunctive relief would affect the entire class.  See id. (stating that "[a]lthough suits in which injunctive or declaratory relief is sought most frequently are brought under Rule 23(b)(2), Rule 23(b)(1)(B) also may be applicable since an individual action seeking relief of that type clearly would affect the interests of all class members").  Accordingly, this suit may proceed as a class action under Rule 23(b)(1)(B) because an "adjudication[] with respect to individual members of the class ... would as a practical matter be dispositive of the interests of the other members not parties to the

33

adjudications...." Fed. R. Civ. P. 23(b)(1)(B).

## II.  Summary Judgment

### A.  Standard of Review

Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). As this court has stated, summary judgment is not a vehicle for the court to resolve disputed factual issues. Faircloth v. United States, 837 F. Supp. 123, 125 (E.D.N.C. 1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. Anderson, 477 U.S. at 249.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. United States v. Diebold, Inc.,

34

369 U.S. 654, 655 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. <u>Anderson</u>, 477 U.S. at 247-48. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. <u>Faircloth</u>, 837 F. Supp. at 125.

In this case, this court must review the general policy of the agency. As such, this court's focus will be on the administrative record. Review of the administrative record is primarily a legal decision, readily resolvable by summary judgment. <u>Citizens for Scenic River Bridge, Inc. v. Skinner</u>, 802 F. Supp. 1325, 1332 (D. Md. 1991).

**B. Analysis**

In this case, both parties have moved for summary judgment. In their motion, defendants argue that the court should dismiss this case for the following two reasons: first, because plaintiffs have failed to exhaust their administrative remedies; second, because plaintiffs lack standing because they suffered no injury to a legally protectable interest. Plaintiffs move for partial summary judgment on their breach of contract and due process claims. The court will first discuss the issue of exhaustion and will then turn to the breach of contract and standing issues, which are connected. The court will then address the violation of due process claim.

35

1.  Exhaustion of administrative remedies

Defendants allege that plaintiffs were required to exhaust their administrative remedies before bringing suit against the USDA in federal court.   Defendants argue that the failure to exhaust administrative remedies is a jurisdictional bar to suit.

Plaintiffs respond that: 1) the agency's administrative appeal procedures were not available here; 2) plaintiffs attempted to exhaust their remedies but were repeatedly rebuffed by the USDA; and 3) plaintiffs are willing to continue to attempt to exhaust their remedies, but to do so would be futile.

Defendants assert that under 7 U.S.C. § 6912(e), plaintiffs were required to exhaust their administrative remedies.   Section 6912(e) states:

> (e) Exhaustion of administrative appeals
> Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against--
> (1) the Secretary;
> (2) the Department; or
> (3) an agency, office, officer, or employee of the Department.

However, unlike instances in which the challenged agency conduct is personally "adverse to the individual participant," if the agency determines that the challenged agency conduct is "a matter of general applicability," the issue is not appealable.   7 C.F.R. § 780.2(c) (providing that "[n]o reconsideration or appeal may be

sought under this part of any general program or provision or program policy, or any statutory or regulatory requirements that is applicable to all similarly situated applicants"). Nevertheless, a plaintiff may appeal the issue of whether the matter is appealable by asking the Director of NAD for a final decision. 7 U.S.C. § 6992(d); 7 C.F.R. § 11.6(a)(2). This appeal must be made within thirty days after the agency determines that the matter is not appealable. 7 C.F.R. § 11.6(a)(1). If the Director upholds the non-appealability decision, that decision becomes the final decision of the agency. Id.

Plaintiffs' repeated and voluminous contact with the RMA shows that they attempted to exhaust their administrative remedies. On November 12, 2002, a week before filing their suit in this court, plaintiffs first wrote the NAD director, asking him for a ruling that the farmers' claims were not appealable because they involved a matter that was applicable to all similarly situated petitioners. (Record at Vol. 3 pp. 10-46.) In the ensuing letters between the two, the RMA stated that the disputes over the crop insurance contracts were between the farmers and their individual insurance companies. (Record at Vol. 1 pp. 1055, 1040.) The RMA denied the farmers' request for a hearing on the matter. (Record at Vol. 3 p. 83.) On April 15, 2003, the RMA sent a letter to plaintiffs stating that "no reconsideration or appeal may be sought because [Bulletin MGR-02-016] is a general program provision that is

27

37

applicable to all similarly situation participants." (Record at Vol. 1 p. 1055.) However, this letter did not inform plaintiffs of their right to appeal the appealability determination. Id.; see Parker v. USDA, No. 1:01CV00057 LMB, at 7 (E. D. Mo. March 12, 2003) (stating that "[e]xhaustion is not required where a plaintiff is not apprised of appeal procedures") (citing Conley v. Pitney Bowes, 34 F.3d 714, 717-18 (8th Cir. 1994)). The government later informed plaintiffs of their right to appeal the appealability determination, by letter dated July 10, 2003. (Record at Vol. 1 p. 1040.) The July 10, 2003, letter stated that "[i]f you disagree with this determination that the matter in dispute is not appealable, you can have this determination reviewed by the Director of [NAD] in accordance with 7 C.F.R. § 11.6." (Id.) As plaintiffs did not dispute that the matter was one of general applicability and thus not appealable, they did not immediately ask to have the determination reviewed by the Director of NAD. When plaintiffs later sought reconsideration of the decision, the RMA replied, "To the extent that you seek to appeal NAD determinations concerning appealability, 7 C.F.R. § 11.6(a)(2) and (3) provide that such determinations are not appealable, whether issued by the Director or his delegate." (Record at Vol. 3 p. 143.) Defendants now argue that plaintiffs should have requested a review of the

28

38

July 10, 2003, letter.[12]

Defendants argue that plaintiffs' failure to exhaust administrative remedies deprives this court of subject matter jurisdiction. They point to cases from outside the Fourth Circuit which have held that the exhaustion requirement in 7 U.S.C. § 6912(e) is jurisdictional. See Bastek v. Fed. Crop Ins. Corp., 145 F.3d 90, 94 (2d Cir. 1998) (stating that "plaintiffs' argument that their broad challenges to FCIC calculations could not adequately have been presented within normal administrative channels is itself an argument that was required to be tested and exhausted before being presented in federal court."); Utah Shared Access Alliance v. Wagner, 98 F. Supp. 2d 1323, 1333 (D. Utah 2000) (concluding that "[p]laintiffs' failure to exhaust existing administrative remedies deprives this court of competent subject matter jurisdiction" but also stating that "[a] court may excuse exhaustion if administrative remedies would be futile, when administrative remedies would provide inadequate relief, or when the agency has adopted a policy or practice of general

_____

[12] As a side note, the court believes that the guidance that the agency gave to the farmers as to whether the farmers should appeal the ruling was at best confusing, and at worst positively misleading. It makes no sense for an agency to tell a petitioner that his issue is non-appealable, and then in the next sentence tell him that he can -- and must -- appeal the decision. See Parker v. USDA, No. 1:01CV00057 LMB, at 6-7 (stating that "the government is attempting to 'have its cake and eat it too,' by informing plaintiffs that their claims were not appealable to the NAD and then asserting exhaustion for failure to appeal to the NAD when plaintiffs bring those claims in federal court").

