ORIGINAL

FILED

MAY 1 2 2003

U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TEXAS PEANUT FARMERS et. al,          )
                                      )
                Plaintiff,            )
                                      )
        v.                            )  No. 03-445C
                                      ) (Judge Firestone)
        THE UNITED STATES,            )
                                      )
                Defendant.            )

DEFENDANT'S MOTION FOR AN ENLARGEMENT OF TIME WITHIN
WHICH TO FILE DEFENDANT'S NOTICE, PURSUANT TO THE
COURT'S MARCH 31, 2003 ORDER, OF DEFENDANT'S INTENT
TO PROCEED BY MOTION IN LIEU OF AN ANSWER TO THE COMPLAINT
                        AND
            DEFENDANT'S MOTION TO STAY
        THE FILING OF AN ANSWER TO THE COMPLAINT

Introduction

Pursuant to the Court's Special Procedures Order (SPO) dated

March 31, 2003, we respectfully request that the Court grant

defendant an enlargement of time of 65 days, to and including

July 21, 2003, within which to submit defendant's memorandum.

Our memorandum will identify the factual and legal bases that

support a motion to dismiss the complaint for failure to state a

claim upon which relief may be granted, and an alternative motion

for summary judgment, which motion we intend to file in lieu of

an answer to the complaint.

Counsel for defendant contacted plaintiffs' counsel early in

the week of May 5, 2003, and counsel have been consulting about

these matters.  Plaintiffs' counsel indicated he may wish to file

a response to our legal memorandum and, if so, would require
thirty days from receipt of our legal memorandum within which to
file plaintiffs' response before participating in a conference
call with the Court.  If plaintiff files a response, defendant's
counsel would require at least ten days to review plaintiffs'
memorandum and consult with the appropriate agency counsel and
other Department of Justice attorneys before participating in the
Court's conference call.  Given these time frames, counsel for
defendant is available for a status conference during the week of
August 25 (beginning on Tuesday, August 26) or the weeks of
September 8 or 15, 2003.  Counsel suggests that defendant file a
supplement to this motion at a time after counsel have attempted
to agree to dates and contacted the Court's chambers (pursuant to
the Court's SPO).

    This is defendant's second request for an enlargement of
time relating to the date for filing the answer or otherwise to
plead.  By motion dated April 23, 2003, defendant filed an
unopposed motion for an enlargement of time of 18 days, to and
including May 16, 2003, within which to file its answer or
otherwise plead; the motion was granted.  However, at the time
defendant filed its motion, counsel for defendant was unaware of
the Court's Special Procedures Order (SPO) dated March 31, 2003,
because counsel for defendant had not received it.  It was only
in a telephone conversation with plaintiffs' counsel about

matters relating to this case that counsel became aware of this order. Later, on April 25, 2003, counsel for plaintiffs forwarded by facsimile a copy of the Court's SPO to counsel for defendant.

Also, during counsels' telephone conversation, counsel for defendant requested that counsel for plaintiffs forward to counsel for defendant a copy of the separate peanut crop provisions of the crop insurance policies, because the incorrect crop provisions (relating to cotton) were attached to plaintiffs' complaint. (Counsel for defendant had reviewed a copy of the peanut crop provisions, which had been attached to the complaint in a companion district court case filed in North Carolina), but both counsel agreed that plaintiffs' counsel should forward a copy of the specific document upon which plaintiffs rely in this case to support their complaint, so that counsel for defendant and the Court possess the correct document(s). Counsel for defendant suggested that counsel for plaintiffs file a motion for leave to file an amended complaint, attaching the correct peanut crop provisions, a motion that defendant would not oppose.[1]

Defendant also respectfully requests that this Court stay defendant's obligation to file an answer to plaintiffs' complaint

---

[1] Counsel was out of the office on April 24-25, 2003, in connection with the care of an elderly parent. Upon counsel's return to her office on April 28, 2003, counsel reviewed the Court's SPO, consulted with plaintiffs' counsel, and prepared this motion.

