ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
FILED
JAN 5 2004
U.S. COURT OF
FEDERAL CLAIMS
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TEXAS PEANUT FARMERS, *et al.*    )
                                  )
    Plaintiffs,                   )
                                  )
vs.                               )   No. 03-445C
                                  )   (Judge Firestone)
THE UNITED STATES, *et al*        )
                                  )
    Defendants.                   )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

```
A TRUE COPY
TEST:        APR  4 2006
    BRIAN BISHOP
Clerk, U.S. Court of Federal Claims
```

## MOTION TO RECONSIDER ORDER OF DISMISSAL

NOW COME the Plaintiffs in the above-captioned matter and respectfully request, pursuant to RCFC 60, that this Court reconsider its Order of Dismissal. In support of this Motion, undersigned counsel and Plaintiffs show the Court that:

1.    This Court has ordered dismissal of the case without considering a transfer of the case or a stay of the proceedings. Based on a recent filing by the Government, as set forth in the attached supporting Memorandum of Law, Plaintiffs request that this Court consider transferring the case or alternatively staying final resolution of the case pending resolution of the other parallel proceedings in the federal district courts.

2.    The Order was received by undersigned counsel after December 16, 2003. Further, the filing of Defendants' Motion for Summary Judgment which contain statements in conflict with this Court's Order, was not received until some time after December 22, 2003.

3.    Furthermore, undersigned counsel has been involved in a summary judgment hearing, the filing of a Fourth Circuit Court of Appeals brief and resolution of two significant cases during the month of December. Undersigned counsel also has been responsible for the

Vw
19

filing of responses to motions for summary judgment and the filing of a Motion for Summary Judgment and a Motion for Class Certification as well as other motions in parallel cases. These filings all occurred in December. Undersigned counsel also had previously scheduled an out-of-state trip with family over the Christmas holidays.

4.     Plaintiffs respectfully request that this Court reconsider the dismissal, and instead, transfer the case to each respective federal district court as allowed by 28 U.S.C. § 1631, 28 U.S.C. § 610, 28 U.S.C. § 1404 and 28 U.S.C. § 1406. Alternatively, the Plaintiffs request that this Court stay final resolution of the case pending rulings in the federal district courts.

5.     Accordingly, undersigned counsel and Plaintiffs respectfully request that this Court grant the relief requested pursuant to RCFC 60 and that this Court either stay the proceedings or transfer the proceedings to the respective federal district courts.

This the 31st day of December, 2003

BOYCE & ISLEY, PLLC

R. Daniel Boyce
N. C. State Bar # 12329
Post Office Box 1990
Raleigh, NC 27602-1990
Telephone: (919) 833-7373
Facsimile:  (919) 833-7536
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 31st, 2003, I caused to be served by United States mail, postage prepaid, copies of the foregoing *Motion to Reconsider Order on Rule 12(b)(1) Motion to Dismissal* addressed as follows:

JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn:  Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, DC 20530

BOYCE & ISLEY, PLLC

R. Daniel Boyce
N. C. State Bar # 12329
Post Office Box 1990
Raleigh, NC  27602-1990
Telephone: (919) 833-7373
Facsimile:  (919) 833-7536
*Attorney for Plaintiffs*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| TEXAS PEANUT FARMERS, *et al.* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| THE UNITED STATES, *et al* | ) |
| | ) |
| Defendants. | ) |

No. 03-445C
(Judge Firestone)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM IN SUPPORT OF MOTION TO
## RECONSIDER ORDER OF DISMISSAL

Now come the Plaintiffs pursuant to RCFC 60 and respectfully request relief from the order of dismissal entered this month. Plaintiffs request that this Court reconsider its dismissal of this action or alternatively that this Court transfer the case to the appropriate federal district courts. In support of this motion, Plaintiffs assert as follows:

### STATEMENT OF CASE AND FACTS

1.    In prior pleadings, the Government contended jurisdiction did not exist in the Court of Federal Claims (see Government's Memorandum in Support of Motion to Dismiss).

2.    Based on the Government's representations, this Court ruled that there is no jurisdiction under the breach of contract theory as well as several other theories. (See Order on Rule 12(b)(1) Motion to Dismiss).

3.    However, the Government Defendants now represent, in newly filed District Court pleadings, that jurisdiction may properly lie in the Court of Federal Claims.

1

4.     These same Defendants, in parallel proceedings in a federal district court in Virginia,[1] represented to the Court that: "If this lawsuit is no longer one under the Federal Crop Insurance Act, then the jurisdictional provisions of that Act no longer govern this dispute, and the case may more properly lie in the Court of Federal Claims (See 28 U.S.C. § 1346 (limiting district court's jurisdiction in ordinary implied contract cases to under $10,000) e.g. Plaintiff's Exhibit 8 (Clements Affidavit asserting a claim of "almost $60,000"); Plaintiffs' Exhibit 9 (Moore Affidavit asserting a claim of $86,892.96). Exhibit A attached hereto and incorporated herein, "Defendants' Brief in Opposition to Plaintiffs Motion for Summary Judgment," Footnote 5 at pg. 13. This representation was made six days after this Court's Order dismissing the case in the Court of Federal Claims.

5.     The Government also now alleges there is no standing on breach of contract claims. Exhibit A, ("Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment filed in the Federal District Court for the Eastern District of Virginia," See pg. 8.)

6.     Defendants also have asserted they will raise all other potential defenses including "statute of limitations and/or other time-bars...." Exhibit B attached hereto and incorporated herein, (Letter from Attorney Anne Veneman, pg. 5.)

7.     This case has been delayed at least six months by the Government requesting extensions of time and waiting for the Court's ruling. The lawsuit was filed on February 19, 2003. The Government filed its Motion to Dismiss on July 21, 2003. The Court ruled on December 16, 2003.

---

[1] Realizing the Government's procedural tactics, Plaintiffs filed prophylactic lawsuits in the federal district courts, but several of those suits were filed many months after the Court of Federal Claims lawsuit was filed. The Government sought delays in rulings in every federal district court suggesting that jurisdiction might lie in the Court of Federal Claims.

**ARGUMENT**

Plaintiffs rely on several theories of recovery in this case including contractual, constitutional and regulatory issues.[2] This Court's ruling is based primarily on the contractual language requiring filing of a complaint in the federal district courts.[3]

However, even if a federal district court is the more appropriate forum, dismissal is not the appropriate or fair resolution. 28 U.S.C. 1346(a)(2) provides that the district courts shall have original jurisdiction, concurrent with the United States Claims Court over any other civil action or claim against the United States. Moreover, 28 U.S.C. § 1631 provides for transfer to cure want of jurisdiction:

> "Whenever a civil action is filed in a court as defined in section 610 of this title or
> an appeal including a petition for review of administrative action, is noticed for or
> filed with such a court and that court finds that there is a want of jurisdiction  the

---

[2] Even if the Government contends that for some reason an express contract with the Government fails, the Court may examine whether Plaintiffs and Defendants are parties to an implied-in-fact contract. See *Martinez*, 48 Fed. Cl. 851, 860. See also, *Home Sav. of America, et al, v. U.S.*, 51 Fed. Cl. 487, 497-498 (2002). (Plaintiffs' better argument is that the assistance agreement is only one part of a larger transaction to which a plaintiff was a party - namely, a separate implied-in-fact agreement at the time the plaintiff sought approval of its acquisitions through one of the target banks. An implied-in-fact contract may exist if there is a meeting of the minds which can be inferred from the parties' conduct showing in light of the surrounding circumstances a tacit understanding [of an agreement] between them." *Martinez*, 48 Fed. Cl. at 860. Also, Plaintiffs argue that the Complaint can be amended to add third party beneficiary claims and implied-in-fact contract in addition to the other regulatory and constitutional theories. (See Rule 15 -- amendment to pleadings should be freely given). These theories would not be controlled by the contract itself but instead under alternative theories outside the four corners of the contract.

