IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:02-CV-159-H(4)

FILED
JUL 2 2 2004

MARVIN TAYLOR BARNHILL, <u>et</u>
<u>al.</u>,

    Plaintiffs,

    v.

ROSS J. DAVIDSON,
ADMINISTRATOR, RISK
MANAGEMENT AGENCY, <u>et al.</u>,

    Defendants.

**ORDER**

This matter is before the court on the plaintiffs' motion for class certification pursuant to Fed. R. Civ. P. 23, filed June 18, 2003, and on the parties' cross-motions for summary judgment, filed June 6, 2003, and January 2, 2004. The court conducted a full hearing in this matter on May 20, 2004, at which the parties addressed all pending issues and motions. Thus, this matter is ripe for adjudication.

## STATEMENT OF THE CASE

Plaintiffs in this action are 461 peanut farmers from Virginia, North Carolina, and South Carolina,[1] who applied for and obtained Multiple Peril Crop Insurance ("MPCI"), pursuant to the Federal Crop Insurance Act, 7 U.S.C. § 1508(h), for their peanut

---

[1] Of the 461 plaintiffs, 274 are from North Carolina, 185 are from Virginia, and 2 are from South Carolina.

EXHIBIT

crops for the 2002 crop year.[2]   Defendants administer the federal crop insurance program and include the Risk Management Agency (RMA); Ross Davidson, the Administrator for the RMA; the United States Department of Agriculture (USDA); Ann Veneman, the Secretary of Agriculture for the United States; and, the United States.[3]

Plaintiffs expected to receive federal crop insurance coverage at the quota price election level of $0.31 per pound of peanuts grown for 2002. However, on May 13, 2002, Congress passed the Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134 ("the Farm Security Act"), which eliminated the quota system for peanuts.[4] As a result, all insurance claims for peanut crop losses were paid at the non-quota price election rate of $0.1775 per pound.  Plaintiffs claim that defendants breached the insurance contract by reducing the coverage payments from $0.31 to $0.1775 per pound of peanuts.

Plaintiffs' complaint, filed on November 19, 2002, includes six claims: a breach of contract claim, three claims for denial of

---

[2] The court is aware that similarly situated peanut farmers have filed complaints in the Court of Federal Claims and in federal district courts in Virginia, Texas, Alabama, Georgia, Florida, and South Carolina.  Additionally, the plaintiffs have filed documents with the Judicial Panel on Multidistrict Litigation.  However, as pendency before the panel does not affect pretrial jurisdiction of this court, this court will currently decide the motions before it.

[3] The court will collectively refer to the defendants as "the government."

[4] The sections of the Farm Security Act that relate to peanuts are codified at 7 U.S.C. 7951-7960.

2

due process, and two claims for violation of various statutes requiring notice of policy changes.  Plaintiffs currently seek class certification and request summary judgment on the breach of contract and due process claims.

On January 2, 2004, defendants filed a motion to dismiss, or alternatively for summary judgment.  Because defendants' motion references documents outside the pleadings, the court will consider it as a motion for summary judgment.  Defendants' motion for summary judgment requests the court to dismiss the plaintiffs' claims for lack of standing and for failure to exhaust administrative remedies.

## STATEMENT OF THE FACTS

The parties agree on the following facts.[5]  The peanut quota system had been in place, in various versions, since 1938, when Congress enacted the Agricultural Adjustment Act of 1938 ("the 1938 Act"), currently codified at 7 U.S.C. § 1281 (2000).  The 1938 Act "terminated the free market production and sale of agricultural commodities within the United States, including peanuts."  See Members of the Peanut Quota Holders Ass'n v. United States, 60 Fed. Cl. 524, 525 (2004) (discussing history of peanut quota

---

[5]  Though defendants dedicate a section of their response to plaintiffs' motion for summary judgment to "disputed facts," defendants do not actually dispute any of the dispositive facts, but merely the legal conclusions that may follow from them.

3

regulation).  It provided assistance to farmers through direct payments and restrictions on competition.  Id.  The peanut quotas were initially based solely on acreage, but the Food and Agriculture Act of 1977, Pub. L. No. 95-113, §§ 801-807, 91 Stat. 913, instituted quotas based on the weight of peanuts produced. Id. These poundage quotas applied to domestic edible peanuts, but not those grown for export or for crushing into oil.  Id.  In 1981 Congress terminated acreage quotas, leaving only poundage quotas. Id. (citing the Agriculture and Food Act of 1981, Pub. L. No. 97-98, §§ 701-707, 95 Stat. 1213, 1248).

In 1996, Congress passed the Federal Agriculture Improvement and Reform Act of 1996, Pub. L. No. 104-127, § 155(I)(2), 110 Stat. 888, 928 ("the 1996 Act").  This Act ended direct payments to peanut farmers but gave them price supports in the form of marketing loans.  The 1996 Act set the loan rate for quota peanuts at $610 per ton (approximately $0.31 per pound) for the years 1996 through 2002.  In contrast, the loan rate originally set for non-quota peanuts for the 2002 crop year was only $132 per ton ($0.16 per pound).

On May 13, 2002, Congress passed the Farm Security Act.  The Farm Security Act took the drastic step of eliminating the quota system for peanuts,  so that "anyone could now grow and market unlimited quantities of peanuts without penalty or restriction." Members of the Peanut Quota Holders Ass'n v. United States, 60 Fed.

4

Cl. at 525. The Farm Security Act included a "buyout" for quota holders under which quota holders would receive a total of $0.55 per pound. This buyout did not affect the crop insurance agreements. The federal peanut program is managed by the Farm Service Agency (FSA), an agency of the USDA.

The federal crop insurance program also began in 1938, with the passage of the Federal Crop Insurance Act of 1938. See H. R. Rep. No. 103-649, reprinted in 1994 U.S.S.C.A.N. 2516, 2518. "From its origin, the stated purpose of the federal crop insurance program has been 'to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance.'" Wiley v. Glickman, No. CIV A3-99-32, 1999 WL 33283312, at *1 (D.N.D. Sept. 3, 1999) (discussing history of federal crop insurance program) (quoting 7 U.S.C. § 1502(a)). The crop insurance program was amended in 1980 and again in 1994 to increase farmers' participation in the program and to make federal crop insurance "the farmers' primary source of risk management." Id. (citing 1994 U.S.S.C.A.N. at 2517, 2519).

The federal MPCI policies are contracts of insurance between private insurers and eligible farms. The Federal Crop Insurance Corporation ("FCIC"), an agency of the USDA, reinsures these contracts through separate contracts between the insurers and the FCIC. The Risk Management Agency is also an independent agency of the USDA and is responsible for overseeing the FCIC and

administering the MPCI program.

For the 2002 crop year, plaintiffs obtained MPCI policies on their peanut crops. The MPCI policies consisted of the basic provisions, the peanut provisions, the special provisions and actuarial documents, the applicable regulations in 7 CFR chapter IV and the accepted insurance application. (MPCI policy, basic provisions § 1.) The amount of MPCI coverage available to peanut farmers was tied to the federal peanut program as it then existed. Under the MPCI policy provisions, any changes to the policy provisions, price elections, amounts of insurance, premium rates, and program dates must be made prior to the contract change date. (Id. § 4(b).) For the 2002 crop year, the contract change date was November 30, 2001. (MPCI policy, peanut provisions § 4.) On November 30, 2001, an addendum to the insurance policies provided that the price election would be $0.31 per pound for quota peanuts and $0.16 per pound for non-quota peanuts. (MPCI policy, special provisions.)

The MPCI policies also contained other key dates. The cancellation and termination date and the sales closing date for North Carolina policies was February 28, 2002. (Peanut provisions § 5; N.C. Special Provisions.) After this date, the farmers were bound by the insurance contract and were not allowed to rescind or change the contract. (Basic provisions § 1.) The initial planting

6

date for North Carolina farmers was April 16, 2002.[6]  (N.C. Special

Provisions.)  Farmers in North Carolina could plant their peanut

crops only between this date and the final planting date, May 31,

2002.  (Basic provisions § 1.)