39

applicability which is contrary to law"); Calhoun v. USDA Farm Serv. Agency, 920 F. Supp. 696, 700 (N.D. Miss. 1996) (stating that "[w]hen the requirement is mandated by statute, exhaustion becomes a jurisdictional prerequisite to maintaining an action"). However, other courts have held that a failure to exhaust administrative remedies under § 6912(e) does not deprive a court of jurisdiction. See McBride Cotton & Cattle Corp. v. Veneman, 290 F.3d 973, 980 (9th Cir. 2002) (holding that "7 U.S.C. § 6912(e) does not limit the district court's subject matter jurisdiction over the plaintiffs' claims"), cited in Rain & Hail Ins. Serv., Inc. v. Fed. Crop Ins. Corp., 229 F. Supp. 2d 710, 714 n.4 (S. D. Tex. 2002); Parker v. USDA, No. 1:01CV00057 LMB, at 9 (stating that "a plaintiff's failure to exhaust administrative remedies under § 6912(e) does not divest the court of subject matter jurisdiction"). The Fourth Circuit has not directly addressed whether the requirements in § 6912(e) are jurisdictional.

In Gold Dollar Warehouse, Inc. v. Glickman, 211 F.3d 93 (4th Cir. 2000), the Fourth Circuit addressed the petitioners' challenges to USDA regulations. The court found that the petitioners were required to exhaust their "as-applied" challenges to the regulations through the agency's appeal procedures but were not required to exhaust their facial challenges to the regulations. Gold Dollar Warehouse, Inc. v. Glickman, 211 F.3d at 99-101. The court stated that "a direct facial challenge to the regulations ...

30

cannot be brought within the agency's appellate process because, as noted, 7 C.F.R. § 11.3(b) precludes agency review of USDA regulations." Id. at 99.

Similarly, under 7 C.F.R. § 780.2, the plaintiffs' challenge to the agency's generally applicable program provision could not be brought within the agency's appellate process.  Like the facial challenges in Gold Dollar Warehouse, this case involves a legal challenge to agency action and does not involve underlying factual disputes.  The District of North Dakota has concluded that where a plaintiff challenges a generally applicable agency action, 7 U.S.C. § 6912(e) does not require exhaustion. Wiley v. Glickman, No. CIV A3-99-32, 1999 WL 33283314, at *2 (D.N.D. Apr. 7, 1999).  In that case, the court stated that "[s]ince this claim features purely legal questions which require no agency fact-finding, none of the purposes of the exhaustion requirement would be served by requiring plaintiffs to submit the claim to NAD." Id.; see also Kuster v. Veneman, 226 F. Supp. 2d 1190, 1192 (D.N.D. 2002) (stating that it would be fruitless to require exhaustion in a case involving a purely legal challenge to a generally applicable agency action). In accordance with Gold Dollar Warehouse and Wiley v. Glickman, this court concludes that because agency review was not available for plaintiffs' challenge to generally applicable program policies, administrative exhaustion is not required.

31

$4|$

### 2.   Breach of contract

The most hotly contested issues in this case are whether the insurance contracts guaranteed coverage at the quota price election of $0.31 and whether the government breached those contracts. Defendants frame these issues as standing issues. They point to Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992), for the proposition that in order to have standing, plaintiffs must show an actual injury to a legally-protected interest. Defendants contend that plaintiffs had no legally-protected interest in receiving $0.31 per pound in insurance coverage. Specifically, defendants argue that the policies did not guarantee the farmers that they would receive coverage at the $0.31 election level and that the farmers had no constitutionally-protected interest in the continuation of the quota system. The court believes that the issue of whether the plaintiffs have a contractual right to insurance coverage at $0.31 is not merely a standing issue, but will ultimately determine whether plaintiffs have established their claim for breach of contract.

For the court to find that the government breached its contracts, the court must first find a prima facie breach, that is, it must find that the government violated the express provisions of the contract. If a prima facie breach is shown, the court must then consider whether the government has a valid defense under the

32

42

sovereign acts doctrine or the unmistakability doctrine.[13] <u>Cuyahoga Metro. Hous. Auth. v. United States</u>, 57 Fed. Cl. 751, 762 (2003) (framing government's breach of contract as two separate issues -- "[w]as there a <u>prima facie</u> breach here?" and "[d]oes the unmistakability doctrine shield defendant from liability?"). "Only if [the government's actions are not covered by these doctrines] can the court then say, with confidence, that defendant[s] actually breached the contracts in question." <u>Id.</u>

### a.  **Prima facie breach of contract**

Government contracts are subject to the general rule that "when the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." <u>Lynch v. United States</u>, 292 U.S. 571, 579 (1934). Accordingly, the court must use general contract principles to determine whether the government has breached the insurance contracts.

Defendants' primary argument is that the government did not

---

[13] Neither plaintiffs nor defendants have fully briefed the issues of whether the sovereign acts doctrine or the unmistakability doctrine are valid defenses under the current facts. The plaintiffs noted that in <u>United States v. Winstar Corp.</u>, 518 U.S. 839 (1996), the Supreme Court rejected these defenses. Defendants stated in a footnote that they did not brief these issues because they believed that discussion of any "special defense" on the merits was premature. The court believes that the government should have raised both defenses in its response to the plaintiffs' motion for summary judgment. Nevertheless, because the application of these doctrines to this case is a purely legal issue and does not require any further facts from the parties, the court will address these defenses.

33

contractually promise or guarantee insurance coverage at $0.31 per pound.    Defendants argue that in order to receive insurance coverage and proceeds at the $0.31 election level, a farm must have been assigned a farm poundage quota by the FSA.  Because the Farm Security Act eliminated the quota system, they argue, the FSA did not establish poundage quotas for individual farms for the 2002 crop season, and as a result, the farmers did not have insurance at the election level for quota peanuts.

Defendants point to language in the insurance policy to support their position.  Section 3 of the Peanut Crop Provisions provides, in pertinent part:

> **Insurance Guarantees, Coverage Levels, and Prices for Determining Indemnities.**
> ...
> (b) The maximum pounds that may be insured at the quota price election are the lesser of:
>   (1) The effective poundage marketing quota; or
>   (2) The insured acreage multiplied by the production guarantee.  If the insured acres multiplied by the production guarantee exceeds the effective poundage marketing quota, the difference will be insured at the non-quota peanut price election.

In turn, the policy defines the term "effective poundage marketing quota" as:

> The number of pounds reported on the acreage report as eligible for the average support price per pound ..., not to exceed the Marketing Quota established by FSA for the farm serial number.

(Peanut provisions § 1. emphasis added.)  According to defendants,

34

٤٤

under the definition of "effective poundage marketing quota", an individual farm did not have any peanuts eligible to be quota peanuts unless and until the FSA assigned a marketing quota to that farm.   That is, the assignment of a farm poundage quota was a condition that must be met for the farmers to receive coverage at the quota price election.  Because the farms had not been assigned a farm poundage quota by the FSA, defendants argue, the farmers' insurance coverage defaulted to coverage at the non-quota price election.    Furthermore, defendants argue, the contract never guaranteed that the FSA would assign a marketing quota to each farm serial number.