3

pending the Court's resolution of the defendant's Notice, pursuant to the Court's March 31, 2003 order, of defendant's intent to proceed by motion in lieu of an answer to the complaint.

Nature of the Case

This is a case filed by peanut farmers in Texas, Georgia, Alabama, Florida and South Carolina.  Plaintiffs (who seek class certification) challenge the part of the 2002 Farm Bill (Farm Security and Rural Investment Act of 2002, effective May 13, 2002) that reduced the crop insurance coverage level for peanuts from $.31 per pound (formerly, the price for quota peanuts) to $.17 per pound (price for non-quota peanuts), as of May 13, 2002. The reduction in the price per pound to be paid for peanut crop losses was a direct result of another provision of the 2002 Farm Bill that repealed the peanut marketing quota program.  We discuss that repeal below, because it is the subject of another case pending in this Court.  Members of the Peanut Quota Holders Association v. United States, No. 02-1664C(Fed. Cl.).[2]

The crop insurance policy at issue is the Multiple Peril Crop Insurance Policy (MPCI). (A copy of the MPCI policy is attached to plaintiffs' complaint.)  The MPCI is issued by state insurance agencies, and is reinsured by the Federal Crop

---

[2] Counsel is also considering whether to file a Rule 40.2(b) Notice of Indirectly-Related Cases, in connection with these cases.

4

Insurance Corporation (FCIC).  The MPCI program is administered by the United States Department of Agriculture, through the Risk Management Agency (RMA).  The insurance covers adverse weather conditions.  During the crop year at issue, there were droughts affecting peanut farmers in the three peanut growing regions of the United States.

As noted above, counsel for defendant is also counsel of record for another a case filed in this Court by plaintiff peanut farmers in <u>Members of the Peanut Quota Holders Association v. United States</u>, No. 02-1664C(Fed. Cl.) (answer filed; dispositive motion was due May 12, 2003; motion for enlargement recently granted, with due date now June 11, 2003).  These plaintiffs (who also seek class certification, but who are represented by a different attorney) challenge the repeal of the peanut marketing quota program, that led to the reduction in the crop insurance payment at issue in this case.  These cases arise out of farm legislation that began in the late 1930s after the Great Depression, and which have changed periodically over the years since then.  In <u>Members of the Peanut Quota Holders Association</u>, the Court directed counsel for defendant to provide plaintiffs' counsel with a summary of the Government's defenses.  We attach a copy of our letter dated February 27, 2003, to plaintiffs' counsel (which was later filed in connection with a motion for an enlargement of time in that case); our letter describes some (but

5

not necessarily) all of the defenses that we will raise in our dispositive motion in that case.  Appendix (App). 1-10.

As our letter establishes, the issues raised by plaintiffs who challenge various farm legislation involve complex statutory and regulatory schemes, with long and evolving histories, as well as complicated legal issues.  See generally S.Rep.No. 357, 101st Cong. 2d Sess. 118-19 (1990), U.S. Code Cong. & Admin. News 1990, pp. 4456-5284. In all three complaints challenging the reduction in the payment on the peanut crop insurance policies (this case in this Court, and the two pending cases in Federal district courts), plaintiffs allege the following counts:

1.    breach of contract;

2.    violation of due process by impairment of contract;

3.    denial of due process;

4.    violation of statutory requirement that policy changes be published in Federal Register;

5.    violation of statutory requirement that policy changes be made before November 30, 2001; and,

6.    violation of plaintiffs' statutory and due process rights by failing to notify plaintiffs of their right to appeal.

Plaintiffs also assert the same claims for relief in all three suits.  While most are framed in terms of declaratory or injunctive relief,  all of the claims are essentially claims for money damages owing, for the past (current peanut crop year), and possibly also for future years.  Plaintiffs assert entitlement to:

6

1.  injunctive relief to forbid the settlement of insurance claims at the lower level of $.17 per pound;

2.  declaratory judgment relief to enforce the terms of the contract of insurance which provided for insurance coverage at $.31 per pound for any losses covered by the contract;

3.  relief including a preliminary injunction and a permanent injunction to declare that the Secretary of Agriculture must immediately implement the insurance policy at the indemnity rate, according to the dates established by the various contracts;

4.  a declaration that the agency conduct was an abuse of discretion and violated the Constitution;

5.  a remand to USDA and an injunction, essentially to enforce the insurance policy at $.33 per pound;

6.  a money judgment in accordance with the contract, to recover losses at $.31 per pound; and,

7.  an injunction declaring the agency Bulletins void under the contract and the Constitution.