[3] As noted even if this Court determines that jurisdiction may lie in the federal district courts on some of the claims, the Government conceded in recent pleadings that jurisdiction may be more appropriate on an implied in fact contract; third party beneficiary claim or one of the other claims for relief in the Complaint in the Court of Federal Claims. Indeed, in other cases the Government has argued that because a plaintiff's claims allege various contractual theories, the suit is more properly characterized as a contractual claim against the government and that the Tucker Act and Little Tucker Act grant jurisdiction and concurrent jurisdiction to both U.S. District Courts and the Court of Federal Claims for contractual claims against the United States. (See e.g. *Roberts v. U.S.*, 242 F. 3d 1065 (2001).

3

court <u>shall</u>, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred." (emphasis added).

Further, 28 U.S.C. § 610 provides the word "courts" includes the courts of appeals and district courts of the United States... [and] the United States Claims Court ([United States Court of Federal Claims]...." In addition to 28 U.S.C. § 1631, two other statutes provide for transfers to other courts rather than dismissal (see 28 U.S.C. § 1404 and 28 U.S.C. § 1406.)

In *Britell v. U.S.,* 318 F. 3d 70 (2003), the First Circuit Court of Appeals discussed the transfer statute, 28 U.S.C. § 1631. The First Circuit pointed out that Congress' use of the word "shall" in 28 U.S.C. § 1631 seemingly dictated a preference for transfer in all cases that could have been brought in some other federal court. The First Circuit concluded that the Congressional intent was to create a presumption in favor of transfer. The Court noted that Congress enacted 28 U.S.C. § 1631 to ensure that a litigant does not find himself without a remedy because of a lawyer's error or a technicality of procedure that results from uncertainty in some statutes regarding which court has review authority. The Court noted it sought to prevent duplicitous litigation that would prove wasteful and costly. It concluded that the transfer, rather than the dismissal, is the option of choice and is consistent with the formulation of those goals. As noted, the transfer is presumptively preferable because dismissal of an action or appeal that might thrive elsewhere is not only resource-wasting but also justice-defeating. Against that backdrop, the First Circuit, knowing that the appeal period had run and dismissal would leave the Government without any effective means of obtaining judicial review of the District Court's judgment, granted the Government's motion to transfer and directed the transfer to the United States Court of Appeals for the Federal Circuit.

4

In *Intercargo Insurance Co. v. Burlington N. Santa Fe R.R., et al,* Case No. ED CV 98-0220 RT (VAPx), 1999 U.S. Dist. LEXIS 22302, the Court held that when venue in a case has been laid in the wrong district or division, a district court may, pursuant to 28 U.S.C. § 1406(a) transfer the case to any district or division in which it could have been brought if such transfer is in the interest of justice. Further, a party seeking a transfer pursuant to § 1406 must show that: (1) venue was improperly laid; (2) the district or division to which it seeks transfer is one in which the case could have been brought; and (3) "the interest of justice" favors transfer rather than dismissal or remand. In that case, plaintiffs demonstrated transfer rather than dismissal was in the interest of justice.

In *Proctor v. Morrissey,* No. 95-1937, 1996 U.S. App. LEXIS 25712, the Fourth Circuit Court of Appeals concluded that under the circumstances, it would be in the "interest of justice" to order transfer rather than to dismiss the action for lack of personal jurisdiction. The Court noted most critically that the District Court's dismissal on jurisdictional grounds was without prejudice and that its practical effect could be loss of the claim on the Virginia statute of limitations defense that the defendant had raised. The defendant contended that equitable tolling was not available under Virginia law to defeat the statute's bar. The Fourth Circuit held that in determining whether the interest of justice called for ordering transfer, it was not necessary to address the merits of the limitations questions raised under Virginia law. It sufficed that the issue had been raised and might succeed. Accordingly, the Fourth Circuit held that in the interest of justice, it was appropriate to transfer the case to the United States district court where it could have been brought. Accordingly, the Fourth Circuit vacated the district court's order dismissing the action and remanded with instructions to transfer the action to the United States district court for further proceedings.

In *Imundo, et al. v. Pocono Palace, Inc., et al.*, Civ. No. 01-807 (WGB), 2002 U.S. Dist. LEXIS 16717, plaintiffs had moved for re-argument pursuant to both 28 U.S.C. § 1631 and 28 U.S.C. § 1406(a) to transfer venue to a different district. The Court noted that both statutes considered that where jurisdiction is otherwise proper in a federal district court, the appropriate remedy should be to transfer venue from a U. S. district court to another U. S. district court. The Court also noted that where venue is improper, 28 U.S.C. § 1406 permits a district court to transfer the case to any district court in which it could have been brought if it is in the interest of justice. Accordingly, the Court had power under both 28 U.S.C. § 1404(a) as well as 28 U.S.C. § 1631 to transfer instead of dismissing the action so long as it could have been brought in the district while it was in the interest of justice in doing so. Accordingly, the United States District Court for the District of New Jersey vacated and reversed its prior order of dismissal and transferred the action pursuant to both of the above statutes.

In *Farmer v. Levenson*, 79 Fed. Appx. 918, 2003 U.S. App. LEXIS 22460, the Seventh Circuit Court of Appeals vacated the dismissal and remanded with directions to transfer the case to a different district. In that case, the Court noted that the record established that plaintiffs apparently made a mistake that was easy to commit, and so the penalty of dismissal, even without prejudice, was too harsh. The Court noted that the problem which gave rise to the enactment of 28 U.S.C. § 1406(a) was that of avoiding the injustice which had often resulted to plaintiffs from dismissal of their actions merely because they had made an erroneous guess with regard to the existence of some elusive fact of the kind upon which venue provisions often turn. The Court vacated the dismissal and remanded it to the district court with directions to transfer the case to a separate district.

The Court of Federal Claims in *Glenn v. U. S.*, 858 F.2d 1577 (1988), heard the appeal from a decision of the United States Claims Court that dismissed the plaintiff's complaint for lack of jurisdiction. The U. S. Court of Appeals vacated the dismissal of plaintiffs' complaint due to lack of jurisdiction and stated that plaintiff's motion to transfer should have been granted. The case was remanded with instructions to transfer. The Court noted that the unique circumstances of the case required that the Claims Court's Order be vacated and case remanded to the Claims Court with instructions to transfer the appeal to a board for consolidation with the appeal pending before that tribunal. The Court noted that action would avoid the necessity of two tribunals concurrently deciding appeals on interrelated issues and the possibility of inconsistent decisions.

Numerous other cases in the Court of Federal Claims have acknowledged the applicability of transfer and 28 U.S.C. § 1631 (Whether a case should be transferred rests within the sound district of the transferor court. *Siegal v. United States*, 38 Fed. Cl. 386, 390 (1997); *Williams International Corporation v. United States*, 7 Cl. Ct. 726, 731 (1985); the test for transferring a case is "whether it would be 'in the interest of justice' to do so." *Hicks v. United States*, 23 Cl. Ct. 647, 653 (1991); *Williams International Corporation*, 7 Cl. Ct. at 731-732; the determination that a transfer would be "in the interest of justice," as required by the statute, "turns on the peculiar facts and circumstances of each case." *Siegal*, 38 Fed. Cl. at 390, quoting *Bienville v. United States*, 14 Cl. Ct. 440, 445 (1988).