The method for settling crop loss claims was set forth in the

peanut crop provision, § 14.  Under that method, the amount of

insured non-quota peanuts is equal to the insured acreage

multiplied by the production guarantee per acre, minus the insured

effective poundage marketing quota.  (Peanut provisions §

14(c)(1)-(2)).  For settling the claim, the effective poundage

marketing quota is the lesser of:

> 1)  The amount of the effective poundage
>     marketing quota reported on the acreage
>     report;
> 2)  The amount of the FSA effective poundage
>     marketing quota; or
> 3)  The amount determined at the final
>     settlement of your claim.

(Id. § 14(b)).  Similarly, the peanut provisions define the term

"[e]ffective poundage marketing quota" as "[t]he number of pounds

reported on the acreage report as eligible for the average support

---

[6] The cancellation and termination date for Virginia, New
Mexico, and Oklahoma, and some Texas counties was March 15, 2002.
(Peanut provisions § 5.)  Some other Texas counties were subject to
a January 15, 2002, cancellation and termination date, and the
February 28, 2002, cancellation and termination date also applied
to some counties in Texas and to all other states.  (Id.)  The
sales closing date in Virginia was March 15, 2002.  For Virginia
peanut farmers, the initial planting date was April 11, 2002, and
the final planting date was June 10, 2002.  (V.A. Special
Provisions.)

price per pound..., not to exceed the Marketing Quota established by FSA for the farm serial number." (Id. § 1.)

Each year between 1996 and 2002, the Secretary of Agriculture would establish a national poundage quota by December 15 of the year preceding the marketing year, pursuant to former 7 U.S.C. § 1358-1. See 7 U.S.C. § 1358-1(a)(2) (2001) (requiring Secretary to announce national peanut poundage quota for a marketing year not later than December 15 preceding the marketing year). The national poundage quota would later be apportioned to the states, and the FSA would then assign farm poundage quotas to individual farms. See 7 U.S.C. § 1358-1(a)(3) (2001) (stating that the national poundage quota shall be apportioned among the states); 7 U.S.C. § 1358-1(b) (2001) (providing for allocation of farm poundage quotas to individual farms). On December 14, 2001, the USDA announced a national poundage quota for peanuts for the 2002 crop year. (Admin. Record at Vol. 2 p. 3.) The 2002 quota was at the same level as the 2001 quota. When the USDA allocated the national poundage quota to the states on January 15, 2002, it stated that "[t]he 2002 national poundage quota ... will be allocated to eligible quota and nonquota farms according to 1-PN, paragraph 140." (FSA Notice PN-649, Record at Vol. 2 p. 5.)

However, the FSA never allocated the 2002 national poundage quota to individual farms. In fact, on May 3, 2002, the FSA directed the county offices not to allocate the current year peanut

quota, and it informed them that the software that the offices would soon receive would be disabled from allocating the quotas to individual farms. (FSA Notice PN-652, Record at Vol. 2 p. 8; see also RMA Bulletin MGR-01-016, Record at Vol. 1 p. 28.)

The December 14, 2001, announcement alerted the farmers to the possibility that the quota system might be eliminated. Specifically, it stated that:

> The Farm Bill currently being considered by Congress would dramatically change the peanut program. Poundage quotas would be eliminated and price support would be replaced with a target price and deficiency payment plan. If pending legislation is enacted as Law for 2002, the 2002 poundage quota announced according to this notice will be altered or rescinded.

(Record at Vol. 2 p. 3.) The notice allocating the quota to the states also contained a warning that the new Farm Bill, if passed, might eliminate the quota system for peanuts. (FSA Notice PN-649, Record at Vol. 2 p. 5.)

Congress passed the Farm Security Act on May 13, 2002, eliminating the quota system of price supports for peanuts in the middle of the 2002 crop year, after peanuts had been planted and after the last date farmers could cancel or change their crop insurance. The Farm Security Act raised the price election for non-quota peanuts from $0.16 to $0.1775 per pound and effectively eliminated the $0.31 per pound price election for quota peanuts. Because the Farm Security Act eliminated all quota peanuts, the

9

USDA sent a bulletin to the insurance companies stating that all peanuts were to be treated as non-quota peanuts. (RMA Bulletin MGR-02-006.1, Record at Vol. 1 p. 25.) At least some farmers then received an insurance declaration from their insurance company, which stated that "the price election for your peanut crop has been corrected to $0.1775/MPCI.... We apologize for any confusion." (Ex. 9-C to Pls.' Mot. for Partial Summ. J.)

The year 2002 was a disastrous year for the peanut crops. Plaintiffs characterize it as "the worst drought in thirty to forty years." (Pls.' Mot. for Summ. J. at p. 12.) According to the North Carolina Department of Agriculture and Consumer Services, drought reduced peanut production in North Carolina by 41 percent from the 2001 levels. N.C. Dept. Of Agr. & Consumer Servs., <u>N.C. Agriculture Overview -- Field Crops</u>, <u>available at</u> http://www. ncagr.com/stats/general/crop_fld.htm.

The peanut farmers now argue that the insurance contracts had provided coverage for their peanut crops at the price election level of $0.31 per pound for quota peanuts. They argue that the defendants changed the terms of the contract after the contract change date and after the farmers had planted their crops in reliance on this historical program. The farmers have now received loss payments at the election rate of $0.1775 per pound, and they are currently suing for the difference of about $0.13 per pound, which they contend was reasonable to rely upon.

10

**COURT'S DISCUSSION**

I.  **Class Certification**

A district court passing on a motion for class certification is accorded broad discretion in deciding whether to certify a class. In re American Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996). However, the court must exercise this discretion within the strictures of Rule 23, which outlines the requirements a plaintiff must meet in order to bring a representative action. See id.; Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 146 (4th Cir. 2001). The four threshold requirements for class certification are (1) numerosity, (2) commonality, (3) typicality, and (4) representativeness. Fed. R. Civ. P. 23(a). In addition to these requirements, a plaintiff seeking certification must also satisfy one of the three concepts embodied in Rule 23(b).

Plaintiffs have proposed the following definition of the class:

> Peanut farmers in North Carolina and in eligible counties in Virginia and South Carolina who contracted during the period from November 30, 2001 through March 15, 2002 for the 2002 Multiple Peril Crop Insurance policy for peanuts, the terms and conditions of which were published in the Federal Register. The class includes peanut farmers who had automatically applied by virtue of having a contract in 2001 (the Multiple Peril Crop Insurance policy) with continuous coverage who did not cancel the insurance contract. The class does not include farmers who had initially applied for Peanut Multiple Peril Crop Insurance Policy coverage, but who had withdrawn that application before March 15,

11

2002, nor does it include farmers who never
applied for Peanut Multiple Peril Crop
Insurance coverage.

(Pls.' Mot. for Class Certification at p. 2.)

Defendants object to certification of the class as defined by
plaintiffs on the grounds that it is overly broad and that it fails
to meet the requirements of Rule 23(a) and (b). Defendants have
several specific objections. First, they object to the inclusion
in class of peanut farmers from outside the Eastern District of
North Carolina.[7] They point to 7 U.S.C. § 1508(j)(2)(a), which
states that "an action on the [crop insurance] claim may be brought
against the Corporation or Secretary only in the United States
district court for the district in which the insured farm is
located." Defendants also note that the provisions of the MPCI
policy provide that any legal action must be brought in accordance
with the provisions of 7 U.S.C. § 1508(j). (Basic provisions §
25.) Because this court has no jurisdiction over peanut farmers
whose farms are located outside the Eastern District of North
Carolina, the court agrees that the plaintiff class should be
limited to those farmers whose farms are located in this district.

---

[7] The Eastern District of North Carolina consists of the
forty-four counties east of Raleigh, including Wake County. Most
of the peanuts grown in North Carolina are grown in these counties;
the only county outside the Eastern District which grows a
significant amount of peanuts (more than fifty acres) is Scotland
County, in the Middle District of North Carolina. See The Peanut
Farmer, Acreage Map, available at http://www.peanutfarmer.com/
acreage/pfmap.pdf.