The government's argument overlooks the fact that in some instances a contractual condition may be excused.  Specifically, the Restatement (First) of Contracts § 295 provides that a condition is excused if 1) a promisor prevents or hinders the occurrence of a condition, and 2) the condition would have occurred except for such prevention or hindrance.[14]   Restatement (First) of

---

[14] The full text of § 295 is as follows:

§ 295. Excuse Of Condition By Prevention Or Hindrance

If a promisor prevents or hinders the occurrence of a condition, or the performance of a return promise, and the condition would have occurred or the performance of the return promise been rendered except for such prevention or hindrance, the condition is excused, and the actual or threatened nonperformance of the return promise does not

35

Contracts § 295 (1932), quoted in Powers v. Sims and Levin, 542 F.2d 1216, 1226 (4th Cir. 1976) (Winter, J., concurring and dissenting).

The Farm Security Act repealed 7 U.S.C. § 1358-1, which had provided that "[a] farm poundage quota for each marketing year shall be established...." 7 U.S.C. § 1358-1(b)(1)(A) (2001) (emphasis added). Thus, prior to the passage of the Farm Security Act, the FSA was under a statutory duty to assign quotas to individual farms. The FSA instructed its county offices not to allocate the current year peanut quota and pointed to the Farm Security Act, which had not yet been passed, as the reason. (Notice PN-652, Record at Vol. 2 p. 8, stating that "[b]ecause of pending legislation, rollover of peanut files will be completed without allocating 2002 peanut quota holders.") As the FSA would have assigned the farm poundage quotas had the Farm Security Act not prevented or hindered it from doing so, the second prong of § 295 is met.

The first prong of § 295 is also met. The government not only

_____

discharge the promisor's duty, unless

(a) the prevention or hindrance by the promisor is caused or justified by the conduct or pecuniary circumstances of the other party; or

(b) the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party.

36

46

was a promisor on the insurance contract and was bound by its terms, but also is responsible for the actions of the FSA, as the FSA, like the RMA, is an agency of the United States Department of Agriculture. By passing the Farm Security Act, which repealed 7 U.S.C. § 1358-1 and thus eliminated the FSA's duty to allocate the peanut quota to individual farms, the government "prevent[ed] or hinder[ed] the occurrence of a condition."

The facts of this case fall squarely into the language of the Restatement § 295. Section 295 provides the following illustration on its application:

> A promises to build a house for B who, in consideration therefor, promises A to pay him $10,000 on condition that A presents a certificate from C, an architect, showing that the work has been properly done. The work is properly done, but B induces C to refuse to give a certificate. The condition is excused.

This illustration is almost identical to the peanut farmers' situation. Peanut farmers (A) bought insurance from the government (specifically, the FCIC) (B), which promised to pay them $0.31 per pound of peanuts, provided that the FSA (another branch of the government) (C) said that the peanuts grown are quota peanuts. The farmers performed all their obligations, but the government (Congress this time) caused the FSA to refuse to assign the quotas. As in the illustration, the condition will be excused.[15]

_____

[15] Under § 295(b), the condition is not excused if "the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party." This

37

The court agrees with the reasoning behind the Restatement (First) of Contracts § 295. The court believes that it was fundamentally wrong for the government to tell the farmers that they would have insurance coverage at $0.31 per pound for as many peanuts as the FSA declared to be quota peanuts, and then, after the farmers had planted their crops, to tell the FSA not to declare any quota peanuts. Under general contract law principles as expressed in the Restatement of Contracts § 295, the court finds that the condition is excused, and that the government breached its contract by refusing to pay the farmers' insurance claims at the rate of $0.31 per pound.

---

subsection does not apply here. The terms of the contract nowhere indicate that the peanut farmers were to bear the risk of regulatory change. Indeed, the insurance program was set up in such a way as to provide a measure of reliability and stability for a way of life which is by nature unreliable. "From [the] origin [of the Federal Crop Insurance Act of 1938], the stated purpose of the federal crop insurance program has been 'to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance.'" Wiley v. Glickman, 1999 WL 33283312, at *1 (citing 7 U.S.C. § 1502(a)). Furthermore, the goal of the Federal Crop Insurance Act of 1980 was to make federal crop insurance "the farmers' primary source of risk management." Id. (citing 1994 U.S.S.C.A.N. at 2519). In furtherance of these goals, the crop insurance and peanut quota systems provided deadlines that the farmers could rely on in making planting decisions for the upcoming crop year. The insurance contract guaranteed that the price election could not be decreased after the contract change date, which for the 2002 crop year was November 30, 2001. (Peanut provisions §§ 4b, 3e.) Also, by law, the U.S.D.A. was required to announce the national peanut quota by December 15 of the year preceding the crop year. 7 U.S.C. § 1358-1(a)(3) (2001).

38

48

b.    **Sovereign act and unmistakability doctrines**

In the case of <u>United States v. Winstar Corp.</u>, 518 U.S. 829 (1996), the Supreme Court discusses the sovereign acts doctrine and the unmistakability doctrine at length.  Several subsequent cases have analyzed and interpreted <u>Winstar</u> and preceding cases on these doctrines.  <u>See</u> <u>Yankee Atomic Elec. Comp. v. United States</u>, 112 F.3d 1569 (Fed. Cir. 1997) (discussing the sovereign acts doctrine and the unmistakability doctrine); <u>Cuyahoga Metro. Hous. Auth. v. United States</u>, 57 Fed. Cl. 751 (2003) (discussing the unmistakability doctrine); <u>Gen. Dynamics Corp. v. United States</u>, 47 Fed. Cl. 514 (2000) (discussing the sovereign acts doctrine and the unmistakability doctrine).

In <u>General Dynamics Corp. v. United States</u>, the Court of Federal Claims provided the following overview of these doctrines:

> In analyzing whether a particular exercise of sovereign authority breaches a contract between the government and a private party, two longstanding doctrines applicable to contracts with the sovereign come into play. One is the sovereign acts doctrine, which excuses the government from performing a contractual obligation if performance is rendered impossible by a public and general sovereign act. ... The doctrine was recognized by the Supreme Court in <u>Horowitz v. United States</u>, 267 U.S. 458, 461 (1925), which noted that '[i]t has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.' More recently, the Federal Circuit reiterated this principle in similar language: 'Under the

39

C/9

> sovereign act doctrine, the United States as
> contractor will not be held responsible for
> the acts of the United States as sovereign.'
> <u>Hughes Communications Galaxy, Inc. v. United
> States</u>, 998 F.2d 953, 958 (Fed. Cir. 1993).