Counsel for defendant requires additional time within which to research and prepare the legal memorandum required by the Court's recent SPO, given the numerous complex procedural and substantive issues raised in plaintiffs' complaint in this Court, as well as the complaints filed by plaintiffs' counsel in Barnhill et al v. Davidson et al, No. 4:02-CV-159-H (E.D. N.C.), and another (virtually identical) complaint filed in Alabama, Watford et al v. Davidson et al, No. 03-M-153-S (M.D. Ala.), in which plaintiff peanut farmers assert the same claims and seek essentially the same relief.

For example, there are numerous legal and factual issues

which require substantial additional work, before defendant will be able to file its memorandum, including (but not limited to):

1.  Whether this Court possesses jurisdiction to entertain this complaint, or whether exclusive jurisdiction resides in the United States District Courts for the Eastern District of North Carolina or the Middle District of Alabama, see 7 U.S.C. § 1506(d))(Federal Crop Insurance Corporation (FCIC);

    a.  whether plaintiffs are in privity of contract with the United States, sufficient to establish jurisdiction before this Court;

    b.  whether the reinsurance contracts at issue are drawn with such provisions as to create a liability on the part of the Government as the reinsurer directly to the peanut farmers who hold the insurance policies;

2.  Whether plaintiffs have exhausted their administrative remedies, see 7 U.S.C. § 6992(d);

3.  Whether plaintiffs' complaint should be dismissed because the contracting agency, the United States Department of Agriculture (USDA), did not make any changes to the crop insurance policies that would support a breach of contract claim;

4.  Whether the contract provisions contained in the peanut crop provisions permit the Government to settle the insurance claim at the lesser, non-quota per pound rate, see section

8

14(b)(3) (settlement of claim) and section 3(b);

5.   Whether the United States has violated any of plaintiffs'
     statutory and due process rights by allegedly failing to
     notify plaintiffs of their right to appeal;

6.   Whether the United States has violated plaintiff's due
     process rights;

7.   Whether the United States has violated any statutory
     requirements relating to whether policy changes be published
     in the Federal Register, and if so, before November 30,
     2001;

8.   Whether, in the event this Court finds in favor of
     plaintiffs on liability, plaintiffs are entitled to any of
     the relief sought, including declaratory and injunctive
     relief and/or specific performance.

     In addition, there are other issues that counsel must
address with the other agency counsel and Assistant United States
Attorneys handling the other cases pending in Federal district
courts, even though they may not be the subject of a dispositive
motion.  These issues include:

1.   Whether this case should be stayed pending resolution of
     Members of Peanut Quota Holders Association v. United
     States, No. 02-1664C (Fed. Cl.);

2.   Whether the Court should certify the action as a class
     action;

9

3.     If the Court certifies the action as a class action, whether
       28 U.S.C § 1500 would then preclude this Court from
       exercising jurisdiction to entertain the case, given that
       some of the individual plaintiff peanut farmers could be the
       same in this Court and in one or more Federal district
       courts.

Counsel's Other Responsibilities

     As explained above, this case is one of several cases
presently assigned to counsel of record that involve agricultural
commodities and relatively recent farm legislation.  Counsel is
required to prepare our dispositive motion in <u>The Peanut Quota</u>
<u>Holders Association, Inc. v. United States</u>, No. 02-1664C (Fed.
Cl.) (third motion for enlargement of time to June 11, 2003
recently granted).  Further, counsel was recently assigned
responsibility for another complex case involving crop insurance,
in which the Government's answer was also due on April 28, 2003
(motion for an enlargement of time to June 12, 2003, having been
granted).  <u>ACE Property & Casualty Insurance Co. v. United</u>
<u>States</u>, No. 03-470C (Fed. Cl.).