In *Simanonok v. Simanonok, et al.*, 918 F.2d 947 (1990), the court dealt with the question of whether the district court lacked jurisdiction over the United States claims. The court stated that it was cognizant of the Supreme Court's admonition that they are obliged to "adhere strictly to principles of law of the case" in order to avoid a "perpetual game of jurisdictional ping pong"

citing *Christianson, et al. v. Colt Industries Operating Corp.*, 486 U.S. 800, 818-19, 108 S. Ct. 2166, 100 L. Ed. 2d 811 (1988). The Court in *Simanonok* noted that the whole jurisdictional dispute had been orchestrated by the Government, which had made and refrained from making arguments as the mood struck. The Court noted that on appeal to the Eleventh Circuit, the Government argued that the district court indeed had Little Tucker Act jurisdiction, and so the appeal should lie there. In support of its motion to transfer, the Government cited the district court's order finding Little Tucker Act jurisdiction. The Eleventh Circuit accepted the argument and transferred the case back to the United States Court of Appeals for the Federal Circuit. Once there, however, the Government doubled back and argued again that there was no Little Tucker Act jurisdiction in district court. The Court noted that under those circumstances, there was little wonder that the jurisdictional status of the case had been unsettled. Accordingly, the Federal Circuit retransferred back to the United States Court of Appeals for the Eleventh Circuit.

The flow of cases between the Court of Federal Claims and Federal District Courts flow both ways. In *Mitchell v. U. S.*, 930 F.2d 893, (1991), the Court noted that under complex jurisdictional rules, monetary claims against the United States can arise in either the Claims Court or a district court, and on occasion, the overlapping authority raises thorny jurisdictional problems. Accordingly, the Court vacated the district court's order and remanded with instructions to grant the motion to transfer the case to the Claims Court.

In the case of *In re Sealed Case*, 37 Fed. Appx. 536, 2002 U.S. App. LEXIS 11954 (2002), the United States Court of Appeals for the Federal Circuit dealt with the problem where the Court lacked jurisdiction over the appeal. The Court agreed with the Government's argument that it lacked jurisdiction over the appeal but rejected the Government's opposition to transfer. Instead, the Court noted that it must be cautious in exercising that authority, because in doing so,

they would in effect be adjudicating the merits of the claim that Congress had denied jurisdiction to adjudicate. The Federal Circuit could not rule that the legal theory was clearly frivolous as to justify terminating the plaintiff's case without giving him access to a court having jurisdiction to address the merits of his claim. The Court directed that the case be transferred to the United States of Court of Appeals for the District of Columbia Circuit pursuant to 28 U.S.C. § 1631.

The Government should not be allowed to use delays and "ping-pong tactics" and then assert statute of limitations or other time bar defenses to prevent any court from hearing the merits of this case. The Plaintiffs are entitled to their day in a federal court. They should be allowed the opportunity to present their case in some federal forum. They should not be ousted by using procedural ping-pong tactics and delays to prevent determination on the merits.

Plaintiffs' claims are meritorious. Plaintiffs' losses have been devastating. Assertion of a citizen's legal rights is not a game to be played out for lawyer's entertainment. Plaintiffs should be accorded the courtesy to be heard out, before an impartial tribunal, and in a timely fashion. Anything less is a denial of justice. Accordingly, Plaintiffs respectfully request that this court considering striking its Dismissal Order and staying the proceedings pending outcome in the federal district courts. Alternatively, Plaintiffs request that this Court transfer jurisdiction to the federal district courts as required under 28 U.S.C. § 1631 and the other cited statutes.

WHEREFORE, Plaintiffs respectfully request that the Court strike its Order of Dismissal and reinstate the action pending ultimate determination of the federal district courts as to jurisdiction; or alternatively that this Court strike its dismissal of the action and instead transfer this case pursuant to 28 U.S.C. § 1631 and other previously cited statutes to the respective district courts for further proceedings to determine jurisdiction and as well as other issues.

9

This the 31st day of December, 2003

BOYCE & ISLEY, PLLC

R. Daniel Boyce
N. C. State Bar # 12329
Post Office Box 1990
Raleigh, NC  27602-1990
Telephone: (919) 833-7373
Facsimile:  (919) 833-7536
*Attorney for Plaintiffs*

10

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 31st, 2003, I caused to be served by United States mail, postage prepaid, copies of the foregoing *Memorandum in Support of Motion to Reconsider Order of Dismissal* addressed as follows:

> JANE W. VANNEMAN
> Senior Trial Counsel
> Commercial Litigation Branch
> Civil Division
> Department of Justice
> Attn: Classification Unit, 8th Floor
> 1100 L Street, N.W.
> Washington, DC 20530

**BOYCE & ISLEY, PLLC**

R. Daniel Boyce
N. C. State Bar # 12329
Post Office Box 1990
Raleigh, NC 27602-1990
Telephone: (919) 833-7373
Facsimile: (919) 833-7536
*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

TOM CLEMENTS *et al.*,                                          )
            Plaintiffs,                              )
                                  )

v.                                                              ) CIVIL ACTION NO: 2:03cv352
                                  )

ROSS J. DAVIDSON, ADMINISTRATOR,                                )
FOR RMA, *et al.*                                               )
            Defendants.                              )

### DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiffs filed suit pursuant to the Federal Crop Insurance Act, 7 U.S.C. § 1501 *et seq.*, asserting that the Risk Management Agency (RMA), the United States Department of Agriculture (USDA) and their respective heads (collectively defendants) illegally modified the express terms of their Multiple Peril Crop Insurance (MPCI) policies for the year 2002. On November 7, 2003, defendants filed a motion to dismiss or in the alternative, summary judgment pursuant to Fed.R.Civ.P. 12 and 56. *See, Defendants' Memorandum in Support of Motion to Dismiss or in the Alternative, Summary Judgment (Def. Dismissal Memo).* On November 26, 2003, the Court, with the agreement of defendants, extended the time for plaintiffs to December 15, 2003 to "respond to the defendants' motion to dismiss or in the alternative, summary judgment." *See, Order Extending Time.*

On December 11, 2003, prior to responding to the motion to dismiss, plaintiffs filed the instant motion for partial summary judgment. *See, Compl.* pg. 22. Plaintiffs appear to argue that as pure matters of law, *Pl. SJ Memo,* pg. 11-12, their Multiple Peril Crop Insurance policies for

1

**EXHIBIT**
_4_

the year 2002 guaranteed them coverage for insurable losses at a rate of $0.31 per pound, that the defendants erred in concluding otherwise, and that such undisputed fact therefore entitles them to partial summary judgment.

For the reasons set forth herein, as well as on the facts, argument and exhibits submitted with defendants' *Memorandum in Support of Motion to Dismiss or in the Alternative, Summary Judgment* filed November 7, 2003 (which are fully incorporated by reference herein), plaintiffs' motion must be denied.

## SUMMARY JUDGMENT STANDARDS

Plaintiffs may obtain summary judgment when it is established "that there is no genuine issue as to any material fact." F.R.Cv.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Even if facts are undisputed, but there are disputes or disagreements as to the "conclusions to be drawn" from the facts, summary judgment is not appropriate. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). It must be "perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of law." *Charbonnages de France*, 597 F.2d at 414; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (matter must be "so one-sided that one party must prevail as a matter of law.").