Defendants also object that the class definition improperly includes peanut farmers who "(i) never had insurance coverage on peanuts for various reasons (e.g. never planted or did not file acreage reports); (ii) did not have any loss in the 2002 crop year; or, (iii) had claims for losses which were denied for reasons wholly unrelated to the loss of peanut quota." Plaintiffs do not take issue with the defendants' objections, but instead respond that the court can tailor the definition of the class to meet the objections raised by the defendant. Indeed, the plaintiffs seem to acknowledge that even though 1,848 peanut producers contracted for crop insurance as of the sales closing date, only the 735 producers who have been paid claims at the rate of $0.1775 would be eligible to recover under this suit. Thus, the court must further limit the class to those peanut producers who actually recovered $0.1775 under the insurance policy for their losses.

Defendants also argue that the plaintiffs' class definition is overly broad in that it does not limit the class of peanut farmers to those who operated farms to which a quota was assigned in previous years by the Farm Service Agency. Defendants contend that only those farmers who had "lost" their quotas due to the 2002 Farm Bill were impacted by the elimination of the quota.

Plaintiffs do not address this argument, but they imply elsewhere in their briefs that because the price election level for growing peanuts was below the cost to the farmers for growing

13

peanuts, many if not all of the farmers only grew peanuts that they believed would be quota peanuts. (Pls.' Reply at p. 11.) Under the 2001 version of 7 U.S.C. § 1358-1(b)(1)(B), the quota for each farm would be "the same as the farm poundage quota for the farm for the immediately preceding marketing year," subject to adjustments that could increase or decrease the quota amount. Because the peanut quotas for each year were based on the quota assigned the previous year, only those peanut farmers who had been assigned a quota in 2001 had an expectation of receiving a quota for the 2002 crop year and "lost" the quota for 2002. Accordingly, the court concludes that the class should include only those farmers who had been assigned a quota for the 2001 crop year.

As limited by the court, the new definition of the class is as follows:

> Peanut farmers whose farms are located in the Eastern District of North Carolina, who had insurance coverage on peanuts under the 2002 Peanut Multiple Peril Crop Policies, who had losses for the 2002 crop year, who settled those losses for $0.1775 per pound, and who had been assigned farm poundage quotas for the 2001 crop year.

The court will now turn to the requirements of Federal Rule of Civil Procedure 23(a) and 23(b).

### A.    Numerosity

Numerosity requires that a class be so large that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Seven hundred and thirty-five North Carolina peanut farmers have settled

14

their insurance claims at the rate of $0.1775 per pound. Potentially all of these farmers would be included in the plaintiff class.[8] Currently, 274 North Carolina farmers have joined in this lawsuit; therefore, the plaintiff class would include about 461 additional eastern North Carolina farmers. Plaintiffs argue that they have met the numerosity requirement under Rule 23(a)(1), and defendants concede this point. The court believes that judicial economy is best served by handling these matters as a class action, and finds that the numerosity threshold is satisfied.

**B.    Commonality**

Commonality requires that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); see Stott v. Hawsworth, 916 F.2d 134, 145 (4th Cir. 1990). Plaintiffs argue that the commonality requirements are met because all the insurance contracts had the exact same terms and were subject to the same rates, rules, and regulations provided by the FCIC or the RMA. Plaintiffs note that the changes in the peanut quota system affected all farmers in the exact same manner and that the defendants' defenses are the same for all class members.

Defendants note that the requirements of commonality and

_____

[8] While the plaintiffs did not specify in their filings how many of these North Carolina farmers are from the Eastern District of North Carolina, they later indicated that only the Lassiters, from Moore County, are from another North Carolina district. As stated above, the court has subject matter jurisdiction only over plaintiffs from the Eastern District of North Carolina, and the court will dismiss all farmers from outside this district.

typicality tend to merge with adequacy of representation. Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 337 (4th Cir. 1998). Defendants argue that the class, as originally defined by plaintiffs, includes many peanut producers who would not be entitled to recover at all, including those who never had or perfected a loss claim, who had never grown quota peanuts, and who had not filed the required acreage report. However, as the court has defined the class more narrowly, most of defendants' concerns disappear.[9]

Defendants argue that even when the class is more narrowly defined, some commonality issues would remain. Specifically, defendants argue that because no quotas were ultimately assigned to individual farms for the 2002 crop year due to the 2002 Farm Bill, plaintiffs' damages can be determined only by first making an individualized determination as to what quota might have been assigned to each farm. Defendants point out that under the applicable regulations, former 7 C.F.R. § 729.210, enacted in 1996 under the 1996 Act, the quota assigned to an individual farm could change from year to year.

Plaintiffs agree that there are certain variables among the

---

[9] The court believes that it is better to address defendants' concern that most or all of the plaintiffs have not exhausted their administrative remedies as a substantive inquiry rather than a certification issue. Furthermore, the court believes that the argument that some farmers have assigned their insurance proceeds to banks is more appropriately addressed at the damages stage.

plaintiffs -- the level of insurance coverage (e.g. 70% or 85%),
the actual production histories, and the number of acres -- that
are necessary to calculate damages for individual plaintiffs.
Plaintiffs contend that class treatment is nevertheless warranted
because class issues predominate.  Plaintiffs assert that the issue
of damages could be handled as a matter of administration and would
impose no burden on the court.

The court believes that this case is an ideal prospect for
class action litigation, as the basic facts of this case are the
same for each plaintiff.  Each plaintiff had the exact same crop
insurance contract, each plaintiff had previously been assigned a
quota by the FSA in 2001, each plaintiff expected to have coverage
at the price election level of $0.31 per pound for their peanut
crop, and each plaintiff received only $0.1775 per pound in
insurance proceeds for the 2002 crop year because Congress
eliminated the quota system for peanuts.  The determination of
damages for each plaintiff is a mathematical determination that can
be easily calculated based on each farmer's percentage of coverage
and the like.  Because these facts are the same for each plaintiff,
each plaintiff has the same claims for breach of contract and
violation of due process.

Furthermore, class certification in this case is proper even
though the individual amounts of damage will differ.  "Individual
questions of damages are typical in class actions, and they are

17

rarely a barrier to certification." <u>DeLoach v. Philip Morris Cos.,</u>
<u>Inc.</u>, 206 F.R.D. 551, 566 (M.D.N.C. 2002). Accordingly, the court
finds that this case involves questions of law and fact common to
all plaintiffs.

   C.   **Typicality**

   Typicality requires that the claims of the named class
representatives be typical of those of other members of the class.
In short, a named class member who satisfies the typicality
requirement "must be part of the class and possess the same
interest and suffer the same injury as the class members." <u>General</u>
<u>Tel. Co. of Southwest v. Falcon</u>, 457 U.S. 147, 156 (1982).

   In the plaintiffs' proposed order for class certification,
plaintiffs suggest that the class representatives should consist of
only the original fourteen plaintiffs named in the complaint.[10] As
some of these plaintiffs are Virginia farmers, not all of the
proposed representatives would be part of the class, which is
restricted to farmers with farms located in the Eastern District of
North Carolina.

   The first four of these plaintiffs -- Barnhill, Hamill,
Branham, and Jenkins -- farm and reside in the Eastern District of

_____

   [10] On the same day that they filed their complaint, the named
plaintiffs moved to join over 400 additional plaintiffs. The court
allowed the joinder of these additional plaintiffs previous to this
order, and so there are currently 461 named plaintiffs. Exhibit A
to plaintiffs' motion lists the North Carolina plaintiffs to be
added and Exhibit B lists the Virginia plaintiffs.