<u>Gen. Dynamics Corp. v. United States</u>, 47 Fed. Cl. at 533-34. Under
the unmistakability doctrine, "a government will not be deemed in
a contract to surrender a sovereign power unless it does so
unmistakably." <u>Id.</u>

   This court will follow the following framework set forth by
<u>Yankee Atomic</u>, as explained by <u>General Dynamics</u>:

> [T]he analytical approach set forth by the
> Federal Circuit in deciding <u>Yankee Atomic</u> ...
> was a two-step analysis which first explored
> the question of whether the governmental
> action preventing performance of a contract
> was a 'public and general' act within the
> meaning of the sovereign acts doctrine. After
> an affirmative conclusion on that issue, the
> second question to explore was whether the
> contract contained an unmistakable promise
> that the Government would refrain from
> exercising its sovereign power in a way that
> could block performance of the contract. If
> the answer to that question was also yes, then
> the governmental action at issue would
> constitute a breach of contract.

<u>Gen. Dynamics Corp. v. United States</u>, 47 Fed. Cl. at 541. If,
under the first step, the governmental action in question was not
a 'public and general' act, then the sovereign acts doctrine would
not constitute a valid defense to the breach of contract claim and
the court would not need to proceed to the second step of the
analysis. <u>Id.</u> (stating that "[i]f the Federal Circuit had meant to
decide <u>Yankee Atomic</u> on the basis of the unmistakability doctrine

40

56

regardless of whether the legislation at issue in that case was a 'public and general' act, there would have been no reason for the court to apply, and discuss at length, the sovereign acts doctrine for the purpose of determining the nature of the act"); see also Cuyahoga Metro. Hous. Auth. v. United States, 57 Fed. Cl. at 774 (stating that authorities agree that "at least in the context of legislation, the unmistakability doctrine applies only when the Congress invokes one of the sovereign power protected by the doctrine").

The plurality opinion in Winstar stated that "the sovereign acts doctrine ... balances the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor." United States v. Winstar, 518 U.S. at 896. The application of the sovereign acts doctrine, then, is "not a hard and fast rule, but rather a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts." Yankee Atomic Elec. Comp. v. United States, 112 F.3d at 1575.

Under Winstar, acts that are "public and general" are acts of the sovereign and are not attributable to the government as contractor. United States v. Winstar, 518 U.S. at 895-96. Winstar provides further guidance as to what constitutes a "public

41

51

and general" act. If the action's "impact upon public contracts is
... merely incidental to the accomplishment of a broader
governmental objective," then the act is "public and general." Id.
at 898. Conversely, "a governmental act will not be public and
general if it has the substantial effect of releasing the
Government from its contractual obligations." Id.

Under the framework created by the Federal Circuit in Yankee
Atomic, the court must first decide whether the government, in
enacting the relevant provisions of the Farm Security Act of 2002,
was (i) acting for the purpose of retroactively decreasing the
amount of coverage of its insurance contracts with the peanut
farmers, or (ii) acting for a more general purpose, for the benefit
of the public. For the reasons that follow, the court concludes it
was for the former.

The Farm Security Act had a very broad scope, occupying 406
pages in the Statutes at Large and containing more than 400
numbered sections. See Pub. L. No. 107-171, 116 Stat. 134. The
stated purpose of the Act was very general, "[t]o provide for the
continuation of agricultural programs through fiscal year 2007, and
for other purposes." 116 Stat. 134. The Act dealt with, among
other topics, direct and counter-cyclical payments to farmers,
peanuts, sugar, dairy, wetlands conservation, grasslands
conservation, environmental quality incentives, agricultural trade
development, the food stamp program, child nutrition programs, farm

42

52

loans, farm and rural development, rural electrification, various research programs, forestry assistance, and animal health and welfare. However, the length and breadth alone do not make the act "public and general" -- "any act of repudiation can be buried in a larger piece of legislation, and if that is enough to save it then the Government's contracting power will not count for much." Winstar, 518 U.S. at 903 n.52. Rather, the court must look at the relevant provisions of the Farm Security Act.

The provisions of the Farm Security Act that relate to peanuts are found in sections 1301 through 1310. Section 1309 terminates the quota program for peanuts and provides compensation for peanut quota holders for the loss of the quotas. Sections 1301 through 1308 contain other various changes for peanut farmers, including the availability of counter-cyclical payments for farmers. Section 1310(a) repealed the authority for the price supports for quota peanuts found in 7 U.S.C. § 7271. Section 1310(c) stated as follows:

> (C) TREATMENT OF CROP INSURANCE POLICIES FOR 2002 CROP YEAR.--
> (1) APPLICABILITY.-- This subsection shall apply for the 2002 crop year only notwithstanding any other provision of law or crop insurance policy.
> (2) PRICE ELECTION.-- The nonquota price election for segregation I, II, and III peanuts shall be 17.75 cents per pound and shall be used for all aspects of the policy relating to the calculations of premium, liability, and indemnities.
> (3) QUALITY ADJUSTMENT.-- For the purposes of quality adjustment only, the average

>           support price per pound of peanuts shall
>           be a price equal to 17.75 cents per
>           pound. Quality under the crop insurance
>           policy for peanuts shall be adjusted
>           under procedures issued by the Federal
>           Crop Insurance Corporation.

Section 1310(c) directly stated that the nonquota price election, which it raised to $0.1775 from $0.16, would be used for all calculations of coverage under the insurance contracts, "notwithstanding any other provision of law or crop insurance policy." (Emphasis added.) This provision of the Farm Security Act obviously and specifically targeted the contractual obligations under the peanut farmers' pre-existing crop insurance policies for the 2002 crop year. Thus, the reduction of insurance coverage was direct, not "merely incidental to the accomplishment of a broader governmental objective."

This provision is similar to the legislation involved in Cuyahoga Metropolitan Housing Authority and General Dynamics Corp., in which Congress specifically targeted pre-existing contracts in order to save money. It also similar to the legislation in question in Winstar, in which Congress, in passing legislation attempting to resolve the crisis in the savings and loan industry, caused the government to breach its contracts with banks that had allowed banks to count supervisory goodwill as core capital. In Winstar, the Court noted that opponents of the legislation complained that "[i]n its present form, [FIRREA] would abrogate written agreements made by the U.S. government to thrifts that

44

54

acquired failing institutions by changing the rules in the middle of the game." United States v. Winstar, 518 U.S. at 900.

Most of the comments surrounding the peanut provisions in the Farm Security Act note that the new peanut rules bring treatment of peanuts into parity with the treatment of other crops. Senator Miller, from Georgia, noted that the changes in the peanut program were painful to but ultimately beneficial for farmers. 148 Cong. Rec. S3922, S3933 (May 7, 2002) (statement of Sen. Miller). However, an opponent of the Farm Security Act, who was concerned not with peanuts but with wheat, stated that he had introduced legislation that would have addressed some of the problems with the Farm Security Act. He stated:

> I introduced this package for two reasons: Our producers and our lenders needed some kind of certainty on the assistance they would receive for this crop year, and second, virtually all planting and lending decisions had already been made for the 2002 crop, this year's crop, and it did not make sense to change the rules of the game in the middle of the 2002 crop year. It made more sense to do an assistance package this year and have the new bill apply to the 2003 crop after our producers and the Department of Agriculture had time to digest the details of the new bill.