     In addition, counsel has responsibilities in other cases
during this time and into the coming weeks: <u>HPI/GSA-3C, LLC. v.</u>
<u>GSA</u>, No. 03-1252 (Fed. Cir.) (appellant's brief due to be filed
in May 28; Government's brief presently due July 7, 2003);
<u>Schleicher Community Corrections Center, Inc. v. Attorney General</u>

of the United States, No. 03-1039 (Fed. Cir. (brief filed March
10, 2003 on jurisdictional issue; court of appeals could at any
time require briefing on the merits).

Defendant's Motion to Stay

    Defendant also respectfully requests that this Court stay
defendant's obligation to file an answer to plaintiffs' complaint
pending the Court's resolution of the defendant's notice,
pursuant to the Court's March 31, 2003 order, of defendant's
intent to proceed by motion in lieu of an answer to the
complaint.

    Given the complexities of this case, both procedurally and
substantively, as described above, defendant believes that it
would be in the interest of judicial economy for defendant to
focus its resources upon preparing the legal memorandum, and
ultimately defendant's dispositive motion, rather than expend the
resources necessary to complete preparation of defendant's answer
to the complaint.

                            Conclusion

    Accordingly, defendant respectfully requests that this Court
grant defendant an enlargement of time of 65 days to and
including July 21, 2003, within which to submit defendant's
memorandum that will briefly identify the factual and legal bases
that support a motion to dismiss the complaint for failure to
state a claim upon which relief may be granted, and an

                              11

alternative motion for summary judgment, which motion we intend
to file in lieu of an answer to the complaint.

Defendant also respectfully requests that this Court stay
defendant's obligation to file a response to plaintiffs'
complaint pending the Court's resolution of the defendant's
notice, pursuant to the Court's March 31, 2003 order, of
defendant's intent to proceed by motion in lieu of an answer to
the complaint.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
Assistant Attorney General

DAVID M. COHEN
Director

JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn:  Classification Unit
        8th Floor
1100 L Street, N.W.
Washington, D.C.  20530
Tele: (202) 307-1011
Facsimile: (202) 514-8624

Attorneys for Defendant

Kim Arrigo
United States Department
  of Agriculture
Office of the General
  Counsel
Washington, D.C.

Mark Simpson
United States Department
  of Agriculture
Office of the General
  Counsel
Atlanta, Georgia

May 12, 2003

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on May 12, 2003, I caused to be served by United States mail, postage prepaid, copies of "DEFENDANT'S MOTION FOR AN ENLARGEMENT OF TIME WITHIN WHICH TO FILE DEFENDANT'S NOTICE, PURSUANT TO THE COURT'S MARCH 31, 2003 ORDER, OF DEFENDANT'S INTENT TO PROCEED BY MOTION IN LIEU OF AN ANSWER TO THE COMPLAINT AND DEFENDANT'S MOTION TO STAY THE FILING OF AN ANSWER TO THE COMPLAINT" and "APPENDIX" addressed as follows:

> R. Daniel Boyce
> Post Office Box 1990
> Raleigh
> North Carolina 27602-1990

APPENDIX

Page

Letter, February 27, 2003, from Ms. Jane Vanneman
    to Mr. David Boone, <u>Members of the Peanut</u>
    <u>Quota Holders Association v. United States</u>,
    No. 02-1664L (Fed. Cl.) . . . . . . . . . . . . . .    1

# **APPENDIX**

**U.S. Department of Justice**

Civil Division

RM:DMC:JVanneman
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

Telephone:  (202) 307-1011
Fax:          (202) 514-8624

*Washington, D.C. 20530*

February 27, 2003

Mr. David Boone
Boone & Stone
3166 Mathieson Drive
Atlanta, Georgia 30305

> Re:  Members of Peanut Quota Holders
>       <u>Association v. United States, No. 02-1664 (Fed. Cl.)</u>

Dear Mr. Boone:

<u>Introduction</u>

At the status conference held in this case on January 23, 2003, the court directed the government to notify plaintiffs if we intend to file a dispositive motion.  This letter is to provide our notice that we do intend to file a dispositive motion.