In assessing plaintiffs' proffer, the Court must consider plaintiffs' burden of proof at trial. *Anderson*, 477 U.S. at 254. This case, because no express standard of review is set by the Federal Crop Insurance Act, 7 U.S.C. § 1506(d), involves a record review. *United States v. Carlo Bianchi and Co., Inc.*, 373 U.S. 709, 715 (1963) ("in cases where Congress has simply provided for review, without setting forth the standards to be used or the procedures to be followed, [the Supreme Court] has held that consideration is to be confined to the administrative

2

record and that no de novo proceeding may be held."); *accord United States v. A.S. Holcomb*, 651 F.2d 231, 236 (4th Cir. 1981) (citing *Carlo Bianchi*, 373 U.S. at 715); *Deaf Smith County Grain Processors v. Glickman*, 162 F.3d 1206, 1211 and 1213 (D.C. Cir. 1998) ("Congress intended ... the APA to govern ... the procedural and scope of review aspects of any appeal from the NAD."); *Old Republic Ins. co. v. FCIC*, 947 F.2d 269, 282 (7th Cir. 1991) (applying APA "arbitrary and capricious" standard to actions under the FCIA); *American Growers Insurance Company v. Federal Crop Insurance Corp.*, 21 F.Supp.2d 1088, 1093 (S.D.Iowa 2002) ("Congress intended for judicial review of plaintiff's claims in an administrative review context" in an action seeking indemnification from the FCIC pursuant to 7 U.S.C. 1508(j)(3)); *American Growers Insurance Company v. Federal Crop Insurance Corp.*, Civil No. 1-01-CV-10059, * 8-10 (S.D. Iowa, December 11, 2003) (later order in same case granting motion to limit review to the administrative record) (copy attached as Exhibit 1); *see also, Rain & Hail Ins. Serv. v. FCIC*, 229 F. Supp. 2d 710 (S.D. Tex. 2002) (applying APA standard and limiting review to administrative record in suit seeking, *inter alia*, indemnification pursuant to 7 U.S.C. 1508(j)(3)). *See also, Plaintiffs' Response to Defendants' Motion to Dismiss*, pg. 12 (this action is "brought ... under the judicial review provision of the Administrative Procedures Act, 5 U.S.C. § 702-706."); *Compl.* ¶ 16. Accordingly, it is plaintiffs' burden to establish the defendants' actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Finally, the burden rests solely on plaintiffs to show there is no genuine issue as to any material fact and in that regard, all evidence is assessed "in the light most favorable to the party

3

opposing the motion."[1] *Charbonnages de France*, 597 F.2d at 414.  Thus, the nonmoving party's

> version of all that is in dispute is accepted, all internal conflicts in it resolved
> favorably to him, the most favorable possible alternative inferences from it drawn
> in his behalf; and finally, [the nonmoving party is] to be given the benefit of all
> favorable legal theories invoked by the evidence so considered.

*Id.*

## STATEMENT OF DISPUTED FACTS

Contrary to local rule, *see*, Local Rule 56(B), plaintiffs' "Statement of Facts" does not list

specific material facts that they believe support their motion, but rather consists of a running

narrative, often argumentative and mostly immaterial to the narrow scope of the motion and

nature of the review available in this case.  It is plaintiffs' burden to put forth the specific

material facts they believe support their motion.  They have not done so, and accordingly,

defendants respectfully assert that plaintiffs' "statement of facts" should be stricken.

Without waiving the foregoing, defendants respond to plaintiffs' narrative as follows:

1. The MPCI policies.  *Pl. SJ Memo*, pg 3.  Defendants do not dispute that plaintiffs'

exhibit 1 appears to represent an MPCI policy utilized during the 2002 crop year; that the price

election for quota peanuts (the "quota price election") was established on November 30, 2001

(plaintiffs' exhibit 2); that the national peanut quota was announced December 14, 2001 by the

Farm Service Agency (not a defendant herein) (plaintiffs' exhibit 4-E); that the price support

level for "quota" peanuts was announced by the Farm Service Agency on February 15, 2002

(plaintiffs' exhibit 16).

Defendants dispute that any of this either directly or impliedly establishes a MPCI

---

[1] It is wholly unclear the source of law for plaintiffs' incorrect assertion that "[o]f course,
for summary judgment purposes, all the allegations are deemed admitted." *Pl. SJ Motion*, pg. 2.

guarantee for MPCI coverage for insurable losses at the "quota price election" of $0.31 per pound. *See generally*, *Def. Dismissal Memo*, pg. 4-5 ("Undisputed Facts" 5, 7, 8-9) and pg. 8-12. In particular:

     (i) The express language of the MPCI policy entitled plaintiffs to coverage at the "quota price election" of $0.31 per pound only to the extent their farms were assigned a peanut poundage quota for 2002. Plaintiff's Exhibit 1, "Peanut Crop Provisions," ¶¶ 1 and 3(b)(1).

     (ii) It was well known that peanut quota might be eliminated for 2002. Plaintiffs' exhibit 4-E; plaintiffs' exhibit 16.

     (iii) Plaintiffs' MPCI policies contain no guarantee that quota peanuts would be continued in 2002, or that plaintiffs' farms would be assigned a peanut poundage quota for 2002. Plaintiff's Exhibit 1, "Peanut Crop Provisions."

     (iv) Peanut poundage quotas are established and assigned by the Farm Service Agency (FSA). Plaintiff's Exhibit 1, "Peanut Crop Provisions," ¶ 1 (definition of "effective poundage marketing quota"); *Def. Dismissal Memo*, DEX 2, FSA Release # 1747.01 (12/14/01); DEX 3, FSA Notice PN-649 (1/15/02).

     (v) Plaintiffs' farms were not assigned a peanut poundage quota for 2002 by FSA. *Def. Dismissal Memo*, DEX 4, FSA Notice PN-652 (5/3/02); *id.*, DEX 6, RMA Bulletin MGR-02-016 (8/20/02).

     (vi) There were no "quota" peanuts in 2002. Farm Security and Rural Investment Act (the "2002 Farm Bill"), Pub.L. 107-171, 116 Stat.182; 7 U.S.C. § 7960; *see also*, *Compl.*, ¶ 102.

     2. "Admissions" in North Carolina Case. *Pl. SJ Memo*, pg 3. The source of these facts

(plaintiffs' exhibit 3) is neither in proper form, nor does it reflect materials on file in this case such that they could be properly referenced. Fed.R.Civ.P. 56(c) and (e). This "evidence" should therefore be stricken. In any event, as just demonstrated, defendants dispute that any of these purported "admissions" as characterized by plaintiffs establish the existence of a MPCI policy guarantee for MPCI coverage for insurable losses at the "quota" price election of $0.31 per pound. Moreover, to the extent it is suggested, defendants dispute the existence of any MPCI policy provision that guaranteed the continuation of the federal peanut quota program. Plaintiff's exhibit 1.

3. Affidavit of Gary Bullen. *Pl. SJ Memo*, pg 4-5. Plaintiff offers this affidavit for issues "relating to the cost of production and marketing values" for peanuts during the 2002 crop year. *Id.*, pg. 4. Such evidence is inconsistent with the nature of the review applicable to this case. Moreover, it is irrelevant and immaterial and should be stricken. *See also*, Fed.R.Civ. P. 56(e) (affidavit should also be stricken because references to what farmers thought, believed or expected, hearsay, and not based on personal knowledge). This case concerns whether the defendants erred when they interpreted the MPCI policies as not guaranteeing plaintiffs $0.31 per pound for insurable losses in 2002. What it may have cost peanut producers to farm, why they wished to purchase MPCI coverage at any particular level based upon what it might have cost them to farm peanuts, and how they farmed, are all irrelevant matters when it comes to whether they had an express policy guarantee of $0.31 per pound that the defendants did not honor. Put another way, whether plaintiffs' costs to farm were $0.01 cent per pound or $10.00 per pound has no bearing on their express written terms of their MPCI policies. In any event, as just demonstrated, defendants dispute the existence of any guarantee for MPCI coverage for insurable

6

losses at the "quota price election" of $0.31 per pound. Moreover, to the extent it is suggested, defendants dispute the existence of any MPCI provision that guaranteed the continuation of the federal peanut quota program. Plaintiffs' exhibit 1.