North Carolina.  Of the next four plaintiffs, Clements resides in
Virginia and has farms in Virginia and North Carolina, and Grant,
Phelps, and Flythe reside in North Carolina and have farms in
Virginia and North Carolina.  The remaining farmers reside and farm
only in Virginia.[11]

As the court has already indicated, the court has no subject
matter jurisdiction over plaintiffs from other North Carolina
districts, Virginia districts, and the District of South Carolina.
7 U.S.C. § 1508(j).  The court therefore will dismiss all
plaintiffs, including the proposed class representatives, who do
not have farms in the Eastern District of North Carolina.  These
farmers and others similarly situated must address these issues
within their own district.  The farmers who have farms in both the
Eastern District of North Carolina and Virginia will not be
dismissed, but may only recover as to their farms in North
Carolina.

The remaining eight proposed class representatives are peanut
farmers who farm in the Eastern District of North Carolina and who
had perfected insurance contracts on their crops for the 2002

_____

[11] Although the complaint indicates clearly that the first four
farmers farm and reside in the Eastern District of North Carolina,
it did not specify whether the remaining ten plaintiffs farmed in
Virginia, North Carolina, or both because farms in both Virginia
and North Carolina, as well as a small section in South Carolina,
were part of the Virginia-Carolina growing region and were all
subject to regulation by the Raleigh, North Carolina, Regional RMA
office.

growing season.  The FSA had assigned a farm poundage quota to
these proposed representatives for crop years prior to 2002.  The
proposed representatives all sustained losses on their crops from
the unusually poor weather during the summer of 2002.  Their peanut
crop losses were covered by their crop insurance, and their claims
were settled at the non-quota price election amount of $0.1775 per
pound.

The elimination of the peanut quota system affected the rights
of the proposed class representatives in the same manner as the
rest of the plaintiff class.  These proposed representative
plaintiffs suffered the same injury as the rest of the class.  The
court therefore finds that the claims of the remaining proposed
class representatives are typical of the class, and will appoint
those eight farmers as class representatives.

**D.    Representativeness**

Representativeness requires that the named class members "will
fairly and adequately protect the interests of the class."  Fed. R.
Civ. P.  23(a)(4).  The class representatives have the same claims
and are subject to the same defenses as the entire plaintiff class.
The representative plaintiffs do not appear to have any interests
antagonistic to the class interests.  The court finds that the
representatives will fairly and adequately protect the interests of
the class from the Eastern District of North Carolina.

The court finds that plaintiffs' current counsel, Philip R.

20

Isley, G. Eugene Boyce, and R. Daniel Boyce, will adequately represent the plaintiff class within the Eastern District of North Carolina.   Counsel is currently representing peanut farmers in similar cases in other federal district courts, and counsel has had previous experience in class action litigation.

This court therefore concludes that the class, as defined by the court, satisfies the requirements of numerosity, commonality, typicality, and representativeness under Rule 23(a).

E.    **Rule 23(b)**

For a plaintiff class to be certified, the class must satisfy all the requirements of 23(a), and one of the one of the following subsections of Rule 23(b):

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of
>> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
>> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only

>           individual members, and that a class action is
>           superior to other available methods for the
>           fair and efficient adjudication of the
>           controversy. ...

Plaintiffs argue that classification is appropriate under Rule 23(b)(2) because defendants' actions are generally applicable to the class and because plaintiffs seek injunctive relief and/or recovery of insurance proceeds at $0.31 per pound. In the complaint, plaintiffs request a declaratory judgment that the defendants breached the insurance contract and violated plaintiffs' due process and statutory rights. Plaintiffs also seek an injunction compelling the defendants to honor the contract. Alternatively, plaintiffs seek recovery of money damages.

Class certification under Rule 23(b)(2) is appropriate only when "the relief sought is exclusively or predominantly injunctive or declaratory." Lukenas v. Bryce's Mountain Resort, Inc., 538 F.2d 594, 595 (4th Cir. 1976). Defendants argue that although the requested relief is couched in terms of declaratory and injunctive relief, plaintiffs essentially seek monetary damages. The court agrees and finds that the appropriate final relief is predominantly monetary. "[A]n action seeking a declaration that certain conduct constitutes a breach of conduct would not qualify under Rule 23(b)(2) because the effect simply is to lay the basis for a damage award rather than injunctive relief." Wright & Miller, Fed. Prac. & Proc. § 1775. Accordingly, the court finds that the plaintiff class may not be certified pursuant to 23(b)(2).

Plaintiffs alternatively argue that the court may certify the class pursuant to 23(b)(1) or 23(b)(3). "[W]here certification is appropriate under both Rule 23(b)(1) and Rule 23(b)(3), the Court must certify the class under the former so that any resulting judgment will have <u>res judicata</u> effect as to the entire class." <u>Peoples v. Wendover Funding, Inc.</u>, 179 F.R.D. 492, 500 (D. Md. 1998) (citing <u>In re A.H. Robins Co., Inc.</u>, 880 F.2d 709, 728 (4th Cir. 1989)).

Wright and Miller have indicated that certification under Rule 23(b)(1)(B) is appropriate for cases involving breach of contract. Wright & Miller, <u>Fed. Prac. & Proc.</u>, § 1774.  In this case, individual class members would present the same facts and claims and would be subject to the same defenses.  Furthermore, although the court believes that any monetary relief would predominate the requested declaratory relief, any declaratory or injunctive relief would affect the entire class.  See <u>id.</u> (stating that "[a]lthough suits in which injunctive or declaratory relief is sought most frequently are brought under Rule 23(b)(2), Rule 23(b)(1)(B) also may be applicable since an individual action seeking relief of that type clearly would affect the interests of all class members"). Accordingly, this suit may proceed as a class action under Rule 23(b)(1)(B) because an "adjudication[] with respect to individual members of the class ... would as a practical matter be dispositive of the interests of the other members not parties to the

23

adjudications...."  Fed. R. Civ. P. 23(b)(1)(B).

## II.  Summary Judgment

### A.  Standard of Review

Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  As this court has stated, summary judgment is not a vehicle for the court to resolve disputed factual issues.  Faircloth v. United States, 837 F. Supp. 123, 125 (E.D.N.C. 1993).  Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial.  Anderson, 477 U.S. at 249.

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party.  United States v. Diebold, Inc.,

369 U.S. 654, 655 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247-48. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. Faircloth, 837 F. Supp. at 125.

In this case, this court must review the general policy of the agency. As such, this court's focus will be on the administrative record. Review of the administrative record is primarily a legal decision, readily resolvable by summary judgment. Citizens for Scenic River Bridge, Inc. v. Skinner, 802 F. Supp. 1325, 1332 (D. Md. 1991).

**B.  Analysis**

In this case, both parties have moved for summary judgment. In their motion, defendants argue that the court should dismiss this case for the following two reasons: first, because plaintiffs have failed to exhaust their administrative remedies; second, because plaintiffs lack standing because they suffered no injury to a legally protectable interest.  Plaintiffs move for partial summary judgment on their breach of contract and due process claims.  The court will first discuss the issue of exhaustion and will then turn to the breach of contract and standing issues, which are connected.  The court will then address the violation of due process claim.

25

### 1.    Exhaustion of administrative remedies

Defendants allege that plaintiffs were required to exhaust their administrative remedies before bringing suit against the USDA in federal court.    Defendants argue that the failure to exhaust administrative remedies is a jurisdictional bar to suit.

Plaintiffs respond that: 1) the agency's administrative appeal procedures were not available here; 2) plaintiffs attempted to exhaust their remedies but were repeatedly rebuffed by the USDA; and 3) plaintiffs are willing to continue to attempt to exhaust their remedies, but to do so would be futile.

Defendants assert that under 7 U.S.C. § 6912(e), plaintiffs were required to exhaust their administrative remedies.    Section 6912(e) states:

> (e) Exhaustion of administrative appeals
> Notwithstanding any other provision of law, a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against--
>> (1) the Secretary;
>> (2) the Department; or
>> (3) an agency, office, officer, or employee of the Department.