148 Cong. Rec. S3979, 3980 (May 8, 2002) (statement of Sen. Roberts) (emphasis added).

The statutory text makes it clear that § 1310(c) of the Farm Security Act specifically targeted coverage under existing crop insurance contracts. By including this provision in the Act,

45

55

Congress was indeed "changing the rules in the middle of the game."

As the Court of Federal Claims explained in General Dynamics,

> While there is no question that the Government had the sovereign right to enact a prospective [reduction in contractual benefits] -- i.e., applicable to any and all government contracts executed after the act was passed - the application of the [reduction] to pre-existing contracts ... constituted an abrogation of the Government's contractual obligations. Thus, it is a classic example of legislation 'attributable to the Government as contractor' and 'tainted by a governmental object of self-relief.'

Gen. Dynamics Corp. v. United States, 47 Fed. Cl. at 542 (quoting United States v. Winstar, 518 U.S. at 896).

In conclusion, the court finds that the congressional act reducing crop insurance coverage on peanuts for the 2002 crop year was not a "public and general" act; therefore, the sovereign acts doctrine does not allow the government to escape its contractual obligations under the 2002 crop insurance policies. Furthermore, because the governmental act was not "public and general", the unmistakability doctrine does not apply. See Gen. Dynamics Corp. v. United States, 47 Fed. Cl. at 541.

The plaintiffs have satisfied their burden of showing a prima facie breach of contract and the defendants do not have a valid defense. Therefore, the court finds that the reduction of coverage under the insurance contracts from $0.31 per pound to $0.1775 per pound was not in accordance with law. 5 U.S.C. § 706(1)(A). Accordingly, the court will grant plaintiffs' motion for summary

56

judgment as to the breach of contract claim and will deny
defendants' motion on the same.

### 3.  Violation of due process

Plaintiffs point to the Supreme Court case of <u>Lynch v. United
States</u> for support for their argument that defendants violated
their due process rights. The court in <u>Lynch</u> described due process
as it relates to government contracts in the following way:

> The Fifth Amendment commands that property be
> not taken without making just compensation.
> Valid contracts are property, whether the
> obligor be a private individual, a
> municipality, a state, or the United States.
> Rights against the United States arising out
> of a contract with it are protected by the
> Fifth Amendment.  When the United States
> enters into contract relations, its rights and
> duties therein are governed generally by the
> law applicable to contracts between private
> individuals.

<u>Lynch v. United States</u>, 292 U.S. at 579 (citations omitted).  The
court emphasized that:

> The United States are as much bound by their
> contracts as are individuals.  If they
> repudiate their obligations, it is as much
> repudiation, with all the wrong and reproach
> that term implies, as it would be if the
> repudiator had been a State or a municipality
> or a citizen.

<u>Id.</u> at 580 (citing <u>The Sinking Fund Cases</u>, 99 U.S. 700, 719
(1878)).

As in <u>Lynch</u>, plaintiffs' due process claims are based on
contracts with the government that were granted and later taken
away by statute.  As in <u>Lynch</u>, then, the plaintiffs' due process

arguments are primarily based on their contract claims. Defendants acknowledge that "in the end analysis, in evaluating whether the defendants' erred in their interpretation of the MPCI policy, 'ordinary principles governing contracts and their interpretation remain applicable.'" (Defs.' Response at 16.)

As the court has already discussed the plaintiffs' contract claim at length and found for the plaintiffs as to this claim, the court need not reach plaintiffs' due process claims.[16]

## CONCLUSION

The court hereby orders that this case shall proceed as a class action and hereby certifies the following class:

> Peanut farmers whose farms are located in the Eastern District of North Carolina, who had insurance coverage on peanuts under the 2002 Peanut Multiple Peril Crop Policies, who had losses for the 2002 crop year, who settled those losses for $0.1775 per pound, and who had been assigned farm poundage quotas for the 2001 crop year.

The court hereby appoints the following plaintiffs as class representatives: Marvin Taylor Barnhill, Jerry Hamill, John Branham, Clark Jenkins, Tom Clements, David Grant, Tim Phelps, and

---

[16] The court notes that the Court of Federal Claims has recently ruled that the peanut quota is not a property right sufficient to support a takings claim under the Fifth Amendment. See Members of the Peanut Quota Holders Ass'n v. United States, 60 Fed. Cl. 524, 525 (2004). This decision is irrelevant to the current plaintiffs' claim, as the Federal Claims Court's decision was based solely on the claimed statutory entitlement to the peanut quotas whereas the current plaintiffs' claim is based on the insurance contracts.

58

Tommy Flythe.   Philip R. Isley, G. Eugene Boyce, and R. Daniel Boyce shall represent the certified class.

For lack of subject matter jurisdiction, the court hereby dismisses all plaintiffs who do not have peanut farms in the Eastern District of North Carolina, including Jim Ferguson, Glen Hawkins, Billy Bain, Glen Moore, R. L. Smith, H. Steven Allen, and all plaintiffs listed in Exhibit B to plaintiffs' motion to join additional plaintiffs, filed November 19, 2002.

For the foregoing reasons, the court grants the plaintiffs' motion for summary judgment on its breach of contract claim and denies the defendants' motion for summary judgment.

Class representatives shall have fifteen (15) days from the date of this Order to file a proposed notice for class members.

This _22ⁿᵈ_ day of July, 2004.

MALCOLM J. HOWARD
United States District Judge

At Greenville, NC
#1

49
57

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

FILED
JAN 2 1 2005
US DISTRICT COURT, E.DNC
BY _____ DEP. CLK

| | |
|---|---|
| In re: Peanut Crop Insurance ) <br> Litigation, MDL-1634 ) <br> ) <br> ) <br> ) | **Master Docket No:** <br> **4:05-CV-8-H2** <br> **ALL CASES** |

## ORDER SCHEDULING HEARING

The court hereby schedules a hearing for Thursday, February 17, 2005, at 10:00 a.m. at the United States District Courthouse, Greenville, North Carolina. The parties should be prepared to address the following:

1.  Plaintiffs' motion for class certification and summary judgment for plaintiff peanut farmers in other states;

2.  Plaintiffs' motion for setting of damages calculation formula and establishment of common fund;

3.  Defendant's cross-motion for adoption of damages formula; and,

4.  other motions pending at the time of hearing.

This  2/5<u>t</u>  day of January, 2005.

MALCOLM J. HOWARD
United States District Judge

_____ the foregoing to be a true and correct
copy of the original.

United States District Court
Eastern District of North Carolina

By _____
Deputy Clerk

At Greenville, NC
#26

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION



```
                              )
In re: Peanut Crop Insurance  )      Master Docket No:
Litigation, MDL-1634          )        4:05-CV-8-H2
                              )         ALL CASES
                              )
```

**PRACTICE AND PROCEDURE ORDER NUMBER ONE UPON TRANSFER
PURSUANT TO 28 U.S.C. §1407(a)**

This order shall govern the practice and procedure in those actions transferred to this court by the Judicial Panel on Multidistrict Litigation pursuant to the order of October 26, 2004, as well as all related actions originally filed in this court or transferred or removed to this court. This order shall also govern the practice and procedure in any tag-along actions transferred to this court by the Judicial Panel on Multidistrict Litigation pursuant to Rule 1 of the Rules of Procedure of that Panel subsequent to the filing of the final transfer order by the Clerk of this Court and any related actions subsequently filed in this court or otherwise transferred or removed to this court. The actions transferred to this court as of the date of this order are listed in Schedule A attached hereto.