At the status conference, the court also directed the government to provide you with a statement of our defenses.  In making this direction, the court made clear that we would not be limited to whatever statements of defenses we outline in this letter.  In addition, this letter will serve to provide you, in accordance with the court's order dated January 24, 2003, with citations to some of the various statutes and regulations relating to the peanut program.

*/*

-2-

Statement of the Case

    This case involves the Farm Bill of 2002, and in particular,
the peanut program.  Plaintiffs are individuals who allege that
they own farms that either had produced peanuts in the past or
for which plaintiffs had leased out their peanut marketing quotas
in recent years to others who actually produced the peanuts.
Plaintiffs challenge the Farm Bill of 2002 as effecting a
unlawful takings and they seek money damages.  It appears that
plaintiffs allege three major types of claims:

    1.    the buyout figure of $.11 per pound (over 5 years in
          installment payments, for a total of $.55 per pound, in
          one-time payment) of their quota is less than fair
          market value;

    2.    the repeal of the former peanut marketing poundage
          quota, and Congress's enactment of the new peanut
          "base" (from which future price and/or income supports
          or other benefits will be calculated) to those who had
          actually produced the peanuts during the last four
          years, is an unfair and retroactive taking of
          plaintiffs' property (e.g., the peanut marketing
          quota);

    3.    the repeal of the former peanut marketing poundage
          quota diminishes the value of plaintiffs' land.

Farm Bills, Particularly the 2002 Farm Bills Relating to Peanuts

    The Farm Bill of 2002 (Farm Security and Rural Investment
Act, P.L. 107-171) is one of many farm bills enacted periodically
since 1938 relating to various agricultural commodities,
including peanuts (which were first made part of the farm bills
in 1941).  These farm bills frequently modify and/or eliminate
various price and/or income support payments, and other benefits
relating to peanuts, as well as other agricultural commodities.
In fact, the new "peanut base" program was a new program created
in 2002 that included direct payments and counter-cyclical
payments for peanuts, similar to the programs that had existed
for cotton and other commodities in previous years (and which

2

-3-

continued for other commodities in a modified form).  See
generally Competitive Enters. Inst. v. United States Dept. of
Agriculture, 954 F. Supp. 265 (D.C. D.C. 1996) (summary of farm
bills relating to peanut programs).

Summary of History of Farm Bills, Beginning in 1938

     The provisions of the 1938 Act, the seminal farm legislation
enacted during the Great Depression, are often suspended and
superseded by multi-year farm legislation.  In 1941, the 1938 Act
was amended to establish a national marketing quota program for
peanuts.  Pub. L. No. 77-27, 55 Stat. 88 (1941).  The various
programs relating to peanuts have changed numerous times over the
years since 1941.  Under the old program (prior to revisions
which we will discuss below), the annual national marketing quota
was converted later to a national acreage allotment and
distributed to qualified farms.  A peanut farmer was subject to
financial penalties for marketing peanuts in excess of the farm's
allotment.  Additionally, a system was created so that the
marketing quota program could be temporarily suspended if a
certain percentage of peanut farmers voted in a referendum that
way; however, price support loans for peanuts would not be
available during years in which the marketing quota was
suspended.  See generally 7 U.S.C. §§ 1358 and 1359.

     In 1967, 1969, and 1970 legislation, Congress authorized the
transfer of peanut acreage allotments.  Pub. L. No. 90-211, 81
Stat. 658 (1967); see also Pub. L. No. 91-122, 83 Stat. 213
(1969); Pub. L. No. 91-568, 84 Stat. 1499 (1970).  Subject to
certain conditions, acreage allotment holders were permitted to
sell or lease all or part of their allotments.  See generally 7
U.S.C. § 1358a.