4. Affidavits from Peanut Producers. *Pl. SJ Memo*, pg 5-11. Plaintiffs submit the affidavits of ten peanut producers (plaintiffs' exhibits 5-14), three of whom are not plaintiffs in this case (*id.*, #11, 13 and 14). These affidavits can be summed up as assertions of plaintiffs' interpretation of their MPCI policies for 2002 (*Pl. SJ Memo*, pg. 5-6, ¶ 1, 3, 4, 6), why their interpretation was important to them (*id.*, ¶ 2, 3), and why they purportedly needed insurance in 2002 (*id.*, ¶ 5). Defendants assert that this "evidence" is inconsistent with the available review, and irrelevant and immaterial and should be stricken. Whatever plaintiffs thought the policy was cannot override its express terms. *Rock-ola Manufacturing Corp. v. Wertz*, 282 F.2d 208, 210 (4th Cir. 1960) (parole evidence rule precludes admission of evidence contradicting explicit provision of a written contract). In any event, the alleged inference intended to be drawn from these affidavits that there existed an express MPCI policy guarantee for MPCI coverage for insurable losses at the "quota" price election of $0.31 per pound, or an express MPCI policy provision that guaranteed the continuation of the federal peanut quota program, is, as already demonstrated *supra*, disputed.

Finally, defendants further fully incorporate their statement of undisputed facts as set forth at pages 3 through 7 of their *Memorandum in Support of Motion to Dismiss or in the Alternative, Summary Judgment* filed November 7, 2003 to the extent they conflict with plaintiffs' factual narrative.

**ARGUMENT**

A.    Plaintiffs' motion should be denied for lack of Constitutional Standing and Failure
      to Exhaust Administrative Remedies.

In defendants' motion to dismiss, it was asserted that as a threshold matter, plaintiffs were

not entitled to proceed to a trial on the merits of their claims because: (i) plaintiffs lacked

Constitutional standing in that they possessed no legally protected interest in MPCI coverage at

$0.31 per pound (*Def. Dismissal Memo*, pg. 7-14); and, (ii) plaintiffs failed to exhaust their

required administrative remedies, a mandatory prerequisite to bringing this lawsuit (*id.*, pg. 14-

22).  For the reasons set forth in that motion, plaintiffs' motion for summary judgment should be

denied because plaintiffs have not established that the Court has jurisdiction over their claim.

Absent jurisdiction, plaintiffs' are not entitled to an advisory opinion on the merits of their

claims.  Defendants fully incorporate by reference its facts, arguments and evidence on these

points as set forth in its *Memorandum in Support of Motion to Dismiss or in the Alternative,*

*Summary Judgment* filed November 7, 2003 as well as their rebuttal brief expected to be filed on

or before January 14, 2004.

B.    There is a genuine dispute over whether plaintiff can establish a breach of the
      MPCI policy.

Whether the defendants' interpretation of the policy provisions was erroneous centers on

plaintiffs' assertion that it is "uncontroverted" their MPCI policy guaranteed them crop insurance

at the "quota price election" of $0.31 per pound for insurable losses.  *Pl. SJ Memo*, pg 12.

Plaintiffs base this assertion on the authority of *Lynch v. United States*, 292 U.S. 571 (1934),

*United States v. Winstar Corporation*, 518 U.S. 839 (1996) and *United States v. Bankers*

*Insurance Company*, 245 F.3d 315 (4th Cir. 2001).  Plaintiffs' reliance on these cases, none of

8

which arose under the Federal Crop Insurance Act nor concerned policy attributes of MPCI

policies, is misplaced.

*Lynch* concerned yearly term insurance policies -- War Risk Insurance policies -- and

specifically, the impact of the Economy Act of 1933 on enforcement of such policies. 292 U.S.

575. The Act expressly repealed "all laws granting or pertaining to" such policies. *Id.* There

was never any question whether the particular insurance benefit or right had been contractually

promised. *See e.g., Lynch v. United States*, 67 F.2d 490 (5th Cir. 1933) ("Conceding that the

policy of insurance is a contract ...."); *see also, Winstar*, 518 U.S. at 885 (*Lynch* involved a

contractual obligation "embodied in a statute."). Rather, the United States took the position that

the impact of the Economy Act was that the right simply could no longer be enforced in court,

but could only be enforced administratively through Veterans' Affairs. *Lynch*, 67 F.2d at 490;

*Wilner*, 68 F.2d at 443-444. Thus, the argument went, the United States' consent to be sued had

been withdrawn, thereby removing the courts' subject matter jurisdiction over legal claims under

such policies. 292 U.S. at 575; *see also, Lynch v. United States*, 67 F.2d 490 (5th Cir. 1933);

*Wilner v. United States*, 68 F.2d 442, 443-444 (7th Cir. 1933). The lower courts agreed, passing

on the "interesting questions" of whether any of the plaintiffs' rights under the insurance contract

had actually been abrogated by the Economy Act. *Lynch*, 67 F.2d at 490; *Wilner*, 68 F.2d at 443.

It was in that context that the cases came to the Supreme Court with "the question requiring

decision ... whether [the Economy Act was] aimed at the right or merely at the remedy." 292

U.S. at 579. Finding that the Economy Act was aimed at the obligation itself, and not just the

enforcement remedy, the Supreme Court reversed and remanded. *Lynch*, 292 U.S. at 572, 583.

The dispute in *Winstar* arose out of the savings and loan crisis of the 1980's. *Winstar*,

518 U.S. at 845-847. In particular, in seeking to stem the flow of failed thrift institutions, federal regulators reached agreements with healthy thrift institutions that in exchange for the healthy thrifts taking over failing thrifts, the healthy thrifts would be accorded favorable regulatory and "accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations." 518 U.S. at 848, 849-853. When Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), the favorable regulatory and accounting treatment agreed to by the regulators as an inducement to the healthy thrifts to acquire the failing thrifts was eliminated, with the result that "many institutions immediately fell out of compliance with regulatory capital requirements making them subject to seizure by thrift regulators." 518 U.S. at 856-858.

In *Winstar*, although the question was not specifically before the Court, the Court found no reason to disagree with the appellate court that the regulators had contractually agreed to provide the thrifts with favorable regulatory and accounting treatment. *Winstar*, 518 U.S. at 859 (plurality opinion) ("The anterior question whether there were contracts at all ... dealing with [favorable] regulatory treatment ... is not strictly before us."), and 865-867 (accepting Federal Circuit's conclusion that express agreements existed to provide favorable regulatory and accounting treatment); *id.* at 919 (concurring opinion) ("the contracts at issue in this case gave rise to an obligation on the part of the Government to afford respondents favorable accounting treatment").[2] Nor was there any question that FIRREA was contrary to the specific contract provision. 518 U.S. at 870 (plurality opinion) and 919 (concurring opinion). Rather, the

---

[2] Reference to "concurring opinion" is to the opinion of Justices Scalia, Kennedy and Thomas. Justice Breyer joined in the plurality opinion, but also wrote separately as well. 518 U.S. at 910.

10

question presented was "the enforceability of [the] contracts between the Government and participants in a regulated industry, to accord them particular regulatory treatment," in light of a number of special and unique defenses available only to the government. *Winstar*, 518 U.S. at 843. Although the plurality and concurring opinions differed in their analysis of these "special [sovereign] defenses,"[3] *id.*, the end result was that a majority of the Supreme Court found that none of these "special defenses" served to allow the government to escape enforcement of the express contractual agreement. *Winstar*, 518 U.S. at 887, 889-890, 891 (plurality opinion); *id.* at 919-924 (concurring opinion).