However, unlike instances in which the challenged agency conduct is personally "adverse to the individual participant," if the agency determines that the challenged agency conduct is "a matter of general applicability," the issue is not appealable.    7 C.F.R. § 780.2(c) (providing that "[n]o reconsideration or appeal may be

26

sought under this part of any general program or provision or program policy, or any statutory or regulatory requirements that is applicable to all similarly situated applicants"). Nevertheless, a plaintiff may appeal the issue of whether the matter is appealable by asking the Director of NAD for a final decision. 7 U.S.C. § 6992(d); 7 C.F.R. § 11.6(a)(2). This appeal must be made within thirty days after the agency determines that the matter is not appealable. 7 C.F.R. § 11.6(a)(1). If the Director upholds the non-appealability decision, that decision becomes the final decision of the agency. Id.

Plaintiffs' repeated and voluminous contact with the RMA shows that they attempted to exhaust their administrative remedies. On November 12, 2002, a week before filing their suit in this court, plaintiffs first wrote the NAD director, asking him for a ruling that the farmers' claims were not appealable because they involved a matter that was applicable to all similarly situated petitioners. (Record at Vol. 3 pp. 10-46.) In the ensuing letters between the two, the RMA stated that the disputes over the crop insurance contracts were between the farmers and their individual insurance companies. (Record at Vol. 1 pp. 1055, 1040.) The RMA denied the farmers' request for a hearing on the matter. (Record at Vol. 3 p. 83.) On April 15, 2003, the RMA sent a letter to plaintiffs stating that "no reconsideration or appeal may be sought because [Bulletin MGR-02-016] is a general program provision that is

applicable to all similarly situation participants." (Record at
Vol. 1 p. 1055.) However, this letter did not inform plaintiffs of
their right to appeal the appealability determination. Id.; see
Parker v. USDA, No. 1:01CV00057 LMB, at 7 (E. D. Mo. March 12,
2003) (stating that "[e]xhaustion is not required where a plaintiff
is not apprised of appeal procedures") (citing Conley v. Pitney
Bowes, 34 F.3d 714, 717-18 (8th Cir. 1994)). The government later
informed plaintiffs of their right to appeal the appealability
determination, by letter dated July 10, 2003. (Record at Vol. 1 p.
1040.) The July 10, 2003, letter stated that "[i]f you disagree
with this determination that the matter in dispute is not
appealable, you can have this determination reviewed by the
Director of [NAD] in accordance with 7 C.F.R. § 11.6." (Id.) As
plaintiffs did not dispute that the matter was one of general
applicability and thus not appealable, they did not immediately ask
to have the determination reviewed by the Director of NAD. When
plaintiffs later sought reconsideration of the decision, the RMA
replied, "To the extent that you seek to appeal NAD determinations
concerning appealability, 7 C.F.R. § 11.6(a)(2) and (3) provide
that such determinations are not appealable, whether issued by the
Director or his delegate." (Record at Vol. 3 p. 143.) Defendants
now argue that plaintiffs should have requested a review of the

28

July 10, 2003, letter.[12]

Defendants argue that plaintiffs' failure to exhaust administrative remedies deprives this court of subject matter jurisdiction. They point to cases from outside the Fourth Circuit which have held that the exhaustion requirement in 7 U.S.C. § 6912(e) is jurisdictional. See Bastek v. Fed. Crop Ins. Corp., 145 F.3d 90, 94 (2d Cir. 1998) (stating that "plaintiffs' argument that their broad challenges to FCIC calculations could not adequately have been presented within normal administrative channels is itself an argument that was required to be tested and exhausted before being presented in federal court."); Utah Shared Access Alliance v. Wagner, 98 F. Supp. 2d 1323, 1333 (D. Utah 2000) (concluding that "[p]laintiffs' failure to exhaust existing administrative remedies deprives this court of competent subject matter jurisdiction" but also stating that "[a] court may excuse exhaustion if administrative remedies would be futile, when administrative remedies would provide inadequate relief, or when the agency has adopted a policy or practice of general

---

[12] As a side note, the court believes that the guidance that the agency gave to the farmers as to whether the farmers should appeal the ruling was at best confusing, and at worst positively misleading. It makes no sense for an agency to tell a petitioner that his issue is non-appealable, and then in the next sentence tell him that he can -- and must -- appeal the decision. See Parker v. USDA, No. 1:01CV00057 LMB, at 6-7 (stating that "the government is attempting to 'have its cake and eat it too,' by informing plaintiffs that their claims were not appealable to the NAD and then asserting exhaustion for failure to appeal to the NAD when plaintiffs bring those claims in federal court").

applicability which is contrary to law"); <u>Calhoun v. USDA Farm Serv. Agency</u>, 920 F. Supp. 696, 700 (N.D. Miss. 1996) (stating that "[w]hen the requirement is mandated by statute, exhaustion becomes a jurisdictional prerequisite to maintaining an action"). However, other courts have held that a failure to exhaust administrative remedies under § 6912(e) does not deprive a court of jurisdiction. <u>See McBride Cotton & Cattle Corp. v. Veneman</u>, 290 F.3d 973, 980 (9th Cir. 2002) (holding that "7 U.S.C. § 6912(e) does not limit the district court's subject matter jurisdiction over the plaintiffs' claims"), <u>cited in</u> <u>Rain & Hail Ins. Serv., Inc. v. Fed. Crop Ins. Corp.</u>, 229 F. Supp. 2d 710, 714 n.4 (S. D. Tex. 2002); <u>Parker v. USDA</u>, No. 1:01CV00057 LMB, at 9 (stating that "a plaintiff's failure to exhaust administrative remedies under § 6912(e) does not divest the court of subject matter jurisdiction"). The Fourth Circuit has not directly addressed whether the requirements in § 6912(e) are jurisdictional.

In <u>Gold Dollar Warehouse, Inc. v. Glickman</u>, 211 F.3d 93 (4th Cir. 2000), the Fourth Circuit addressed the petitioners' challenges to USDA regulations. The court found that the petitioners were required to exhaust their "as-applied" challenges to the regulations through the agency's appeal procedures but were not required to exhaust their facial challenges to the regulations. <u>Gold Dollar Warehouse, Inc. v. Glickman</u>, 211 F.3d at 99-101. The court stated that "a direct facial challenge to the regulations ...

cannot be brought within the agency's appellate process because, as noted, 7 C.F.R. § 11.3(b) precludes agency review of USDA regulations." Id. at 99.

Similarly, under 7 C.F.R. § 780.2, the plaintiffs' challenge to the agency's generally applicable program provision could not be brought within the agency's appellate process. Like the facial challenges in Gold Dollar Warehouse, this case involves a legal challenge to agency action and does not involve underlying factual disputes. The District of North Dakota has concluded that where a plaintiff challenges a generally applicable agency action, 7 U.S.C. § 6912(e) does not require exhaustion. Wiley v. Glickman, No. CIV A3-99-32, 1999 WL 33283314, at *2 (D.N.D. Apr. 7, 1999). In that case, the court stated that "[s]ince this claim features purely legal questions which require no agency fact-finding, none of the purposes of the exhaustion requirement would be served by requiring plaintiffs to submit the claim to NAD." Id.; see also Kuster v. Veneman, 226 F. Supp. 2d 1190, 1192 (D.N.D. 2002) (stating that it would be fruitless to require exhaustion in a case involving a purely legal challenge to a generally applicable agency action). In accordance with Gold Dollar Warehouse and Wiley v. Glickman, this court concludes that because agency review was not available for plaintiffs' challenge to generally applicable program policies, administrative exhaustion is not required.

31

## 2.    Breach of contract

The most hotly contested issues in this case are whether the insurance contracts guaranteed coverage at the quota price election of $0.31 and whether the government breached those contracts. Defendants frame these issues as standing issues. They point to <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992), for the proposition that in order to have standing, plaintiffs must show an actual injury to a legally-protected interest. Defendants contend that plaintiffs had no legally-protected interest in receiving $0.31 per pound in insurance coverage. Specifically, defendants argue that the policies did not guarantee the farmers that they would receive coverage at the $0.31 election level and that the farmers had no constitutionally-protected interest in the continuation of the quota system. The court believes that the issue of whether the plaintiffs have a contractual right to insurance coverage at $0.31 is not merely a standing issue, but will ultimately determine whether plaintiffs have established their claim for breach of contract.