1.   **MASTER DOCKET**

     a.   The clerk shall maintain a master docket and case file under the caption "In re: Peanut Crop Insurance Litigation, MDL-1634," master file number 4:05-CV-8-H2.

$\zeta$ /

All orders, pleadings, motions and other documents will, when filed and docketed in the master case file, be deemed filed and docketed in each individual case to the extent applicable.

2. **FILING**

   a. All orders, pleadings, motions, and other documents will bear a caption similar to that of this order. If generally applicable to all consolidated actions, they shall include in their caption the notation that they relate to "All Cases" and be filed and docketed only in the master file.

   b. If such document does not relate to all cases, the individual docket numbers assigned by the Clerk of this Court (as listed in Schedule A hereto) to those actions to which the document relates shall also be listed. Documents which apply to 2 or more actions shall be filed and docketed only in the master file.

   c. If the document applies to a single action, it shall be docketed only in the individual case file. Any document which is to be filed in any of these actions shall be filed with the Clerk of this Court and not with the transferor district court.

3. **LIAISON COUNSEL**

   a. Liaison Counsel is (1) authorized to receive orders and notices from the transferee court and the Panel on behalf

2

(3)

of all parties within their liaison group and (2) is
responsible for the transmittal of copies of orders and
notices to the parties within their liaison group.
Additionally, liaison counsel is responsible for keeping
the respective members of their liaison group apprized of
the nature of all papers filed. Counsel is required to
serve pleadings and other documents on each liaison
counsel appointed by the transferee court.

b.  To act as liaison counsel on behalf of all plaintiffs,
    except Joey Watford, the court designates R. Daniel
    Boyce, Boyce & Isley, PLLC, PO Box 1990, Raleigh, North
    Carolina, 27602-1990, (919)-833-7373. Service shall be
    effected separately upon L. Andrew A. Hollis, Jr., Hollis
    & Wright, PC, Financial Center, 505 North 20th Street,
    Suite 1750, Birmingham, Alabama, 35203 on behalf of
    plaintiff Joey Watford, of case number 4:05-CV-2-H2.

c.  To act on behalf of defendant as liaison counsel, the
    court designates Eric D. Goulian, Assistant United States
    Attorney, United States Attorney's Office, 310 New Bern
    Avenue, Suite 800, Raleigh, North Carolina, 27601, (919)-
    856-4530.

4.  **SERVICE OF DOCUMENTS**

    a.  The clerk of this court will provide a copy of each order
        to liaison counsel for distribution as appropriate to
        other counsel and to the parties.

3

6.3

    b.    Service of each pleading, motion or other document shall
        be deemed complete by making service upon liaison
        counsel.

5.  **HEARINGS**

    a.    Hearings shall not be held on any motions filed except by
        order of Court upon such notice as the Court may direct.

6.  **MISCELLANEOUS**

    a.    No parties to any of these actions shall be required to
        obtain local counsel in this district and the
        requirements of Rule 83.1 of the Local Rules of the
        Eastern District of North Carolina are waived as to any
        attorney appearing in these actions who is duly admitted
        to practice before any United States Court.

    b.    This court shall enter additional Practice and Procedure
        Orders as the need arises.

This __21st__ day of January, 2005.


                         MALCOLM J. HOWARD
                         United States District Judge

At Greenville, NC
#26

               ... the foregoing to be a true and ...
               copy of the original.

               United States District Court
               Eastern District of North Carolina
               By

64

<u>Schedule A</u>

<u>MDL-1634-In re Peanut Crop Insurance Litigation</u>
Master Docket No. 4:05-CV-8-H2

Eastern District of North Carolina
<u>Barnhill v. Davidson</u>, 4:02-CV-159-H2

     and Transferee Cases under 28 U.S.C. §1407 with their respective
Eastern District of North Carolina case numbers:

     Middle District of Alabama
     <u>Beasley v. Davidson</u>, 4:04-CV-188-H2

     Northern District of Florida
     <u>Florida Peanut Farmers v. Davidson</u>, 4:04-CV-189-H2

     Middle District of Georgia
     <u>Georgia Peanut Farmers v. Davidson</u>, 4:04-CV-190-H2

     District of South Carolina
     <u>Berry v. Davidson</u>, 4:04-CV-187-H2

     Eastern District of Texas
     <u>Texas Peanut Farmers v. Davidson</u>, 4:04-CV-186-H2

     Eastern District of Virginia
     <u>Clements v. Davidson</u>, 4:04-CV-191-H2

     Middle District of Alabama
     <u>Watford v. Davidson</u>, 4:05-CV-2-H2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

FILED
MAR 3 1 2005

In re Peanut Crop Insurance   )
Litigation, MDL-1634          )        **Master Docket**
                              )        **No: 4:05-CV-8H**
                              )        **ALL CASES**
                              )

### ORDER

This matter is before the court on the parties' cross motions
for adoption of a damages formula.    The parties have filed
appropriate responses and replies.    In addition, the court
conducted a hearing on February 17, 2005, and a status conference
on March 18, 2005, at which times the parties addressed all pending
issues relating to these motions regarding the formula to be
adopted for this case.   The parties agree that this damages formula
is applicable to all transferred cases.    This matter is ripe for
adjudication.

This court granted plaintiffs' motions for summary judgment,
finding that defendants had breached the insurance contracts with
the plaintiffs.   Now these cases are before the court on the issue
of damages.    In a breach of contract action, plaintiffs are
entitled to damages to make them "whole," in other words, to place
them in as good a position as they would have been but for the
breach of contract.   LaSalle Talman Bank v. U.S., 317 F.3d 1363,
1371 (Fed. Cir. 2003); Hughes Communication Galaxy, Inc. V. U.S.,
271 F.3d 1060, 1066 (Fed. Cir. 2001).    However, in general, the

66

"non-breaching party is not entitled, through the award of damages,
to achieve a position superior to the one it would reasonably have
occupied had the breach not occurred." LaSalle, 317 F.3d at 1371.

Plaintiffs are entitled to be made whole; however, they are
not entitled to a windfall. Benefits received in mitigation of
those damages must be taken into account. "When there is a direct
relation, in time and in subject matter, between the breach and
mitigating events, the damages are reduced accordingly." LaSalle,
317 F.3d at 1371, citing Restatement 2d. of Contract Section 347.