     The peanut program was revised again in the Food and
Agriculture Act of 1977, Pub. L. No. 95-113, §§ 801-807, 91 Stat.
913, 944 (1977) (the 1977 Act).  The 1977 Act implemented a farm
poundage quota system with acreage allotments and a two-tier
classification of peanuts, in addition to price support loans.
The two categories of peanuts were: (1) quota peanuts and (2)
additional peanuts.  "Quota" peanuts were those produced pursuant
to a farm poundage quota on an eligible farm and thereby eligible
for domestic edible use and seed.  "Additional" peanuts were
those produced in excess of the farm poundage quota on an

-4-

eligible farm and thereby eligible only for export or crushing resulting in oil for food uses and meal for feed uses. Financial penalties applied to the marketing of peanuts in violation of the rules. In fact, as indicated in <u>Calloway v. Block</u>, 763 F.2d 1283 (11th Cir. 1985)(discussed below), the 1981 Farm Bill actually reduced the amount of expected demand that would be committed to "quota" peanuts, so as provide more opportunities to market "additional" peanuts; that is, the quota was reduced. In addition, provisions were made in the 1981 Act to eliminate the marketing quota in certain cases for farms owned by persons who were not actually producers of peanuts. Indeed, throughout the period of several farm bills, there were a number of years in which the marketing quota was a number which could fluctuate based upon demand issues and upon provisions of the pertinent statutes in effect at the time.

The peanut program was revised again in 1981, in the Agriculture and Food Act of 1981, Pub. L. No. 97-98, §§ 701-707, 95 Stat. 1213, 1248 (1981). The 1981 Act implemented a farm <u>poundage</u> quota system, without acreage allotments, and maintained (with modification) a two-tier classification of peanuts (as well as the two-tier structure of price support loans). Absent transfers, farm which had acreage allotments under the 1977 Act received a farm poundage quota under the 1981 Act and were the only ones allowed to produce quota peanuts. As before, those farms could also produce additional peanuts. However, because there were no acreage allotments under the 1981 Act, other farms could now produce "additional" peanuts.

The 1981 Act also established annual national poundage quotas. There were complex rules governing the apportionment among the states and within each particular state of the national poundage quotas allocated under previous law. Criteria were established for making reductions in poundage quotas with respect to farms in a state when the amount of national poundage quota allocated to a state was reduced in future years. There were also rules concerning increases in poundage quota allocations. Additionally, a system was created so that the poundage quota program could be temporarily suspended if a certain percentage of quota peanut farmers voted that way in a referendum. There were also rules governing the definitions of "quota peanuts" and "additional peanuts." Also, under the 1981 Act, subject to certain conditions, the owner of a farm could sell or lease all

4

-5-

or part of the poundage quota to any other owner or operator of a farm within a specified geographic range for transfer to the farm. See generally 7 U.S.C. § 1358b and 7 C.F.R. § 729.214.

Subsequent to the 1981 Act and prior to the 2002 Act, the most basic provisions of the peanut poundage quota system were continued essentially unchanged in multi-year farm legislation. See Food Security Act of 1985, Pub. L. No. 99-198, §§ 701-707, 99 Stat. 1354, 1430 (1985); Food, Agriculture, Conservation and Trade Act of 1990, Pub. L. No. 101-624, §§ 801-809, 104 Stat. 3359, 3459 (1990); Pub. L. No. 103-66, § 1109, 107 Stat. 312, 325 (1993); Agricultural Market Transition Act, Pub. L. No. 104-127, § 155, 110 Stat. 888, 922 (1996). See generally 7 U.S.C. §§ 1358-1, 1358b, 1358c, and 1359a; 7 C.F.R. part 729 (2001). This is not to say that the quota amounts were fixed, or that there were not substantive adjustments made to the peanut marketing program. Rather, the quota amounts did change at times, as, for example, in the 1996 legislation in which Congress made provisions again (as it had in 1981) for farms to lose quotas in cases in which the quotas were held by persons who did not meet certain producing criteria.

Congress, in the 2002 Act repealed the marketing quota program for peanuts in part VI of subtitle B of title III of the 1938 Act, as amended (7 U.S.C. §§ 1357-1359a). Section 1309(b)(1) provided for the "buyout" for each person that the Secretary determines is an eligible peanut quota holder, at the statutorily-determined price of 11 cents per pound.