*Bankers Insurance* involved an affirmative lawsuit by the United States on various contract claims. 245 F.3d at 317-318. An express provision of the contract, which had been promulgated by the government, provided for mandatory arbitration. *Id.* Like *Winstar*, the dispute in the case focused principally on whether the government had a defense against enforcement of the express contract provision requiring arbitration, which the Fourth Circuit held that it did not. *Id.* at 319-325.

In sum, these cases stand for the proposition that where particular rights and benefits have been <u>expressly</u> contractually promised by the government (War Risk insurance benefits in *Lynch*; favorable accounting and regulatory treatment in *Winstar*; arbitration in *Bankers Trust*), often as

---

[3] The analyses differed because of slightly different characterizations of the contract terms. The plurality characterized the contract as expressly allocating the risk of regulatory change to the government, 518 U.S. at 881 (("As construed by each of the courts that considered these contracts before they reached us, ... [t]he contracts have been read as solely risk-shifting agreements."), while the concurring opinion characterized the agreement as one in which the regulators expressly promised to regulate the thrifts in a certain manner. 518 U.S. at 921-922 ("It was found below that the Government had plainly made promises *to regulate* in a certain fashion, into the future."). Inherent in both was the common agreement that the government had agreed to accord special treatment to the thrifts.

the *quid pro quo* for the deal, the ability of the government to escape enforcement of the express provisions is essentially the same as if it were a private party unless some special or unique defense available to the government in the dual roles as sovereign and contractor applied. None of these cases, however, assist plaintiffs with the "anterior question," *Winstar*, 518 U.S. at 859, of whether in the first instance there was a benefit promised (i.e. the purported guarantee of MPCI coverage at $0.31 per pound for insurable losses), and thereafter a breach of that promise by the defendants.[4]

Crop insurance (and thus plaintiffs' MPCI policies) is overseen by RMA; the federal peanut program is overseen by FSA. MPCI policies <u>do not</u> establish specific amounts of coverage (as plaintiffs suggest), but rather contain a formula for determining whether peanut crops were insurable at the "quota price election" (which was $0.31) or the "non-quota price election" (which was $0.16 prior to 2002, but raised to $0.1775 by the 2002 Farm Bill). As has been demonstrated, under the policies, peanut crops were eligible for insurance at the "quota price election" <u>only</u> to the extent that the farmers had an "effective poundage marketing quota" assigned to their farm <u>by FSA</u>, and further, had reported on their acreage reports (around late June) that they were growing and thus insuring "quota" peanuts. Peanuts not eligible for the "quota price election" automatically were insured at the "non-quota price election." The MPCI policy was not changed or altered, and its terms are clear and unambiguous.[5] The formula that

---

[4] Defendants do not concede that no "special defenses" would be applicable in this matter. However, because plaintiffs' motion is limited only to the question of whether there is a specific policy provision that the defendants' erroneously breached, discussion of any defense on the merits is premature.

[5] To the extent plaintiffs' arguments are construed as an assertion that they were also entitled to the continuation of peanut quota, such arguments should be rejected. First, there is

determined whether they had coverage at the "quota price election" remained the same, was applied to plaintiffs' situation exactly as written, but because plaintiffs had no "effective poundage marketing quota" as a result of the 2002 Farm Bill, the calculation resulted in coverage for all peanuts at the non-quota price election.

Defendants assert and have fully demonstrated that the express language of the MPCI policies makes clear such policies do not guarantee insurable losses at $0.31 per pound. *See Def. Dismissal Memo.* (Indeed, if the language were express as plaintiffs claim, it would be unnecessary for plaintiffs to submit their views of what they thought or believed the MPCI policies covered.) Accordingly, the defendants did not err when they did paid claims for insurable losses at the "non-quota price election" of $0.1775 per pound, but at a minimum, there

---

nothing in the MPCI contract, or the statutory or regulatory provisions governing crop insurance that suggests in any way or implies plaintiffs would receive quota, or ties crop insurance to the receipt of quota. Crop insurance though offered, is not mandatory; no peanut producers, whether or not their farms had previously been assigned quota, were required to obtain crop insurance. Moreover, the policies are form policies issued in the same form to any farmer that obtains crop insurance, whether or not "quota" farmers. Indeed, one need only visit the RMA website (www.rma.usda.gov) to find that the 2003 and 2004 Peanut Provision of the MPCI policies are identical to those used in 2002. If MPCI policies guaranteed quota (or for that matter insurance at the "quota price election,"), a producer could simply obtain crop insurance and thereby be "guaranteed" the "quota price election" for any insurable losses. This is unreasonable.

Second, and in any event, plaintiffs' had no right to the continuation of the peanut quota program. *Def. Dismissal Memo*, pg. 11-12. Finally, to the extent plaintiffs claims are construed really as a facial challenge to the 2002 Farm Bill's elimination of peanut quota and an implied contract for the continuation of peanut quota, *Pl. SJ Memo*, pg. 12 (summary judgment appropriate to resolve "facial attack on a constitutionality of a statute"), then such a "morphing" of their claim constitutes a substantial shift from the contract breach focus of the complaint. If this lawsuit is no longer one under the Federal Crop Insurance Act, then the jurisdictional provisions of that Act no longer govern this dispute, and the case may more properly lie in the Court of Federal Claims. *See*, 28 U.S.C. § 1346 (limiting district court's jurisdiction in ordinary implied contract cases to under $10,000); *e.g.*, plaintiffs' exhibit 8 (Clements affidavit asserting a claim of "almost $60,000"); plaintiffs' exhibit 9 (Moore affidavit asserting a claim of $86,892.96).

is a genuine dispute over this fact, *see Def. Dismissal Memo*, precluding summary judgment.

C.     There is a genuine dispute over whether plaintiff can establish a due process claim.

Plaintiffs also assert the defendants' conduct was erroneous because there is no genuine dispute over whether there has been a "unilateral and retroactive reduction in [their MPCI] insurance coverage" in violation of their due process rights. *Pl. SJ Memo*, pg. 18. In essence, plaintiffs attempt to bootstrap their breach argument into a due process claim, however, again, their arguments fail to establish that there is no dispute on this point.

Plaintiffs assert that their procedural due process rights were violated when their "protected property rights and vested contract rights" were deprived without notice and an opportunity to be heard. *Pl. SJ Memo*, pg. 18. As plaintiffs correctly note, to have a legally protected interest in crop insurance, they must "'have more than an abstract need or desire for it ... [and] more than a unilateral expectation of it.'" *Pl. SJ Memo*, pg. 19, *quoting, Callaway v. Block*, 763 F.2d 1283, 1290 (1985). Plaintiffs' "expert" affidavit and their own affidavits, plaintiffs' exhibits 4-14, establish <u>at best</u> that plaintiffs needed, desired and thought they had crop insurance at a certain level, but as *Callaway* makes clear and defendants have pointed out *supra*, these subjective feelings are irrelevant and immaterial. As has been demonstrated herein and previously, plaintiffs had no legally protected interest in crop insurance coverage at $0.31 per pound, the "quota price election." *See Def. Dismissal Memo*, pg. 8-12. The individual subjective thoughts of any of the plaintiffs are irrelevant, but in the event this Court disagrees, there is, at a minimum, a genuine dispute over these facts that precludes summary judgment.