For the court to find that the government breached its contracts, the court must first find a <u>prima facie</u> breach, that is, it must find that the government violated the express provisions of the contract. If a <u>prima facie</u> breach is shown, the court must then consider whether the government has a valid defense under the

32

sovereign acts doctrine or the unmistakability doctrine.[13] <u>Cuyahoga</u>
<u>Metro. Hous. Auth. v. United States</u>, 57 Fed. Cl. 751, 762 (2003)
(framing government's breach of contract as two separate issues --
"[w]as there a <u>prima facie</u> breach here?" and "[d]oes the
unmistakability doctrine shield defendant from liability?"). "Only
if [the government's actions are not covered by these doctrines]
can the court then say, with confidence, that defendant[s] actually
breached the contracts in question." <u>Id.</u>

### a.   <u>**Prima facie**</u> **breach of contract**

Government contracts are subject to the general rule that
"when the United States enters into contract relations, its rights
and duties therein are governed generally by the law applicable to
contracts between private individuals." <u>Lynch v. United States</u>,
292 U.S. 571, 579 (1934). Accordingly, the court must use general
contract principles to determine whether the government has
breached the insurance contracts.

Defendants' primary argument is that the government did not

---

[13] Neither plaintiffs nor defendants have fully briefed the
issues of whether the sovereign acts doctrine or the
unmistakability doctrine are valid defenses under the current
facts. The plaintiffs noted that in <u>United States v. Winstar</u>
<u>Corp.</u>, 518 U.S. 839 (1996), the Supreme Court rejected these
defenses. Defendants stated in a footnote that they did not brief
these issues because they believed that discussion of any "special
defense" on the merits was premature. The court believes that the
government should have raised both defenses in its response to the
plaintiffs' motion for summary judgment. Nevertheless, because the
application of these doctrines to this case is a purely legal issue
and does not require any further facts from the parties, the court
will address these defenses.

contractually promise or guarantee insurance coverage at $0.31 per pound.  Defendants argue that in order to receive insurance coverage and proceeds at the $0.31 election level, a farm must have been assigned a farm poundage quota by the FSA.  Because the Farm Security Act eliminated the quota system, they argue, the FSA did not establish poundage quotas for individual farms for the 2002 crop season, and as a result, the farmers did not have insurance at the election level for quota peanuts.

Defendants point to language in the insurance policy to support their position.  Section 3 of the Peanut Crop Provisions provides, in pertinent part:

> **Insurance Guarantees, Coverage Levels, and Prices for Determining Indemnities.**
> . . .
> (b) The maximum pounds that may be insured at the quota price election are the lesser of:
>> (1) The effective poundage marketing quota; or
>> (2) The insured acreage multiplied by the production guarantee.  If the insured acres multiplied by the production guarantee exceeds the effective poundage marketing quota, the difference will be insured at the non-quota peanut price election.

In turn, the policy defines the term "effective poundage marketing quota" as:

> The number of pounds reported on the acreage report as eligible for the average support price per pound ..., not to exceed the Marketing Quota established by FSA for the farm serial number.

(Peanut provisions § 1, emphasis added.)  According to defendants,

under the definition of "effective poundage marketing quota", an
individual farm did not have any peanuts eligible to be quota
peanuts unless and until the FSA assigned a marketing quota to that
farm.   That is, the assignment of a farm poundage quota was a
condition that must be met for the farmers to receive coverage at
the quota price election.  Because the farms had not been assigned
a farm poundage quota by the FSA, defendants argue, the farmers'
insurance coverage defaulted to coverage at the non-quota price
election.   Furthermore, defendants argue, the contract never
guaranteed that the FSA would assign a marketing quota to each farm
serial number.

The government's argument overlooks the fact that in some
instances a contractual condition may be excused.  Specifically,
the Restatement (First) of Contracts § 295 provides that a
condition is excused if 1) a promisor prevents or hinders the
occurrence of a condition, and 2) the condition would have occurred
except for such prevention or hindrance.[14]  Restatement (First) of

---

[14] The full text of § 295 is as follows:

§ 295. Excuse Of Condition By Prevention Or
Hindrance

If a promisor prevents or hinders the
occurrence of a condition, or the performance
of a return promise, and the condition would
have occurred or the performance of the return
promise been rendered except for such
prevention or hindrance, the condition is
excused, and the actual or threatened
nonperformance of the return promise does not

35

Contracts § 295 (1932), quoted in Powers v. Sims and Levin, 542
F.2d 1216, 1226 (4th Cir. 1976) (Winter, J., concurring and
dissenting).

The Farm Security Act repealed 7 U.S.C. § 1358-1, which had
provided that "[a] farm poundage quota for each marketing year
shall be established...."   7 U.S.C. § 1358-1(b)(1)(A) (2001)
(emphasis added).  Thus, prior to the passage of the Farm Security
Act, the FSA was under a statutory duty to assign quotas to
individual farms.   The FSA instructed its county offices not to
allocate the current year peanut quota and pointed to the Farm
Security Act, which had not yet been passed, as the reason.
(Notice PN-652, Record at Vol. 2 p. 8, stating that "[b]ecause of
pending legislation, rollover of peanut files will be completed
without allocating 2002 peanut quota holders.")  As the FSA would
have assigned the farm poundage quotas had the Farm Security Act
not prevented or hindered it from doing so, the second prong of §
295 is met.

The first prong of § 295 is also met.  The government not only

_____

discharge the promisor's duty, unless

(a) the prevention or hindrance by the
promisor is caused or justified by the conduct
or pecuniary circumstances of the other party;
or

(b) the terms of the contract are such that
the risk of such prevention or hindrance as
occurs is assumed by the other party.

36

was a promisor on the insurance contract and was bound by its terms, but also is responsible for the actions of the FSA, as the FSA, like the RMA, is an agency of the United States Department of Agriculture.  By passing the Farm Security Act, which repealed 7 U.S.C. § 1358-1 and thus eliminated the FSA's duty to allocate the peanut quota to individual farms, the government "prevent[ed] or hinder[ed] the occurrence of a condition."

The facts of this case fall squarely into the language of the Restatement § 295.  Section 295 provides the following illustration on its application:

> A promises to build a house for B who, in consideration therefor, promises A to pay him $10,000 on condition that A presents a certificate from C, an architect, showing that the work has been properly done.  The work is properly done, but B induces C to refuse to give a certificate.  The condition is excused.

This illustration is almost identical to the peanut farmers' situation.  Peanut farmers (A) bought insurance from the government (specifically, the FCIC) (B), which promised to pay them $0.31 per pound of peanuts, provided that the FSA (another branch of the government) (C) said that the peanuts grown are quota peanuts.  The farmers performed all their obligations, but the government (Congress this time) caused the FSA to refuse to assign the quotas.  As in the illustration, the condition will be excused.[15]

---

[15] Under § 295(b), the condition is not excused if "the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party."  This

37

The court agrees with the reasoning behind the Restatement (First) of Contracts § 295.  The court believes that it was fundamentally wrong for the government to tell the farmers that they would have insurance coverage at $0.31 per pound for as many peanuts as the FSA declared to be quota peanuts, and then, after the farmers had planted their crops, to tell the FSA not to declare any quota peanuts.  Under general contract law principles as expressed in the Restatement of Contracts § 295, the court finds that the condition is excused, and that the government breached its contract by refusing to pay the farmers' insurance claims at the rate of $0.31 per pound.