I.   **Calculation of Gross Damages:**

1.   **Determining 2002 Insured Quota and Non Quota Amounts**

For purposes of this lawsuit, a Class Member's 2002 quota and
non-quota amounts shall be determined as follows:

```
Class Member's 2002 Production Guarantee
     for insured Farm Unit for which loss claimed
x District Specific Percentage of Quota Liability for 2001
= Amount of Class Member's 2002 Insured Quota

Class Member's 2002 Production Guarantee
     for insured Farm Unit for which loss claimed
x District Specific Percentage of Non-Quota Liability 2001
= Amount of Class Member's 2002 Insured Nonquota
```

2.   **Determining Gross Damage Award for Loss of Quota Peanuts**

a.   **2002 Quota Peanut Loss:**

```
Amount of Class Member's 2002 Insured Quota
- Class Member's 2002 Production to Count
= Class Member's 2002 Quota peanut loss in pounds
```

2

b.  **Gross Indemnity for 2002 Quota Peanut Loss:**

The formula for damages in all cases shall be calculated at the rate of $.31 per pound less payment of $.1775 per pound for the 2002 Crop Year to be calculated for those farmers who had been assigned farm poundage quotas for the 2001 Crop Year.

The identical formula shall be used for calculation of damages for all class members in each class.

Accordingly, the gross entitlement for the claimants will be the quota poundage multiplied times $.31 minus the quota poundage times $.1775, or as expressed in a formula:

Class Member's 2002 Quota Peanut Loss in pounds
x .1325 ($0.31 minus $0.1775)
= Gross Indemnity on Class Member's 2002 Quota Peanut Loss

II.  **Adjustments**

A. **Adjustment for Additional Premium owed on Quota Peanuts**

The parties agree that the gross indemnity should be adjusted for additional premiums owed on quota peanuts.  This adjustment should be calculated as follows:

Amount of Class Member's 2002 Insured Quota
x .1325
x Premium Rate applicable to Class Member on insured Farm Unit
for which loss claimed
= Additional Premium Owed

Gross indemnity on Class Member's 2002 Quota Peanut Loss
- Additional Premium Owed
= Adjusted Gross Indemnity for
     Class Member's 2002 Quota Peanut Loss

3

68

Also, the court finds that the adjusted gross indemnity must be further adjusted if the class member's share in the insured farm unit is less than 100%.

> Adjusted Gross Indemnity for Class Member's 2002 Quota Peanut Loss
> x Class Member's Percentage Share of Insured Farm United
> = Additional Indemnity Owed under Policy for Class Member's 2002 Quota Peanut Loss

### B. Adjustment for Overpayment of Indemnity on Non-quota Peanut Loss

The additional indemnity owed under the crop insurance policy for a Class Member's 2002 Quota Peanut Loss shall be reduced by any overpayment of indemnity for a Class Member's 2002 Non-quota Peanut Loss, calculated as follows:

**1. Determination of Class Member's 2002 Non-quota Peanut Loss:**

Class Member's 2002 Production Guarantee for insured Farm Unit
- Class Member's 2002 Production to Count
- Class Member's 2002 loss of Quota Peanut Loss in Pounds
= 2002 Non-quota Peanut Loss

**2. Determination of overpaid indemnity for Class Member's 2002 Non-quota Peanut Loss:**

2002 Non-quota Peanut Loss
x .0175 ($0.1775 minus $0.16)
= Gross Overpayment of Indemnity on 2002 Non-quota Peanut Loss

**3. Credit for additional premium paid:**

Amount of Class Member's 2002 Insured Nonquota
x .0175
x Premium Rate applicable to individual Class Member for insured Farm Unit
= Overpaid premium on 2002 Non-quota Peanuts

4

67

Gross Overpayment of indemnity on 2002 Non-quota Peanut Loss
- Overpaid premium on 2002 Non-quota Peanuts
= Adjusted Gross Overpayment of indemnity for Class Member's
        2002 Non-quota Peanut Loss for insured farm unit

**4. Adjusted for Class Member's share in insured Farm Unit (if
less than 100%):**

Adjusted Gross Overpayment of Indemnity for Class Member's
2002 Non-quota Peanut Loss for insured Farm Unit
x Class Member's Percentage Share of insured Farm Unit
= Overpayment of Indemnity for
        Class Member's 2002 Non-quota Peanut Loss

### III. Reductions

Defendants' motion requests certain reductions or adjustments
to the individual class member recovery. The plaintiffs object to
these reductions.

#### A. Quota Buyout

Defendants contend there should be a deduction to the extent
that a class member in this lawsuit was an eligible peanut quota
holder and received a payment pursuant to 7 U.S.C. § 7959 (the
quota buyout). This court finds that the Farm Bill of 2002 did not
provide a nexus between quota buyout payments and decreased
insurance coverage. The buyout payments were made to landowners
only, without regard to whether they were quota holders or whether
they had paid for crop insurance. The court finds that the quota
buyout is not in any way related to the insurance contract and
therefore does not qualify as mitigation of damages. See LaSalle,
discussed supra, 317 F.3d at 1371.

Finding no direct relationship between the contract breach and

5

7 o

any payments for quota buyout, defendants' motion for a reduction based on the quota buyout is denied.

## B.   Direct and Countercyclical Payments

Defendants further contend that, to the extent that a class member in this lawsuit was a historic peanut producer and received a direct payment pursuant to 7 U.S.C. §7953 and/or a countercyclical payment pursuant to 7 U.S.C. § 7954 for the 2002 crop year for peanuts, any additional net indemnity owed the class member under the crop insurance as calculated above should be reduced by the amount of such class member's direct and/or countercyclical payment.

This court finds that the direct and countercyclical payments under the 2002 Farm Bill are unrelated to the peanut insurance contract at issue in this lawsuit. Compensation under the 2002 Farm Bill was afforded to all farmers, regardless of the crop they produced. In addition, these payments were made without regard to any indemnity received for 2002 peanut losses or any indemnity that may be owed under the contract. The court, finding no relationship between these payments and the insurance contract at issue in this litigation, see Lasalle, supra, denies defendants' motion for a reduction based on direct and/or countercyclical payments.

## C.   Disaster Relief Payments

Finally, defendants contend that to the extent a class member received a crop disaster payment for loss of the 2002 peanut crop

6

7 /

pursuant to P.L. 108-7, 117 Stat. 538 (section 202, Division N, February 20, 2003) and 7 C.F.R. Part 1480, any additional net indemnity owed the class member under the crop insurance policy as calculated above should be reduced by the amount of the Crop Disaster Payment made for 2002 peanut crop loss. As with quota buyouts and direct and/or countercyclical payments, this court finds that the crop disaster payments are unrelated to the contract breached by the defendants. Therefore, defendants' motion for a reduction based on crop disaster payments is denied.

Accordingly, the formulas set about above shall be used in calculating the total damages due to each individual class member.

Remaining before the court in these cases is plaintiffs' motion for the establishment of a common fund. Plaintiffs seek to have this court order the establishment of a common fund to be followed by the establishment of a special master/independent accountant to disburse said funds. The defendants, however, object to disbursement of funds through a special master/independent accountant.    The court has taken this issue under advisement and will rule on this issue in due course.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for adoption of a damages formula is granted in part and denied in part. Defendants' motion for adoption of a damages formula is granted in part and denied in part.    The above formula shall be used in

7

72

calculating the total damages due to each individual class member.