Section 1309(f) of the 2002 Act defines "eligible peanut quota holder." Section 1309(f)(1) provides the general rule that a person is an eligible peanut quota holder if the person, as of the date of enactment of the 2002 Act, owned a farm that, also as of that same date, was eligible for a peanut quota under § 358-1(b) of the Agricultural Adjustment Act of 1938 (7 U.S.C. § 1358-1(b)), irrespective of temporary leases or transfers of quotas. Section 1309(f)(6) provides in part that the determination of the peanut poundage amount for which the person qualifies shall be made based on the 2001 crop quota levels.

-6-

<u>Defendant's Dispositive Motion</u>

Our legal arguments may be structured as follows:

1.  Pursuant to Rule 12(b)(6) [formerly Rule 12(b)(4) in the
    Court of Federal Claims], the court should grant defendant's
    motion to dismiss for plaintiffs' failure to state a claim
    upon which relief may be granted. <u>See generally</u> <u>Fifth Third</u>
    <u>Bank of Western Ohio v. United States</u>, No. 95-503C (February
    10, 2003, Fed. Cl.), slip op. at 4 (standards for Rule
    12(b)(6) motion) (Judge Miller);

    a.  With respect to the peanut marketing programs under
        various Farm Bills, no person ever "owned" a quota;
        rather, by statute and regulations, the marketing
        quotas were assigned to a farm, not to persons;

        i.  In any event, because the peanut marketing quota
            was a program of congressional creation, and was
            simply an allowance to market peanuts without
            financial penalties, Congress could change the
            program when it wished to further the public
            policy;

            (1)  The "buyout" in the 2002 Farm Bill was, in
                 reality, simply a payment to persons who were
                 formerly associated with farms that had a
                 peanut marketing quota;

            (2)  The "buyout" was neither required by any law
                 or by the Constitution;

        ii. Because plaintiffs did not own a quota or a right
            to exclude other persons from marketing peanuts
            penalty-free, the repeal of the peanut marketing
            poundage quota and enactment of a new peanut
            "base" do not constitute a taking; in fact,
            plaintiffs' farms now, in effect, have an
            unlimited "quota" because they can grow without
            penalty all the peanuts they want, as can every
            other farm whether or not it held a quota in the
            past;

        iii. To the extent, if any, that the peanut marketing
             program that ended with the 2002 Farm Bill had an
             adverse effect upon farm land values generally in
             areas where peanuts are grown, that effect was one

6

-7-

that reflected a risk that always existed in
connection with the congressional ability to
regulate farm commodities, including peanuts, and
was extraneous to any inherent characteristic or
value of the farm itself because no owner of a
peanut farm possesses a right to compensation
whenever Congress changes the regulatory scheme
governing peanuts as a farm commodity;

2.    Alternatively, pursuant to Rule 56, the court should grant
defendant's motion for summary judgment;

a.    There are no genuine issues as to any material fact and
the government is entitled to judgment as a matter of
law.  See generally Fifth Third Bank of Western Ohio v.
United States, No. 95-503C (February 10, 2003, Fed.
Cl.), slip op. at 13 (standards for summary
judgment)(Judge Miller);

b.    Plaintiffs are not entitled to any recovery under any
takings theory;

i.    A regulatory takings case is evaluated according
to a three-part test: character of Government
action (whether government took property for
public use), economic impact, and interference
with reasonable investment-backed expectations.
See Ruckelshaus v. Monsanto Co., 467 U.S. 986,
1005 (1984); see generally Penn. Cent. Transp. Co.
v. New York City, 438 U.S. 104 (1978);

ii.   Plaintiffs did not own any property interest.
Calloway v. Block, 763 F.2d 1283 (11th Cir. 1985)
(peanut farmers had no protected property interest
in the peanut quotas; important public policy of
reducing the peanut price support program, in
part, to allow growers of "additional" peanuts to
participate in marketing of peanuts; Congress
reduced quotas and affirmed preferences for those
who actually produced peanuts and took the
business and market risks of production);

(1)   Even if plaintiffs did own some kind of
property interest in the former peanut
marketing quota, plaintiffs had no reasonable
investment-backed expectation that Congress
would continue the peanut marketing quota at
all, or in the same format(s) unchanged;
rather, Congress could determine that a

7

-8-

change was in order whether by <u>ad</u> <u>hoc</u> legislation or by a new farm bill at whatever time new legislation might be in order.