Plaintiffs assert that their crop insurance coverage at $0.31 per pound, the "quota price

14

election," was deprived by Government action. *Pl. SJ Memo*, pg. 20 (the 2002 Farm Bill "reduced the 2002 executed insurance contract from $.31 to $.17."). However, as has been demonstrated, the defendants are not responsible for any change to the MPCI policies. *See Def. Dismissal Memo*, pg. 12-14. The MPCI policies utilized a formula that determined whether they had coverage at the "quota price election" which was unchanged and was applied to plaintiffs situation exactly as written. The "quota price election" was not changed by the 2002 Farm Bill, only the non-quota price election which actually was <u>raised</u> from $0.16 to $0.1775 per pound. *See* 7 U.S.C. § 7960(c)(2). And once again, to the extent plaintiffs' true argument is one challenging the elimination of "quota" peanuts, such an argument should be rejected in this case involving interpretation of the MPCI policy language. *See* footnote 5 *supra*.

Finally, plaintiffs assert the defendants failed to provide them with "notice and a meaningful opportunity to be heard" before changing their MPCI policies. *Pl. SJ Memo*, pg. 21. Yet again, it has been amply demonstrated that there was no change to an express term of the MPCI policies. What changed was the elimination of peanut quota by enaction of the 2002 Farm Bill. As plaintiffs argue that this "congressional regulation" caused their injury, plaintiffs are really arguing that they were entitled to individualized and particularized notice before Congress passed the 2002 Farm Bill. Plaintiffs have provided no authority for this proposition. *Callaway*, 763 F.2d at 1289 (rejecting plaintiffs' contention "that before an act of Congress can become law, each person affected by it must be given personal notice of it.").

Plaintiffs also argue their substantive due process rights were violated when the defendants altered their MPCI policies. *Pl. SJ Memo*, pg. 23. Plaintiffs base their argument primarily on *Wiley v. Glickman*, 1999 WL 33283312 (D.N.D. 1999), an unpublished opinion

from North Dakota. This reliance is misplaced.

*Wiley*, an APA review case, involved revenue protection plans for wheat farmers which insured farmers a certain minimum revenue should actual yield and revenue fall short. *Id.* at *3. The minimums were calculated using formulas expressly contained in the plans to establish base prices for wheat. *Id.* at *7. When it was later determined that a "flaw" in the formula would result in guarantees "well above expected market revenue," the agency simply changed the formula in the plans and substituted a "revised base price formula." *Id.* at *7-8. The agency did not dispute that it had expressly changed the formula that had been in the plan but defended its action on the basis of express statutory authority "that the crop insurance program be operated in an actuarially sound manner," and it was that reliance the formed the basis of the action. *Id.* * 15. The sole issue in *Wiley* was the "agency's construction of the statute which it administers" and which it relied upon to issue a "revised base price formula," *id.* at *14-15, and after review, the court concluded that the agency had "misconstrue[d]" these statutory provision, and therefore set aside the "revised base price formula," *id.* at 16-17.

In this case, as has been demonstrated repeatedly, plaintiffs' MPCI policies provided formulas for whether crops would be insured at the "quota price election" or the "non-quota price election" and, contrary to *Wiley*, these formulas have never been changed nor have they been "misconstrued" by the defendants. At a minimum, there is a genuine dispute over whether these formulas were changed or misconstrued precluding summary judgment, and, again, to the extent plaintiffs are arguing instead the repeal of the peanut quota program, such an argument should be rejected.

Plaintiffs' final arguments are that they had "settled expectations" of a continuation of

16

MPCI coverage at the "quota price election" and reiterate that these expectations were in fact "vested contractual rights." *Pl. SJ Memo*, pg. 25-26. (Again, to the extent that this is really an argument directed at the repeal of peanut quota, it is misdirected and must be rejected.) This argument at its root seeks to take what plaintiffs say they had in the past, what they thought they had in 2002, what they believed they had in 2002, and what they wished they had in 2002, cloak it all in the garb of purported "contractual rights" and tout the "harsh and oppressive" results inconsistent with the purposes of the federal crop insurance program.

However, in the end analysis, in evaluating whether the defendants' erred in their interpretation of the MPCI policy, "ordinary principles governing contracts and their interpretation remain applicable." *Bankers Insurance*, 245 F.3d at 321. "'It is the function of the court to construe the contract made by the parties, not to make a contract for them, or to alter the contract they have made so as to conform it to the court's notion of the contract they should have made in view of the subject matter and the surrounding facts and circumstances.'" *L & E Corporation v. Days Inns of America*, 992 F.2d 55, 58 (4th Cir. 1993), *quoting Ames v. American Nat'l Bank*, 163 Va. 1 (1934). Accordingly, plaintiffs' beliefs of what they thought they had and what they believe the FCIA was intended to cover are irrelevant and immaterial, and simply "cannot justify deviation from [the] unambiguous contractual language" of the MPCI policies. *Id.*; *Rock-ola Manufacturing*, 282 F.2d at 210 (parole evidence rule precludes admission of evidence contradicting explicit provision of a written contract). *See also*, *Dominick v. Vassar*, 235 VA. 295 (1988) ("[A] court is not a liberty to rewrite a contract simply because the contract may appear to reach an unfair result.") (*cited in L& E Corporation*, 992 F.2d at 59). However, even if the Court were to disagree in how this policy should be interpreted, at a minimum, there

17

is clearly a genuine dispute over whether the MPCI policies were changed, thereby precluding summary judgment.

## CONCLUSION

For the reasons stated herein, plaintiffs have failed to establish that they are entitled to judgment in this matter as a matter of law. Accordingly, their motion for summary judgment must be denied.

Respectfully Submitted,

ROSS J. DAVIDSON, ADMINISTRATOR,
FOR RMA, *ET AL.*

PAUL J. MCNULTY
UNITED STATES ATTORNEY

By:

Kent P. Porter, Virginia State Bar #22853
Counsel for Federal Defendants
Assistant United States Attorney
8000 World Trade Center
101 W. Main Street
Norfolk, Virginia 23510
(757) 441-6331

## CERTIFICATE OF SERVICE

I certify that an exact and true copy of the foregoing memorandum was mailed by first class mail on this 22nd day of December, 2003 to R. Daniel Boyce, Esq., P.O. Box 1990, Raleigh, NC, 27602-1990, and J. Brian Donnelly, Esq., 621 Lynnhaven Parkway, Suite 350, Virginia Beach, VA 23452-7402.

Kent P. Porter
Assistant United States Attorney

18

**U.S. Department of Justice**

Civil Division

PK:DMC:JVanneman
154-03-445

Telephone: (202) 307-1011
Fax:          (202) 514-8624

*Washington, D.C. 20530*

August 15, 2003

Mr. R. Daniel Boyce
Boyce & Isley
Post Office Box 1990
Raleigh, North Carolina 27602-1990

Re:  Texas Peanut Farmers, et al. v. United States,
     No. 03-445C (Fed. Cl.)

Dear Mr. Boyce:

This letter is to respond, on behalf of the United States Department of Justice, to your letter dated July 30, 2003.  In your letter, you propose a dismissal of this action, subject to a variety of conditions.  We cannot agree to your proposal, for the following reasons.[1/]

Jurisdiction.  As a threshold matter, there is a specific statutory provision that provides that jurisdiction to entertain these types of claims resides exclusively in the Federal district court in which the peanut farm is located.  Given the sovereign immunity issues involved when a party sues the United States, the parties cannot stipulate to jurisdiction in a court in which jurisdiction does not properly lie.  Therefore, it is not possible for all of the cases that you have filed on behalf of peanut farmers in various district courts to be adjudicated all in one district court, the Eastern District of North Carolina (the first case you filed).

---

[1/]  We are still researching various issues, so this letter is a preliminary response.  We reserve the right to amend and/or supplement our response to your letter at a later date.