---

subsection does not apply here.  The terms of the contract nowhere indicate that the peanut farmers were to bear the risk of regulatory change.  Indeed, the insurance program was set up in such a way as to provide a measure of reliability and stability for a way of life which is by nature unreliable.  "From [the] origin [of the Federal Crop Insurance Act of 1938], the stated purpose of the federal crop insurance program has been 'to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance.'"  Wiley v. Glickman, 1999 WL 33283312, at *1 (citing 7 U.S.C. § 1502(a)).  Furthermore, the goal of the Federal Crop Insurance Act of 1980 was to make federal crop insurance "the farmers' primary source of risk management."  Id. (citing 1994 U.S.S.C.A.N. at 2519).  In furtherance of these goals, the crop insurance and peanut quota systems provided deadlines that the farmers could rely on in making planting decisions for the upcoming crop year.  The insurance contract guaranteed that the price election could not be decreased after the contract change date, which for the 2002 crop year was November 30, 2001.  (Peanut provisions §§ 4b, 3e.)  Also, by law, the U.S.D.A. was required to announce the national peanut quota by December 15 of the year preceding the crop year.  7 U.S.C. § 1358-1(a)(3) (2001).

b.    **Sovereign act and unmistakability doctrines**

In the case of <u>United States v. Winstar Corp.</u>, 518 U.S. 829 (1996), the Supreme Court discusses the sovereign acts doctrine and the unmistakability doctrine at length.    Several subsequent cases have analyzed and interpreted <u>Winstar</u> and preceding cases on these doctrines.    See <u>Yankee Atomic Elec. Comp. v. United States</u>, 112 F.3d 1569 (Fed. Cir. 1997) (discussing the sovereign acts doctrine and the unmistakability doctrine); <u>Cuyahoga Metro. Hous. Auth. v. United States</u>, 57 Fed. Cl. 751 (2003) (discussing the unmistakability doctrine); <u>Gen. Dynamics Corp. v. United States</u>, 47 Fed. Cl. 514 (2000) (discussing the sovereign acts doctrine and the unmistakability doctrine).

In <u>General Dynamics Corp. v. United States</u>, the Court of Federal Claims provided the following overview of these doctrines:

> In analyzing whether a particular exercise of sovereign authority breaches a contract between the government and a private party, two longstanding doctrines applicable to contracts with the sovereign come into play. One is the sovereign acts doctrine, which excuses the government from performing a contractual obligation if performance is rendered impossible by a public and general sovereign act. ... The doctrine was recognized by the Supreme Court in <u>Horowitz v. United States</u>, 267 U.S. 458, 461 (1925), which noted that '[i]t has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.' More recently, the Federal Circuit reiterated this principle in similar language: 'Under the

39

> sovereign act doctrine, the United States as
> contractor will not be held responsible for
> the acts of the United States as sovereign.'
> <u>Hughes Communications Galaxy, Inc. v. United</u>
> <u>States</u>, 998 F.2d 953, 958 (Fed. Cir. 1993).

<u>Gen. Dynamics Corp. v. United States</u>, 47 Fed. Cl. at 533-34.  Under

the unmistakability doctrine, "a government will not be deemed in

a contract to surrender a sovereign power unless it does so

unmistakably."  <u>Id.</u>

This court will follow the following framework set forth by

<u>Yankee Atomic</u>, as explained by <u>General Dynamics</u>:

> [T]he analytical approach set forth by the
> Federal Circuit in deciding <u>Yankee Atomic</u> ...
> was a two-step analysis which first explored
> the question of whether the governmental
> action preventing performance of a contract
> was a 'public and general' act within the
> meaning of the sovereign acts doctrine. After
> an affirmative conclusion on that issue, the
> second question to explore was whether the
> contract contained an unmistakable promise
> that the Government would refrain from
> exercising its sovereign power in a way that
> could block performance of the contract.  If
> the answer to that question was also yes, then
> the governmental action at issue would
> constitute a breach of contract.

<u>Gen. Dynamics Corp. v. United States</u>, 47 Fed. Cl. at 541.  If,

under the first step, the governmental action in question was not

a 'public and general' act, then the sovereign acts doctrine would

not constitute a valid defense to the breach of contract claim and

the court would not need to proceed to the second step of the

analysis.  <u>Id.</u> (stating that "[i]f the Federal Circuit had meant to

decide <u>Yankee Atomic</u> on the basis of the unmistakability doctrine

regardless of whether the legislation at issue in that case was a 'public and general' act, there would have been no reason for the court to apply, and discuss at length, the sovereign acts doctrine for the purpose of determining the nature of the act"); <u>see also</u> <u>Cuyahoga Metro. Hous. Auth. v. United States</u>, 57 Fed. Cl. at 774 (stating that authorities agree that "at least in the context of legislation, the unmistakability doctrine applies only when the Congress invokes one of the sovereign power protected by the doctrine").

The plurality opinion in <u>Winstar</u> stated that "the sovereign acts doctrine ... balances the Government's need for freedom to legislate with its obligation to honor its contracts by asking whether the sovereign act is properly attributable to the Government as contractor." <u>United States v. Winstar</u>, 518 U.S. at 896. The application of the sovereign acts doctrine, then, is "not a hard and fast rule, but rather a case-specific inquiry that focuses on the scope of the legislation in an effort to determine whether, on balance, that legislation was designed to target prior governmental contracts." <u>Yankee Atomic Elec. Comp. v. United States</u>, 112 F.3d at 1575.

Under <u>Winstar</u>, acts that are "public and general" are acts of the sovereign and are not attributable to the government as contractor. <u>United States v. Winstar</u>, 518 U.S. at 895-96. <u>Winstar</u> provides further guidance as to what constitutes a "public

and general" act. If the action's "impact upon public contracts is ... merely incidental to the accomplishment of a broader governmental objective," then the act is "public and general." <u>Id.</u> at 898. Conversely, "a governmental act will not be public and general if it has the substantial effect of releasing the Government from its contractual obligations." <u>Id.</u>

Under the framework created by the Federal Circuit in <u>Yankee Atomic</u>, the court must first decide whether the government, in enacting the relevant provisions of the Farm Security Act of 2002, was (i) acting for the purpose of retroactively decreasing the amount of coverage of its insurance contracts with the peanut farmers, or (ii) acting for a more general purpose, for the benefit of the public. For the reasons that follow, the court concludes it was for the former.

The Farm Security Act had a very broad scope, occupying 406 pages in the Statutes at Large and containing more than 400 numbered sections. <u>See</u> Pub. L. No. 107-171, 116 Stat. 134. The stated purpose of the Act was very general, "[t]o provide for the continuation of agricultural programs through fiscal year 2007, and for other purposes." 116 Stat. 134. The Act dealt with, among other topics, direct and counter-cyclical payments to farmers, peanuts, sugar, dairy, wetlands conservation, grasslands conservation, environmental quality incentives, agricultural trade development, the food stamp program, child nutrition programs, farm

42

loans, farm and rural development, rural electrification, various research programs, forestry assistance, and animal health and welfare. However, the length and breadth alone do not make the act "public and general" -- "any act of repudiation can be buried in a larger piece of legislation, and if that is enough to save it then the Government's contracting power will not count for much." Winstar, 518 U.S. at 903 n.52. Rather, the court must look at the relevant provisions of the Farm Security Act.

The provisions of the Farm Security Act that relate to peanuts are found in sections 1301 through 1310. Section 1309 terminates the quota program for peanuts and provides compensation for peanut quota holders for the loss of the quotas. Sections 1301 through 1308 contain other various changes for peanut farmers, including the availability of counter-cyclical payments for farmers. Section 1310(a) repealed the authority for the price supports for quota peanuts found in 7 U.S.C. § 7271. Section 1310(c) stated as follows:

(C) TREATMENT OF CROP INSURANCE POLICIES FOR 2002 CROP YEAR.--

(1) APPLICABILITY.-- This subsection shall apply for the 2002 crop year only notwithstanding any other provision of law or crop insurance policy.

(2) PRICE ELECTION.-- The nonquota price election for segregation I, II, and III peanuts shall be 17.75 cents per pound and shall be used for all aspects of the policy relating to the calculations of premium, liability, and indemnities.

(3) QUALITY ADJUSTMENT.-- For the purposes of quality adjustment only, the average

43

> support price per pound of peanuts shall
> be a price equal to 17.75 cents per
> pound. Quality under the crop insurance
> policy for peanuts shall be adjusted
> under procedures issued by the Federal
> Crop Insurance Corporation.