This 30<u>th</u> day of March, 2005.

_____
MALCOLM J. HOWARD
United States District Judge

At Greenville, NC
#26

I certify the foregoing to be a true and correct
copy of the original.
Fred L. Bon h III, Clerk
United States District Court
Eastern District of North Carolina

By _____
Deputy Clerk

8

73

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

FILED
MAR 3 1 2005

In re Peanut Crop Insurance      )
Litigation, MDL-1634             )        **Master Docket No:**
                                 )        **4:05-CV-8H**
                                 )        **ALL CASES**
                                 )

#### ORDER

This matter is before the court on defendants' motion to dismiss or alternatively for summary judgment in transferred cases and plaintiffs' motion for class certification and summary judgment for transferred cases. The parties have filed proper responses and replies; therefore, these matters are ripe for adjudication.

### I. Summary Judgment in <u>Barnhill v. Davidson</u>, 4:02-CV-159-H(4)

By order dated July 22, 2004, in the case of <u>Barnhill v. Davidson</u>, No. 4:02-CV-159-H(4) (E.D.N.C.)("<u>Barnhill</u>" case), this court granted the plaintiffs' summary judgment motion on its breach of contract claim and denied defendants' cross-motion for summary judgment. Defendants' motion for reconsideration of the July 22, 2004, order was denied on January 26, 2005.

### II. Summary Judgment in Transferee Cases

On October 26, 2004, the Judicial Panel on Multidistrict Litigation ordered that six actions pending in other district courts raising the identical claims for relief be transferred to this district for consolidated pretrial proceedings ("transferred cases").

74

The parties have renewed their cross-motions for summary judgment with respect to the transferred cases. Since there are no new facts presented which would cause this court to rule differently from the summary judgment order in the <u>Barnhill</u> case of July 22, 2004, which is incorporated herein by reference, plaintiffs' motion for summary judgment is GRANTED and defendants' motion for summary judgment is DENIED in each of the transferred cases.

In anticipation of this ruling, defendants have also renewed their motion for reconsideration. This court again finds no basis for amending its summary judgment order, and therefore defendants' motion for reconsideration is hereby DENIED in each of the transferred cases.

## III. Class Certification in <u>Barnhill v. Davidson</u>, 4:02-CV-159-H(4)

In the <u>Barnhill</u> case, this court previously certified the following class:

> Peanut farmers whose farms are located in the Eastern District of North Carolina, who had insurance coverage on peanuts under the 2002 Peanut Multiple Peril Crop Policies, who had losses for the 2002 crop year, who settled those losses for $0.1775 per pound, and who had been assigned farm poundage quotas for the 2001 crop year.

July 22, 2004, Order at 48.

## IV. Class Certification in the Transferee Cases

Plaintiffs now also seek class certification in each of the transferred cases. Although defendants oppose class certification

75 [2]

in the transferred cases on the same grounds that they asserted in Barnhill, the parties agree that the issues with respect to class certification in the transferred cases are identical to those presented in Barnhill. Accordingly, for the reasons set forth in the July 22, 2004, order, the court hereby ORDERS certification of a district-wide class corresponding to the originating district in each of the transferred cases, using the otherwise identical class definition quoted above.

It is further ORDERED that R. Daniel Boyce, G. Eugene Boyce and Philip R. Isley of the law firm, Boyce & Isley, PLLC, shall serve as class counsel for plaintiffs in all transferee cases. Class counsel shall send the previously approved class notice to all potential class members as soon as practicable as required by Fed. R. Civ. P. 23.

It is further ORDERED that the following plaintiffs shall serve as class representatives in each of the transferee cases and that class counsel advise class representatives of their duties and responsibilities under Rule 23:

> **David Donaldson:**
> ALABAMA PEANUT FARMERS:
> TERRY E. BEASLEY, et al., v. ROSS J. DAVIDSON, ADMINISTRATOR FOR RISK MANAGEMENT AGENCY, et al.,
> EDNC File # 4:04-CV-188-H2
> Joey Watford v. Ross J. Davidson, et al.,
> EDNC File # 4:05-CV_2-H2
> U.S. District Court, MDAL;
> No. 1:03-500 and No. 1:03-153

3

76

**James Barnes and Joseph Ditty:**
FLORIDA PEANUT FARMERS:JAMES C. BARNES; et al.
v. ROSS J. DAVIDSON, et al.,
EDNC File # 4:04-CV-189-H2
U.S. District Court, NDFL, Panama City
Division; No. 5:03-CV-107-MCR

**Milton L. Hall, the Honorable Larry Jones,
Cliff Oliver, and Walter Davenport:**
GEORGIA PEANUT FARMERS:BRADFORD L. CARROLL, et
al. v. ROSS J. DAVIDSON, et al.,
EDNC File # 4:04-CV-190-H2
U. S. District Court, MDGA; CIVIL ACTION 1:03-
CV 175-WLS

**Wallace Berry:**
SOUTH CAROLINA PEANUT FARMERS:WALLACE A.
BERRY, et al. v. ROSS J. DAVIDSON,
ADMINISTRATOR FOR RISK MANAGEMENT AGENCY, et
al.,
EDNC File # 4:04-CV-187-H2
U.S. District Court, NDSC; C/A No.: 3:03-1631-
10

**Tommy Mercer:**
TEXAS PEANUT FARMERS: BILLY M. BARNES; et al.
v. ROSS J. DAVIDSON,
ADMINISTRATOR FOR RISK MANAGEMENT AGENCY, et
al.,
EDNC File No. 4:04-CV-186-H2
U.S. District Court, EDTX, Marshall Division;
Civil Action No. 2-03CV-120

**Tom Clements, Billy Bain, Jim Ferguson, and
Glenn Hawkins:**
[VIRGINIA PEANUT FARMERS] TOM CLEMENTS, et
al. v. ROSS J. DAVIDSON, ADMINISTRATOR FOR
RISK MANAGEMENT AGENCY, et al.,
EDNC File # 4:04-CV-191-H2
U. S. District Court, EDVA, NORFOLK AND
NEWPORT NEWS DIVISIONS
# 2:03-CV-352

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary

judgment is granted, and defendants' motion for summary judgment is

4

7-1

denied.    Defendants' motion for reconsideration is also denied.

Plaintiffs' motion for class certification is granted and class

counsel and class representatives were appointed as stated above.

Class counsel shall send class notice to all potential class

members as soon as practicable as required by Federal Rule of Civil

Procedure 23.

This _30 TH_ day of March, 2005.


_[signature]_
MALCOLM J. HOWARD
United States District Judge

At Greenville, NC
#26

I certify the foregoing to be a true and correct
copy of the original.
Fred L. Borch III, Clerk
United States District Court
Eastern District of North Carolina
By _[signature]_
Deputy Clerk

5

78

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on September 21, 2005, I caused to be served by United States mail, first class postage prepaid, copies of "DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR TRANSFER OF THIS CASE TO THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION" and "APPENDIX" addressed as follows:

R. Daniel Boyce
Post Office Box 1990
Raleigh, North Carolina 27602-1990