(2)  Congress had modified the peanut program many times since the early 1940s, and, because the quota system was a regulatory system for determining which peanuts could be marketed penalty-free, no one could reasonably have expected that any future Congress would waive, for peanuts or any other farm commodity, Congress' own ability to regulate agricultural markets;

(3)  Because plaintiffs had no reasonable investment-backed expectations, there would be no need for the court to evaluate the economic impact of the government action;

iii.  In any event, the "buyout" payment is not insufficient because "insufficiency" assumes that there was some obligation on the part of Congress to make a "buyout" payment, and there was no such obligation;

(1)  Further, it was anticipated that Congress would enact a new farm bill at the end of the 2002 crop year, if not sooner, because the applicability of previous Farm Bills ended with that 2002 crop;

(2)  Even if, however, the termination of the last year of coverage of the previous Farm Bill could create a claim for that one final year (2002) (which it cannot), the amount of the buyout is more than the "fair market value" of the quota because the support rate for marketing of peanuts in 2002 was $605 per ton, or approximately $.30 per pound, and, Congress provided for a total of $.55 per pound in the "buyout";

c.  Congress can change the terms of the Farm Bills governing peanuts (and other agricultural commodities) without incurring any type of monetary liability to those who had received benefits under the prior Farm Bills;

i.  The changes that Congress made to the peanut commodity program serve important public policies,

-9-

including, among others, Congress's determinations
about what legislation is needed, if any, to
address the orderly marketing of peanuts,
considering changes in the domestic and
international agricultural markets; what
protections, if any, are necessary for producers,
handlers, processors, consumers of peanuts, and
local communities involved in the production of
peanuts;

d.   Changes enacted by Congress with respect to other farm
commodities since the 1938 bill, which included
reductions and/or eliminations of benefits previously
provided to farmers and/or producers of various
commodities (including reductions to various types of
quotas for other types of farm commodities), establish
that farmers and/or producers can have no reasonable
investment-backed expectations that any particular type
of programmatic support to farmers or producers of
particular agricultural commodities will continue
unchanged, see Calloway v. Block, 763 F.2d at 1283;

e.   To the extent that plaintiffs contend that any official
of the United States government made statements or
promises that no changes would be made to the peanut
marketing quota program that might adversely affect
plaintiffs, any such statements cannot bind the United
States as a matter of law. E.g., City of El Centro v.
United States, 922 F.2d 816, 820 (Fed. Cir. 1990)
(government employees have actual authority to bind the
government only when the Constitution, a statute, or a
regulation conveys such authority in an unambiguous
manner), citing Federal Crop Ins. Corp. v. Merrill, 332
U.S. 380, 384 (1947).

i.   The rationale for these requirements is obvious,
because federal expenditures would be wholly
uncontrollable if government employees could, of
their own volition, obligate the United States.
City of El Centro, 922 F.2d at 820. Accord OPM v.
Richmond, 496 U.S. 414 (1990);

ii.  Moreover, there was no basis on which any
reasonable person could reasonably have believed
that any officer or employee of the United States
Department of Agriculture had the power to
guarantee that Congress would not change the

9

-10-

peanut program at any time that Congress, in its
judgment, decided that a change was in order.

If you believe that we have misconstrued or misinterpreted
any of the claims in the complaint, or if we have not addressed
any claims that you believe you have raised in your complaint
omitted, please inform me in writing.  Also, if you have any
questions, please feel free to telephone me at 202 307-1011.


Very truly yours,

S/

JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division

cc:  Mr. Terry Jackson
     Mr. Michael Gurwitz

A TRUE COPY
TEST:  APR  4 2006

BRIAN BISHOP
Clerk, U.S. Court of Federal Claims

By Dossa L. Sanders
Deputy Clerk

/ O