**EXHIBIT**

B

-2-

The statute at issue that governs claims involving Federal crop insurance is 7 U.S.C. §1508(j)(2)(A).[1]  See <u>Williams Farms of Homestead, Inc. v. Rain and Hail Insurance Services</u>, 121 F.3d 630 (11th Cir. 1997).  This statute governs jurisdiction and cannot be waived.  Therefore, we cannot enter into the type of "stipulation" that you propose.

As we establish in our motion to dismiss, the Court of Federal Claims lacks jurisdiction to entertain the suit.  Each plaintiff must file his or her suit in the appropriate district court, that is, the court in which his or her farm(s) are located.[2]

In addition, even if the potentially dispositive issues (<u>e.g.</u>, alleged breach of contract and violation of due process) are purely issues of law, all of the remaining issues would clearly be fact-bound (<u>e.g.</u>, whether there was an insurable cause of loss, whether each individual farmer complied with all of the terms and conditions of the insurance policy).  These and other factual issues (including potential damages issues) may depend

---

[1]  In our motion to dismiss, we established that a plaintiff peanut farmer who holds Federal crop insurance must file in an appropriate district court.  While we cited 7 U.S.C. §1506(d)(any suit against the Corporation shall be brought in the District of Columbia, or in the district wherein the plaintiff resides or is engaged in business), it is the section cited above, 7 U.S.C. §1508(j)(2)(A), that is more specific and governs here.  The statute, 7 U.S.C. §1508(j)(2)(A), requires that a plaintiff, such as the ones you represent, who asserts a claim for indemnity, must file in the district court in which the insured farm is located.

[2]  For a listing of district courts and their areas of jurisdiction, <u>see</u> 28 U.S.C. Chapter 5, §81 (Alabama), §89 (Florida), §90 (Georgia), §113 (North Carolina), §121 (South Carolina), §124 (Texas), §127 (Virginia).

In your letter, you also refer to 28 U.S.C. §1407, governing multidistrict litigation.  If you are aware of any authority that would permit the type of transfer to one court, in suits involving the United States involving the types of jurisdictional issues raised in these cases, we would consider any such authority.

upon key dates and/or conditions in a particular state and/or peanut-growing region. As another example, there may be important factual differences among peanut-growing regions, states, and counties, and among the plaintiffs, that would affect the merits issues. Further, the opinion that you proffer as an expert opinion (Mr. Gary Bullen) in the North Carolina motion for partial summary judgment provided his opinions only with respect to peanut crop insurance in North Carolina and Virginia (with only tangential reference to South Carolina). Mr. Bullen's affidavit contains no information on any of the other peanut-growing regions at issue in the other cases (e.g., Georgia, Florida, Alabama, Texas).

In sum, it is too early in these sets of cases to reach any possible agreement on any global treatment of these cases. Accordingly, even if there were no jurisdictional or other bars to consolidation, we cannot agree at this time to your proposal to litigate all of the cases in one district court, given the potentially wide variety of factual scenarios among plaintiffs and peanut-growing regions and states.

<u>Transfer</u>. For the same reasons, we cannot stipulate to a transfer of all of the cases to the one case that you filed in the Eastern District of North Carolina. As we established above, the court in North Carolina lacks jurisdiction to entertain claims brought by plaintiffs whose farms are located in another state.

Indeed, for the same reasons, the court in North Carolina may lack jurisdiction to entertain the claim of any particular plaintiff named in that suit if the person's farm is located outside the boundaries of the Eastern District of North Carolina in which you filed. This applies not only to the plaintiffs whose farms are located in Virginia or South Carolina, but also to those whose farms may be located in the Middle or Western Districts of North Carolina.

As another example, only approximately twenty of the more than fifty plaintiffs named in the suit that you filed in the Eastern District of Texas have farms located in that district; other named plaintiffs have farms located in the other three districts for Federal district courts in Texas.

-4-

We are still in the process of reviewing all the named
plaintiffs in each suit that you have filed in the several
states.  There may be other examples of these problems as well
with respect to plaintiffs in the other states.

One trial court disposition, one circuit court of appeals.
Similarly, because the district court in North Carolina would not
possess jurisdiction to entertain the claims of farmers in other
Circuits, we cannot agree to only one "trial court disposition,"
with an appeal to only one Circuit Court, as you suggest.
(Further, we do not agree to trial by jury, one of your other
conditions.)

Information requested.  It is your burden to establish
jurisdiction on behalf of each individually-named plaintiff for
the court(s) in which you file.  I have consulted with many of
the Assistant United States Attorneys assigned to these cases and
with agency counsel and we request that you provide the following
information (some of which is not available to the Government).
We request this information so that we may ascertain whether the
named plaintiffs in each of the complaints that you have filed
are individuals whose farms[4] are located in the respective
(appropriate) districts and so that we may also determine other

---

[4]  We recognize that it may be that an individual who owns a
farm for which the farm property boundaries extend beyond more
than one county line, or who owns more than one farm in more than
one state (and/or more than one district within a state), may
properly be named in more than one district court complaint.  7
U.S.C. §1508(j)(2)(A).

-5-

facts relating to other issues that are potentially
jurisdictional in nature (see discussion below): ·

1.   name of plaintiff[5/];
2.   address of farm (include county);
3.   address of residence (include county);
4.   farm number (number assigned by the Farm Services Agency
     (FSA) and any other pertinent numbers associated with the
     crop insurance program;
5.   name and address of plaintiff's insurance company;
6.   whether the plaintiff filed a claim with his or her
     insurance company (and if so, the date), and if so;
     a.   whether the claim was allowed (and if so, the date), or
     b.   whether the claim was denied (and if so, the date);
          · and,
7. ·  whether the plaintiff filed any notice of appeal to the
     National Appeals Division (NAD), United States Department of
     Agriculture (and if so, the date)..

     I believe that the most prudent course would be first to
clarify and correct these jurisdictional and other matters,
before proceeding in any of the district courts on the merits or
any other matters.

     Other defenses.  We also wish to make clear that, even
though one or more of the plaintiffs may be named in the
appropriate district court, the Government reserves the right to
assert other defenses (which may or may not be jurisdictional in
nature), and if we prevail, these defenses would result in a
dismissal of that plaintiff's action.  These potential defenses
include: statute of limitations and/or other time-bars, and/or
failure to exhaust administrative remedies.

---

[5/]   Please ensure the correct spelling of names.  For example,
for some of the plaintiffs in the complaint filed in the Court of
Federal Claims and also in the Eastern District of Texas, the
names are spelled differently.

     You should also be aware that there is an inconsistency in
your filings; for example, in the Texas complaint, some of the
named plaintiffs are listed in the caption of the complaint but
not listed in the text of the complaint, while some are in the
text of the complaint but not listed in the style of the caption.

-6-

In addition, there may be other reasons to support the denial of a plaintiff's claim (e.g., whether the plaintiff complied with all the terms and conditions of the insurance policy), which also might support dismissal of the action. Therefore, even if any of the individually-named plaintiffs are or will be in the correct district court, there may be other defenses (in addition to the merits) that would warrant dismissal of the plaintiff's action.

* * *

If you have any questions, please feel free to telephone me at (202) 307-1011 (or on my direct line if you are unable to reach me at the main number).

Very truly yours,

JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division

cc:  Mr. Eric Goulian (AUSA, North Carolina)
     Mr. Rand Neeley (AUSA, Alabama)
     Ms. Pat Stout (AUSA, Georgia)
     Ms. Ruth Yeager (AUSA, Texas)
     Mr. Bryan Wilson (AUSA, Florida)
     Ms. Terri Bailey (AUSA, South Carolina)
     Mr. Kent Porter (AUSA, Virginia)
     Ms. Kim Arrigo (USDA, OGC, Washington, D.C.)
     Mr. Mark Simpson (USDA, OGC, Atlanta)