Section 1310(c) directly stated that the nonquota price election, which it raised to $0.1775 from $0.16, would be used for all calculations of coverage under the insurance contracts, "notwithstanding any other provision of law or crop insurance policy." (Emphasis added.)  This provision of the Farm Security Act obviously and specifically targeted the contractual obligations under the peanut farmers' pre-existing crop insurance policies for the 2002 crop year.  Thus, the reduction of insurance coverage was direct, not "merely incidental to the accomplishment of a broader governmental objective."

This provision is similar to the legislation involved in Cuyahoga Metropolitan Housing Authority and General Dynamics Corp., in which Congress specifically targeted pre-existing contracts in order to save money.  It also similar to the legislation in question in Winstar, in which Congress, in passing legislation attempting to resolve the crisis in the savings and loan industry, caused the government to breach its contracts with banks that had allowed banks to count supervisory goodwill as core capital.  In Winstar, the Court noted that opponents of the legislation complained that "[i]n its present form, [FIRREA] would abrogate written agreements made by the U.S. government to thrifts that

44

acquired failing institutions by changing the rules in the middle

of the game." <u>United States v. Winstar</u>, 518 U.S. at 900.

Most of the comments surrounding the peanut provisions in the

Farm Security Act note that the new peanut rules bring treatment of

peanuts into parity with the treatment of other crops.   Senator

Miller, from Georgia, noted that the changes in the peanut program

were painful to but ultimately beneficial for farmers.  148 Cong.

Rec. S3922, S3933 (May 7, 2002) (statement of Sen. Miller).

However, an opponent of the Farm Security Act, who was concerned

not with peanuts but with wheat, stated that he had introduced

legislation that would have addressed some of the problems with the

Farm Security Act.  He stated:

> I introduced this package for two reasons: Our
> producers and our lenders needed some kind of
> certainty on the assistance they would receive
> for this crop year, and second, virtually all
> planting and lending decisions had already
> been made for the 2002 crop, this year's crop,
> and <u>it did not make sense to change the rules
> of the game in the middle of the 2002 crop
> year</u>. It made more sense to do an assistance
> package this year and have the new bill apply
> to the 2003 crop after our producers and the
> Department of Agriculture had time to digest
> the details of the new bill.

148 Cong. Rec. S3979, 3980 (May 8, 2002) (statement of Sen.

Roberts) (emphasis added).

The statutory text makes it clear that § 1310(c) of the Farm

Security Act specifically targeted coverage under existing crop

insurance contracts.   By including this provision in the Act,

Congress was indeed "changing the rules in the middle of the game."
As the Court of Federal Claims explained in <u>General Dynamics</u>,

> While there is no question that the Government
> had the sovereign right to enact a prospective
> [reduction in contractual benefits] -- <u>i.e.</u>,
> applicable to any and all government contracts
> executed after the act was passed - the
> application of the [reduction] to pre-existing
> contracts ... constituted an abrogation of the
> Government's contractual obligations. Thus,
> it is a classic example of legislation
> 'attributable to the Government as contractor'
> and 'tainted by a governmental object of self-
> relief.'

<u>Gen. Dynamics Corp. v. United States</u>, 47 Fed. Cl. at 542 (<u>quoting</u>
<u>United States v. Winstar</u>, 518 U.S. at 896).

In conclusion, the court finds that the congressional act
reducing crop insurance coverage on peanuts for the 2002 crop year
was not a "public and general" act; therefore, the sovereign acts
doctrine does not allow the government to escape its contractual
obligations under the 2002 crop insurance policies. Furthermore,
because the governmental act was not "public and general", the
unmistakability doctrine does not apply. <u>See</u> <u>Gen. Dynamics Corp.</u>
<u>v. United States</u>, 47 Fed. Cl. at 541.

The plaintiffs have satisfied their burden of showing a <u>prima</u>
<u>facie</u> breach of contract and the defendants do not have a valid
defense. Therefore, the court finds that the reduction of coverage
under the insurance contracts from $0.31 per pound to $0.1775 per
pound was not in accordance with law. 5 U.S.C. § 706(1)(A).
Accordingly, the court will grant plaintiffs' motion for summary

judgment as to the breach of contract claim and will deny
defendants' motion on the same.

### 3.    Violation of due process

Plaintiffs point to the Supreme Court case of <u>Lynch v. United</u>
<u>States</u> for support for their argument that defendants violated
their due process rights.  The court in <u>Lynch</u> described due process
as it relates to government contracts in the following way:

> The Fifth Amendment commands that property be
> not taken without making just compensation.
> Valid contracts are property, whether the
> obligor be a private individual, a
> municipality, a state, or the United States.
> Rights against the United States arising out
> of a contract with it are protected by the
> Fifth Amendment.  When the United States
> enters into contract relations, its rights and
> duties therein are governed generally by the
> law applicable to contracts between private
> individuals.

<u>Lynch v. United States</u>, 292 U.S. at 579 (citations omitted).  The
court emphasized that:

> The United States are as much bound by their
> contracts as are individuals.  If they
> repudiate their obligations, it is as much
> repudiation, with all the wrong and reproach
> that term implies, as it would be if the
> repudiator had been a State or a municipality
> or a citizen.

<u>Id.</u> at 580 (citing <u>The Sinking Fund Cases</u>, 99 U.S. 700, 719
(1878)).

As in <u>Lynch</u>, plaintiffs' due process claims are based on
contracts with the government that were granted and later taken
away by statute.  As in <u>Lynch</u>, then, the plaintiffs' due process

47

arguments are primarily based on their contract claims. Defendants acknowledge that "in the end analysis, in evaluating whether the defendants' erred in their interpretation of the MPCI policy, 'ordinary principles governing contracts and their interpretation remain applicable.'" (Defs.' Response at 16.)

As the court has already discussed the plaintiffs' contract claim at length and found for the plaintiffs as to this claim, the court need not reach plaintiffs' due process claims.[16]

## CONCLUSION

The court hereby orders that this case shall proceed as a class action and hereby certifies the following class:

> Peanut farmers whose farms are located in the Eastern District of North Carolina, who had insurance coverage on peanuts under the 2002 Peanut Multiple Peril Crop Policies, who had losses for the 2002 crop year, who settled those losses for $0.1775 per pound, and who had been assigned farm poundage quotas for the 2001 crop year.

The court hereby appoints the following plaintiffs as class representatives: Marvin Taylor Barnhill, Jerry Hamill, John Branham, Clark Jenkins, Tom Clements, David Grant, Tim Phelps, and

---

[16] The court notes that the Court of Federal Claims has recently ruled that the peanut quota is not a property right sufficient to support a takings claim under the Fifth Amendment. See Members of the Peanut Quota Holders Ass'n v. United States, 60 Fed. Cl. 524, 525 (2004). This decision is irrelevant to the current plaintiffs' claim, as the Federal Claims Court's decision was based solely on the claimed statutory entitlement to the peanut quotas whereas the current plaintiffs' claim is based on the insurance contracts.

Tommy Flythe. Philip R. Isley, G. Eugene Boyce, and R. Daniel Boyce shall represent the certified class.

For lack of subject matter jurisdiction, the court hereby dismisses all plaintiffs who do not have peanut farms in the Eastern District of North Carolina, including Jim Ferguson, Glen Hawkins, Billy Bain, Glen Moore, R. L. Smith, H. Steven Allen, and all plaintiffs listed in Exhibit B to plaintiffs' motion to join additional plaintiffs, filed November 19, 2002.

For the foregoing reasons, the court grants the plaintiffs' motion for summary judgment on its breach of contract claim and denies the defendants' motion for summary judgment.

Class representatives shall have fifteen (15) days from the date of this Order to file a proposed notice for class members.

This _22 nd_ day of July, 2004.

MALCOLM J. HOWARD
United States District Judge

At Greenville, NC
#1

49